Richard Bagarozy
Special Treatment Unit
P.O. Box 905
Avenel, NJ 07001

**RECEIVED**

**To: Lawrence S. Lustberg, Esq. and
Johnathan Manes, Esq**.
Gibbons PC
One Gateway Plaza
Newark, NJ  07102

MAY   9 2012

AT 8:30_____M
WILLIAM T WALSH, CLERK

April 20, 2012

**To: Ian Marx, Esq**.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

**Presiding Judge: Hon. Dennis M. Cavanaugh, U.S.D.J.**
U.S. District Court of New Jersey
451 U.S. Post Office Courthouse Bldg.
P.O. Box 999
Federal Square
Newark, NJ 07101-0999

## RE: Objections to settlement in Alves v. Ferguson 01-cv-789 (DMC) (MF)

I am the STU Resident identified at the top of this page, and I strenuously object to the above captioned settlement on numerous grounds.  **Part I** outlines three main reasons:
First: Because we completely reject counsel designated and the residents designated as representatives.
Second: Because the settlement as proposed completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years.
Third: Because the settlement doesn't comport in many areas with the report of authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

**Part II** then places on the record to the Court and all parties, commitments made to plaintiffs of Bagarozy v. Harris by counsel, Ian Marx, Esq., of Greenberg Traurig, LLP. These promises were both verbal and in writing and address issues Mr. Marx promised to preserve and prosecute on behalf of Bagarozy plaintiffs. In the interest of fairness and justice, we reach out to the Court to insure that Mr. Marx is enabled to keep the

1

promises he made and to insure that these promises are not barred from being kept. We've been told that the issues not addressed in this settlement are not dead and that they can be raised "separately;" however, a number of things make this difficult including statute of limitation concerns. Bagarozy v. Harris plaintiffs ask the Court to be allowed to go forward with all of its matters in their entirety and for Mr. Marx to be allowed, as he has promised, to prosecute these issues on our behalf. (See **Part II** of this submission).

**Part III** specifically demonstrates the lack of objective criteria for progress and release from the treatment record of Plaintiff Bagarozy.

**Part I:**

**First**, because we completely reject counsel designated and the residents designated as representatives:

Residents have objected to Seton Hall personnel and Gibbons attorneys for years in that Seton Hall representatives were retained to advise how New Jersey's Sexually Violent Predator Act ("SVPA") ought to be constructed. This connection creates a conflict of interest. The fact that they are now involved in generating such a narrow settlement in spite of the numerous significant meritorious issues that have been presented, indicates that our worries about a conflict of interest may be warranted and is cause for grave concern. Additionally, over the years of "settlement negotiations," neither Seton Hall personnel, nor Gibbons counsel, nor the plaintiffs of Alves v. Ferguson have communicated with the rest of the residents about the progress of the settlement, and they have ignored significant pieces of attempted input. Residents have had very little if any input into these negotiations. STU Residents are so troubled by the narrowness of the settlement and by how vague, conditional, and subjective it is, that many are concerned that the plaintiffs of Alves received some "enticement" in order to manipulate their surrender to such a narrow set of agreements. We reach out to counsel for Bagarozy v. Harris, Mr. Ian Marx, Esq. to further develop and prosecute this issue on our behalf.

**Second**, because the settlement as proposed is far too narrow and completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years. We were so concerned that our issues were being suppressed that on September 2, 2009, we met with Ian Marx, Esq., Counsel for Bagarozy v. Harris, and in writing he agreed to protect and prosecute our issues (See the contract agreement signed by Mr.

2

Marx in the objection submitted by Bagarozy). The issues that Mr. Marx committed to preserve and prosecute on our behalf include the following:

*Seton Hall's voluntary surrender on the issue of compelling the State to create half way houses for STU residents. This "surrender" additionally flies in the face of Dr. Becker's call for de-escalation of restraints. Also, again, Seton Hall was retained to advise how to create New Jersey's SVPA. Because of this connection, the surrender is a conflict of interest.

*In view of Kearny Residents being transferred to a building that was formerly used as a detention center for prisoners (a depressing, highly restrictive, counter-therapeutic facility), we strenuously object to the elimination of the ability to challenge the housing facilities. We are shocked by this elimination and additionally this suppression also flies in the face of Dr. Becker's report. Dr. Becker advocated for a therapeutic environment.

*The literally pervasive presence of the Department of Corrections ("DOC") in a treatment facility has a counter-therapeutic effect and creates a highly restrictive and counter-therapeutic environment which continues to exist at the STUs and has gotten worse since Dr. Becker's visit. Mr. Marx had committed in writing to challenge this condition (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy) and we request that he further develops this issue in his reply.
*We seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment, the lack of qualified treatment personnel (Doctors), and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions as outlined in Dr. Becker's report, the "worst she has ever seen." Monetary damages have been a part of Bagarozy from its inception, Mr. Marx has committed in writing to seek such monetary damages, we seek to go to trial on this and the other issues, and I request that Mr. Marx further develop this issue our behalf.

*Because Dr. Barone, a previous Director of Psychology at the STU, was fired for conduct that was completely inappropriate, we submit that her judgment was fatally flawed and that she was patently unfit to judge who should be civilly committed. In view of this, we request that every resident that she had a hand in committing be re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General. Mr. Marx committed in writing that he would seek this (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

3

\*We have also asked Mr. Marx to make constitutional arguments on our behalf, including: **Double Jeopardy**, **Ex Post Facto**, and **Res Judicada** as well as those mentioned below (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

**a)** A concentrated challenge of the Due Process violations of the initial commitment process:

**b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

**c)** A concentrated effort, in view of item "**b**" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General. Towards this end, we seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release.

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.

**e)** A concentrated challenge of the denial of Trial by Jury. The claim is being made that a jury is not required because this commitment is "civil and not criminal." However, crucial liberty interests are involved to a degree that is above and beyond any criminal case.

**f)** There is evidence that the rule of law has been ignored for STU residents: there is a delay of approximately one (1) year between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the Public Advocate's Office. There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply. Regarding the statutory **yearly** review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered. Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year. We aggressively challenge this.

4

**Third**, Because of all of the above reasons and because in numerous areas the proposed settlement does not comport with the report of Dr. Judith Becker, the authority chosen by the Attorney General, we ask the court to dismiss it, or in the alternative, to separate the Bagarozy v. Harris and the Hasher v. Corzine case from the Alves v. Ferguson settlement allow the Bagarozy and Hasher cases to go forward.  We respectfully request that in their reply to this settlement proposal that Greenberg Traurig, counsel for Bagarozy, focus on the areas where the Alves settlement is not in accord with Dr. Becker.  However, some of those areas are presented below and the designation "P" refers to the page in Dr. Becker's final Report that addresses the issue:

**P-1**: Dr. Becker indicates that there is no licensing for both the facility and the program.

**P-3**: Dr. Becker points out that in one civil commitment program it took from three to seven years to complete the program.  This confirms that even though this program has the appearance of having a working structure on paper, with a microscopic number of residents on level 5 (after 12 years), this is not the case.

**P-4**: Dr. Becker Describes specifically how much therapy should be afforded.  She also points out the quote of Judge William L Dwyer in Turay v. Weston, 1999, that "Nothing compels a state to adopt a statute of this nature in the first place, and many states have not done so, but a state that chooses to have such a program must make adequate mental health treatment available to those committed."

Also on Page 4, fourth paragraph, Dr. Becker is conveying that the Division has made claims that Dr. Becker has exceeded the scope of her retention in several areas. However, Ian Marx, Esq. had told us that in return for the State being able to remove the designation of "Punitive" as an option for grading in each category of her review, Dr. Becker would then have the discretion to additionally address any area she felt appropriate.  The court should not allow the state to renege on this agreement.  This also goes for the paragraph on page 4 immediately after the topic: **Response to the Plaintiffs' Comments**.

**P-5**: Dr. Becker again raises in item b. that she couldn't comment on the facilities run by DOC, however, in view of the information presented above, she ought to be able to do so.  Even though Dr. Becker believes it is beyond her "scope" of what she is to evaluate (see item b), she still feels compelled to note at the beginning of page 5 that the facilities appear to be **less** than therapeutically adequate (Page 5, line 6).

5

**P-6**: This page as a whole demonstrates the overwhelming subjectivity and resulting lack of objectivity of the evaluation process. The proposed settlement does little to remedy this and as such does not comport with Dr. Becker's report.

**P-8**, top: "Living conditions worst she has ever seen."

**P-9**: "Overall therapeutic and rehabilitative milieu is not minimally adequate."

**P-10**: Lines 3-4: "No specific dynamic risk assessment instrument being utilized."

**P-11**: Bottom half of page: Here again Dr. Becker expresses a lack of clear, <u>objective</u> requirements for advancement. How do the changes in the proposed settlement remedy this? Bottom of page 11: "Clinical assessment evaluation and treatment team plans are <u>not</u> minimally adequate and are unsatisfactory." How do the changes in the proposed settlement remedy this?

**P-13**: This page as a whole again speaks of the lack timely advancement of residents and the lack of an "objective measure" (Paragraph 3, line 2). How do the changes in the proposed settlement remedy this?

**P-14**: This page is most telling of all. In Paragraph 5, Dr. Becker reports that treatment phases as outlined "on paper" are satisfactory but that resident progress through the phases and the means by which progress is evaluated are together 'not minimally adequate and are unsatisfactory.'" This dichotomy points out one of the significant problem existing in New Jersey's SVPA process and environment. How do the changes in the proposed settlement remedy this?

**P-15**: Paragraph 2, handicapped residents are not being given the services they require. E.g. resident Dismukes who is almost totally blind. How do the changes in the proposed settlement remedy this?

**P-16**: Again the dichotomy appears. In Paragraph 2, Dr. Becker states that the model of process groups described on paper is satisfactory, but the manner in which they actually exist is not. I greatly fear that this "proposed settlement" is another example of a document which is a paper tiger but entails no real reform to ameliorate the significant problems existing in the New Jersey SVPA process and environment which caused Dr. Becker to call it the "worst she has ever seen." How do the changes in the proposed settlement remedy this?

**P-17**: "Vocational, rehabilitative, and educational programming is <u>not</u> minimally adequate and is unsatisfactory.

**P-19**: "Release preparation and programming are <u>barely</u> adequate.  How do the changes in the proposed settlement remedy this?

**P-21**: "Therapist training and supervision is not minimally adequate and is unsatisfactory."

**P-22**: "T.C. Community is not minimally adequate and is unsatisfactory."  How do the changes in the proposed settlement remedy this?

**P-23**: "Level of confidentiality is <u>not</u> minimally adequate and is unsatisfactory.  Item 11: Dr. Becker determines that Gradual de-escalation of restraints does <u>not</u> occur at the rate or quantity one would hope to see in a therapeutic program." The changes in the proposed settlement do nothing to remedy this.  This is a huge concern.  At the bottom of page 23, Dr. Becker quotes Judge Dwyer in the Washington State case that if mental health treatment "is to be anything other than a sham, it must give the confined person the hope that if he gets well enough to be safely released, then he will be transferred to some less restrictive alternative."

**P-24**, Top of page: Dr. Becker determines that **<u>"Gradual de-escalation of restraints is not minimally adequate and is unsatisfactory."</u>**  This is the most crucial item we address relative to Dr. Becker's report and the proposed settlement does not objectively change this.  Bottom of page, Dr. Becker gives suggestions as to how the visitation program could be improved and expresses the importance of doing so.  It should be noted that DOC took away our family day event where families could come and spend the entire day with their resident family member and where therapy staff is present. Such an event is irreplaceable in strengthening family ties, and DOC negligently removed this event because of some incident at one of their prisons.  The proposed settlement does not remedy this and is does not comport with Dr. Becker's report in this area.

**P-25**: Dr. Becker determines that "the availability of psychiatric consultation in <u>not</u> minimally adequate and is unsatisfactory."

Several suggestions we would like to make here are as follows:  1- Do not lock the doors in the hospital unit (D-Wing) - ever - unless requested by patient. 2- Leave door 1 (door to the bobbed wire enclosed yard) open at all times so that residents can go to and from the yard anytime without the need of DOC formal moves.  This would also prevent the significant problem of smoking in the building.  3- Get rid of the extremely punitive "dog

van" for civilly committed <u>non</u> prisoners (partitioned van, which is extremely painful to travel in). 4- Use only ankle chains for court and trips. 5- Increase visiting to be in accord with other health care facilities rather than other prisons. 6- Resume family day. 7- Create clear, objective goals (e.g. modules, etc.) for a resident to complete in order to be released from the program. Adjust the program to last at least 3 and no more than 7 years for all civilly committed residents (see Dr. Becker report P-3, Paragraph 2).

## Part II:

The attached exhibits formerly places on the record to the Court and all parties, commitments made to plaintiffs of <u>Bagarozy v. Harris</u> by counsel, Ian Marx, Esq., of Greenberg Traurig, LLP, regarding issues Mr. Marx promised verbally and in writing to preserve and prosecute on our behalf.

<u>Exhibits A-1 through A-6</u> is the agreement signed both by <u>Bagarozy v. Harris</u> plaintiffs and Ian Marx, Esq., counsel for those 28 plaintiffs, during a meeting on September 2, 2009. At that time all the issues were mutually discussed and Mr. Marx signed off by the way of his initials "ISM" on each issue and then provided his complete signature on page A-6. We humbly pray that the Court takes no action that would preclude counsel form honoring his commitments on all issues and that the Court specifically take whatever action necessary to enable Mr. Marx to honor all of his commitments to the 28 <u>Bagarozy v. Harris</u> plaintiffs, a significantly more representative group than <u>Alves v. Ferguson</u>.

<u>Exhibits B-1 through B-3</u> is a memorial letter sent to Mr. Marx on September 3, 2009, a single day after the meeting described immediately above. The last sentence on page B-3 asks Mr. Marx that "if any of the items memorialized in this letter are 'in any way' contrary to your memory of our agreements, please contact me in writing as soon as possible." Mr. Marx made no subsequent notice of any corrections that needed to be made.

<u>Exhibit C-2, top of page</u> (September 22, several weeks after the above), raises the concern of Dr Becker being misled about her authority. This issue was first raised in Ex. A-2, last two lines of paragraph 3: "As part of this we seek that Dr. Becker be informed that she has the authority to investigate and issue an opinion on anything she deems warranted."

<u>Exhibits D-1 to D-7</u> September 19, 200**8** letter from designated <u>Bagarozy v. Harris</u> Representatives at the time, outlining the major issues which we instructed Mr. Marx, as

8

assigned counsel, to prosecute on our behalf, even if that technically required an amended complaint. Mr. Marx never argued against or rejected any of them.

Exhibit E-1 describes a totally unacceptable concession that no resident approved and Exhibits E-2 & E-3 revisits several crucial issues.

Exhibit F-2 at the first item with a "*" requests Mr. Marx take action on several important issues including making an effort to "aggressively seek to separate the Bagarozy case from the Alves case" and allow the Bagarozy case to proceed to trial in a timely manner. We requested this numerous times.

Exhibit G-1 addresses the issue Dr. Barone's significant misconduct and makes the request that those residents whom she had a hand in having civilly committed be completely re-evaluated by neutral professionals approved by the American Psychological and Psychiatric associations (and Dr. Becker) and not beholden to the Attorney General.

**Part III**

**Exhibits H-1 through H-3** Presents a written description of the progress Bagarozy perceives that he has made towards reducing his risk of re-offending since his predicate offence in September of 1993. Bagarozy is 63 years old and his Static-99 is a three (3). Note also the partial confirmation of this progress (shortly after Bagarozy's temporary commitment) in **Exhibit I-1**, a letter by Federal District Judge Debevoise.

In view of this progress, at his last commitment re-hearing in the latter part of 2011, the Court asked the STU to definitively come up with exactly what they expected for Bagarozy to "move on and obtain less restrictive conditions."

In reply, treatment personnel came up with a number of areas (see **Exhibits J-1 to J-3**). Bagarozy then made a simpler list (See **Exhibit K-1**). Bagarozy than took care to earnestly comply what all asked of him and prior to his next meeting presented his input as to what progress he made (see **Exhibits L-1 to L-2**). Bagarozy's latest Treatment Plan Status Review (see **Exhibits M-1 to M-3**) indicates that Bagarozy had done what was asked of him. However, now new things are asked, things that he has done many times previously, e.g.:

*Process group 2x per week *(Have been doing this for eight years)*
*Present deviant arousal *(Have done this so many times I can't count it)*

*Relapse Prevention strategies *(Have done this many times over the years in process groups and modules)*
*Maintenance contract *(Completed and presented years ago and presented to the Court several times). Etc, etc.*

So in spite of the commitment (Superior) Court asking STU treatment staff, exactly what does Bagarozy need to yet accomplish in addition to the perceived growth he presented in Exhibits H-1 through H-3, the substance of what is presented is to keep doing the same things. I pray that the Court from this gets a sense of what Dr. Becker attempted to convey when she stated that the program looks satisfactory on paper but residents are not being advanced at a reasonable rate. The proposed settlement does not provide sufficient guarantee that this will be any different.

For all the foregoing reasons I petition the court to reject this proposed settlement and allow this matter to go to trial, or, in the alternative, to separate the Bagarozy and Hasher cases and allow them to proceed separately. At the very least, in the interests of justice, we pray that the Court enable Ian Marx, Esq., to preserve and prosecute on our behalf, all the issues that he has committed verbally and in writing to preserve and prosecute.

Respectfully submitted,

Richard Bagarozy

Richard Bagarozy

10



9/2/09

**RE: Bagarozy v. Harris, 04-cv-3066**
**Issues to be addressed at September, 2009, meeting**

We have had no recent communications with you.  What is going on?

Since DHS's reply was completely unsatisfactory, we request that you submit a comprehensive reply to DHS on behalf of <u>Bagarozy</u> plaintiffs in which you correct the unacceptable concessions made by Seton Hall: (giving up our demand for half-way houses and greatly increased furloughs and releases under less restrictive conditions). Will you do this as an urgent matter?  Also, what process will be used for us to veto/reject any <u>**un**</u>-approved "concessions?"  Presently we reject the entire Seton hall submission because we had no part in formulating it.

*Mr. Marx will make Submission to Da Costa seeking RB*
*to Cheny. Bottom 18 + top of 19*
                                                            *yes - ISM*

In view of recent rumors that residents will be transferred to a highly restrictive, counter-therapeutic facility, we request that you, as our assigned counsel, submit an immediate request for a <u>Temporary Restraining Order</u> (Injunction) preventing DOC from moving residents to any other facility without Court and Expert approval that it is a suitably therapeutic environment as described by Dr. Becker.

*Mr. Marx favors TRO PI  ① No additional overcrowding*
*② not to facility Inadequate  RB*
*Needs Affidavit about Increase in #'s & New Wing*
                                                            *yes - ISM*

Excessively over-crowded, counter-therapeutic conditions that violate basic human rights where DOC has a counter-therapeutic and pervasive involvement and creates a highly restrictive and counter-therapeutic environment continues to exist at the STUs and has gotten worse since Dr. Becker's visit.  We need strong action in the form of a <u>T.R.O.</u> to remedy this ongoing situation which was identified by Dr. Becker?  Officers have told residents that D-Wing will be double bunked.  M.A.P. time, as Dr. Becker discovered, is still seriously excessive.

*See above - ISM*

*Ex A-1*

We ask that you aggressively seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions.

*Mr. Marx agrees on individual level and will try to work claim into our lawsuit as group. He agrees with the strategic advantage. —JSM — Will figure out how to use this advantage —JSM fB*

DOC <u>Discovery</u> and a motion for <u>Summary Judgment</u>. DOC's influence into the treatment environment is nothing less that pervasive. The new Administrator has now told us that DOC officers will issue punishments such as taking televisions with**out** the involvement of DHS and with**out** a Due Process hearing. We seek that a strong move be made for the <u>complete</u> <u>removal</u> of DOC from the treatment environment. We seek that an argument be made that the presence of DOC in and of itself, as applied, makes the STU environment punitive.

*Mr. Marx will research how other states got DOC out —JSM fB*

We seek that Dr. Becker be granted access to all of the documents that residents have submitted to her and that she be permitted to make an addendum to her report based on those documents. As part of this we seek that Dr. Becker be informed that she has the authority to investigate and issue an opinion on anything she deems warranted.

*Mr. Marx disagrees with this as not best use of our resources —JSM fB*

Dr. Barone: Due to Dr. Barone's misconduct, we ask that every resident for whom Dr. Barone had a key roll in obtaining the commitment of be given a new commitment hearing.

*Will seek details + documents regarding her resignation + about residents she played in role of committment. ok —JSM fB*

*fB Ex A-2*

SMYCZEK

Medical care is so inadequate at times that residents with serious medical problems are ignored, overlooked or are not given treatment (operations, M.R.I.s, etc.)  Due to monetary concerns:  Investigate Steve Rasinski, Robert Bergenstock (deceased), Calvin McCloud) and Townsend, etc.  *also* Jason Davis

*Issue is not presently subject of Settlement Discussions But is part of case*
*will seek to Take Deposition of Dr. Smyczek. CC-ISM*

We seek that you make timely efforts to depose significant witness on our behalf: e.g. Denise Cole, Dr. Gambone, Ms. Aguilera, and Dr. Becker (on all the issues she was unable to include in her report including her opinion on whether she believes the environment is punitive.

*Mr. Marx will make effort to interview These Witnesses - not main priority right now* *RB*
*★ will make Denise Cole a priority.* *ISM*

We ask that you make constitutional arguments on the issues of: **Double Jeopardy**, **Ex Post Facto**, and **Res Judicada**.

*Letter to Judge*

We ask that you take action on all the prior pro se motions we had submitted prior to the assignment of counsel that were dismissed until counsel was assigned (e.g. Joinder motions).

*SOG came to Search today and (Mr Marx's Visit) and Thrashed Mr Simon's Cell + Legal Documents ISM will write letter to $^{3}$ protest/inquire - ISM*   *Ex A-3*

Now that the issue of the Special Master has been completed, we ask that you now take timely action on the numerous verbal promises you have made to us over the years that you promised to take action on after the Special Masters investigation was completed, especially:

    **a)** A concentrated challenge of the Due Process violations of the initial commitment process:

        *During our initial commitment process, there are so many violations of basic American Due Process rights: Hearsay, inaccurate information, prior reports taken out of context, acquittals, errors on police reports, etc., are used to commit an individual and no one is present to advocate on behalf of the resident and challenge this information. By the time a prior offender gets to his initial commitment hearing, this information is plastered throughout so many reports it is virtually impossible to extricate or challenge it. Just recently a new resident had his initial commitment hearing. His two doctors testified that commitment was not called for. Of the state doctors, one agreed that commitment was not called for and one diagnosed that it was. So, three of the four doctors examining him diagnosed that commitment was not required. Nevertheless, Judge Freedman committed him. How does one manage under such a closed system? One cannot even request a Trial by Jury because the courts have ruled that this is "Civil and not Criminal." Yet under New Jersey's S.V.P.A. a resident's precious liberty interests are gravely threatened. For this reason, we ask that you tirelessly challenge for the right to Trial by Jury for those who want it.*

*Will Write to Judge*
*will list past issues are not subject of settlement discussions and will be preserved and Survive — TSM*

    **b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

    *The New Jersey S.V.P.A. is so overbroad that any prior sex offense qualifies. What you have then is an arbitrary population that has been detained in order to insure that this program continues. At the same time, numerous prior offenders who have worse records were never required to be diagnosed by the two doctors who issue the certificates of temporary commitment. Additionally, prior offenders who were ruled to be "repetitive and compulsive" and as a result were sent to A.D.T.C. but while there became "treatment refusals" were nevertheless released, yet we remain here.*

*Will write to Judge*

Ex A-4

**c)** A concentrated effort, in view of item "**b**" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Towards this end, we ask that you seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release and that you additionally seek to have DOC completely removed from the civil commitment environment.  Will you do this?

_Letter to Judge_

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.  *(The most weighted actuarials are static and don't take into consideration changes a resident has made in his life.  Additionally, it is our understanding that the scoring criteria have been revised to make it easier to commit prior offenders.  {See* ***http://www.static99.org*** *for information of actuarials}).*

_Letter to Judge_

**e)** A concentrated challenge of the denial of <u>Trial by Jury</u>.  The claim is being made that a jury is not required because this commitment is civil and not criminal.  However, crucial liberty interests are involved to a degree that is above and beyond any criminal case, the two retired judges have proven not to be impartial, and <u>Trial by Jury</u> ought to be an option if the individual facing commitment seeks it.

_Letter to Judge_

Ex A-5

There is evidence that the rule of law has been ignored for STU residents: there is a delay of approximately <u>one (1) year</u> between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the Public Advocate's Office. There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply.  Regarding the statutory **<u>yearly</u>** review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered.  Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year.  We seek that this be aggressively challenged.

*Letter to Judge*

    For all the foregoing reasons, Mr. Marx, we respectfully request that you sign below giving your written assurance that you pledge to aggressively prosecute the above issues as well as any other meritorious issue that is presented.

On behalf of residents:

On behalf of Greenberg Traurig:

Ian Marx, Esq., counsel for plaintiffs

9/2/09

Note: additional issues will be entered on additional sheets of blank paper.

Ex A-6

STU-Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001                              **Memorial Letter**

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677                    September 3, 2009

### RE: STU-Annex Class Action (Bagarozy v. Harris) Lawsuit

Dear Mr. Marx:

Thank you for your visit yesterday.  All felt that it was productive and that a
"road-map" now exists that we can work towards.  We do ask that you take the
action agreed upon - which is memorialized in this letter - in as timely a manner
as humanly possible.

**First**: You agreed to send a formal letter to Mr. DaCosta informing him that
we withdraw the concession made by Seton Hall in which they surrendered both
our claim for half-way houses and greater use of the remedies of furlough and
release.  You agree to clarify that our plaintiff class absolutely does <u>not</u> agree to
these concessions (see Seton Hall reply p.p. 18-19).

**Second**: You agreed to submit a timely "<u>Motion for a Preliminary
Injunction</u>" seeking the Court to prohibit two things: 1- any further increase in
population at the Annex or Kearny and, 2- the transfer of any residents to a new
location without expert and Court inspection and approval.  <u>We cannot delay</u> on
this for obvious reasons.

**Third**: After discussing the issue of <u>monetary damages</u>, you conveyed that
you saw the strategic benefit of both in making this claim a part of our lawsuit
**and** in putting the State on notice that these damages are continuing to accrue
due to: continuing inhumane conditions, a continuing inhumane environment,
and continuing counter-therapeutic treatment, and you agreed to take specific
action towards making monetary damages part of the remedy sought within <u>this</u>
lawsuit and you agreed to "figure out how to use this to our advantage."

1

Ex B-1

**Fourth**: You agreed to investigate how other states removed D.O.C. from their Civil commitment process and make such efforts on our behalf due to the pervasive, overly-restrictive, counter-therapeutic impact D.O.C. has on the civil commitment process and in the civil commitment environment here in N.J.

**Fifth**: You informed us that you judged it unwise at this point to waste effort towards having Dr. Becker review all the documents given to her by residents.  In your opinion this would be wasted effort because Dr. Becker's report is very favorable to us and such an effort would take time away from other priorities.  We accepted your advice on this.

**Sixth**: You agreed that the circumstances surrounding Dr. Barone's resignation needed to be looked into and felt that this could end up being a real "smoking gun."  You agreed to request discovery relative to her resignation **and** a list of all residents against whom she testified in obtaining their civil commitment. We further request that you take steps towards challenging the commitments of such residents and seek re-evaluations for all residents that were committed with the help of her testimony.

**Seventh**: Regarding the serious medical "nightmares" you were made aware of; you agreed to seek making a timely deposition of Dr. Smyczek (unsure of spelling).

~~**Eighth**:   S.O.G.: You agreed to write a letter protesting the thrashing of cells and the lack of sensitivity of S.O.G. personnel towards the medical needs of residents.~~

**Ninth**:  You agreed to seek additional counsel within your firm to assist with our lawsuit and to make <u>investigation efforts</u> on our behalf.

**Tenth**: You agreed to write a letter to the Court that would effectively put all of our <u>Constitutional</u> issues on record, preserve them and insure that they are addressed within the framework of <u>this</u> lawsuit.  E.g.:

   a) A concentrated challenge against the <u>Due Process</u> violations of the initial commitment process (see explanation in 9-2-09 agreement).



b) A concentrated challenge against the <u>Unequal Application of the Law violation</u> for individuals under the same class and circumstances (see explanation in 9-2-09 agreement).

c) A concentrated effort in view of all the above to have the civil commitment of every resident re-evaluated by neutral professionals (see explanation in 9-2-09 agreement).

d) A concentrated challenge to the misuse of actuarial instruments used to commit and the use of such instruments which do not take into consideration changes individuals have made in their lives, and they do not take into consideration the significant reduction in risk as a result of the increasing age of the prior offenders (see explanation in 9-2-09 agreement).

e) A concentrated effort to raise the concerns in the minority opinion in <u>Kansas v. Hendricks</u> by Justice Kennedy stating that it would be punitive if "treatment were a sham" (Dr. Becker report), if the "need for treatment" is claimed after incarceration is completed, or if "commitment was the only option, etc."

f) A concentrated challenge to the denial of trial by jury (see explanation in 9-2-09 agreement).

g) A concentrated challenge to the evidence that the rule of law is being ignored in the New Jersey civil commitment process on numerous fronts (see explanation in 9-2-09 agreement and the letter given to you by one of our group).

To the above list we also add the issues of:

**Double Jeopardy** violations, **Ex Post facto** violations, **Res Judicada** violations, the lack of a **Recent Overt Act** requirement and the fact that the New Jersey S.V.P.A. does not require that **only convictions** be considered for purposes of commitment.

Please be advised that the Affidavit you requested should be in the mail by Monday, September 7, 2009, and that we are grateful for your visit and your recognized commitment to seriously work with us.

If any of the items memorialized in this letter are in any way contrary to your memory of our agreements, please contact me in writing as soon as possible.

Very truly yours,

c. Kearny residents
Cezar Alvarez, Esq.

Richard Bagary

Ex B-3

3

STU Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

September 22, 2009

### Bagarozy v. Harris, 04-cv-3066 (DMC)

Dear Mr. Marx:

This letter is for two purposes:

**First**, to report that over the past month, the STU-Annex, under the new administrator, Mr. Conway, has become increasing more restrictive, punitive, and counter-therapeutic:

1- Nighttime recreation (after the dinner meal) has been cancelled.  There are no more evening recreation programs.
2- With the addition of a new dormitory already under construction by way of knocking down walls in treatment/recreation rooms, the already overcrowded Annex will become further inhumanely overcrowded.
3- Resident maintenance workers have told us that a gate has been ordered to be put up between the day room and the dining room.
4- Visitors to residents on visit nights will no longer be able to use food and soda vending machines.

**Second**: As for the State challenging Dr. Becker's report; this is the time, in your reply to their efforts, to revisit two crucial issues:

a) Dr. Becker's report would have been much more harmful to the State had she been able to consult all of the significant documents residents provided her with.  The state objected to her even being able to look at these materials.

Ex C-1

b) If Dr. Becker had been informed (in your reply to the State) of her authority to consider "anything else she deemed appropriate" (by way of agreement with the State, this in return for surrendering her option to rule various areas of the STUs "punitive"), she would not have back-tracked in her report on such areas as the Statute needing to be changed.

These matters ought to be included in your reply to the State's present challenge to Dr. Becker's report.

Respectfully,

Richard Bagary

Ex C-2

Richard Bagarozy, Jeremiah Simons
Gilbert Davis, Walter Harrell
STU-Annex
P.O. Box 905
Avenel, NJ 07001

*Exhibits For This Letter Not Included*

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

September 19, 2008

## RE: Reply to Dr. Becker's Preliminary Report        Letter/Affidavit

Dear Mr. Marx:

Numerous residents have read Dr. Becker's report and are impressed that she was so receptive to our input. However, we are also acutely aware that she held back in addressing the abuses that exist here, that there is more work to be done and that this is clearly not the time to "drop the ball."

Concerns have also been expressed about the lack of communication we've been able to have with your office and with the apparent reluctance on the part of your office to extend itself to protect individuals who have come forward as witnesses on our behalf. We ask that you do what you can to remedy these problems and we additionally reach out to you as assigned counsel to use all of your ability as well as all of the resources of your office to submit a formidable reply on our behalf at this crucial point. Keep in mind that we have grave concerns about being connected with Seton Hall because of their apparent reluctance to challenge the constitutionality of the New Jersey SVP Statute. Below we present our input which is the result of the combined efforts of numerous residents:

## Primary issue:  Ten years, practically no one released:

This is our priority issue. In view of the successful **out**-patient program in Texas, in view of the New Jersey Dept. of Corrections own recidivism rates of 6% over five years for prior sex offenders, in view of the success of Dr. Richard Hamill's out-patient program in New York (518) 489-7971 (presently being used in Arizona) with 2% recidivism rates for high-risk offenders over a 12-year period, and in view of the fact that numerous experts agree that the best way to treat prior sex offenders is to monitor them closely in society; there is obviously a significant gap between the effective conditions of release that successfully protect the public and the complete loss of liberty experienced under New Jersey's S.V.P.A. which has effectively created a warehouse for prior sex offenders.

Statements by residents are often taken out of context to portray the resident in the worst possible light to maintain commitment. Evidence that progress has been made and

*Ex D-1*

that the resident no longer requires commitment is minimized, ignored or suppressed. The result is an environment of hopelessness that is unimaginable.

T.P.R.C. and C.A.R.P. boards are effectively used to maintain commitment and insure that therapists are unable to recommend release. This is also done by using hearsay, inaccurate information, and a resident's statements taken out of context to portray the resident in the worst possible light and then solidifying that faulty, destructive information in permanent reports. Residents have no honest mechanism to challenge these inaccurate allegations and are permanently and fatally but wrongly labeled.

Prior records are overly relied on. Changes an individual has made in his life are systematically ignored throughout the entire process.

Finally, polygraphs are improperly and systematically being used as a tool to maintain commitment. It should be noted that with the rare instances where both sides stipulate to accepting polygraph results, they are typically not accepted by the courts of any State in this country because scientifically they are <u>not</u> recognized as being reliably accurate. To use such a tool to continue to deprive a citizen of his liberty under civil commitment is fundamentally unfair and a violation of both constitutional and human rights (see **Ex. 1**, "Lie Detector Roulette"). Also, please present to Dr. Becker the expert report we sent you by e-mail last week: "**Sexually Violent Predators in the Courtroom, <u>Science on Trial</u>**." Dr. Becker referred to a study in her preliminary reply, so she can consider this one also. In view of the abuses all have experienced as outlined in Dr. Becker's preliminary report, the group of residents presently committed - and who have lived under these "unsatisfactory, <u>un</u>-therapeutic" conditions - need to be released with appropriate conditions. Another significant problem is the refusal to permit Residents who have family out of State, to return to their families.

**2-** We ask that in your reply, you strongly challenge the <u>initial commitment process</u>. Granted this was not part of Dr. Becker's protocol; however, one of the concessions you received from the A.G. Office was that Dr. Becker could also address anything she felt a need to address. Information was presented to Dr. Becker relative to the initial commitment process as part of the documents handed to her by Bagarozy and others during her interviews, including the March 26, 2007, Michael Hasher letter that had been previously sent to you and which is included here as **Ex. 2** with**out** Hasher's name on it and the ethics complaint Bagarozy had submitted against the doctors who committed him (see **Ex. 3**). Dr. Becker's wealth of experience ought to qualify her as an expert in this area and she ought to be eminently capable of determining if the initial commitment process of STU residents was valid. If she is not the one to investigate this issue, who is?

The initial commitment process is fatally flawed and we request that each resident be re-valuated by neutral experts not beholden to the Attorney General and recognized by the American Psychiatric and Psychological Associations as unbiased. But even here, if re-evaluated residents are then simply referred back to the hearing court in its present form, it would be a problem. With the present hearing court, commitment cases do not

2



rotate among the regular Superior Court Judges but all are heard before two specially appointed, formerly retired judges behind prison walls in secret hearings. These judges systematically accept whatever the State doctors present, even those who are unlicensed. These same judges routinely ignore licensed defense doctors who have had extensive sex offender experience and testify that commitment isn't necessary.

Some of the additional problems with the initial commitment process are presented below:

*The practice of "doctor shopping" is often used and State doctors are not neutral professionals seeking an honest evaluation but are overly beholden to the Attorney General. The State has used **un**licensed doctors to obtain lifetime civil commitment.
*There is very little genuine effort to consider less restrictive conditions at initial commitment hearings in place of complete loss of liberty.
*There is no requirement of a "recent overt act" so the State can reach into the indefinite past to commit a citizen for life.
*There is no protection of Trial by Jury in New Jersey and the two specially appointed judges commit almost everyone that comes before them.
*The New Jersey S.V.P.A. is so over-broad that almost <u>any</u> prior sex offense qualifies for lifetime civil commitment.
*The decision whether or not to screen a prior offender for commitment is arbitrary. Now that the STUs are almost full, newly released prior offenders with worse records than many presently committed are being released under Megan's Law and we remain here. There was a point (about three years ago) when an average of three prior offenders a week were being at least temporarily committed. Now just one prior offender a month might be temporarily committed. Productively releasing these prior offenders instead of screening them for commitment not only is further evidence that out-patient monitoring is effective and is successfully being used even in New Jersey, but it is clearly unequal application of the law for individuals under the same class and circumstances.
*We have been told that even several <u>treatment refusal</u> residents from A.D.T.C. (originally ruled to be repetitive and compulsive) have been released and not screened for commitment, yet we remain here. This is another clear example of unequal application of the law for individuals under the same class and circumstances.
*Changes have been made from the original guidelines in scoring of some of the actuarial instruments making commitment far simpler to obtain.
*Commitment criteria is overly focused on past record and genuine changes prior offenders have made over a period of years are ignored, minimized or suppressed.
*Juvenile records are used to commit people.

For all the foregoing reasons we respectfully request that each resident be re-evaluated by neutral experts recognized by the American Psychiatric and Psychological Associations as unbiased.

**3-** We ask that you present a strong challenge to the injustice being practiced here of "<u>unequal application of the law for individuals under the same class and circumstances</u>" (now that the STUs are full; ADTC and prison inmates, many of whom have verifiably

3

worse records than STU committed residents, are arbitrarily <u>not</u> being screened and are being released while we remain here). This needs to be investigated and ought to be a significant focus in our reply.

4- We ask that you present a strong challenge against **actuarial instruments** being used improperly for commitment and risk assessment, especially with respect to older residents. It is our understanding that the commitment criteria of some of the instruments were arbitrarily changed (e.g. MN-SOST-R arbitrarily changed from a cut-off of 13 to a cut-off of 8) to make commitment easier. It is our further understanding that not only doesn't the Static-99 take into consideration changes that an individual has made in this life but that it overstates the risk of older residents [see **Ex. 4**, scientific study]). We seek that all of this be brought out to Dr. Becker in your reply.

5- We ask that you extend your self to insure that Dr. Becker is authorized to read all the documents residents provided to her (e.g. **Ex. 5** list of issues which we were unable to hand to Dr. Becker as well as the rest of the exhibits enclosed here [**Exs. 1-10**], many of which are crucial supporting confirmation of the information she received verbally during her interviews with residents and staff).

6- When you spoke with Denise Coles by telephone, you subsequently informed us that she had information crucial to our lawsuit. This being the case, have you extended yourself to insure that Dr. Becker communicates with her? If not, why not? And if not, do you intend now to do so? It is our understanding that she is able to convey examples of serious abuse of residents by DOC. What is the reason for the delay in following through on this? Has the ball been dropped?

7- We ask that you present a strong challenge against the presence here of DOC and the excessively repressive environment created by them:

DOC's influence is controlling, pervasive, overly-restrictive, counter-therapeutic, and punitive and DOC ought to be completely removed from the STU treatment setting:

*MAP program (supposedly a therapeutic program but DOC has controlling influence). At the very minimum, Residents seek a formal due process hearing before any MAP restrictions or lock up may be imposed.

*Mail Room restrictions: there used to be a "contraband list." Now there is only a relatively short list of "approved items" and <u>everything</u> not on that list is contraband.

*Phone restrictions: Blocks have been requested and received by DOC personnel on most of the prepaid phone cards available to us. A majority of 800 numbers (such as postal services) available to other citizens are no longer available to us. This greatly restricts our access to the outside world. It harms our ability to seek professional, legal or therapeutic help and it significantly inhibits our efforts to maintain constructive contact with our families and support individuals. This is aggravated by the fact that cell phones with<u>out</u> internet access are denied us even though we have agreed to make our detailed phone bills completely available to the administration resulting in us being accountable for each and every call we make or receive.

4

Ex D-4

*Computer possession denied us by DOC (even with monitoring or completely without internet access). In addition to depriving STU Residents of numerous educational opportunities that personal computers would afford, this DOC policy further deprives Residents of useful skills that could prove valuable in successfully reentering society.

*DOC Lockdowns. Rules imposed by <u>prison</u> rulebook unsigned by any DOC official.

*Verbal and physical abuse.

*DOC's "Special Operations Group" (S.O.G.): shakedowns with guns.

*Contraband planted in resident's property motivated by DOC personnel.

*Outside visits from family and friends are limited and are highly restricted by DOC (e.g. no kissing, no holding hands, no recreation for children, structured sitting, etc.) This is <u>un</u>-therapeutic and counterproductive for individuals seeking to strengthen family ties. Visitors are often treated with great disrespect by DOC personnel. This is so frequent therapeutically beneficial visits from family and friends have greatly declined. There is no "grievance box" for visitors even though one has been requested.

*Prison like lock up.

*Prison like DOC rules.

*Requirements that require shackling even of heart attack patients needing to be rushed to the hospital.

*DOC's overriding control of the mail room: 1- we used to have a "contraband" list (see **Ex. 6**); now we only have a "limitation on possessions" list (**Ex. 7**) and anything not on that is contraband.

*DOC has conducted "searches" in which they completely thrash a resident's property - including legal files – for purposes of punishment.

*DOC's overriding control of the MAP process is confirmed by **Ex. 8** which consists of two grievances from Bagarozy challenging this control. The first was never replied to (a frequent occurrence with the grievance process here) and in the second a DHS staff member <u>admits</u> that DOC has refused to release Bagarozy even though DHS had recommended it. The courts have permitted MAP to be imposed without a due process hearing because it is "treatment and not punishment." However, if it is under the control of DOC, that is not the case. In her interviews, Dr. Becker asked numerous residents, "Would this environment be better if DOC were to be removed." We were therefore surprised by her suggestion that there needs to be "more custody staff." It is one thing to have DOC on the perimeter to prevent escape (as the SVP law implies) with DHS having its own inside security. It is quite another thing for DOC to usurp and (presently have) such pervasive control of everything. Their pervasive presence results in making this a highly punitive environment and we seek that Dr. Becker be pressed on this. She acknowledges that even STU staff reported that this environment and process was punitive. We need to press Dr. Becker to see if she, herself, agrees that this in her expert opinion is a punitive environment. She spoke about lengthy MAP placement, but she said nothing about lengthy <u>prison type lock up</u>. In summary, it is impossible to make genuine constructive, therapeutic changes here without the complete removal of DOC. It should additionally be noted that the make up of DHS treatment staff is exclusively white and female with the exception of one African male doctor. With the population here being exclusively male and significantly black male, this is a problem.

Ex. 5

**8-** We ask that you be mindful of the issue of monetary damages.  We seek significant compensatory and punitive monetary damages for our inhumane treatment and deprivation of liberty.  However, if the A.G.'s office is willing to release residents under less restrictive conditions in a timely manner (e.g. significant release within 30 days, the majority released within 60 days and an outside maximum of 90 days) we expect to be very conciliatory on this point.  However, if they don't extend themselves to facilitate this in a timely manner, there can be no settlement, especially in view of the low recidivism rates for prior offenders (**Ex. 9,** *page 2,* **& Ex. 10**), and the fact that ADTC and prison inmates who definitely qualify for civil commitment under New Jersey's S.V.P.A. are now arbitrarily being released without even being screened.

**9-** We ask that you present a strong challenge to the disparity in treatment and advancement between ADTC residents vs. prison residents (who initially were determined not to compulsive and repetitive but who, in general, are held behind).

**10-** We ask that you present a strong challenge on the issue of punishment.  In the initial protocol, one of the criteria Dr. Becker was enabled to grade various areas on was the category of whether it was "punitive."  The A.G. wanted that option removed.  The fact that your office allowed this in view of our claims of this environment being extremely restrictive and punitive has the appearance of and is viewed by many here as being in "cahoots with the A.G. Office or at the very lease being an example of willful, gross negligence.  In Dr. Becker's report, she speaks of residents <u>and</u> staff describing this environment as punitive.  We now ask your office to ascertain if Dr. Becker agrees.

**11-** Residents seek the complete removal of prison medical and dental treatment from this process and environment.  St. Francis Hospital is, to our understanding, a DOC contract.  DOC's controlling, pervasive, punitive environment needs to be removed.

**12-** We need to address the almost certain effort that the A.G. will make to strike Dr. Becker's statement - as "not part of her protocol" - that the <u>Statute</u> ought to be changed.  As a pre-emptive defense, it should first be noted that the Attorney General agreed to the protocol addition that Dr. Becker also had the authority to address anything that "she felt needed to be addressed."  Secondly, Dr. Becker doesn't advocate that the statute be changed on legal grounds, but on treatment grounds as pert of her expertise that it creates and un-therapeutic environment.

    We swear that all the foregoing statements which are a matter of fact are true to the best of our knowledge and belief.  We are aware that if any of the foregoing matters of fact are willfully false, we are subject to punishment.

Respectfully Submitted,

| | |
|---|---|
| Jeremiah Simons | Walter Harrell |
| Gilbert Davis | Richard Bagarozy |

6

Ex D-6

## **Addendum**

Just for your information, regarding the "furlough" process, it often appears that every effort is made by STU personnel to delay or deny the option. A case in point is John DeAngelis. In early May, the court ORDERED a release plan and a return court date of July 17. On July 17, the release plan was approved the start of furloughs was ordered. The judge ruled that he would be out within 10 weeks. On Aug. 10, John had furlough to go to Oxford House. It never happened. Parole said it was a problem area. On Aug. 17, John was returned to Court and the Court issued an ORDER that he be transported to Oxford House. He was transported a week later but was denied under Megan's Law because "children visit there." To date, no staff member has brought any other place forward except "Brother's Keeper" at the price of $10,000 for six months and with the rule that John cannot work to earn money. It should be noted that Parole had no problem with Brother's Keeper, even though it is in a drug infested area which John recognizes as a genuine concern for him. He returns to Court Friday, September 19, 2008, and basically he is starting all over for the third time.

