# EXHIBIT E

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: MR. SALAAM HAKEEM ABDullAh

Signature: Mr. Salaam Hakeem ABdullah

Resident Identification Number: 311

Date: 4-14-2012

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: *Victor Acevedo*

Signature: *Victor Acevedo*

Resident Identification Number: *025*

Date: *4/11/2012*

Comments:

I completely object to the settlement. It does not comport ~~with the report of Dr. Becker (the authority nominated by the~~ Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues ~~passed over.~~

Raymond Alves
Special Treatment Unit
8 Production Way, Trl #2
CN 905
Avenel, New Jersey 07001

April 22, 2012

**Seton Hall University**
School of Law
Center for Social Justice
833 McCater Highway
Newark, New Jersey 07102

Re: Alves, et al., v. Main, et al., No. 01-cv-0789 (DMC) (MF)

Dear Ms. Moses;

After reading the purposed settlement agreement, I severely distraught at the disregard in the states approach to the operation of the STU facility and treatment of the residents housed within the facility. Therefore, below, I have outlined several reasons why I disapprove of the purposed settlement agreement.

With the above being said, I disagree with the purposed settlement agreement. The reasons for my disagreement are as follows;

1. The Settlement does not clarify or address the Inter-agency Oversight Committee as established in N.J.S.A. §30:4-27.34 (c) Appropriate representatives of the Department of Corrections and the Department of Human Services shall participate in an interagency oversight board to facilitate the coordination of the policies and procedures of the facility; (d) Notwithstanding the provisions of section 10 of P.L. 1965, c. 59 (C. 30:4-24.2) or any other law to the contrary, the rights and rules of conduct applicable to a person subject to involuntary commitment as a sexually violent predator pursuant to P.L. 1998, c. 71 (C. 30:4-27.24 et seq.) shall be established by regulation promulgated jointly by the Commissioner of Human Services and the Commissioner of Corrections, in consultation with the Attorney General. The regulations promulgated under this subsection shall take into consideration the rights of patients as set forth in section 10 of P.L. 1965, c. 59 (C. 30:4-24.2), but shall specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators. In developing these regulations, the commissioners shall give due regard to security concerns and safety of the residents, treatment staff, custodial personnel and others in and about the facility. However, as of date this committee has failed to include an appeal process to challenge any decisions made by said committee. Additionally, we have yet been provided with the ability to present issues of concern to the committee for review, specifically the decision of DOC to deny the resident the ability to own and possess computers. DOC just issued a

Raymond Alves
Letter of Settlement Disagreement

decision with no regard for treatment and the re-integration process associated with the expected release of the residents.

2. The residents here at the STU do not have access to a Human Right Committee as in other civil commitment facility within New Jersey. Therefore leaving the residents here at the STU with no one to turn to regarding their issues for treatment, lack there of, an advocate to assist them with treatment concerns, ect. This is an extremely important issue that is not addressed in any manner in the purposed settlement agreement. (Mental Health Disability Law 2nd Ed, §3A-3.1d; (Wyatt v. Stickney **325 F. Supp. 781;1971 U.S. Dist. LEXIS 14217 Civ. A. No. 3195.** )

3. The settlement does not provide for the assessment of those residents that were and have been in treatment for many years and are now civilly committed and this programs new changes do not account for what the residents that have been committed for years, has completed. The settlement only speaks to the residents that are getting committed or who has been recently committed.

4. The settlement have provisions for a treatment ombudsman, however, this person is only permitted to address issues within the settlement agreement. Therefore, the settlement does not account for a treatment advocacy for the residents incarcerated under the SVPA to address their therapeutic needs.

5. I am one of the residents that are selected to represent the class. I do and cannot fully represent the population as a whole. There is no resident in the listed class representatives that can effectively represent the classes of residents housed within the STU, and I am asking that the list of class representatives be modified to include residents from all classes of resident. I have never acted out while civilly committed and yet I am segregated and denied treatment in totality. I am not the only resident that is faced with this dilemma, yet this class of persons is not represented.

6. Within the purposed settlement agreement, is a section references funding. I object to this section, in its entirety, because several district courts have already established that budgetary shortcomings due not justify not providing the civilly committed with treatment. This is noted as far back as the Wyatt v. Aderholt, 1974, 5th Cir. And the most recent being Turay v. Seling, 1998, 9th Cir. Therefore, why does the State get a break when it comes to the SVP's of New Jersey.

7. Use of the plethysmograph should not be considered at any cost. There are several simple reasons as to why; a) We are men and we have been incarcerated for more then ten years, and we are susceptible to outside simulation from many different and this fact alone could and will create a false positive to any one who takes the test; b) Many of the resident are out of shape and have medical problems that effect their blood pressure and circulation and this can and will probably cause false positives; c) There is an equal protection aspect to the application to this test to the SVP's only, simply because they do not put all other sex offender through the same diagnostic testing.

Raymond Alves
Letter of Settlement Disagreement

8. The application, and adherence, of the HARE, PCLR psychopathy test is in of itself, is nothing more then a needless waist of taxpayer's money. The HARE test, as quoted by Robert hare himself, was not designed for the purposes that it is being used, the test was designed for clinical studies and there was not, and is not any real world application found to be creditable to the test. Therefore, the states desire to use said test is nothing more then a roadblock to keep individual locked up. With this being said, this test should be removed from the purposed settlement agreement.

9. There is nothing in the settlement that controls the behavior of the Department of corrections, leaving the fox to protect the hen house. DOC can and does stop groups for cell searches that are routine, they stop groups for the dogs to come through the facility and all of this amounts to the denial of the therapeutic experience and essentially counter therapeutic.

10. Our right to habilitation is not covered in the purposed settlement agreement. Educational needs such as our ability to purchase and possess our own computers in our cells w/limited internet for legal and educational reasons or in the interim w/o internet access, so we can do our legal and therapeutical work is totally overlooked. In the absence of habilitation there is a denial of treatment, therefore, violating the right to treatment to the extent to be cured of improved to the point were a resident could be released.

11. None of the recommendations made by Dr. Becker were included, nor were they agreed to, within the purposed settlement agreement. Since Dr. Becker pointed out several areas were the program was less then minimally adequate don't you think that these areas should be within the purposed agreement. Because they are not, I once again disagree with the Purposed settlement agreement.

The issues above are in no specific order of importance and all the issues are of equal value. I thank you for you time patience and understanding in regards to our situation and due to the past behaviors of the facility I am requesting that you please acknowledge receipt of this letter. I anxiously await your response.

Respectfully Submitted;

*Raymond Alves*

Raymond Alves.

ra
c:  File

Fr: *William Anderson*
Special Treatment Unit
8 Production Way, Trl #2
CN 905
Avenel, New Jersey 07001


To:   STU Settlement
c/o Seton Hall University school of Law
Center for Social Justice
833 McCarter Highway
Newark, New Jersey 07102

Re: **RAYMOND ALVES, et al, v. MERRILL MAIN, PH.D, et al,.**
Objection to Purposed Settlement

1. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of residents have experienced, therefore, making it impossible for the above named residents to speak on behalf of the population. There should be residents added to the representatives, listed above, that reflect the following Classes of persons; a) Juveniles that were civilly committed; b) Residents that were committed from the A.D.T.C. that have multiple years of treatment; c) Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d) Persons that have been committed from society (that were on the streets) when they were selected for commitment; e) Treatment Refusals are not represented; f) MAP residents are not represented; g) and South Unit residents are not represented.

*I dont feel that this settlement should be approved because I am one of many that have been in this program for Eleven years for one charge that I*

2. Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. At the completion of all modules, when a resident has successfully completed the module, there should be some kind of notice given that the resident's risk to re-offend has been mitigated, as well as, his level of dangerousness. This will sequentially, lower the resident's risk assessment. This should be noted and written verification should be given to the resident, in addition to, this verification being placed in the residents file.

received time served for and never
whent to prison for a sex charge.
I alsow came in this place on phase
two because I had one charge and
noun that I am on phase three
after Eleven years of being in this
place do I have to do another Eleven
before I an considerd for phase four.
    I alsow feel that this settlement
should not be consitered of because
we have lost hope being that more
men have died in this place then
they have let go in the last Eleven
years.
    If I am under D.H.S. Why am
I being subjected to being under
D.O.C. Each and every time I finish
treatment even though We only get
three Hours a Week, And just because
they Want to give us more groups
Us that have been in this place
for for Eleven, twelve, and thirteen
years.        respectfuly Submitted
                        W.A. 179

I Do Have a Family

## CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT
### *RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

STU Settlement
c/o Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, NJ 07102

Mr. Ian S. Marx, Esq.
Law Offices of Greenberg & Traurig
200 Park Avenue
PO Box # 677
Florham Park, NJ  07932

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name:   Joseph Aruanno

Signature:   *[signature]*

Resident Identification Number:   363

Date:   4/15/2012

Comments:

* PLEASE SEE ATTACHED SUMMARY.

2

RE: JOSEPH ARUANNO, Docket No(s). 01-789; 04-3066; 07-1212

I, Plaintiff Joseph Aruanno, object to any settlement in this case for the following reasons.

First I, and all other Plaintiffs in the Bagarozy case, object to the fact that not one person from our suit is a "CLASS REPRESENTATIVE", or involved at all. And where we had been requesting of the court and counsel that I, and Bagarozy, attend the hearings to know what is happening and give our position.

All of which has been compounded by the lack of communication from counsel, Ian Marx, and Baher Azmy, which the court knows by the "MANY" objections the court has received from Bagarozy and *myself* over the years.
And where Bagarozy and myself had written Seton Hall MANY times over the years only to receive replies stating they "DO NOT REPRESENT" us. So how can they now?
Which is further compounded by the "CONFLICT" we have been objecting to over the years which is that Seton Hall had assisted in the preparation of the Sexually Violent Predators Act.

And most important here the court and counsel has named Alves, Sessoms and Culbreth, ASC, as representatives which allows them to manipulate these mentally retarded persons. Where a mentally retarded person does not speak for me when they cannot even speak for themselves.
And where the AMENDED complaint mentions certain residents recently testing positive for drugs which was both Sessoms and Culbreth, which they have always done. And where such persons constantly choosing to exist in drug induced stupors also DO NOT speak for me!

And this is compounded by one of the issues the court wishes to hide from here is the fact that the NJ Dept. of Corrections is the main supplier here. And which also includes cell-phones, pornography, including child pornography, etc., where clearly there can be no type of therapy under such counterproductive and harmful conditions.
Which includes the deplorable housing conditions where Dr. Becker in her report had called "THE WORST" she had ever seen. And where when DOC wanted to move us to an even worse facility the court involved itself in this issue, by way of court ORDER, permitting us to be moved into such inhumane conditions. But now chooses to hide from that issue.
And which also includes the courts "rubberstamping" of the motion from defendants CMS, a DOC ally, to dismiss them from the case where once again the court involved itself in a DOC issue allowing those murderers off the hook! With no objection from counsel we must add. And now attempts to hide from that issue as well.

1

And proving the mentality and position of ASC they had been keeping the class in the dark about where the case was. Then when I received a letter from Judge M. Falk stating counsel and ASC had agreed to settle, or sold-us-out, during January, and earlier, they denied this and proceeded to "VICTIMIZE" myself with violence and with aligning other residents against me with promise of release, etc., where they are informing certain persons they will receive release and millions of dollars for themselves if they settle, whether true or not, which is what goes on in their heads! And yet once again is why they DO NOT speak for myself! As well as any of the Plaintiffs in the Bagarozy and Hasher cases.

And which becomes ironic because certain logic used by counsel as reason to settle is "COSTS" if the case continues. Which has its own ethical, and moral, conclusions. As well as legal.

And which adds insult to injury where the settlement states certain relief comes "ONLY" if "FUNDS ARE AVAILABLE"!?! Which once again is not only not "FAIR" but has certain ethical, moral and legal ramifications.

Also, as to the "MAP" issues the agreement has only touched on what needs to be corrected there. Where one issue I/we do agree with is the understanding that while someone is in "LOCK-UP" on MAP status they really need therapy, not denied it in a punitive manner. Which is only common sense and was not understood for 12 years by the defendants.

But an issue that was avoided is how, many times, DHS has taken someone off of MAP and DOC keeps them on it. And in lock-up. Once again proving how intertwined is DOC in any settlement and must be addressed. And which includes the violence many of us are subjected to by them when we complain of the crimes they are committing here. And where ironically is the reason I was placed in lock-up numerous times. And where counsel had promised to act but failed/lied as usual.

And when Dr. Becker came out she called me out before she toured and asked me what my biggest issue was and I stated the barbaric style lock-up and she then proceed there asking defendant Merrill Main "HOW LONG ARE THESE PEOPLE BACK THERE?" And he lied by stating "NO MORE THAN 24 HOURS", which Dr. Becker confirmed when I saw her later. And where this is just one big lie and joke to these fools, as would be any settlement, which also must be addressed here. Including how the proposed settlement is only the tip-of-the-iceberg even as far as the therapeutic issue which this case has been chopped down to. Leaving us "OUT OF TIME" to address other issues we were forced to address in these cases under the "ENTIRE CONTROVERSY DOCTRINE". Which is yet another reason ALL of the issues we addressed must be rectified here. Mainly the Hasher and Bagarozy cases which should be "UNCONSOLIDATED" and allowed to proceed on their own for this reason since these issues are what distinguish them from the Alves case. Where once again, ironically, we were forced to file those cases due to the total neglect by the court in the Alves case!

2

Also, as to MAP, they have created a "SEGREGATION" unit for those on MAP, as well as their alleged "treatment refusals", such as myself, and where I say alleged since according to Dr. Becker there is no therapy available here, or is not even "MINIMALLY ADEQUATE", where these persons are denied a job, in my case in retaliation for exercising my Constitutional Right to Remain Silent, where when these people ask during community meetings, and in writing, for necessities such as soap, shampoo, tooth-paste, clothes, bed sheets, etc., they are told by Merrill Main and Steven Johnson that they will not get any for free, that they must buy it from them on commissary. And where these Plaintiffs/Patients go without soap, etc., which is not only counter-productive but just plain silly!!!

Even when Dr. Becker made clear the defendants must provide these items, as has Judge Philip Freedman and Judge John Kennedy in other work I have done, but these defendants/criminals refuse to comply!

And where I have been told I must forfeit my Right to Remain Silent if I want a job to be able to buy their necessities. Which becomes very complex considering I went to prison for the first time in my life for a crime I did not commit. And where I am having some success with the appeal of my conviction.

And with that I must address a serious DUE PROCESS violation that is part of this case where half of this population was "REFUSED" treatment at sentencing and during their prison term but now the state contradicts itself no matter how it twists that issue. Which must be addressed here as well.

And where I will address the states recently enacted Chapter 112 where it makes clear its understanding that "OUTPATIENT TREATMENT IS THE BEST CONSIDERING THE LEAST RESTRICTIVE ENVIRON-MENT AND THE LIMITED ABILITY TO PREDICT FUTURE BEHAVIOR, ETC.", which also MUST be addressed here.

And due to being denied treatment while I was in prison as well as being denied treatment since I have been committed the COMPENSATORY and PUNITIVE DAMAGES "MUST" also be applied here.

In closing I must point out how a Dept. of Corrections is an organization based on punishment through fear, violence and terror. Where these terrorist house us in facilities designed and built for punishment through lack of space, privacy, etc., which clearly does not work in this type of environment and where their continued presence here makes "MOOT", or "IRRELEVANT", any conditions that "may" be changed.

Compounded by the fact that many guards here are notorious gang members, bloods, etc., whom are the main drug dealers to their people committed here, etc....

3

And most important here in the rare occasion that we have spoken with counsel, Ian Marx, he has promised in writing that he will address ALL of these issues, including the violence by staff, etc., which we have agreed to hold him to.

And where during discussions I have had over the years with Alves he has addressed the same criminal neglect from his counsel, Baher Azmy, and that he had made clear to the court that Azmy nor Seton Hall represent him.

And where he had then made clear that since Judge Cavanaugh refused to correct, or even address this, that he had filed a MOTION FOR RECUSAL, which I had also, and where neither of these parties should be involved with this case.

Though once again ASC are informing their cronies that they are receiving relief that no one else is, or knows about, which would explain their contradiction at this time.

Finally, to summarize, we object to the consolidations, which is compounded by Seton Hall informing the Bagarozy Plaintiffs they don't represent us, but then now they pretend to and we have been left out of this entire process. With this objection being too late. And where many of the Plaintiffs are limited mentally and have no been able to speak up, then or now, and where Bagarozy and myself would become REPRESENTATIVES of the Bagarozy case proceeding to trial. Since clearly counsel and ASC are the biggest problems here, after the courts years of neglect, and now total disregard of the main issues in Bagarozy, which has created insurmountable barriers to justice in Bagarozy's case.

Where DOC "MUST" go. And where we want to present this case and the crimes that have been committed here to a jury for proper relief, including PUNITIVE damages. Especially considering the many false promises here by counsel has allowed the two year limitation statute to run out and cannot be newly presented at this time.

Where the "ENTIRE" MAP issue must be addressed, in detail, which includes hearings afforded all state prisoners and in ALL mental health facilities.

In advance I/we want to thank all concerned here for their time and efforts in these matters.

Sincerely,

Joseph Aruanno

4/15/2012

4

<u>Mr. Joseph Aruanno #363</u>
Special Treatment Unit
P.O. Box 905
Avenel, NJ 07001

**To: Lawrence S. Lustberg, Esq. and**
**Johnathan Manes, esq.**
Gibbons P.C.
One Gateway Plaza
Newark, NJ 07102

Date:___5/4/2012_____

**To: Ian Marx, Esq.**
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

**Presiding Judge: Hon. Dennis M. Cavanaugh, U.S.D.J.**
U.S. District Court of New Jersey
451 U.S. Post Office Courthouse Bldg.
P.O. Box 999
Federal Square
Newark, NJ 07101-0999

## <u>RE: Objections to settlement in Alves v. Ferguson 01-cv-789 (DMC) (MF)</u>

I am the STU Resident identified at the top of this page, and I strenuously object to the above captioned settlement on numerous grounds, but especially for three main reasons: <u>First</u>, because I reject counsel designated and the residents designated as representatives, <u>Second</u>, because the settlement as proposed completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years and <u>Third</u>, because the settlement doesn't comport in many areas with the report of authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

<u>First</u>, because we completely reject counsel designated and the residents designated as representatives:

Residents have objected to Seton Hall personnel and Gibbons attorneys for years in that Seton Hall representatives were retained to advise how New Jersey's Sexually Violent Predator Act ("SVPA") ought to be constructed.  This connection creates a conflict of

1

interest.  The fact that they are now involved in generating such a narrow settlement in spite of the numerous significant meritorious issues that have been presented, indicates that our worries about a conflict of interest may be warranted and is cause for grave concern.  Additionally, over the years of "settlement negotiations," neither Seton Hall personnel, nor Gibbons counsel, nor the plaintiffs of <u>Alves v. Ferguson</u> have communicated with the rest of the residents about the progress of the settlement, and they have ignored significant pieces of attempted input.  Residents have had very little if any input into these negotiations.  STU Residents are so troubled by the narrowness of the settlement and by how vague, conditional, and subjective it is, that many are concerned that the plaintiffs of <u>Alves</u> received some "enticement" in order to manipulate their surrender to such a narrow set of agreements.  We reach out to counsel for <u>Bagarozy v. Harris</u>, Mr. Ian Marx, Esq. to further develop and prosecute this issue on our behalf.

**Second**, because the settlement as proposed is far too narrow and completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years.  We were so concerned that our issues were being suppressed that on September 2, 2009, we met with Ian Marx, Esq., Counsel for <u>Bagarozy v. Harris</u>, and in writing he agreed to protect and prosecute our issues (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).  The issues that Mr. Marx committed to preserve and prosecute on our behalf include the following:

*Seton Hall's voluntary surrender on the issue of compelling the State to create half way houses for STU residents.  This "surrender" additionally flies in the face of Dr. Becker's call for de-escalation of restraints.  Also, again, Seton Hall was retained to advise how to create New Jersey's SVPA, and this is surrender is a conflict of interest.

*In view of Kearny Residents being transferred to a building that was formerly used as a detention center for prisoners (a depressing, highly restrictive, counter-therapeutic facility), we strenuously object to the elimination of the ability to challenge the housing facilities.  We are shocked by this elimination and additionally this suppression also flies in the face of Dr. Becker's report.  Dr. Becker advocated for a therapeutic environment.

*The literally pervasive presence of the Department of Corrections ("DOC") in a treatment facility has a counter-therapeutic effect and creates a highly restrictive and counter-therapeutic environment which continues to exist at the STUs and has gotten worse since Dr. Becker's visit.  Mr. Marx had committed in writing to challenge this condition (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy) and we request that he further develops this issue in his reply.

*We seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment, the lack of qualified treatment personnel (Doctors), and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions as outlined in Dr. Becker's report, the "worst she has ever seen."  Monetary damages have been a part of <u>Bagarozy</u> from its inception, Mr. Marx has committed in writing to seek such monetary damages, we seek to go to trial on this and the other issues, and I request that Mr. Marx further develop this issue our behalf.

*Because Dr. Barone, a previous Director of Psychology at the STU, was fired for conduct that was completely inappropriate, we submit that her judgment was *fatally* flawed and that she was patently unfit to judge who should be civilly committed.  In view of this, we request that every resident that she had a hand in committing be re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Mr. Marx committed in writing that he would seek this (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

*We have also asked Mr. Marx to make constitutional arguments on our behalf, including: <u>**Double Jeopardy**</u>, <u>**Ex Post Facto**</u>, and <u>**Res Judicada**</u> as well as those mentioned below (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

    <u>**a)**</u> A concentrated challenge of the Due Process violations of the initial commitment process:

    <u>**b)**</u> A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

    <u>**c)**</u> A concentrated effort, in view of item "<u>**b**</u>" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Towards this end, we seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release.

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.

**e)** A concentrated challenge of the denial of <u>Trial by Jury</u>.  The claim is being made that a jury is not required because this commitment is "civil and not criminal." However, crucial liberty interests are involved to a degree that is above and beyond any criminal case.

**f)** There is evidence that the <u>rule of law</u> has been ignored for STU residents: there is a delay of approximately <u>one (1) year</u> between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the Public Advocate's Office.  There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply.  Regarding the statutory **<u>yearly</u>** review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered.  Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year.  We aggressively challenge this.

<u>**Third**</u>, Because of all of the above reasons and because in numerous areas the proposed settlement does <u>not</u> comport with the report of Dr. Judith Becker, the authority chosen by the Attorney General, we ask the court to dismiss it, or in the alternative, to separate the <u>Bagarozy v. Harris</u> and the <u>Hasher v. Corzine</u> case from the <u>Alves v. Ferguson</u> settlement allow the <u>Bagarozy</u> and <u>Hasher</u> cases to go forward.  We respectfully request that in their reply to this settlement proposal that Greenberg Traurig, counsel for <u>Bagarozy</u>, focus on the areas where the <u>Alves</u> settlement is not in accord with Dr. Becker.  However, some of those areas are presented below:

After the visit from counsel this week, Seton Hall and Gibbons, I am still going with the objection I had previously filed and which makes clear that I, and many others , do not want or recognize these lawyers as our counsel due to the years of neglect and the fact that they ask that we agree to the nonsense which is the amended complaint and settlement.

Where as stated our case was about a predominately "OUTPATIENT" program which counsel and the settlement hide from. Which includes reasons on the following page.

4

Where seemingly small issues tell the bigger picture that I am being refused a job in retaliation for exercising my right to remain silent which is punitive and forbidden and where I am then denied such basics as shoes and clothes and/or denied postage to write friends and family which would be considered therapeutic. And which includes being denied the ability to buy a phone card to call them, since the lines are always busy when they try to call in.

And even where they do pretend to comply I am given a hard time such as receiving laundry detergent, etc....

And when I complain I am permitted to be assaulted by staff, then placed in lock-up where they pretended they gave me detergent and pretended I assaulted them first.

And where once again as long as the neglect and abuse continue there can be "NO" settlement at all! Where once again I vehemently OBJECT!

Respectfully submitted,

STU Resident

Joseph Aruanno

5

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Michael Auxer

Signature: _____

Resident Identification Number: 561

Date: 4-12-12

Comments:

Theirs no Light at the end of the Tunnel. They tell us to do the Therapy over and over with no Plans to get out of here for the for Seeable future the Avrturial Tools Doesn't reflect

reduction of risk. this tools are used against us in Court to keep us Here. The lawyer are not getting us into Court every year like the law said. it's actually every 18 months To 2 year. Try to save the State money on Psych evaulations. plus when we see the T.P.R.C it's the same people over and over. they don't rotate in and out. Same thing with the State psych's. this whole Programs not worth spit. Because every time we leave group. it's Back to survival (101) it's counter productive to have Therapy in a prison setting like this. one has To go either were Prisoner's with D.O.C. or Patients with D.H.S. They do not go well to gether. Just my opinion. But more Therapy is not going To work in a setting like this.

Sincerely

2

Richard Bagarozy
Special Treatment Unit
P.O. Box 905
Avenel, NJ 07001



To: Lawrence S. Lustberg, Esq. and
Johnathan Manes, Esq.
Gibbons PC
One Gateway Plaza
Newark, NJ  07102

April 20, 2012

To: Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

Presiding Judge: Hon. Dennis M. Cavanaugh, U.S.D.J.
U.S. District Court of New Jersey
451 U.S. Post Office Courthouse Bldg.
P.O. Box 999
Federal Square
Newark, NJ 07101-0999

RE: Objections to settlement in Alves v. Ferguson 01-cv-789 (DMC) (MF)

I am the STU Resident identified at the top of this page, and I strenuously object to the
above captioned settlement on numerous grounds. Part I outlines three main reasons:
First: Because we completely reject counsel designated and the residents designated as
representatives.
Second: Because the settlement as proposed completely ignores and eliminates
significant, crucial, meritorious issues that we have been asserting for years.
Third: Because the settlement doesn't comport in many areas with the report of
authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

Part II then places on the record to the Court and all parties, commitments made to
plaintiffs of Bagarozy v. Harris by counsel, Ian Marx, Esq., of Greenberg Traurig, LLP.
These promises were both verbal and in writing and address issues Mr. Marx promised
to preserve and prosecute on behalf of Bagarozy plaintiffs. In the interest of fairness and
justice, we reach out to the Court to insure that Mr. Marx is enabled to keep the

1

promises he made and to insure that these promises are not barred from being kept. We've been told that the issues not addressed in this settlement are not dead and that they can be raised "separately;" however, a number of things make this difficult including statute of limitation concerns. <u>Bagarozy v. Harris</u> plaintiffs ask the Court to be allowed to go forward with all of its matters in their entirety and for Mr. Marx to be allowed, as he has promised, to prosecute these issues on our behalf. (See <u>Part II</u> of this submission).

<u>Part III</u> specifically demonstrates the lack of objective criteria for progress and release from the treatment record of Plaintiff Bagarozy.

<u>Part I</u>:

<u>First</u>, because we completely reject counsel designated and the residents designated as representatives:

Residents have objected to Seton Hall personnel and Gibbons attorneys for years in that Seton Hall representatives were retained to advise how New Jersey's Sexually Violent Predator Act ("SVPA") ought to be constructed. This connection creates a conflict of interest. The fact that they are now involved in generating such a narrow settlement in spite of the numerous significant meritorious issues that have been presented, indicates that our worries about a conflict of interest may be warranted and is cause for grave concern. Additionally, over the years of "settlement negotiations," neither Seton Hall personnel, nor Gibbons counsel, nor the plaintiffs of <u>Alves v. Ferguson</u> have communicated with the rest of the residents about the progress of the settlement, and they have ignored significant pieces of attempted input. Residents have had very little if any input into these negotiations. STU Residents are so troubled by the narrowness of the settlement and by how vague, conditional, and subjective it is, that many are concerned that the plaintiffs of <u>Alves</u> received some "enticement" in order to manipulate their surrender to such a narrow set of agreements. We reach out to counsel for <u>Bagarozy v. Harris</u>, Mr. Ian Marx, Esq. to further develop and prosecute this issue on our behalf.

<u>Second</u>, because the settlement as proposed is far too narrow and completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years. We were so concerned that our issues were being suppressed that on September 2, 2009, we met with Ian Marx, Esq., Counsel for <u>Bagarozy v. Harris</u>, and in writing he agreed to protect and prosecute our issues (See the contract agreement signed by Mr.

2

Marx in the objection submitted by Bagarozy). The issues that Mr. Marx committed to preserve and prosecute on our behalf include the following:

*Seton Hall's voluntary surrender on the issue of compelling the State to create half way houses for STU residents. This "surrender" additionally flies in the face of Dr. Becker's call for de-escalation of restraints. Also, again, Seton Hall was retained to advise how to create New Jersey's SVPA. Because of this connection, the surrender is a conflict of interest.

*In view of Kearny Residents being transferred to a building that was formerly used as a detention center for prisoners (a depressing, highly restrictive, counter-therapeutic facility), we strenuously object to the elimination of the ability to challenge the housing facilities. We are shocked by this elimination and additionally this suppression also flies in the face of Dr. Becker's report. Dr. Becker advocated for a therapeutic environment.

*The literally pervasive presence of the Department of Corrections ("DOC") in a treatment facility has a counter-therapeutic effect and creates a highly restrictive and counter-therapeutic environment which continues to exist at the STUs and has gotten worse since Dr. Becker's visit. Mr. Marx had committed in writing to challenge this condition (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy) and we request that he further develops this issue in his reply.
*We seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment, the lack of qualified treatment personnel (Doctors), and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions as outlined in Dr. Becker's report, the "worst she has ever seen." Monetary damages have been a part of <u>Bagarozy</u> from its inception, Mr. Marx has committed in writing to seek such monetary damages, we seek to go to trial on this and the other issues, and I request that Mr. Marx further develop this issue our behalf.

*Because Dr. Barone, a previous Director of Psychology at the STU, was fired for conduct that was completely inappropriate, we submit that her judgment was fatally flawed and that she was patently unfit to judge who should be civilly committed. In view of this, we request that every resident that she had a hand in committing be re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General. Mr. Marx committed in writing that he would seek this (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

*We have also asked Mr. Marx to make constitutional arguments on our behalf, including: **Double Jeopardy**, **Ex Post Facto**, and **Res Judicada** as well as those mentioned below (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

**a)** A concentrated challenge of the Due Process violations of the initial commitment process:

**b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

**c)** A concentrated effort, in view of item "**b**" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Towards this end, we seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release.

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.

**e)** A concentrated challenge of the denial of Trial by Jury.  The claim is being made that a jury is not required because this commitment is "civil and not criminal." However, crucial liberty interests are involved to a degree that is above and beyond any criminal case.

**f)** There is evidence that the rule of law has been ignored for STU residents: there is a delay of approximately one (1) year between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the Public Advocate's Office.  There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply.  Regarding the statutory yearly review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered.  Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year.  We aggressively challenge this.

**Third**, Because of all of the above reasons and because in numerous areas the proposed settlement does <u>not</u> comport with the report of Dr. Judith Becker, the authority chosen by the Attorney General, we ask the court to dismiss it, or in the alternative, to separate the <u>Bagarozy v. Harris</u> and the <u>Hasher v. Corzine</u> case from the <u>Alves v. Ferguson</u> settlement allow the <u>Bagarozy</u> and <u>Hasher</u> cases to go forward. We respectfully request that in their reply to this settlement proposal that Greenberg Traurig, counsel for <u>Bagarozy</u>, focus on the areas where the <u>Alves</u> settlement is not in accord with Dr. Becker. However, some of those areas are presented below and the designation "P" refers to the page in Dr. Becker's final Report that addresses the issue:

**P-1**: Dr. Becker indicates that there is no licensing for both the facility and the program.

**P-3**: Dr. Becker points out that in one civil commitment program it took from three to seven years to complete the program. This confirms that even though this program has the appearance of having a working structure on paper, with a microscopic number of residents on level 5 (<u>after</u> <u>12</u> <u>years</u>), this is not the case.

**P-4**: Dr. Becker Describes specifically how much therapy should be afforded. She also points out the quote of Judge William L Dwyer in <u>Turay v. Weston</u>, 1999, that "Nothing compels a state to adopt a statute of this nature in the first place, and many states have not done so, but a state that chooses to have such a program must make adequate mental health treatment available to those committed."

Also on Page 4, fourth paragraph, Dr. Becker is conveying that the Division has made claims that Dr. Becker has exceeded the scope of her retention in several areas. However, Ian Marx, Esq. had told us that in return for the State being able to remove the designation of "Punitive" as an option for grading in each category of her review, Dr. Becker would then have the discretion to additionally address any area <u>she</u> felt appropriate. The court should not allow the state to renege on this agreement. This also goes for the paragraph on page 4 immediately after the topic: <u>Response to the</u> <u>Plaintiffs' Comments</u>.

**P-5**: Dr. Becker again raises in item b. that she couldn't comment on the facilities run by DOC, however, in view of the information presented above, she ought to be able to do so. Even though Dr. Becker believes it is beyond her "scope" of what she is to evaluate (see item b), she still feels compelled to note at the beginning of page 5 that the <u>facilities</u> appear to be <u>less</u> than therapeutically adequate (Page 5, line 6).

**P-6**: This page as a whole demonstrates the overwhelming subjectivity and resulting lack of objectivity of the evaluation process. The proposed settlement does little to remedy this and as such does not comport with Dr. Becker's report.

**P-8**, top: "Living conditions worst she has ever seen."

**P-9**: "Overall therapeutic and rehabilitative milieu is not minimally adequate."

**P-10**: Lines 3-4: "No specific dynamic risk assessment instrument being utilized."

**P-11**: Bottom half of page: Here again Dr. Becker expresses a lack of clear, <u>objective</u> requirements for advancement. How do the changes in the proposed settlement remedy this? Bottom of page 11: "Clinical assessment evaluation and treatment team plans are <u>not</u> minimally adequate and are unsatisfactory." How do the changes in the proposed settlement remedy this?

**P-13**: This page as a whole again speaks of the lack timely advancement of residents and the lack of an "objective measure" (Paragraph 3, line 2). How do the changes in the proposed settlement remedy this?

**P-14**: This page is most telling of all. In Paragraph 5, Dr. Becker reports that treatment phases as outlined "on paper" are satisfactory but that resident progress through the phases and the means by which progress is evaluated are together 'not minimally adequate and are unsatisfactory.'" This dichotomy points out one of the significant problem existing in New Jersey's SVPA process and environment. How do the changes in the proposed settlement remedy this?

**P-15**: Paragraph 2, handicapped residents are not being given the services they require. E.g. resident Dismukes who is almost totally blind. How do the changes in the proposed settlement remedy this?

**P-16**: Again the dichotomy appears. In Paragraph 2, Dr. Becker states that the model of process groups described on paper is satisfactory, but the manner in which they actually exist is not. I greatly fear that this "proposed settlement" is another example of a document which is a paper tiger but entails no real reform to ameliorate the significant problems existing in the New Jersey SVPA process and environment which caused Dr. Becker to call it the "worst she has ever seen." How do the changes in the proposed settlement remedy this?

6

**P-17**: "Vocational, rehabilitative, and educational programming is <u>not</u> minimally adequate and is unsatisfactory.

**P-19**: "Release preparation and programming are <u>barely </u>adequate.  How do the changes in the proposed settlement remedy this?

**P-21**: "Therapist training and supervision is not minimally adequate and is unsatisfactory."

**P-22**: "T.C. Community is not minimally adequate and is unsatisfactory."  How do the changes in the proposed settlement remedy this?

**P-23**: "Level of confidentiality is <u>not</u> minimally adequate and is unsatisfactory.  Item 11: Dr. Becker determines that Gradual de-escalation of restraints does <u>not</u> occur at the rate or quantity one would hope to see in a therapeutic program." The changes in the proposed settlement do nothing to remedy this.  This is a huge concern.  At the bottom of page 23, Dr. Becker quotes Judge Dwyer in the Washington State case that if mental health treatment "is to be anything other than a sham, it must give the confined person the hope that if he gets well enough to be safely released, then he will be transferred to some less restrictive alternative."

**P-24**, Top of page: Dr. Becker determines that "<u>Gradual de-escalation of restraints is not minimally adequate and is unsatisfactory.</u>" This is the most crucial item we address relative to Dr. Becker's report and the proposed settlement does not objectively change this.  Bottom of page, Dr. Becker gives suggestions as to how the visitation program could be improved and expresses the importance of doing so.  It should be noted that DOC took away our family day event where families could come and spend the entire day with their resident family member and where therapy staff is present.  Such an event is irreplaceable in strengthening family ties, and DOC negligently removed this event because of some incident at one of their prisons.  The proposed settlement does not remedy this and is does not comport with Dr. Becker's report in this area.

**P-25**: Dr. Becker determines that "the availability of psychiatric consultation in <u>not</u> minimally adequate and is unsatisfactory."

Several suggestions we would like to make here are as follows:  1- Do not lock the doors in the hospital unit (D-Wing) - ever - unless requested by patient. 2- Leave door 1 (door to the bobbed wire enclosed yard) open at all times so that residents can go to and from the yard anytime without the need of DOC formal moves.  This would also prevent the significant problem of smoking in the building. 3- Get rid of the extremely punitive "dog

van" for civilly committed <u>non</u> prisoners (partitioned van, which is extremely painful to travel in).  4- Use only ankle chains for court and trips.  5- Increase visiting to be in accord with other health care facilities rather than other prisons.  6- Resume family day.  7- Create clear, objective goals (e.g. modules, etc.) for a resident to complete in order to be released from the program.  Adjust the program to last at least 3 and no more than 7 years for all civilly committed residents (see Dr. Becker report P-3, Paragraph 2).

<u>Part II</u>:

The attached exhibits formerly places on the record to the Court and all parties, commitments made to plaintiffs of <u>Bagarozy v. Harris</u> by counsel, Ian Marx, Esq., of Greenberg Traurig, LLP, regarding issues Mr. Marx promised verbally and in writing to preserve and prosecute on our behalf.

<u>Exhibits A-1 through A-6</u> is the agreement signed both by <u>Bagarozy v. Harris</u> plaintiffs and Ian Marx, Esq., counsel for those 28 plaintiffs, during a meeting on September 2, 2009.  At that time all the issues were mutually discussed and Mr. Marx signed off by the way of his initials "ISM" on each issue and then provided his complete signature on page A-6.  We humbly pray that the Court takes no action that would preclude counsel form honoring his commitments on all issues and that the Court specifically take whatever action necessary to enable Mr. Marx to honor all of his commitments to the 28 <u>Bagarozy v. Harris</u> plaintiffs, a significantly more representative group than <u>Alves v. Ferguson</u>.

<u>Exhibits B-1 through B-3</u> is a memorial letter sent to Mr. Marx on September 3, 2009, a single day after the meeting described immediately above.  The last sentence on page B-3 asks Mr. Marx that "if any of the items memorialized in this letter are 'in any way' contrary to your memory of our agreements, please contact me in writing as soon as possible."  Mr. Marx made no subsequent notice of any corrections that needed to be made.

<u>Exhibit C-2, top of page</u> (September 22, several weeks after the above), raises the concern of Dr Becker being misled about her authority.  This issue was first raised in Ex. A-2, last two lines of paragraph 3: "As part of this we seek that Dr. Becker be informed that she has the authority to investigate and issue an opinion on anything she deems warranted."

<u>Exhibits D-1 to D-7</u> September 19, 200<u>8</u> letter from designated <u>Bagarozy v. Harris</u> Representatives at the time, outlining the major issues which we instructed Mr. Marx, as

8

assigned counsel, to prosecute on our behalf, even if that technically required an amended complaint.  Mr. Marx never argued against or rejected any of them.

<u>Exhibit E-1</u> describes a totally unacceptable concession that no resident approved and <u>Exhibits E-2 & E-3</u> revisits several crucial issues.

<u>Exhibit F-2</u> at the first item with a "*" requests Mr. Marx take action on several important issues including making an effort to "aggressively seek to separate the <u>Bagarozy</u> case from the <u>Alves</u> case" and allow the <u>Bagarozy</u> case to proceed to trial in a timely manner.  We requested this numerous times.

<u>Exhibit G-1</u> addresses the issue Dr. Barone's significant misconduct and makes the request that those residents whom she had a hand in having civilly committed be completely re-evaluated by neutral professionals approved by the American Psychological and Psychiatric associations (and Dr. Becker) and not beholden to the Attorney General.

<u>Part III</u>

<u>Exhibits H-1 through H-3</u> Presents a written description of the progress Bagarozy perceives that he has made towards reducing his risk of re-offending since his predicate offence in September of 1993.  Bagarozy is 63 years old and his Static-99 is a three (3). Note also the partial confirmation of this progress (shortly after Bagarozy's temporary commitment) in <u>Exhibit I-1</u>, a letter by Federal District Judge Debevoise.

In view of this progress, at his last commitment re-hearing in the latter part of 2011, the Court asked the STU to definitively come up with exactly what they expected for Bagarozy to "move on and obtain less restrictive conditions."

In reply, treatment personnel came up with a number of areas (see <u>**Exhibits J-1 to J-3**</u>). Bagarozy then made a simpler list (See <u>**Exhibit K-1**</u>).  Bagarozy than took care to earnestly comply what all asked of him and prior to his next meeting presented his input as to what progress he made (see <u>**Exhibits L-1 to L-2**</u>).  Bagarozy's latest Treatment Plan Status Review (see <u>**Exhibits M-1 to M-3**</u>) indicates that Bagarozy had done what was asked of him.  However, now new things are asked, things that he has done many times previously, e.g.:

*Process group 2x per week *(Have been doing this for eight years)*
*Present deviant arousal *(Have done this so many times I can't count it)*

*Relapse Prevention strategies *(Have done this many times over the years in process groups and modules)*
*Maintenance contract *(Completed and presented years ago and presented to the Court several times). Etc, etc.*

So in spite of the commitment (Superior) Court asking STU treatment staff, exactly what does Bagarozy need to yet accomplish in addition to the perceived growth he presented in Exhibits H-1 through H-3, the substance of what is presented is to keep doing the same things.  I pray that the Court from this gets a sense of what Dr. Becker attempted to convey when she stated that the program looks satisfactory on paper but residents are not being advanced at a reasonable rate.  The proposed settlement does not provide sufficient guarantee that this will be any different.

For all the foregoing reasons I petition the court to reject this proposed settlement and allow this matter to go to trial, or, in the alternative, to separate the Bagarozy and Hasher cases and allow them to proceed separately.  At the very least, in the interests of justice, we pray that the Court enable Ian Marx, Esq., to preserve and prosecute on our behalf, all the issues that he has committed verbally and in writing to preserve and prosecute.

Respectfully submitted,

*Richard Bagarozy*

Richard Bagarozy

10

9/2/09

**RE: Bagarozy v. Harris, 04-cv-3066**
**Issues to be addressed at September, 2009, meeting**

We have had no recent communications with you.  What is going on?

Since DHS's reply was completely unsatisfactory, we request that you submit a comprehensive reply to DHS on behalf of Bagarozy plaintiffs in which you correct the unacceptable concessions made by Seton Hall: (giving up our demand for half-way houses and greatly increased furloughs and releases under less restrictive conditions). Will you do this as an urgent matter?  Also, what process will be used for us to veto/reject any un-approved "concessions?"  Presently we reject the entire Seton hall submission because we had no part in formulating it.

*Mr. Marx will make Submission to DaCosta seeking to Cheng  Bottom 18 + top of 19        RB*
*yes - ISM*

In view of recent rumors that residents will be transferred to a highly restrictive, counter-therapeutic facility, we request that you, as our assigned counsel, submit an immediate request for a Temporary Restraining Order (Injunction) preventing DOC from moving residents to any other facility without Court and Expert approval that it is a suitably therapeutic environment as described by Dr. Becker.

*Mr. Marx Favors TRO ① No additional overcrowding  ② not to facility Inadequate        RB*
*Need Affidavit about increase in #'s + New Wing*
*yes - ISM*

Excessively over-crowded, counter-therapeutic conditions that violate basic human rights where DOC has a counter-therapeutic and pervasive involvement and creates a highly restrictive and counter-therapeutic environment continues to exist at the STUs and has gotten worse since Dr. Becker's visit.  We need strong action in the form of a T.R.O. to remedy this ongoing situation which was identified by Dr. Becker?  Officers have told residents that D-Wing will be double bunked.  M.A.P. time, as Dr. Becker discovered, is still seriously excessive.

*See above - ISM*

EX A-1

We ask that you aggressively seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions.

*Mr. Marx agrees on individual level and will try to work claim into our lawsuit as group. He agrees with the strategic advantage. — Will figure out how to use this advantage. — JSM ฿B*

 DOC Discovery and a motion for Summary Judgment. DOC's influence into the treatment environment is nothing less that pervasive. The new Administrator has now told us that DOC officers will issue punishments such as taking televisions without the involvement of DHS and without a Due Process hearing. We seek that a strong move be made for the complete removal of DOC from the treatment environment. We seek that an argument be made that the presence of DOC in and of itself, as applied, makes the STU environment punitive.

*Mr. Marx will research how other States got DOC out — JSM ฿B*

We seek that Dr. Becker be granted access to all of the documents that residents have submitted to her and that she be permitted to make an addendum to her report based on those documents. As part of this we seek that Dr. Becker be informed that she has the authority to investigate and issue an opinion on anything she deems warranted.

*Mr. Marx disagrees with this as not best use of our resources — JSM ฿B*

Dr. Barone: Due to Dr. Barone's misconduct, we ask that every resident for whom Dr. Barone had a key roll in obtaining the commitment of be given a new commitment hearing.

*Will seek detail + documents regarding her resignation + about residents she played in role of commitment. ฿B OK — JSM*

2

*฿B*

*EX A-2*

Smyczek

Medical care is so inadequate at times that residents with serious medical problems are ignored, overlooked or are not given treatment (operations, M.R.I.s, etc.)  Due to monetary concerns:  Investigate Steve Rasinski, Robert Bergenstock (deceased), Calvin McCloud and Townsend, etc.   also Jason Davis

_Issue is not presently subject of Settlement Discussions But is part of case_
_will seek to Take Deposition of Dr. Smyczek._  OC TSM

We seek that you make timely efforts to depose significant witness on our behalf: e.g. Denise Cole, Dr. Gambone, Ms. Aguilera, ~~and Dr. Becker~~ (on all the issues she was unable to include in her report including her opinion on whether she believes the environment is punitive.

_Mr. Marx will make effort to interview_   RB
_These Witnesses - not main priority right now_   TSM
_* will make Denise Cole a priority._

We ask that you make constitutional arguments on the issues of: **Double Jeopardy**, **Ex Post Facto**, and **Res Judicada**.

_Letter to Judge_

We ask that you take action on all the prior pro se motions we had submitted prior to the assignment of counsel that were dismissed until counsel was assigned (e.g. Joinder motions).

_SOG came to Search today ~~and~~ (Mr Marx's Visit) and_
_Thrashed Mr Simon's Cell + Legal Documents_
_TSM will write letter to 3 protest/inquire - TSM_   EX A-3

Now that the issue of the Special Master has been completed, we ask that you now take timely action on the numerous verbal promises you have made to us over the years that you promised to take action on after the Special Masters investigation was completed, especially:

**a)** A concentrated challenge of the Due Process violations of the initial commitment process:

*During our initial commitment process, there are so many violations of basic American Due Process rights: Hearsay, inaccurate information, prior reports taken out of context, acquittals, errors on police reports, etc., are used to commit an individual and no one is present to advocate on behalf of the resident and challenge this information. By the time a prior offender gets to his initial commitment hearing, this information is plastered throughout so many reports it is virtually impossible to extricate or challenge it. Just recently a new resident had his initial commitment hearing. His two doctors testified that commitment was not called for. Of the state doctors, one agreed that commitment was not called for and one diagnosed that it was. So, three of the four doctors examining him diagnosed that commitment was not required. Nevertheless, Judge Freedman committed him. How does one manage under such a closed system? One cannot even request a Trial by Jury because the courts have ruled that this is "Civil and not Criminal." Yet under New Jersey's S.V.P.A. a resident's precious liberty interests are gravely threatened. For this reason, we ask that you tirelessly challenge for the right to Trial by Jury for those who want it.*

Will Write to Judge
will list these issues are not subject of settle discussion and will be preserved and survive — TSM

**b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

*The New Jersey S.V.P.A. is so overbroad that any prior sex offense qualifies. What you have then is an arbitrary population that has been detained in order to insure that this program continues. At the same time, numerous prior offenders who have worse records were never required to be diagnosed by the two doctors who issue the certificates of temporary commitment. Additionally, prior offenders who were ruled to be "repetitive and compulsive" and as a result were sent to A.D.T.C. but while there became "treatment refusals" were nevertheless released, yet we remain here.*

Will Write to Judge

4

Ex A-4

_____
_____
_____
_____

    __c)__ A concentrated effort, in view of item "__b__" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Towards this end, we ask that you seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the  two doctors were not sent to evaluate prior to their release and that you additionally seek to have DOC completely removed from the civil commitment environment.  Will you do this?

_____ *Letter to Judge* _____

    __d)__ We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents. *(The most weighted actuarials are static and don't take into consideration changes a resident has made in his life.  Additionally, it is our understanding that the scoring criteria have been revised to make it easier to commit prior offenders. {See __http://www.static99.org__ for information of actuarials}).*

_____ *Letter to Judge* _____

    __e)__ A concentrated challenge of the denial of __Trial by Jury__.  The claim is being made that a jury is not required because this commitment is civil and not criminal.  However, crucial liberty interests are involved to a degree that is above and beyond any criminal case, the two retired judges have proven not to be impartial, and __Trial by Jury__ ought to be an option if the individual facing commitment seeks it.

_____ *Letter to Judge* _____

Ex A-5

There is evidence that the rule of law has been ignored for STU residents: there is a delay of approximately <u>one (1) year</u> between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the Public Advocate's Office. There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply.  Regarding the statutory <u>**yearly**</u> review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered.  Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year.  We seek that this be aggressively challenged.

*Letter to Judge*

       For all the foregoing reasons, Mr. Marx, we respectfully request that you sign below giving your written assurance that you pledge to aggressively prosecute the above issues as well as any other meritorious issue that is presented.

On behalf of residents:

On behalf of Greenberg Traurig:

Ian Marx, Esq., counsel for plaintiffs

9/2/09

Note: additional issues will be entered on additional sheets of blank paper.

6

Ex A-6

STU-Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001

**Memorial Letter**

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

September 3, 2009

### RE: STU-Annex Class Action (Bagarozy v. Harris) Lawsuit

Dear Mr. Marx:

Thank you for your visit yesterday. All felt that it was productive and that a "road-map" now exists that we can work towards. We do ask that you take the action agreed upon - which is memorialized in this letter - in as timely a manner as humanly possible.

First: You agreed to send a formal letter to Mr. DaCosta informing him that we withdraw the concession made by Seton Hall in which they surrendered both our claim for half-way houses and greater use of the remedies of furlough and release. You agree to clarify that our plaintiff class absolutely does <u>not</u> agree to these concessions (see Seton Hall reply p.p. 18-19).

Second: You agreed to submit a timely "<u>Motion for a Preliminary Injunction</u>" seeking the Court to prohibit two things: 1- any further increase in population at the Annex or Kearny and, 2- the transfer of any residents to a new location without expert and Court inspection and approval. We <u>cannot</u> <u>delay</u> on this for obvious reasons.

Third: After discussing the issue of <u>monetary damages</u>, you conveyed that you saw the strategic benefit of both in making this claim a part of our lawsuit <u>and</u> in putting the State on notice that these damages are continuing to accrue due to: continuing inhumane conditions, a continuing inhumane environment, and continuing counter-therapeutic treatment, and you agreed to take specific action towards making monetary damages part of the remedy sought within <u>this</u> lawsuit and you agreed to "figure out how to use this to our advantage."

1



**Fourth**: You agreed to investigate how other states removed D.O.C. from their Civil commitment process and make such efforts on our behalf due to the pervasive, overly-restrictive, counter-therapeutic impact D.O.C. has on the civil commitment process and in the civil commitment environment here in N.J.

**Fifth**: You informed us that you judged it unwise at this point to waste effort towards having Dr. Becker review all the documents given to her by residents. In your opinion this would be wasted effort because Dr. Becker's report is very favorable to us and such an effort would take time away from other priorities. We accepted your advice on this.

**Sixth**: You agreed that the circumstances surrounding Dr. Barone's resignation needed to be looked into and felt that this could end up being a real "smoking gun." You agreed to request discovery relative to her resignation **and** a list of all residents against whom she testified in obtaining their civil commitment. We further request that you take steps towards challenging the commitments of such residents and seek re-evaluations for all residents that were committed with the help of her testimony.

**Seventh**: Regarding the serious medical "nightmares" you were made aware of; you agreed to seek making a timely deposition of Dr. Smyczek (unsure of spelling).

~~**Eighth**: S.O.G.: You agreed to write a letter protesting the thrashing of cells and the lack of sensitivity of S.O.G. personnel towards the medical needs of residents.~~

**Ninth**: You agreed to seek additional counsel within your firm to assist with our lawsuit and to make underlined investigation efforts on our behalf.

**Tenth**: You agreed to write a letter to the Court that would effectively put all of our _Constitutional_ issues on record, preserve them and insure that they are addressed within the framework of _this_ lawsuit. E.g.:

    a) A concentrated challenge against the _Due Process_ violations of the initial commitment process (see explanation in 9-2-09 agreement).

Ex B-2

b) A concentrated challenge against the <u>Unequal Application of the Law violation</u> for individuals under the same class and circumstances (see explanation in 9-2-09 agreement).

c) A concentrated effort in view of all the above to have the civil commitment of every resident re-evaluated by neutral professionals (see explanation in 9-2-09 agreement).

d) A concentrated challenge to the misuse of actuarial instruments used to commit and the use of such instruments which do not take into consideration changes individuals have made in their lives, and they do not take into consideration the significant reduction in risk as a result of the increasing age of the prior offenders (see explanation in 9-2-09 agreement).

e) A concentrated effort to raise the concerns in the minority opinion in <u>Kansas v. Hendricks</u> by Justice Kennedy stating that it would be punitive if "treatment were a sham" (Dr. Becker report), if the "need for treatment" is claimed after incarceration is completed, or if "commitment was the only option, etc."

f) A concentrated challenge to the denial of trial by jury (see explanation in 9-2-09 agreement).

g) A concentrated challenge to the evidence that the rule of law is being ignored in the New Jersey civil commitment process on numerous fronts (see explanation in 9-2-09 agreement and the letter given to you by one of our group).

To the above list we also add the issues of:

**Double Jeopardy** violations, **Ex Post facto** violations, **Res Judicada** violations, the lack of a **Recent Overt Act** requirement and the fact that the New Jersey S.V.P.A. does not require that **only convictions** be considered for purposes of commitment.

Please be advised that the Affidavit you requested should be in the mail by Monday, September 7, 2009, and that we are grateful for your visit and your recognized commitment to seriously work with us.

If any of the items memorialized in this letter are in any way contrary to your memory of our agreements, please contact me in writing as soon as possible.

Very truly yours,

c. Kearny residents
   Cezar Alvarez, Esq.

Ex B-3

STU Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677                          September 22, 2009

**Bagarozy v. Harris, 04-cv-3066 (DMC)**

Dear Mr. Marx:

This letter is for two purposes:

**First**, to report that over the past month, the STU-Annex, under the new administrator, Mr. Conway, has become increasing more restrictive, punitive, and counter-therapeutic:

1- Nighttime recreation (after the dinner meal) has been cancelled.  There are no more evening recreation programs.
2- With the addition of a new dormitory already under construction by way of knocking down walls in treatment/recreation rooms, the already overcrowded Annex will become further inhumanely overcrowded.
3- Resident maintenance workers have told us that a gate has been ordered to be put up between the day room and the dining room.
4- Visitors to residents on visit nights will no longer be able to use food and soda vending machines.

**Second**: As for the State challenging Dr. Becker's report; this is the time, in your reply to their efforts, to revisit two crucial issues:

a) Dr. Becker's report would have been much more harmful to the State had she been able to consult all of the significant documents residents provided her with.  The state objected to her even being able to look at these materials.

*Ex C-1*

b) If Dr. Becker had been informed (in your reply to the State) of her authority to consider "anything else she deemed appropriate" (by way of agreement with the State, this in return for surrendering her option to rule various areas of the STUs "punitive"), she would not have back-tracked in her report on such areas as the Statute needing to be changed.

These matters ought to be included in your reply to the State's present challenge to Dr. Becker's report.

Respectfully,

Ex C-2

Richard Bagarozy, Jeremiah Simons
Gilbert Davis, Walter Harrell
STU-Annex
P.O. Box 905
Avenel, NJ 07001

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

September 19, 2008

**RE: Reply to Dr. Becker's Preliminary Report**          **Letter/Affidavit**

Dear Mr. Marx:

Numerous residents have read Dr. Becker's report and are impressed that she was so receptive to our input. However, we are also acutely aware that she held back in addressing the abuses that exist here, that there is more work to be done and that this is clearly not the time to "drop the ball."

Concerns have also been expressed about the lack of communication we've been able to have with your office and with the apparent reluctance on the part of your office to extend itself to protect individuals who have come forward as witnesses on our behalf. We ask that you do what you can to remedy these problems and we additionally reach out to you as assigned counsel to use all of your ability as well as all of the resources of your office to submit a formidable reply on our behalf at this crucial point. Keep in mind that we have grave concerns about being connected with Seton Hall because of their apparent reluctance to challenge the constitutionality of the New Jersey SVP Statute. Below we present our input which is the result of the combined efforts of numerous residents:

**Primary issue:** Ten years. practically no one released:

This is our priority issue. In view of the successful **out**-patient program in Texas, in view of the New Jersey Dept. of Corrections own recidivism rates of 6% over five years for prior sex offenders, in view of the success of Dr. Richard Hamill's out-patient program in New York (518) 489-7971 (presently being used in Arizona) with 2% recidivism rates for high-risk offenders over a 12-year period, and in view of the fact that numerous experts agree that the best way to treat prior sex offenders is to monitor them closely in society; there is obviously a significant gap between the effective conditions of release that successfully protect the public and the complete loss of liberty experienced under New Jersey's S.V.P.A. which has effectively created a warehouse for prior sex offenders.

Statements by residents are often taken out of context to portray the resident in the worst possible light to maintain commitment. Evidence that progress has been made and

*Exhibits of This letter not included*

*Ex D-1*

that the resident no longer requires commitment is minimized, ignored or suppressed. The result is an environment of hopelessness that is unimaginable.

T.P.R.C. and C.A.R.P. boards are effectively used to maintain commitment and insure that therapists are unable to recommend release. This is also done by using hearsay, inaccurate information, and a resident's statements taken out of context to portray the resident in the worst possible light and then solidifying that faulty, destructive information in permanent reports. Residents have no honest mechanism to challenge these inaccurate allegations and are permanently and fatally but wrongly labeled.

Prior records are overly relied on. Changes an individual has made in his life are systatically ignored throughout the entire process.

Finally, polygraphs are improperly and systematically being used as a tool to maintain commitment. It should be noted that with the rare instances where both sides stipulate to accepting polygraph results, they are typically not accepted by the courts of any State in this country because scientifically they are <u>not</u> recognized as being reliably accurate. To use such a tool to continue to deprive a citizen of his liberty under civil commitment is fundamentally unfair and a violation of both constitutional and human rights (see <u>Ex. 1</u>, "Lie Detector Roulette"). Also, please present to Dr. Becker the expert report we sent you by e-mail last week: "<u>**Sexually Violent Predators in the Courtroom, Science on Trial**</u>." Dr. Becker referred to a study in her preliminary reply, so she can consider this one also. In view of the abuses all have experienced as outlined in Dr. Becker's preliminary report, the group of residents presently committed - and who have lived under these "unsatisfactory, <u>un</u>-therapeutic" conditions - need to be released with appropriate conditions. Another significant problem is the refusal to permit Residents who have family out of State, to return to their families.

2- We ask that in your reply, you strongly challenge the <u>initial commitment process</u>. Granted this was not part of Dr. Becker's protocol; however, one of the concessions you received from the A.G. Office was that Dr. Becker could also address anything she felt a need to address. Information was presented to Dr. Becker relative to the initial commitment process as part of the documents handed to her by Bagarozy and others during her interviews, including the March 26, 2007, Michael Hasher letter that had been previously sent to you and which is included here as <u>Ex. 2</u> with<u>out</u> Hasher's name on it and the ethics complaint Bagarozy had submitted against the doctors who committed him (see <u>Ex. 3</u>). Dr. Becker's wealth of experience ought to qualify her as an expert in this area and she ought to be eminently capable of determining if the initial commitment process of STU residents was valid. If she is not the one to investigate this issue, who is?

The initial commitment process is fatally flawed and we request that each resident be re-valuated by neutral experts not beholden to the Attorney General and recognized by the American Psychiatric and Psychological Associations as unbiased. But even here, if re-evaluated residents are then simply referred back to the hearing court in its present form, it would be a problem. With the present hearing court, commitment cases do not

Ex D-2

rotate among the regular Superior Court Judges but all are heard before two specially appointed, formerly retired judges behind prison walls in secret hearings. These judges systematically accept whatever the State doctors present, even those who are unlicensed. These same judges routinely ignore licensed defense doctors who have had extensive sex offender experience and testify that commitment isn't necessary.

Some of the additional problems with the initial commitment process are presented below:

*The practice of "doctor shopping" is often used and State doctors are not neutral professionals seeking an honest evaluation but are overly beholden to the Attorney General. The State has used <u>un</u>licensed doctors to obtain lifetime civil commitment.

*There is very little genuine effort to consider less restrictive conditions at initial commitment hearings in place of complete loss of liberty.

*There is no requirement of a "recent overt act" so the State can reach into the indefinite past to commit a citizen for life.

*There is no protection of Trial by Jury in New Jersey and the two specially appointed judges commit almost everyone that comes before them.

*The New Jersey S.V.P.A. is so over-broad that almost <u>any</u> prior sex offense qualifies for lifetime civil commitment.

*The decision whether or not to screen a prior offender for commitment is arbitrary. Now that the STUs are almost full, newly released prior offenders with worse records than many presently committed are being released under Megan's Law and we remain here. There was a point (about three years ago) when an average of three prior offenders a week were being at least temporarily committed. Now just one prior offender a month might be temporarily committed. Productively releasing these prior offenders instead of screening them for commitment not only is further evidence that out-patient monitoring is effective and is successfully being used even in New Jersey, but it is clearly unequal application of the law for individuals under the same class and circumstances.

*We have been told that even several <u>treatment refusal</u> residents from A.D.T.C. (originally ruled to be repetitive and compulsive) have been released and not screened for commitment, yet we remain here. This is another clear example of unequal application of the law for individuals under the same class and circumstances.

*Changes have been made from the original guidelines in scoring of some of the actuarial instruments making commitment far simpler to obtain.

*Commitment criteria is overly focused on past record and genuine changes prior offenders have made over a period of years are ignored, minimized or suppressed.

*Juvenile records are used to commit people.

For all the foregoing reasons we respectfully request that each resident be re-evaluated by neutral experts recognized by the American Psychiatric and Psychological Associations as unbiased.

3- We ask that you present a strong challenge to the injustice being practiced here of "<u>unequal application of the law for individuals under the same class and circumstances</u>" (now that the STUs are full; ADTC and prison inmates, many of whom have verifiably

3

Ex D-3

worse records than STU committed residents, are arbitrarily <u>not</u> being screened and are being released while we remain here). This needs to be investigated and ought to be a significant focus in our reply.

4- We ask that you present a strong challenge against **actuarial instruments** being used improperly for commitment and risk assessment, especially with respect to older residents. It is our understanding that the commitment criteria of some of some of the instruments were arbitrarily changed (e.g. MN-SOST-R arbitrarily changed from a cut-off of 13 to a cut-off of 8) to make commitment easier. It is our further understanding that not only doesn't the Static-99 take into consideration changes that an individual has made in this life but that it overstates the risk of older residents [see **Ex. 4**, scientific study]). We seek that all of this be brought out to Dr. Becker in your reply.

5- We ask that you extend your self to insure that Dr. Becker is authorized to read all the documents residents provided to her (e.g. **Ex. 5** list of issues which we were unable to hand to Dr. Becker as well as the rest of the exhibits enclosed here [**Exs. 1-10**], many of which are crucial supporting confirmation of the information she received verbally during her interviews with residents and staff).

6- When you spoke with Denise Coles by telephone, you subsequently informed us that she had information crucial to our lawsuit. This being the case, have you extended yourself to insure that Dr. Becker communicates with her? If not, why not? And if not, do you intend now to do so? It is our understanding that she is able to convey examples of serious abuse of residents by DOC. What is the reason for the delay in following through on this? Has the ball been dropped?

7- We ask that you present a strong challenge against the presence here of DOC and the excessively repressive environment created by them:

    DOC's influence is controlling, pervasive, overly-restrictive, counter-therapeutic, and punitive and DOC ought to be completely removed from the STU treatment setting:

        *MAP program (supposedly a therapeutic program but DOC has controlling influence). At the very minimum, Residents seek a formal due process hearing before any MAP restrictions or lock up may be imposed.
        *Mail Room restrictions: there used to be a "contraband list." Now there is only a relatively short list of "approved items" and <u>everything</u> not on that list is contraband.
        *Phone restrictions: Blocks have been requested and received by DOC personnel on most of the prepaid phone cards available to us. A majority of 800 numbers (such as postal services) available to other citizens are no longer available to us. This greatly restricts our access to the outside world. It harms our ability to seek professional, legal or therapeutic help and it significantly inhibits our efforts to maintain constructive contact with our families and support individuals. This is aggravated by the fact that cell phones with<u>out</u> internet access are denied us even though we have agreed to make our detailed phone bills completely available to the administration resulting in us being accountable for each and every call we make or receive.

4

Ex D-4

\*Computer possession denied us by DOC (even with monitoring or completely without internet access). In addition to depriving STU Residents of numerous educational opportunities that personal computers would afford, this DOC policy further deprives Residents of useful skills that could prove valuable in successfully reentering society.

\*DOC Lockdowns. Rules imposed by <u>prison</u> rulebook unsigned by any DOC official.

\*Verbal and physical abuse.

\*DOC's "Special Operations Group" (S.O.G.): shakedowns with guns.

\*Contraband planted in resident's property motivated by DOC personnel.

\*Outside visits from family and friends are limited and are highly restricted by DOC (e.g. no kissing, no holding hands, no recreation for children, structured sitting, etc.) This is <u>un</u>-therapeutic and counterproductive for individuals seeking to strengthen family ties. Visitors are often treated with great disrespect by DOC personnel. This is so frequent therapeutically beneficial visits from family and friends have greatly declined. There is no "grievance box" for visitors even though one has been requested.

\*Prison like lock up.

\*Prison like DOC rules.

\*Requirements that require shackling even of heart attack patients needing to be rushed to the hospital.

\*DOC's overriding control of the mail room: 1- we used to have a "contraband" list (see **Ex. 6**); now we only have a "limitation on possessions" list (**Ex. 7**) and anything not on that is contraband.

\*DOC has conducted "searches" in which they completely thrash a resident's property - including legal files – for purposes of punishment.

\*DOC's overriding control of the MAP process is confirmed by **Ex. 8** which consists of two grievances from Bagarozy challenging this control. The first was never replied to (a frequent occurrence with the grievance process here) and in the second a DHS staff member <u>admits</u> that DOC has refused to release Bagarozy even though DHS had recommended it. The courts have permitted MAP to be imposed without a due process hearing because it is "treatment and not punishment." However, if it is under the control of DOC, that is not the case. In her interviews, Dr. Becker asked numerous residents, "Would this environment be better if DOC were to be removed." We were therefore surprised by her suggestion that there needs to be "more custody staff." It is one thing to have DOC on the perimeter to prevent escape (as the SVP law implies) with DHS having its own inside security. It is quite another thing for DOC to usurp and (presently have) such pervasive control of everything. Their pervasive presence results in making this a highly punitive environment and we seek that Dr. Becker be pressed on this. She acknowledges that even STU staff reported that this environment and process was punitive. We need to press Dr. Becker to see if she, herself, agrees that this in her expert opinion is a punitive environment. She spoke about lengthy MAP placement, but she said nothing about lengthy <u>prison type lock up</u>. In summary, it is impossible to make genuine constructive, therapeutic changes here without the complete removal of DOC. It should additionally be noted that the make up of DHS treatment staff is exclusively white and female with the exception of one African male doctor. With the population here being exclusively male and significantly black male, this is a problem.

Ex D-5

8- We ask that you be mindful of the issue of monetary damages. We seek significant compensatory and punitive monetary damages for our inhumane treatment and deprivation of liberty. However, if the A.G.'s office is willing to release residents under less restrictive conditions in a timely manner (e.g. significant release within 30 days, the majority released within 60 days and an outside maximum of 90 days) we expect to be very conciliatory on this point. However, if they don't extend themselves to facilitate this in a timely manner, there can be no settlement, especially in view of the low recidivism rates for prior offenders (**Ex. 9, *page 2*, & Ex. 10**), and the fact that ADTC and prison inmates who definitely qualify for civil commitment under New Jersey's S.V.P.A. are now arbitrarily being released without even being screened.

9- We ask that you present a strong challenge to the disparity in treatment and advancement between ADTC residents vs. prison residents (who initially were determined not to compulsive and repetitive but who, in general, are held behind).

10- We ask that you present a strong challenge on the issue of punishment. In the initial protocol, one of the criteria Dr. Becker was enabled to grade various areas on was the category of whether it was "punitive." The A.G. wanted that option removed. The fact that your office allowed this in view of our claims of this environment being extremely restrictive and punitive has the appearance of and is viewed by many here as being in "cahoots with the A.G. Office or at the very lease being an example of willful, gross negligence. In Dr. Becker's report, she speaks of residents and staff describing this environment as punitive. We now ask your office to ascertain if Dr. Becker agrees.

11- Residents seek the complete removal of prison medical and dental treatment from this process and environment. St. Francis Hospital is, to our understanding, a DOC contract. DOC's controlling, pervasive, punitive environment needs to be removed.

12- We need to address the almost certain effort that the A.G. will make to strike Dr. Becker's statement - as "not part of her protocol" - that the Statute ought to be changed. As a pre-emptive defense, it should first be noted that the Attorney General agreed to the protocol addition that Dr. Becker also had the authority to address anything that "she felt needed to be addressed." Secondly, Dr. Becker doesn't advocate that the statute be changed on legal grounds, but on treatment grounds as pert of her expertise that it creates and un-therapeutic environment.

We swear that all the foregoing statements which are a matter of fact are true to the best of our knowledge and belief. We are aware that if any of the foregoing matters of fact are willfully false, we are subject to punishment.

Respectfully Submitted,

_____          _____
Jeremiah Simons                          Walter Harrell

_____          _____
Gilbert Davis                              Richard Bagarozy

Ex D-6

## Addendum

Just for your information, regarding the "furlough" process, it often appears that every effort is made by STU personnel to delay or deny the option. A case in point is John DeAngelis. In early May, the court ORDERED a release plan and a return court date of July 17. On July 17, the release plan was approved the start of furloughs was ordered. The judge ruled that he would be out within 10 weeks. On Aug. 10, John had furlough to go to Oxford House. It never happened. Parole said it was a problem area. On Aug. 17, John was returned to Court and the Court issued an ORDER that he be transported to Oxford House. He was transported a week later but was denied under Megan's Law because "children visit there." To date, no staff member has brought any other place forward except "Brother's Keeper" at the price of $10,000 for six months and with the rule that John cannot work to earn money. It should be noted that Parole had no problem with Brother's Keeper, even though it is in a drug infested area which John recognizes as a genuine concern for him. He returns to Court Friday, September 19, 2008, and basically he is starting all over for the third time.

Ex. D-7

STU-Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001

Jan Marx, Esq.
Greenberg Traurig, LLP                    **Certified #: 7009 0820 0002 1648 2443**
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

June 11, 2009

### RE: STU-Annex Class Action Lawsuit

Dear Mr. Marx:

This letter is for the purposes of STU-Annex replying to the recent June 5, 2009, Seton Hall reply to DHS.

We note that this reply did not originate from your office.  We nevertheless have grave concern that it was your office that sent the reply to us without any prior communication to get our consent for its concessionary content.  While it is true that we are all prior sex offenders, we have not been diagnosed as incompetent and we are clearly capable of executing our constitutional rights to have a say into these issues which affect our lives, the lives of our families and our most precious of possession, our liberty.

It is a matter of fact that neither your office to us, nor Seton Hall to Mr. Alves, has made any effort to consult resident representatives before making  settlement "concessions" which are absolutely unacceptable.  It is one thing to submit a comprehensive reply challenging the unsatisfactory position of DHS.  It is another matter entirely to make settlement concessions without the consent of plaintiffs.

Please take note that our most significant objection is to the section on page 18, section 11 of the reply (Gradual de-Escalation of Restraints).  We absolutely do not agree to surrender our claims to a half-way house or increased furloughs.

We refer you to the many letters we have sent you clearly communicating numerous issues and our position on those issues.  Among those is that *"unless the State is willing to transform the STUs substantially into an out-patient program, there*

1

EX E-1

*can be no settlement and we go to trial." Knowing this, how could you not have objected to the June 5, 2009, Seton Hall reply that was just sent to us?*

Bagarozy called Ray Alves after reading the reply and Mr. Alves reported that not only did he **not** give consent to the content of the reply, but additionally that he has been trying to contact Ms. Goldberg and Mr. Azmy for months and that they have not accepted or returned his calls. This appears to be a violation of the Lawyer's Canon of Ethics on Attorney's requirements for <u>due diligence</u> and <u>communication</u>. We therefore again remind you of the concern we've presented to you repeatedly that it was a conflict of interest for Seton Hall, which had input in the initial formulation of the New Jersey SVPA, to have involvement in our lawsuit. We further submit that their recent reply and the manner in which it was submitted (without the consent of plaintiffs) give the impression of Seton Hall counsel being involved in unethical collusion with the State. Accordingly, we ask that you take immediate, emergency action not only to remedy the damage done by Seton Hall's June 5, 2009, reply, but to finally come center stage with the major constitutional issues which we have been communicating to you for years (and which you have repeatedly verbally promised to address on our behalf "after the matter of the Special Master has been completed"), especially:

1- Due process violations of the <u>initial commitment process</u> including violations of the principal of <u>Unequal Application of the Law for Individuals under the Same Class and Circumstances</u>.

2- DOC <u>Discovery</u> and a motion for <u>Summary Judgment</u>.

3- A Motion seeking an <u>Injunction</u> protecting us against any move to a facility that has not been approved by the Court.

4- Communicating to us the process by which we will be able to veto any <u>un</u>-approved "concessions."

5- What compensation will you seek for residents for the additional years of lost liberty they have had to suffer due to inadequate treatment and un-constitutional, inhumane, counter-productive and counter-therapeutic conditions? What possible remedy can compensate for those lost years?

6- A challenge of the whole manner in which actuarial were mis-used to commit residents.



Ex E-2

7- A concentrated effort, in view of all the abuses that residents have been subjected to as a whole, to have every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.

8- A determined effort to obtain our right to a <u>Trial by Jury</u> when facing commitment.  (Please refer to the rest of our prior letters over the years for the other major issues we have communicated with you).

You've told Mr. Harrell and Mr. Simons that you would visit here this month (<u>June, 2009</u>).  We seek to resolve the above concerns with you during that meeting and receive a <u>written confirmation</u> from you on your commitments regarding them.

Mr. Marx, throughout history whenever society has created a class that is so unpopular that it has been denied its rights and the protection of law, it has been the province of the Courts and counsel to protect them.

The Special Master's report is submitted.  Accordingly, we are now at the point at which you have promised for years that you would formally address these issues.  We now humbly and respectfully request that you honor your years of promises and take the proverbial "bull by the horns" in an aggressive and adversarial manner.  Will you do that?  Please reply to this letter in detail in writing and via your timely visit.


<u>Original signed by:</u>

                                                                    Yours truly,


<u>Nine (9) Resident Representatives</u>




c. Kearny Residents
   Ms. Goldberg, Seton Hall


3



Richard Bagarozy
STU-Annex
P.O. Box 905
Avenel, NJ 07001
**24-Hour Voice Mail: 1-XXX-XXX-XXXX**

Ian Marx, Esq.                  **Cert. No: 7009 2250 0001 0919 5734**
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677                      November 29, 2010

**RE: Bagarozy v. Harris, 04-cv-3066 (DMC)**

Dear Mr. Marx:

I write this to complain at the complete lack of communication your office is having with Resident representatives in the above captioned matter.

Prior to the Friday just before November 1, 2010, you had neither accepted nor returned any of our telephone calls since the opening of the new building (back in May, 2010) this in spite of our repeated appeals for you to visit the new building to confirm that it is grossly punitive and <u>un</u>-therapeutic. Even the therapists were telling us that. You didn't visit, nor would you speak with us, nor are we aware of any action whatsoever by you on our behalf during this period.

Then we found out by way of the court clerk (<u>not </u>by way of your office) that there was to be a "settlement conference" on November 1st, 2010. When we left you a message about this conference, your secretary finally called and set up a telephone appointment. During that conference call, we again complained about the <u>Bagarozy</u> case being joined with the <u>Alves</u> case because the Bagarozy case dealt primarily with the STU Annex and the Bagarozy case addressed many constitutional issues and sought significant monetary damages. During that telephone conference, you promised to be our "voice and advocate" at the November 1, 2010, settlement hearing that you would formally "object to any settlement agreement" and you would seek to "schedule a hearing where a select group or residents could testify" (as to what is going on here relative to the commitment process and environment).

EX F-1

However, after November 1st, we again were left with no communication with your office.  Again, neither you nor your secretary would accept nor return any of our calls and again you did not come to tour of the new building.  This is true as of the morning of the above date.

Mr. Marx, we submit that you are violating your attorney responsibilities of communication  and due diligence and we ask that you take immediate action to reverse this manner of representing us.

We plead with you to accept this complaint constructively and extend yourself on our behalf to:

*Aggressively seek to separate The Bagarozy case from the Alves case.
*Aggressively seek the significant monetary damages that are called for in our
    initial complaint and are justified by way of Dr. Becker's report.
*Aggressively prosecute our Constitutional issues: (eg. Due Process, Unequal
    Application of the Law, an unconstitutional commitment process, Trial by
    jury, and the other issues you signed of on with us at a prior meeting).
*Diligently Accept (or at least return) our calls, greatly improve communication
    with us, and diligently prosecute our issues.

In advance, we thank you for your diligent attention to this letter and your future diligent efforts on our behalf.

Cordially,

Richard Bagarozy

c. Resident Representatives
   file

Ex F-2

STU-Annex Residents
STU-Annex
P.O. Box 905
Avenel, NJ 07001

Ian Marx, Esq.
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677                                      August 12, 2009

**Bagarozy v. Harris, 04-cv-3066**
**Alves v. Ferguson, 01-cv-789**                    **Re: Dr. Barone, Dir. of Psychology**

Dear Mr. Marx:

I write this letter on behalf of all STU Residents to address an additional, possibly significant matter which you may be unaware of: Apparently Dr. Barone, the STU "Director of Psychology," was either suspended, fired, or compelled to resign for having an "inappropriate relationship" with a resident for whom she played a significant role in obtaining his release from civil commitment. As a result, Dr. Barone is no longer here and an investigation is being conducted. Additionally, this resident has now been brought back to the STU-Annex.

We further inform you that Dr. Barone was a major factor towards obtaining the civil commitment of a significant number of residents by testifying against them as an expert on behalf of the State during their initial civil commitment process.

We submit that the above incident would indicate that Dr. Barone was neither fit nor qualified to provide expert testimony towards the commitment of these residents and accordingly we request that you further investigate this matter and then make a sincere effort to challenge the initial civil commitment of every resident against whom she provided expert testimony in obtaining their commitment **and** that a concerted effort be made to nullify any and all written reports that she authored that are presently in the files of residents.

Please, please use your position as our assigned counsel to devise the most effective challenge possible.

We also request your timely action in conscientiously prosecuting all the other issues we have written about to you and which, thus far, it seems you have ignored.

In advance, please know that we are extremely grateful for your serious attention to the matters presented in this letter.                              Yours truly,

Ex G-1

*Richard Bagarozy*

## Progress in Treatment at the STU, Revised 2-27-12

My greatest focus in treatment over the past couple of years has been the following:

-achieving a greater victim empathy and deeper insight into the harm I have
      caused innocent youths,
-understanding and reconditioning my deviant arousal,
-experiencing growth regarding healthy, appropriate relationships, and
-developing tools that would help me effectively manage my risk.

It is my perception that my most important growth occasion has been experiencing a more genuine remorse for my offending conduct and a more genuine empathy for my victims. At the time of my first offense, I was completely blinded to the obvious fact that the state of their lives were such that they needed significant genuine help. I am now acutely aware that I took unconscionable advantage against youths who were already significantly troubled.

During my 1993 offense, I suffered from the almost unimaginable distortion that not only was all of this conduct causing no harm; I also believed I was not violating the law because I was following the letter of the law. Again, I clearly recognize that I was dead wrong in these selfish, immoral, unethical assumptions and that my conduct was inexcusable. I additionally recognize that each nude picture of a teenager portrayed in the approximately 100 explicit magazines was a permanent record of child abuse and had the potential to cause the victim involved incalculable harm. But I had been truly blind, and asleep, to all of this.

However, upon my federal arrest in 1993, I felt an overwhelming sense of remorse, albeit flawed remorse, when police conducted themselves in a manner which I perceived "traumatized" the youths involved. I imagined the shame and fear the youths had to have experienced to have their parents see the videotapes. At the time I felt complete helplessness because I was unable to ease their suffering or comfort them. I recall at the time falling to my knees, crying to myself in my cell, and praying to God for their wellbeing. Even then, I took the responsibility in that the youths were suffering because of me. But I now recognize that it was a flawed remorse in that I was looking at myself as defective (much as I did as a teenager) and perceived at the time that their trauma was the result of their associating with me, a "homo," and due to the abuse they received at the hands of the police - not as a result of my unacceptable conduct.

*Ex H-1*

At the point of my 1993 arrest, I placed part of the responsibility for the trauma experienced by the youths on the police for the manner in which they treated them, and I still just didn't get how heinous, selfish, and potentially harmful <u>my actions</u> had the potential to be against youths I believed I cared for.

It was at some point in 2003 in my treatment with Dr. Martinez during my 16 months of freedom that he shared with the group a DVD entitled *"Four Men Speak Out"* by Professor Body. In it, four adults who had been molested as children revealed the impact the molestation had on them. In a matter of approximately one hour, during which the DVD had me spellbound, it shocked me out of my sleep and completely blew me away. I deeply grasped the sobering truth of this incredible production, and I found myself filled with remorse solely due to <u>my</u> actions. I had never wanted to hurt anyone, least of all the youths I believed I cared for, and the kind of harm that may well have resulted overwhelmed me with great sorrow and further deepened resolve that it would never happen again. These insights and my strengthened resolve were additionally reinforced as a result of me again viewing this same DVD at the STU-Annex, as a result of me twice taking the Victim Empathy module, and as a result of work in my process group. Over this time, I have grown to deeply regret <u>my actions</u>. I have since purchased my own copy of *"Four Men Speak Out"* as a continual reminder of the trauma caused by abuse and to share it with others. I wish I could change the past. I can't. But I can do all in my power to reduce my risk of ever reoffending, and I do that diligently.

Another area of significant growth I've discerned within me - subsequent to my final offense - is having developed (unexpectedly) strong emotional feelings for two age-appropriate equals and then developing loving relationships with them that lasted approximately a year each. I found richness in these relationships that never existed in any of the friendships I had had with teenagers and also a happiness and peace that had eluded me all of my life. Prior to this I had suffered from the distortion that I had to meet a youth during their teenage years in order to be able to "fall in love" with them. These age-appropriate relationships enabled me to abruptly overcome that distortion, and this was a crucial turning point in my growth.

Additionally, my years of earnest arousal reconditioning efforts have effectively helped me to reduce the power of my deviant arousal for teenagers and have been a catalyst for me strengthening my arousal for age-appropriate equals. But I am also only too aware that I will always be a risk, that my deviant arousal will always unexpectedly have the capacity to rear its ugly head, and that I must forever maintain vigilance against entertaining fantasies that are deviant. However, I also clearly recognize that I am a significantly different, more emotionally mature, and a more wide awake person today than the person who offended against children over 18 years ago. I am positively

Ex H-2

determined to have no more victims; and yet, in order to avoid becoming lax, I recognize that I must always maintain awareness that I am a risk.

Finally, as for the tools I have acquired, the following are among the most important:

-The acute awareness I have developed as to the importance of a healthy support group and my need to honestly seek them out and keep them informed about my thoughts and feelings. I've now gained insight into many of the distortions I had, both as a gay teenager and within my offending periods as an adult. However, the question now becomes, how do I recognize present and future distortions if by definition, a distortion is something not recognized? My solution to this problem is to share my thoughts, feelings, and choice options with several of my support members and get their feedback. In doing this, I will see a number of perspectives and existing distortions will come to light prior to me acting on them.

-My greatly increased insights as to the catastrophic damage possible by way of sexual abuse, not only for the victim, but also for family members of both the victim and the offender and for the community. I genuinely do not want to hurt anyone.

-Continue in treatment. Being part of a treatment group will help keep me vigilant about my risk and keep me focused on all I need to do to avoid reoffending.

-Continue using Covert Script and other arousal reconditioning techniques. These have had a significant impact over the 15 years I have diligently used them, but there is always room for further growth.

-After getting my initial priorities in order, continue to build on my growing capacity to find happiness in a healthy, age-appropriate relationship by seeking one in an environment of honor, integrity, and honesty. I perceive such a meaningful relationship to be a significant tool in me finding the kind of happiness that has eluded me most of my life and an effective replacement for my deviancy.

*Richard Bagargy*

3

Ex H-3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CHAMBERS OF
**DICKINSON R. DEBEVOISE**
JUDGE

MARTIN LUTHER KING JR.
FEDERAL BUILDING & COURTHOUSE
50 WALNUT ST., ROOM 5083
P.O. BOX 999
NEWARK, NJ 07101-0999

May 14, 2004

Mr. Richard Bagarozy #360
S.T.U. Annex
C.N. 905
Avenel, New Jersey 07001

    Re:    **U.S. v. Richard Bagarozy**
           <u>**Crim. No. 94-338(DRD)**</u>

Dear Mr. Bagarozy:

    I have received your letter of May 4, 2004 and must note that the proceedings for your continued confinement are not at all what I had contemplated when I sentenced you some months ago on the charge of violation of two relatively minor conditions of supervised release. I was, of course, familiar with your case on the basis of the many years of pre-trial proceedings, the lengthy trial, extended pre-sentencing and sentencing proceedings and periodic reviews after you had served your prison term and were on supervised release. This culminated in the most recent sentence on account of your technical violations of the conditions of supervised release.

    I sentenced you to three months imprisonment which was significantly below the optional Guideline range. I did not impose a continued term of supervised release. My reason was that it was evident to me that you were fully able to lead a constructive life and that you did not pose any danger to under-age persons. This conclusion was based upon my continuing involvement in your case since its inception in 1994, your gainful employment during your period of release, your successful therapy with Dr. Martinez, your successful passing of a lie detector test and other evidence that you had had no involvement with under-age persons and that your sexual orientation was being directed into appropriate channels.

    The proceedings which the State of New Jersey brought against you are not within my jurisdiction. I assume that an attorney has been assigned to represent you. I have requested that the members of our Probation Department who supervised your case cooperate with him or her and make available any material from their files that would be of assistance in the proceedings against you. Any material made available to your attorney would, of course, be made available to the attorneys for the state.

                                    Very truly yours,

                                    Dickinson R. Debevoise
                                    U.S.S.D.J.

cc:    Thomas S. Larson
       Supervisory U.S. Probation Officer

       Janice L. Fink
       Senior U.S. Probation Officer

Ex I-1

SPECIAL TREATMENT UNIT
AVENEL, NEW JERSEY
TREATMENT PLAN STATUS REVIEW

Resident's Name: Bagarozy, Richard          Resident's Number: 360          Date of Last Treatment Plan/Review: 2-25-11
Today's Date: 9-20-11

| Problems | Progress Made toward the Goal (Address each objective for that goal) | Goal Status (C=Continue; A=Achieved; R= Revised; D=Discontinued) | New Target Date |
|---|---|---|---|
| 1) Dangerousness for future sexual offenses. | <u>Some Progress</u>: Mr. Bagarozy is an active participant in his process group. He has consistent attendance and participation. Mr. Bagarozy has taken approximately 3 floors during this review period. At times, Mr. Bagarozy's presentation appears scripted. He is encouraged to continue to work on being more spontaneous by not preparing prior to taking a floor. Mr. Bagarozy wrote in his input form that he does not believe the TC is appropriate for him in order to be discharged. However, he is encouraged to be receptive to eventually entering into the TC. | C: It is recommended that Mr. Bagarozy: <br> • Continue attending process group 2x per week. <br> • Continue to work on being receptive to feedback by waiting to respond and repeating the feedback given prior to responding. <br> • Continue taking floors and providing feedback. <br> • Continue to work on being less scripted and more spontaneous when taking floors. <br> • Continue to present deviant arousal. <br> • Present relapse prevention strategies. <br> • Regularly attend and participate in AR and RP self-help groups. | 6 months |
| 2) Difficulty in developing insight into sex offense related dynamics. | <u>Some Progress</u>: Mr. Bagarozy passed the family of origin module during this review period. He presented his genogram in his process group. He has taken approximately 3 floors. Mr. Bagarozy is in a very active process group, which does not allow him to take as many floors as he would like. Mr. Bagarozy continues to struggle with his shame and guilt about his homosexuality. He has not attended RP | C: It is recommended that Mr. Bagarozy: <br> • Continue to work on reducing his defenses by listening to feedback give, waiting and repeating the feedback prior to responding. <br> • Discuss triggers that are a risk for re-offense <br> • Present Relapse Prevention techniques in group including Personal Maintenance Contract. <br> • Continue to explore arousal patterns in process group. | 6 months |

Ex J-1

9/20/11

| | | | |
|---|---|---|---|
| | and AR self help groups. | • Present material learned in RP 3 module.<br>• Resume attending AR and RP self-help groups. | |
| 3) Lack of accountability for sexual offenses. | **Some progress:** Mr. Bagarozy has demonstrated that he takes some responsibility for his offenses. He continues to discuss concepts learned in the Victim Empathy module. | C: It is recommended that Mr. Bagarozy:<br>• Take floors to discuss complete offense history honestly and accurately in Process Group.<br>• Identify interventions.<br>• Present RP 3 module material in process group. | 6 months |
| 4) Lack of victim empathy | **Some progress:** Mr. Bagarozy demonstrates some understanding of concepts learned in the Victim Empathy module. Through his feedback, he often tries to utilize concepts learned in the VE module. He is encouraged to utilize these concepts when discussing his own victims and fully explore the physical, emotional, and cognitive effects his offenses had on his victims. | C: It is recommended that Mr. Bagarozy:<br>• Attend and participate in process group 2x per week.<br>• Continue to demonstrate empathy towards peers in group.<br>• Continue demonstrating an understanding of concepts learned in the Victim Empathy.<br>• Continue to address need for expanded awareness of the impact of sexual abuse on adolescents (per VE module feedback form)<br>• Continue to address the reasons he did not pickup on the social and interpersonal cues and signs of victims, i.e. promiscuity (per VE module feedback form) | 6 months |
| 5) Ability to utilize social support including self-help programs | **Some progress made:** Mr. Bagarozy is involved in recreational activities and rehabilitation programs. He sings in the Choir and attends Spiritual Development. He does not attend RP or AR self help groups. | C: It is recommended that Mr. Bagarozy:<br>• Continue regular participation in recreational programming.<br>• Resume attending Arousal Reconditioning and RP self-help groups. | 6 months. |

Ex J-2

9/20/11

## New/Revised Problems

| Problems | Objectives | Interventions | Responsible Staff (Name/Title) | New Target Date |
|---|---|---|---|---|
| Resistance to entering into the Therapeutic Community | Gain Entrance into the TC. | -Process Group 2x a week<br>-Address reasons for resistance, including distortions and core beliefs about the TC.<br>-Address reasons Mr. Bagarozy believes the TC is not appropriate for discharge.<br>-Examine intellectual superiority in present interpersonal relationships at the STU, how his dynamics continue to play out and how he utilizes this to support his resistance to the TC.<br>-Reflect on how this thinking impedes his ability to make progress in sex offender treatment and ultimately successfully enter the therapeutic community and integrate amongst his peers<br>-Regular attendance in self-help groups. | Dr. Essandoh & Ms. Ames, MSW, LSW<br><br>Self-help facilitators | 6 months |

*Diagnosis cited from TPRC report dated 7-20-11, authored by Dr. Roquet

Axis I: Paraphilia, NOS (hebephilia, sexually attracted to boys from the age of 13 through 18)
    Pedophilia, sexually attracted to boys, non-exclusive, not limited to incest, provisional diagnosis

Axis II: Personality Disorder, NOS (with Antisocial and narcissistic traits)

Resident Signature: _____    Date: _____

Treatment Team Signature: _____    Date: _____

Ex J-3

Treatment Work Sheet, November, 2011                    Richard Bagarozy

**Treatment Team Recommendations:**

*Be more receptive to feedback
*Be more spontaneous and less scripted
*Continue to explore deviant arousal patterns
*Discuss triggers that are risk for re-offense
*Discuss RP Techniques, Strategies & Interventions
*Present material learned in RP-3 Module
*Continue Discussing complete offense history
*Continue demonstrating an understanding of concepts learned in Victim Empathy
*Continue to expand awareness of impact of sexual abuse on adolescents.
*Continue to address reasons I did not pick up on the social and interpersonal
       cues and signs of my victims, i.e. promiscuity.
*Examine intellectual superiority in present interpersonal relationships and how
       this thinking impedes ability to make progress in sex offender treatment.
*Explore "resistance" to TC.

**TPRC Recommendations not included in the above:**

*Discuss & reconcile patterns evident offense history:
       -Seeking vulnerable & underprivileged youths
       -Used gifts and attention to get to exploit boys
       -Was a patient groomer

*Be open about strength of previous (and current) arousal to underage males,
about "lifestyle" dedicated to pursuit of sexual gratification though contact with
teenage males and the deliberate planned behaviors that were part of the offense

*Discuss the elements of "gratification" and "financial gain" aspects relative to
the sexually explicit materials I collected

*Refrain from inserting legalistic concerns into treatment and explore how this
focus prevents me from treatment progress.

1

Ex K-1

Treatment Plan Update
Resident Input Form

April 6, 2012

Name: Richard Bagarozy                    STU#: 360

1. What progress do you believe you have made towards the goals
and objectives on your treatment plan?

    I have worked on being more receptive to feedback and
towards being more spontaneous and less scripted.  In process
group and in RP-3 self help (where I've taken several floors),
I have continued to explore my deviant arousal patterns and
discussed triggers that are a risk for re-offense.  I have worked
on RP techniques, strategies, and interventions in both RP-3
and process group.  I have worked on my autobiography and my
offense history.  I continue to work on empathy and make it
the main focus in the feedback I provide to my fellow
group-members about their victims.  I continually seek to expand
my awareness of the devastating impact sexual abuse is capable
of having on adolescents.  I have developed a sobering and acute
awareness that the youths I molested were extremely vulnerable
and had significant problems in their lives, including
promiscuity.  I have explored my resistance to the T.C. and
I have overcome that resistance and have become part of the
T.C. community.  Finally, I have extended myself to keep legal
issues completely separate from treatment.

2. What items on your Treatment Plan do you believe you need
to work harder on?

    Being prepared for unexpected triggers after release.

3. Are there any changes you would want to make to your treatment
plan?  Please explain?

EX L-1

I am feeling my way in the T.C. and I imagine that this
will bring changes I am not presently aware of.  Presently,
I am facing the temptation of compromising my integrity as a
contributing member.  I especially don't want to get off to
a bad start in this area, even if it means getting guys angry
at me.

4. Are there goals or objectives that you would add to your
treatment Plan, or any other particular modules or programs
you are interested in attending.

I find myself intrigued by the concept of the "mediation
committee" in the T.C.  I would like to develop skills in such
an area.  As for Modules, I'd like to try sexual orientation
or spirituality.

5. Do you believe that the objectives on the treatment plan
are realistic and within your ability to accomplish?

Hopefully.  I'll know more when I see it.

6. Do you have any needs or issues that are not being addressed
in your Treatment Plan?

I would like to apply for a furlough to visit my mother
in Mt. Vernon, New York.  Can we work towards this?

Ex L-2

SPECIAL TREATMENT UNIT
AVENEL, NEW JERSEY
TREATMENT PLAN STATUS REVIEW

Resident's Name: Bagarozy, Richard

Resident's Number: 360

Date of Last Treatment Plan/Review: 9-20-11

Today's Date: 4-20-12

| Problems | Progress Made toward the Goal (Address each objective for that goal) | Goal Status (C=Continue; A=Achieved; R= Revised; D=Discontinued) | New Target Date |
|---|---|---|---|
| 1) Dangerousness for future sexual offenses. | **Moderate Progress:** Mr. Bagarozy regularly attends and participates in his process group. He took approximately five floors during this review period. He began verbally presenting his autobiography. During this review period, Mr. Bagarozy demonstrated being more receptive to feedback. He was resistant to applying to the Therapeutic Community and believed it was not needed for discharge. To his credit, he applied and was accepted into the TC. | C: It is recommended that Mr. Bagarozy:<br>• Continue attending process group 2x per week.<br>• Continue to work on being receptive to feedback by waiting to respond and repeating the feedback given prior to responding.<br>• Continue taking floors and providing feedback.<br>• Continue to work on being less scripted and more spontaneous when taking floors.<br>• Continue to present deviant arousal.<br>• Present relapse prevention strategies, and apply to current situations.<br>• Present Personal Maintenance Contract and make necessary revisions.<br>• Regularly attend and participate in AR and RP self-help groups. | 6 months |
| 2) Difficulty in developing insight into sex offense related dynamics. | **Some Progress:** Mr. Bagarozy took five floors during this review period. Mr. Bagarozy presented the group with a checklist of recommendations for the group to choose which area Mr. Bagarozy should focus on. To his credit, Mr. Bagarozy processed the feedback received about being scripted. During the past few months, Mr. | C: It is recommended that Mr. Bagarozy:<br>• Continue to work on reducing his defenses by listening to feedback give, waiting and repeating the feedback prior to responding.<br>• Continue to discuss triggers that are a risk for re-offense.<br>• Present Relapse Prevention techniques in group including Personal Maintenance Contract. | 6 months |

4/13/12

| | | | |
|---|---|---|---|
| | Bagarozy has worked on being less scripted and focused more on his offense dynamics. He identified distortions that contributed to his offenses. | • Continue to explore arousal patterns in process group, including, but not limited to, the pedophilic lifestyle created.<br>• Present material learned in RP 3 module.<br>• Resume attending AR self-help group.<br>• Continue regularly attending RP 3 self-help group. | 6 months |
| 3) Lack of accountability for sexual offenses. | **Moderate progress:** Mr. Bagarozy continues to demonstrate that he takes responsibility for his offenses. To his credit, he has identified distortions that contributed to his offending. He also resumed attending the RP-3 self-help. | C: It is recommended that Mr. Bagarozy:<br>• Take floors to discuss complete offense history honestly and accurately in current Process Group.<br>• Identify interventions.<br>• Present RP 3 module material in process group.<br>• Present Personal Maintenance Contract, making necessary revisions. | 6 months |
| 4) Lack of victim empathy | **Moderate progress:** Mr. Bagarozy demonstrates understanding of concepts learned in the Victim Empathy module. Through his feedback, he often tries to utilize concepts learned in the VE module. However, he struggles, at times, applying these concepts to his own offending. Mr. Bagarozy sporadically cites his struggle with his sexuality as a significant factor that led to his offending. He is encouraged to continue utilizing these concepts when discussing his own victims and continue to explore the physical, emotional, and cognitive effects his offenses had on his victims. | C: It is recommended that Mr. Bagarozy:<br>• Attend and participate in process group 2x per week.<br>• Continue to demonstrate empathy towards peers in group.<br>• Continue demonstrating an understanding of concepts learned in the Victim Empathy.<br>• Continue to address need for expanded awareness of the impact of sexual abuse on adolescents (per VE module feedback form)<br>• Continue to address the reasons he did not pickup on the social and interpersonal cues and signs of victims, i.e. promiscuity (per VE module feedback form)<br>• Re-enroll in Victim Empathy. | 6 months |
| 5) Ability to utilize social support including self-help programs | **Some progress made:** Mr. Bagarozy regularly participates in recreational activities and rehabilitation programs. He sings in the Choir and attends | C: It is recommended that Mr. Bagarozy:<br>• Continue regular participation in recreational programming.<br>• Resume attending Arousal Reconditioning | 6 months. |

Ex M-2

4/13/12

| | | |
|---|---|---|
| | • Continue regular participation in RP self-help groups. | |
| 6) Resistance to entering into the Therapeutic Community | Spiritual Development. He attends the RP 3 self'–help group.<br><br>**Progress Made:** Mr. Bagarozy was accepted to the TC. He is encouraged to continue working on his defensiveness and being receptive to feedback. | D: This goal is discontinued. Mr. Bagarozy applied and was accepted into the TC during this review period. |

*Diagnosis cited from TPRC report dated 7-20-11, authored by Dr. Roquet

Axis I: Paraphilia, NOS (hebephilia, sexually attracted to boys from the age of 13 through 18)
Pedophilia, sexually attracted to boys, non-exclusive, not limited to incest, provisional diagnosis

Axis II: Personality Disorder, NOS (with Antisocial and narcissistic traits)

Resident Signature: _____   Date: _____

Treatment Team Signature: _____   Date: _____

Ex M-3

*Darrick Bailey*

**Special Treatment Unit**
**P.O. Box 905**
**Avenel, NJ 07001**

**Lawrence S. Lustberg, Esq. and**
**Johnathan Manes, esq.**
Gibbons P.C.
One Gateway Plaza
Newark, NJ 07102

Date: 4-25-12

*Ian Marx, Esq.*
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

**Hon. Dennis M. Cavanaugh, U.S.D.J.**
U.S. District Court of New Jersey
451 U.S. Post Office Courthouse Bldg.
P.O. Box 999
Federal Square
Newark, NJ 07101-0999

**RE: Objections to settlement in Alves v. Ferguson 01-cv-789 (DMC) (MF)**

I am the STU Resident identified at the top of this page, and I strenuously object to the above captioned settlement for three main reasons: <u>First</u>, because I completely reject *counsel* designated and the residents designated as representatives, <u>Second</u>, because the settlement as proposed completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years and <u>Third</u>, because the settlement doesn't comport in many areas with the report of authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

<u>First</u>, because we completely reject counsel designated and the residents designated as representatives:

Residents have objected to Seton Hall personnel and Gibbons attorneys for years in that Seton Hall representatives played a role in advising how New Jersey's Sexually Violent

1

Predator Act ("SVPA") ought to be constructed.  This connection created a conflict of interest.  The fact that they are now involved in generating such a narrow settlement in spite of the numerous significant meritorious issues that have been presented, indicates that our worries about a conflict of interest may be warranted and is cause for grave concern.  Additionally, over the years of "settlement negotiations," neither Seton Hall personnel, nor Gibbons counsel, nor the plaintiffs of <u>Alves v. Ferguson</u> have communicated with the rest of the residents about the progress of the settlement or what was going on.  We have had very little if any input into these negotiations.  STU Residents are so troubled by the narrowness of the settlement and by how vague, conditional, and subjective it is, that many are concerned that the plaintiffs of <u>Alves</u> received some "enticement" in order to manipulate their surrender to such a narrow set of agreements.  We reach out to counsel for <u>Bagarozy v. Harris</u>, Mr. Ian Marx, Esq. to further develop and prosecute this issue on our behalf.

**Second**, because the settlement as proposed completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years.  We were so concerned that our issues were being suppressed that on September 2, 2009, we met with Counsel for <u>Bagarozy v. Harris</u>, Ian Marx, Esq., and he not only agreed to protect and prosecute our issues, but he agreed to this in writing (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).  The issues that Mr. Marx committed to preserve and prosecute on our behalf include the following:

*We challenge Seton Hall's voluntary surrender on the issue of compelling the State to create half way houses for STU residents.  This "surrender" additionally flies in the face of Dr. Becker's insistence on de-escalation of restraints.  Also, again, Seton Hall played a role in advising how to create New Jersey's SVPA, and this is a conflict of interest.

*In view of Kearny Residents being transferred to a building that was formerly used as a *detention center* for prisoners (a depressing, highly restrictive, counter-therapeutic facility), we strenuously object to the elimination of the ability to challenge the housing facilities.  We are shocked by this elimination and additionally this suppression also flies in the face of Dr. Becker's report.  Dr. Becker advocated for a therapeutic environment.

*The literally pervasive presence of the Department of Corrections ("DOC") in a treatment facility has a counter-therapeutic effect and creates a highly restrictive and counter-therapeutic environment which continues to exist at the STUs and has gotten worse since Dr. Becker's visit.  Mr. Marx had committed in writing to challenge this condition (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy) and we request that he further develops this issue in his reply.

2

*We seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions as outlined in Dr. Becker's report, the "worst she has ever seen." Mr. Marx has committed in writing to seek such monetary damages and I request that he further develop this issue in his reply on our behalf.

*Because Dr. Barone, a previous director of Psychology at the STU, was fired for having sex with one of her resident clients, we submit that she was patently unfit to judge who should be civilly committed. In view of this we request that every resident that she had a hand in committing be completely re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General. Mr.arx committed in writing that he would do this (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

*We have also asked Mr. Marx to make constitutional arguments on our behalf, including: **Double Jeopardy**, **Ex Post Facto**, and **Res Judicada** as well as those mentioned below (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

    **a)** A concentrated challenge of the Due Process violations of the initial commitment process:

    **b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

    **c)** A concentrated effort, in view of item "**b**" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General. Towards this end, we seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release.

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.

**e)** A concentrated challenge of the denial of <u>Trial by Jury</u>.  The claim is being made that a jury is not required because this commitment is civil and not criminal.  However, crucial liberty interests are involved to a degree that is above and beyond any *criminal case*.

**f)** There is evidence that the rule of law has been ignored for STU residents: there is a delay of approximately <u>one (1) year</u> between the filing of Notice of Appeal for a citizen civilly confined under the SVPA and a brief being written by the *Public Advocate's Office*.  There have been instances where the Public Advocate's office permitted fifteen (15) months to pass without the Attorney general's office filing a reply.  Regarding the statutory <u>**yearly**</u> review that is to be afforded to those civilly committed, that hearing is routinely not scheduled until after an Appellate Decision has been rendered.  Residents have at times gone three, four, and five years without a review hearing even though they are entitled to one by law every year.  We aggressively challenge this.

**Third,** because the settlement doesn't comport in many areas with the report of authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

I am objecting to the said Name Settlement Alves v. Main. I'm one of the 28 that also filed in Bagarozy v. Harris.

My concern is that De. Becker's observation of this treatment facility along with the living conditions and over crowdness were't address accordingly.

Let me make clear that I myself came into this program in 2000, to be exact March, 23. I got phase 3 back in Dec. 21 2003 and I have be phase 3 for nearly 9 years.

4

I've Never been mapped No fights No dirty urines
this Needs to be addressed to Why residents have
been stuck on phase 3 and can't advance who has
Never been mapped for any Infractions.
I would also like to add that there shouldn't be
an age limit set for release, however there Should
be a time frame of 5 to 7 years and which Some
of us residents has Completed this program 2
times already.

Respectfully submitted,

Cerrick Bailey
STU Resident

5

## NOTICE OF PROPOSED SETTLEMENT
*RAYMOND ALVES, et al. v. MERRILL MAIN, Ph.D. et al.*

**This Notice is sent to you by Order of Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey.**

**PLEASE READ THIS NOTICE CAREFULLY. IT CONTAINS IMPORTANT INFORMATION ABOUT YOUR RIGHTS.**

**SI USTED NECESITA TRADUCCIÓN DE ESTOS DOCUMENTOS AL ESPAÑOL, POR FAVOR PONGA UNA SOLICITUD PARA OBTENER AYUDA CON LA TRADUCCIÓN EN UNA DE LAS CAJAS DE 'SOLICITUD DE TRABAJADORA SOCIAL' MONTADAS EN LAS UNIDADES DE ALOJAMIENTO STU.**

Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey (the "Court") has preliminarily approved a proposed settlement (the "Settlement") in a case entitled *Raymond Alves, et al. v. Merrill Main, Ph.D., et al.*, No. 01-CV-0789 (the "Litigation"). If the Settlement receives final approval from the Court, the New Jersey Division of Mental Health and Addiction Services ("DMHAS"), which is responsible for the mental health treatment program at the Special Treatment Unit (the "STU") will be required to improve both the quantity and the quality of the therapeutic programming provided to residents of the STU. Such programming will be offered to all qualifying residents, regardless of the location of their living quarters. The Settlement also requires increased staffing of the STU, so as to provide a minimum of seven therapists for every fifty residents. In addition, the Settlement requires the STU treatment staff to provide individually tailored treatment that adequately meets the therapeutic needs of each resident; to adopt objectively measurable pre- and post-module testing; to provide test results promptly; and to provide residents, on a regular basis, with an estimate of the time required to complete their treatment goals, modules, and phases. The Settlement provides for the appointment of a Treatment Ombudsperson to investigate and address complaints regarding treatment-related issues. Further, the Court will appoint an independent Monitor who will conduct annual inspections of the treatment program at the STU to determine whether DMHAS is in compliance with the terms of the Settlement.

On August 6, 2012, Judge Cavanaugh will conduct a hearing to determine if the Settlement should be finally approved as fair, adequate, and reasonable (the "Fairness Hearing").

As a resident of the STU, committed or confined pending commitment pursuant to the New Jersey Sexually Violent Predator Act, you are a member of the class that was certified by Judge Cavanaugh on March 29, 2012 (the "Class"). All members of the Class will benefit from the Settlement, and be bound by it, if it is finally approved by the Court. This Notice explains the nature of the Litigation, describes the terms of the proposed Settlement, and informs you of your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing. *Any such objections or comments must be either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012 in order to be considered by Judge Cavanaugh at the Fairness Hearing.*

## FREQUENTLY ASKED QUESTIONS

**1.      What is the purpose of this Notice?**

The purpose of this Notice is to explain the Litigation and inform you of the terms of the proposed Settlement and your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing.

**2.      What is the Litigation about?**

The Litigation is a civil rights class action in which three Representative Plaintiffs—Raymond Alves, Michael Culbreth and Derrick Sessoms—assert claims on behalf of the Class against the New Jersey officials who are responsible for the treatment program at the STU. Plaintiffs allege that these officials have failed to provide the minimally adequate mental health treatment required by federal and state law before the government may subject a person to indefinite civil commitment on the basis of a mental health diagnosis. Plaintiffs further allege that the mental health treatment program at the STU is so inadequate as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Double Jeopardy Clause of the Fifth Amendment; the Cruel and Unusual Punishments Clause of the Eighth Amendment; the Americans with Disabilities Act, 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. § 794; the New Jersey Constitution; and N.J.S.A. §§ 30:4-24, 30:4-24.1 and 30:4-27.34.

**3.      What has happened in the Litigation?**

The Litigation began on March 9, 2001, when STU resident Raymond Alves filed a *pro se* complaint against various New Jersey officials responsible for the STU. On July 17, 2002, at Judge Cavanaugh's request, the Seton Hall University School of Law Center for Social Justice (the "CSJ") agreed to represent Mr. Alves, together with another STU resident, and shortly thereafter the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., now known as Gibbons, P.C. ("Gibbons") joined as co-counsel. An Amended Complaint was filed on October 25, 2002, raising various treatment-related claims against the New Jersey officials responsible for the mental health program at the STU. The Amended Complaint also raised claims against officials and employees of the New Jersey Department of Corrections ("DOC") regarding the living conditions at the STU facility in Kearny, New Jersey, where Mr. Alves resided, and the conduct of certain DOC officers employed there. The defendants moved to dismiss the Amended Complaint. On November 17, 2003, Judge Cavanaugh granted the motion in part and denied it in part.

From 2003 to 2005 the parties engaged in formal discovery. In addition, the plaintiffs retained an expert, *Dr.* Robert Prentky, who inspected the Kearny facility in May 2004. On October 28, 2004, the plaintiffs filed a motion to amend the Amended Complaint to seek class action status, and to certify a class. On April 12, 2005, in response to a suggestion from the Court, the parties agreed to pursue settlement negotiations, and the plaintiffs withdrew their motion. Counsel for both sides entered into a period of intensive negotiations, supervised by Magistrate Judge Mark Falk. On April 3, 2008, the Court approved the appointment of a joint neutral expert to assist in

2

the settlement process and issued an order governing the manner in which she would conduct her evaluation. On December 29, 2008, the expert, Dr. Judith Becker, issued her final written report.

Settlement negotiations were suspended in the spring of 2010, when Mr. Alves and other residents were moved from the Kearny facility to the current STU in Avenel, New Jersey, but resumed later that year. Based in part on the move, the DOC officials named as defendants in the Amended Complaint took the position that the claims against them were moot. Judge Falk urged the parties to work towards a settlement of the treatment-related claims against the officials responsible for the mental health treatment program at the STU. Counsel then renewed their efforts to reach a settlement with respect to those issues.

On January 20, 2012, at a hearing attended by the Representative Plaintiffs (via video-conference), counsel for both sides informed Judge Falk that they were prepared to execute a formal Settlement Agreement (the "Agreement"), which they did on February 3, 2012. On February 14, 2012, pursuant to the Settlement Agreement, the Second Amended Complaint was filed, formally adding Mr. Culbreth and Mr. Sessoms as named plaintiffs, seeking class action status, and updating the plaintiffs' claims concerning the mental health treatment program at the STU. The defendants named in the Second Amended Complaint are Merrill Main, Ph.D., in his official capacity as Clinical Director of the STU; Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"); Lynn A. Kovich, in her official capacity as the Assistant Commissioner and Deputy Director of the DMHAS; and Jeffrey S. Chiesa, in his official capacity as Attorney General of New Jersey. The Second Amended Complaint does not include any claims against the DOC or its officials, nor any claims concerning the physical facilities at the STU.

On March 29, 2012, Judge Cavanaugh certified the Class, consisting of all persons who are civilly committed or confined pending commitment to the STU pursuant to the NJSVPA, with Messrs. Alves, Culbreth and Sessoms as Representative Plaintiffs. The Court also appointed CSJ and Gibbons as Class Counsel, directed them to send this Notice to each member of the Class, and scheduled the Fairness Hearing to take place on August 6, 2012.

During the pendency of the Litigation, a number of STU residents filed claims that overlapped or were similar to the claims filed by Mr. Alves. Many of these cases were consolidated, in whole or in part, with the Litigation. Other STU residents filed additional documents with the Court, some of them supporting Mr. Alves' position or asserting similar claims of their own.

4.      **Who will be included in the Settlement?**

If the Settlement receives final approval from the Court, it will be binding on all members of the Class and on all of the defendants named in the Second Amended Complaint and their successors in those offices (the "Settled Defendants"). In other words, the Settlement will resolve the claims set forth in the Second Amended Complaint on behalf of every member of the Class. The Settlement will *not* affect claims by individual residents that are outside of the scope of the Second Amended Complaint, such as tort claims, *habeas corpus* petitions, or challenges to civil commitment under the NJSVPA by an individual resident. Nor will the Settlement prevent residents from filing or pursuing claims against DOC officials or employees.

3

**5.**     **Who is Class Counsel?**

The Court has appointed the CSJ and Gibbons to represent the Class.  If you have any questions, you may contact Class Counsel:

> **Barbara Moses, Esq.**
> **Seton Hall University School of Law**
> **Center for Social Justice**
> 833 McCarter Highway
> Newark, NJ 07102
> (973) 642-8700
>
> **Lawrence S. Lustberg, Esq.**
> **Jonathan Manes, Esq.**
> **Gibbons P.C.**
> One Gateway Center
> Newark, NJ 07102
> (973) 596-4500

**6.**     **What are the Benefits of the Proposed Settlement?**

The Settlement Agreement is a lengthy and complex document.  You may obtain a copy of the complete Agreement by placing your request in a Social Work Request box at the STU.  This Notice provides a summary of some of the key terms of the Agreement.

### a.  Individually Tailored Treatment

If the Settlement is finally approved by the Court, treatment staff at the STU will be required to adopt and employ clinical assessments and provide individually tailored treatment that adequately meets your therapeutic needs.   Any final report, recommendation, or determination for treatment, treatment status, phase designation, phase progression, and/or disciplinary action must be communicated to you by treatment staff, both orally and in writing, within fifteen (15) days of such action.  Moreover, treatment staff must adopt objectively measurable pre- and post-module testing, provide you with a copy of your test results within fifteen (15) days of the completion of the post-module testing, and discuss your results in process group within thirty (30) days from the completion of the module.

Further, you will be provided with an updated and accurate Residents' Guide which will include, among other things, a description of the treatment program, including process groups, treatment modules, program phases, and the estimated times for completion of each phase.  This Guide will also include an explanation of the ways in which you may request individual treatment sessions.

### b.  Comprehensive Initial Treatment Plan

The treatment staff will be required to produce a comprehensive initial treatment plan for you

4

within forty-five (45) days of entry of an order of final commitment. If you have already been committed but have not yet received a comprehensive treatment plan, you will be entitled to such a treatment plan within forty-five (45) days after the Settlement is approved. Your comprehensive initial treatment plan must be tailored to your individual needs as determined by the treatment staff, and will include and incorporate your past treatment progress and evaluations, if available, including prior treatment at the Adult Diagnostic and Treatment Center. Moreover, you will be provided with specific and individualized recommendations regarding your treatment goals, the objective criteria necessary to meet these goals, and *anticipated time frames for completion of both the objective criteria and your ultimate goals.*

c. **Six Month Review by Treatment Team**

Your comprehensive treatment plan will be reviewed by your treatment team every six (6) months and will be followed within fifteen (15) days by a meeting with you. During your meeting, your treatment team will review your progress, discuss new treatment goals for the next six months, including specific curricular recommendations, and provide you with an *estimate of the time for completion of your treatment goals, modules, and phases,* based on an individualized assessment of your participation in treatment, with the assumption that you will fully participate in treatment.

If you were subject to restrictions under modified activities programming ("MAP") at any time during the past six months, your treatment team will review your progress through MAP; the impact, if any, that your time on MAP may have on your phase designation; and the steps that you should take to avoid future MAP restrictions.

Additionally, the treatment team will discuss with you any recommendations made to the Treatment Progress Review Committee ("TPRC") for your progression in phase designation, a description of the recommended phases, and your ability to enroll in modules within the recommended phase while official designation change is pending upon TPRC review.

d. **Annual Review by TPRC**

. The Treatment Progress Review Committee ("TPRC") will conduct an annual review of your treatment plan and will produce a written report and recommendation, including a phase designation recommendation. Recommendations for phase 3 or higher will be submitted to a Clinical Assessment Review Panel ("CARP") for approval. Your treatment team will deliver the final TPRC report to you within fifteen (15) days of receipt from the TPRC or CARP. In addition to delivering the written report, the treatment staff will explain it to you, including the following:

(i)     Your current phase designation and any change in designation;
(ii)    The requirements and evaluation criteria for progression in each phase, along with *an estimated time frame in which you can complete your current phase,* based upon an individualized assessment of your participation in treatment with the assumption that you will participate in treatment;

(iii)   Specific, individualized recommendations for specific treatment goals and an objective criteria necessary for meeting those goals, including an estimate of the time required for you to complete both the objective criteria and the goals;

(iv)   Specific curricular recommendations and an estimate of when the recommended module(s) will next be offered and available to you; and

(v)   Any recommendations regarding your potential post-discharge placement file or discharge plan.

**e.  Overall Course of Treatment Not to be Extended**

The treatment program at the STU is currently divided into five (5) phases, from Phase 1 ("Orientation") to Phase 5 ("Transition"). If the Settlement is finally approved by the Court, DMHAS will be required to notify Class Counsel of any proposed changes to the phase designations in advance, and will not be permitted to use any such changes to extend the overall course of treatment or to keep residents in the program any longer than they would be under the current phase designations.

**f.  At Least Twenty Hours of Therapeutic Programming per Week**

If the Settlement is finally approved by the Court, every resident not on Treatment Refusal Status or subject to restrictions under MAP will have the opportunity to receive a minimum of twenty (20) hours per week of professionally led (or in the case of self-help groups, professionally monitored) therapeutic programming. This programming will be made available to you regardless of the location of your living quarters and will encompass sex-offender-specific, mental health, recreational, and rehabilitation/vocational programming, and will include, *at a minimum*:

(i)   Three (3) ninety (90) minute process group sessions per week;

(ii)   One (1) to two (2) ninety (90) minute modules per week, if therapeutically appropriate;

(iii)   Professionally monitored self-help groups for at least ninety (90) minutes per week, provided willing and appropriate Residents are available to facilitate self-help groups; and

(iv)   Regularly scheduled community meetings.

Unstructured recreational activity will not count as "therapeutic programming" for purposes of the 20 hour per week minimum. At least eighty-seven percent (87%) of the scheduled process group meetings must actually meet during the calendar year. Such meetings must utilize the full time periods for which they are scheduled and take place in designated meeting rooms providing a reasonable degree of quiet and privacy.

DMHAS will make available a minimum of one (1) to two (2) module(s) in every sixteen (16) week module cycle for residents not on Treatment Refusal Status or MAP, so long as (a) the module is currently recommended in that resident's comprehensive treatment plan, six month review, TPRC review, or has been mandated by court order; and (b) there is sufficient space available in the recommended module (or DMHAS has offered a self-study module).

6

Your post-module testing must be conducted within seven (7) days of completing either a class-based or self-study module.

**g.  MAP Groups**

If you are subject to Tier or Wing MAP, you will be placed in a MAP Group that meets at least twice per week. *If you are subject to Program MAP, you will continue to attend all of your regularly-assigned process group sessions and modules*, unless specifically contraindicated in light of the underlying behaviors that resulted in the MAP placement. In such cases, you will be informed of the reasons for the treatment restrictions, in writing, as part of your initial MAP Placement Review and at least every thirty (30) days thereafter so long as the restrictions remain in place. Further, you will be placed in a MAP Group that meets at least twice per week until such time as you are permitted to resume attendance at all of your regularly-assigned process group sessions and modules.

**h.  Increased Staff Ratios**

If the Settlement is finally approved by the Court, DMHAS will be required to hire and retain sufficient additional treatment staff to maintain a ratio of seven (7) therapists for every fifty (50) residents who are actively participating in treatment.  Treatment staff must meet all qualifications for their job titles (including licensure or certification, where required) specified in the New Jersey Civil Service standards.

**i.  Vocational Training**

DMHAS will conduct individualized vocational assessments of each resident within 45 days of final commitment, evaluate his skills and strengths, and develop a plan for building on them through vocational training.  All residents who are not on Treatment Refusal Status or subject to MAP will be offered an average of ten (10) hours of vocational activities per week, including institutional jobs.   Additionally, DMHAS will solicit and arrange for outside vendors to provide onsite vocational offerings (to be paid for by interested residents), provided physical plant space is available.

**j.  Educational Opportunities**

You will be entitled to pursue an educational curriculum for *at least* ten (10) hours per week, including formal instruction, homework time, and self-help programming.  If you are interested in remedial education or GED coursework, you will be provided such education within six (6) months of your initial request.  If you wish to pursue post-secondary education within the facility (*e.g.*, college courses), you may do so, as long as DMHAS is not required to pay for the program and it does not interfere with your therapeutic goals.

**k.  Recreational Opportunities**

DMHAS will conduct annual surveys to assess your desired recreational activities.  Staffing will be provided for professionally facilitated recreational activities six (6) days per week.

l.  **Post-Discharge Preparation**

*If the* Settlement is finally approved, social work staff will be required to use the information contained in your potential post-discharge placement file to develop a discharge plan for you: when recommended by the TPRC, when ordered by a court, or when you reach Phase 4.  In developing the discharge plan, the social work staff must assist you in finding housing and obtaining support.

m.  **Treatment Ombudsperson**

If the Settlement is finally approved, a Treatment Ombudsperson will be appointed and will establish a resident complaint system for treatment issues.  The Treatment Ombudsperson will establish and implement procedures for eliciting, receiving, processing, responding to, and resolving complaints from you, your family members, and other interested citizens concerning treatment conditions at the STU. DMHAS will create a standardized form for treatment-related complaints and provide this form to any resident upon request. Further, DMHAS will submit resident complaint forms directly to the Treatment Ombudsperson.

The Treatment Ombudsperson will determine whether a complaint is within the scope of the Settlement and send the resident a standard notice of this determination within thirty (30) days of receipt of the complaint form.  The Treatment Ombudsperson will then investigate any complaints within the scope of the Settlement and take action appropriately tailored to the nature of the resident complaint, which may include:

 (i)  Communicating with the appropriate administrator or staff at the STU;
 (ii)  Gathering information from the appropriate administrator or staff at the STU;
 (iii) Informing the appropriate administrator or staff of the resident's complaint;
 (iv) Communicating with the complaining resident to further investigate the nature of complaint; and/or
 (v)  Taking such other measures as the Treatment Ombudsperson deems appropriate to investigate or resolve the resident complaint.

The complaining resident will be timely notified by the Treatment Ombudsperson of any additional information or results obtained. Moreover, the Treatment Ombudsperson will correspond with the Director of the STU regarding issues in the treatment program *that are* sufficiently systemic from a review of the residents' complaints.

In addition to documenting all oral correspondence, the Treatment Ombudsperson will attend a community meeting at least twice a year in order to explain his or her role, answer questions, and inform you of the status of any systemic treatment problems reported to the Director of the STU.

n.  **Independent Monitor**

If the Settlement is finally approved, *an independent Monitor will be appointed by the Court* to monitor the Settled Defendants' compliance with the terms of the Agreement.  No

8

person who has been associated with the underlying Litigation, or who has a business relationship with the Settling Defendants, may be appointed as the Monitor.

The independent Monitor will conduct five (5) annual inspections of the STU (unless the monitoring period is shortened or lengthened in accordance with the Agreement) to determine whether the Settled Defendants are in compliance or not in compliance with the requirements of the Agreement.  The first annual inspection will be conducted no later than nine (9) months from the final approval of the Settlement.  Each inspection may last up to five (5) business days and will be followed by a written report determining whether DMHAS is in compliance with each material provision of the Agreement, describing the steps taken by DMHAS to achieve compliance, describing any change in circumstances affecting DMHAS's ability to comply, summarizing information learned from the residents, and summarizing information learned from DMHAS staff.  During the inspections:

    (i)    The Monitor will have *full access* to the facility. The Monitor may not be denied entry to the STU or any portion thereof except for reasons of security, in which case the Monitor must be given full access as soon as the circumstances that caused the security concern have been abated.

    (ii)    The Monitor will have *full access* to the residents who are members of the Class, may review their treatment records, and may conduct interviews with residents.

    (iii)    The Monitor may interview any DMHAS employee working at the facility, including treatment staff, administrative staff, medical services staff, and vocational instructors.  *All DMHAS employees must communicate and cooperate with the Monitor.*

## 7.    What is NOT Included in the Settlement?

The Settlement deals specifically with the treatment program at the STU.   The Settlement will not require any changes to the physical facility, nor to the conduct of the DOC personnel responsible for security at the STU.  This does not mean that residents will be required to give up any claims they may have against the DOC, its officials, or its employees.  Those claims are simply not part of the Settlement and must be pursued through separate litigation.

## 8.    Who Will Pay for the Settlement?

The Settled Defendants will be responsible for the costs of the Settlement, including the cost of the Monitor, subject to appropriation of sufficient funding by the New Jersey Legislature.  The Agreement requires the Settled Defendants to seek such funding from the Legislature as one of DHS's top priorities.  The Agreement also contains provisions specifying the parties' rights and obligations in the event the Legislature fails to appropriate the necessary funds, including the plaintiffs' right to declare the Agreement void, and resume litigation, with respect to any provision that the Settled Defendants do not comply with as a result of a budget shortfall or otherwise.

9.    **How is Class Counsel being paid?**

If the Settlement is finally approved by the Court, the Settled Defendants will pay CSJ the sum of seventy-eight thousand dollars ($78,000.00) in attorneys' fees.  This represents a small fraction of the actual costs and fees accrued by CSJ over the course of the Litigation.

10.    **When is the Fairness Hearing?**

A Fairness Hearing will be held to determine whether final approval of the Settlement should be granted. At the Fairness Hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate, and will consider any timely objections made concerning the Settlement. The hearing will take place before Judge Cavanaugh on August 6, 2012, at 9:30 a.m., or as soon thereafter as practicable, in the United States District Court for the District of New Jersey, U.S. Post Office and Courthouse, 1 Federal Square, Newark, New Jersey, 07101, Court Room PO 4. The time and date of this hearing may be continued or adjourned. **YOU ARE NOT REQUIRED TO ATTEND THIS HEARING.  ANY AND ALL PROPERLY SUBMITTED OBJECTIONS BY CLASS MEMBERS WILL BE PRESENTED TO THE COURT AND CONSIDERED, REGARDLESS OF WHETHER OR NOT THE OBJECTOR PERSONALLY APPEARS.**

11.    **How Can I Object to the Proposed Settlement?**

If you want to object to or comment on the Settlement, you may complete the enclosed form entitled Class Member's Objections/Comments re Proposed Settlement, and mail it to Class Counsel at the following address:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

You may also deposit your written objections/comments in a Social Work Request box at the STU, in which case the staff of the STU will mail it for you, free of charge. Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Your objections/comments will not be considered unless they are either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012.*

12.    **What if I Have More Questions?**

If you have questions about this Notice, or want additional information, you may contact Class Counsel.  You may also consult your personal counsel, if any.  If you want to see the complete Settlement Agreement, you may place your request in a Social Work Request box.  *You should not contact the Court, the Settled Defendants, or their counsel.*

From: <u>John Banda #351</u>
        Special Treatment Unit
        8 Production Way, Trl#2
        P.O.Box 905
        Avenel, New Jersey 07001

To: STU Settlement
        c/o Seton Hall University School of Law
        Center for Social Justice
        833 McCarter Highway
        Newark, New Jersey 07102


**Class Member's Objections/Comments Re Proposted Settlement**
<u>**Raymond Alves, et al., v. Merrill Main, PH.D., et al.**</u>

        I object to the proposal settlement for the following
reasons:

**#1.** SETON HALL - LAW, CENTER for Social Justice needs to be
Dropped from representation in this Law-Suit. For they helped
to create this Sexually Violent Predator Act, and now they want
to represent the Residents against it. They should Not be able
to have it both  ways.

**#2.** The proposal shows the increase in program hours, the
increase in therapists, the increase of the potential new program
groups all in order to keep the Residents here longer just
like a concentration camp. The proposal <u>Fails to show</u> the
increase in of how the program will be releasing Residents.
For there are Residents that been here 8 to 12 years already,
and would like to go home, This proposal is not showing that
chance of going home.

**#3.** Psycho-Educational Modules: The purposed Settlement does
not address the risk mitigation after the successful completion
of Modules. As the Settlement stands now I do not agree with
module testing  only. At the completion of all modules, when
a Resident has successfully completed the module, there should
be some kind of Notice given that the Resident's risk to re-
offend  has  been  mitigated, as well as, His level of
dangerousness. This will sequentially, lower the Resident's
risk assessment. This should be noted and written verification
should  be  given  to  the  Resident, in addition to,  this
verification  being laced in the Residents file.

**#4.** Treatment Ombudsperson needs to be impartial, unbiased,
and Not beholden to the STU. Something needs to be implemented
to insure that there is No retaliation from Staff (Director,
Therapist & Social Workers, etc.) for submitting and talking
with  the  Treatment  Ombudsperson about any complaints against
D.H.S., and/or its Staff members.

#5. <u>Nothing</u> is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

#6. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; a-Juveniles that were civilly committed; b-Residents that were committed from the A.D.T.C. that have multiple years of treatment; c-Residents that have been informed that treatment would not diminish their risk to re-offend; therefore, rendering this commitment a life sentence; d-Persons that have been committed from society (that were on the streets) when they were selected for commitment; e-Treatment Refusals are not represented; f-MAP Residents are not represented; g-and South Wing Residents are not represented.

#7, Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the fairness of a Release Plan to all Residents. For there are a some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

#8. In the form of Cruel and unusual punishment, **Residents on South Wing are label as being the "Undesirables"** and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

#9. Nothing is said in the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys.

#10. Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said in such therapy groups.

#11. Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Diets.

#12. D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

#13. Nothing is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law Sidney S. Zipkin v. Margaret M. Heckler, 790 F.2d 16, 1986 U.S. App. LEXIS 24723: The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: Flemming v. Nestor, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); Schweiker v. Wilson, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); Richardson v. Belcher, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); Buccheri-Bianca v. Heckler, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). Section 202, 42 U.S.C. § 402(x), provides in pertinent part: (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual being able to engage in substantial gainful activity upon release and within a reasonable time. Note: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: Washington v. Secretary of Health and Human Services, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f(1) (42 U.S.C. 423(f)(1)) DISABILITY -- SUSPENSION OF BENEFITS FOR INMATES OF PENAL INSTITUTIONS

-- **CONSTITUTIONALITY** 20 CFR 404-468; SSR 83-28c; **The Statue directly provides that imprisoned felons may receive benefits if they are disable and participates in a satisfactory rehabilitation program while confined. The rehabilitation program must be approved by a competent court.** Thus, a person in this situation is endowed with the opportunity completely conforms and suffices for due process considerations. These programs should result in the person being able to engage in substantial gainful activity upon release with a reasonable period of time. **The plain terms Statute as well as its guidelines for satisfactory rehabilitation programs negate vagueness argument.** Simply, the Statute includes No Punitive elements. The suspension of benefits is not conditioned to any particular form of conduct but applies to all felony crimes ... **even imprisoned felons may obtain disability benefits if participation in a rehabilitation program is undertaken.** The Statute rationally rests upon the reasonable attempt by Congress to provide disability benefit only to those persons who are deprived of a continuing source of income to satisfy basic food, clothing, shelter and medical needs. **For some unknown ignorant reason, most of the Residents are Not being allowed to collect such SSI, and/or SSD.**

**#14.** In regards to Residents Post-Discharge and/or Release, this Facility needs to realize that the State of New Jersey **No-longer** has administrative enforcement powers, **No-longer** has any type of authority or hold over (Residents) in preventing Them from leaving the State of New Jersey to reside elsewhere. See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super. 181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of the offender Not residing in New Jersey).

**#15.** Nothing is being said about the Medical Nightmares, other than the pushing of unnecessary needles & pills on Residents, and the unsanitary / mishandling of such medication, Medical Professionals are instructing the Department of Corrections to take Dying Residents with chest pains to a Hospital up in Somerset, which is approx. 40 miles away. This is where they send inmates from Northern State Prison to. Just like what just happen with the last dying Resident. To Whom Died before leaving these grounds. Since We Residents are No-Longer inmates, Why are We Not taken to Hospitals that are much closer? By this, the Department of Corrections professionals **KILLED** another Resident by instructing kitchen working Residents to unload Food Truck **BEFORE** allowing Ambulance to come in to pick up a Dying Resident with chest pains, Just like what just happen with one of the last dying Resident. To Whom Died before leaving these grounds. Is this what Future dying Residents have to look forward to, the purposely made mis-Judgments **BEFORE** being properly considered, and taken care of. There are Now a total of 41 Residents that had Died within (on the grounds of) this facility of the Special Treatment Unit. Administration Officials to this facility has had approx. 36 of these Residents that Died here at the Special Treatment Unit, release through

treatment, and living on the streets.

#16. Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information.** See: <u>Hill v. Sciarrotta</u>, 14 F.3d 210 (2nd Cir. 1998). In which case, Social Workers along with Therapist cannot be trusted Here at the Special Treatment Unit. Social Workers act as if they are License Therapist in their attempt to coerce & entrap a Resident to give self-incriminating statements. They are just as much apart of the problem as in screwing over the Resident in this Treatment Facility, and are truly not out to help the Resident as to what everyone may think.

#17. It is said that there will be 7-Therapist to every 50 Residents. Does this include certified Social Workers who think that they are License Therapists? Plus, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should Not run for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

#18. Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

#19. In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

#20. What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU.

#21. New Treatment Plans needs to be establish for ALL Residents after this settlement becomes final.

#22. What is considered as Full Participation and/or Full Cooperation? For under case law of <u>Bender v. New Jersey Department of Corrections</u>, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full Cooperation is based on attendance and the quality of participation, and Not the information that is disclosed during therapy.** Plus, under case law of <u>McKune v. Lile</u>, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), **Prohibits the State from extracting information from a (Resident) about His past criminal history, that is Not the subject of a conviction.** For There are some Residents to whom has Never been Convicted of a Sex Crime Offense, So how can You treat a person who has Never been Convicted of a Sex Crime Offense, when this State's SVPA **appropriately limits it's**

application to Convicted Sex Offenders? See: In re Commitment of W.Z., 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Wouldn't this be a Double Jeopardy, Ex Post Facto, Res Judicada, and Recent Overt Act violations? These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#23. Some D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: There is the Main building and its Annex to the State of New Jersey's Special Treatment Unit. The Main building was the Rahway State Prison Administration Segregation Detention Center/Prison to house problem State Prisoners, Now it is being used to house the State of New Jersey's Special Treatment Unit Residents. How can this be considered as "Therapeutic" and Not Punitive?

#24. Some further D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: Four-Men cubicles; Residents at the Annex building are being warehoused and are being forced to live in approx. 10ft x 10ft Four-Men cubicle space. Inmates in a Prison live better and has more space than the Residents that live at this facility's Annex, in which this Annex building was use to house State inmates on their way out and back into society. How can this be considered as "Therapeutic" and Not Punitive?

#25. Residents are being taken to Prison Hospital for Medical special needs special check-ups, and/or special operations. How can being taken to Prison Hospital be considered as "Therapeutic" and Not Punitive?

#26. The Procedure to this SVPA Civil Commitment process for it has created a Due Process Violation of the commitment process: Not all "Convicted" Sex Offenders are being served Notice and/or are being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. Depriving ... of notice would strip them of significant liberty interest; and that a Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP). See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents should not have been

involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#27, The Procedure to this SVPA Civil Commitment process has created a Unequal application of the Law: "Non-Convicted" Sex Offenders are Not being served Notice, Nor are they being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. Depriving ... of notice would strip them of significant liberty interest; and that a Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP). See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#28. The Question of appropriate treatment plan for committee to psychiatric institution was not to await possible rehearing, but required prompt and certain resolution, where evidence suggested that treatment afforded to committee was not providing him with meaningful opportunity for cure or improvement. Matter of Commitment of J.L.J., 509 A.2d 184, 210 N.J.Super. 1. N.J.Super.A.D. 1984.

#29. An Audit needs to be conducted, for the State of New Jersey Budget Committee had found that there is a Total of approx. $60-Million Dollars that is missing in running this State of New Jersey's Special Treatment Unit that houses the State of New Jersey's Sexually Violent Predators. In which, when D.H.S. Officials were asked of what happen to these funds, No answer was given.

#30. If this Resident is going to be placed on this Suit as a Plaintiff, He asks to be compensated in the amount of $25 Million Dollars from each listed defendant in their Personal and Individual Capacities for the deliberate indifference torment that the listed defendants continues to display towards this Resident/Plaintiff for the past 8-years to present.

I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS MADE BY ME ARE TRUE AND CORRECT.

Date: __04-14-12__

_John Banda_
John Banda
Resident #351

John Banda
Special Treatment Unit
SVPA-Punitive Detention Center
P.O.Box 905
Avenel, New Jersey
07001


Professor Barbara Moses
Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, New Jersey 07102


05-01-12


Re: <u>Raymond Alves, et al., v. Merrill Main, PH.D., et al.</u>


Dear Ms. Moses,

     Hello, My name is John Banda. I am a Resident here at this subterfuge Special Treatment Unit / <u>SVPA-Punitive Detention Center</u> / S.T.U. <u>Concentration Camp</u>. I met You at the Meeting that You had with the Residents on South Wing here at the STU. I was sitting at the table with Ray Alves. I'm the one that brought up the issue about "TR's".

     Let Me say that, Due to having My Civil Commitment Writ of Habeas Corpus in. I chose to be "TR" and chose to adhere to My First Amendment right to FREE SPEECH / FREEDOM TO REMAIN SILENT, without being punish, manipulated and compelled to speak about My Non-Sex Crime Convictions.

     I am again writing to You, to OBJECT to Your attempt to sell out to the Residents this propaganda Settlement Proposal. How can this be a proposal, when <u>You</u> <u>are</u> determine to make this proposal the actual Settlement? Especially when it favors the Defendants more so than the Plaintiffs. To My understanding, this Complaint was to expose to the Court of the Violations D.H.S. and D.O.C displays against the Residents. This Settlement Proposal is basically attempting to sweep these Violations under the rug, and  to give the Defendants more ways to Violate the Residents, in keeping the Residents here longer. This Settlement Proposal may be good for the New arrivals, BUT it does not help those who has already been here 8 to 12 years already in gaining the chance to be "Discharged / Release" any time soon. In other words, by this Settlement Proposal, those to whom has already been here 8 to 12 years already has to start all over again to reach to that point again in the program, to be given that chance to be Discharged / Release.

Plus, I would like to ask You, "How can this subterfuge Treatment Facility treat a person who has Never been convicted of a Sex Crime Offense, when the SVPA appropriately limits its application to Convicted Sex Offenders? See: In re Commitment of W.Z., 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Non-Convicted Sex Offenders were not properly notified of the potential possibility of being Civilly Committed after they complete their term of incarceration. They were not given the proper chance to prepare for a proper defense. So tell Me, how is this Settlement Proposal going to help Non-Convicted Sex Offenders? The only way that this would help them is for D.H.S. to forcefully have them incriminate themselves on their DISMISSED Sex Crime Offenses.

Furthermore, I am writing to You in regards to what You had said at this meeting. When I had asked. "How will this Settlement help those who choose to be TR's?" You basically stated "That is why We will need a Monitor". That is all fine and good, but in the meantime, until We get to that point, BUT, "How will this Settlement going to help those who choose to be TR's?" For D.H.S. are threatening NOW to take Our TR Orientation Group away from Us. How are We going to support Ourselves? For the TR's takes the TR Orientation Group to hold down a institutional job. Without this subterfuge Group, We loose Our institutional job. D.H.S. & D.O.C. refuses to provide any type of Personal Needs Allowance. So again I ask, "How will this Settlement going to help those who choose to be TR's?" AND/OR "How are We going to support Ourselves?"

So in other words, You are telling Me to comply with this subterfuge treatment, incriminate Myself, and give up My First Amendment right to FREE SPEECH / FREEDOM TO REMAIN SILENT, atleast until We get a Monitor. In which, You claim can be approx. another 10 or so years away.

So again, Now that I am being considered as a Plaintiff in the above entitled caption matter, and Now that You told Us that the Court is already against Sex Offenders (Bias against Sex Offenders), I OBJECT to the whole Settlement Proposal AND Want to be Compensated for the 8+ years of deliberate indifference torment that I am going through, at this Concentration Camp treatment facility, at the Hands of D.H.S. & D.O.C. in NOT BEING A CONVICTED SEX OFFENDER!!!! So Yes, Lets go to trial and let the Court decide (Not You) the Case, and if I will be Compensated.

Sincerely,

John Banda

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

>    **STU Settlement**
>    **c/o Seton Hall University School of Law**
>    **Center for Social Justice**
>    **833 McCarter Highway**
>    **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: *Vasco Bell*

Signature: *Vasco Bell*

Resident Identification Number: *609*

Date: *5-11-2012*

**Comments:**

I completely object to the settlement. It does not comport ~~with the report of Dr. Becker (the authority nominated by the~~ Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues ~~passed over.~~

From: _____  # _____
      Print Your Name   and   Number
      Special Treatment Unit
      8 Production Way, Trl#2
      P.O.Box 905
      Avenel, New Jersey 07001

To: STU Settlement
      c/o Seton Hall University School of Law
      Center for Social Justice
      833 McCarter Highway
      Newark, New Jersey 07102

**Class Member's Objections/Comments Re Proposed Settlement**
**<u>Raymond Alves, et al., v. Merrill Main, PH.D., et al.</u>**

I object to the proposal settlement for the following reasons:

**#1.** SETON HALL - LAW, CENTER for Social Justice needs to be Dropped from representation in this Law-Suit. For they helped to create this Sexually Violent Predator Act, and now they want to represent the Residents against it. They should Not be able to have it both ways.

**#2.** The proposal shows the increase in program hours, the increase in therapists, the increase of the potential new therapy groups all in order to keep the Residents here longer **just like a concentration camp.** The proposal <u>Fails to show</u> the increase in of how the therapy will be releasing Residents. For there are Residents that been here 8 to 12 years already, would like to go home, This proposal is not showing that chance of going home.

**#3.** Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. At the completion of all modules, when a Resident has successfully completed the module, there should be some kind of Notice given that the Resident's risk to re-offend has been mitigated, as well as, His level of dangerousness. This will sequentially, lower the Resident's risk assessment. This should be noted and written verification should be given to the Resident, in addition to, this verification being laced in the Residents file.

**#4.** Treatment Ombudsperson needs to be impartial, unbiased, and Not beholden to the STU. Something needs to be implemented to insure that there is No retaliation from Staff (Director, Therapist & Social Workers, etc.) for submitting and talking with the Treatment Ombudsperson about any complaints against D.H.S., and/or its Staff members.

#5. Nothing is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

#6. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; a-Juveniles that were civilly committed; b-Residents that were committed from the A.D.T.C. that have multiple years of treatment; c-Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d-Persons that have been committed from society (that were on the streets) when they were selected for commitment; e-Treatment Refusals are not represented; f-MAP Residents are not represented; g-and South Wing Residents are not represented.

#7. Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the fairness of a Release Plan to all Residents. For there are some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

#8. In the form of Cruel and unusual punishment, **Residents on South Wing are label as being the "Undesirables"** and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

#9. Nothing is said in the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys. They are suppose to be doing this already, but are Not, in which case they erase the tape in front of the Resident.

#10. Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said by the Resident in such therapy groups.

#11. Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Residents on some sort of Diet.

**#12.** D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

**#13.** Nothing is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law Sidney S. Zipkin v. Margaret M. Heckler, 790 F.2d 16, 1986 U.S. App. LEXIS 24723: The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: Flemming v. Nestor, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); Schweiker v. Wilson, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); Richardson v. Belcher, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); Buccheri-Bianca v. Heckler, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). **Section 202, 42 U.S.C. § 402(x), provides in pertinent part:** (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, **unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual being able to engage in substantial gainful activity upon release and within a reasonable time.** Note: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: Washington v. Secretary of Health and Human Services, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f)(1) (42 U.S.C. 423(f)(1)) DISABILITY

-- SUSPENSION OF BENEFITS  FOR INMATES OF PENAL INSTITUTIONS
-- CONSTITUTIONALITY 20 CFR 404-468; SSR 83-28c; **The Statue
directly provides that imprisoned felons may receive benefits
if they are disable and participates in a satisfactory
rehabilitation program while confined. The rehabilitation
program must be approved by a competent court.** Thus, a person
in this situation is endowed with the opportunity completely
conforms and suffices for due process considerations. These
programs should result in the person being able to engage
in substantial gainful activity upon release with a reasonable
period of time. **The plain terms Statute as well as its
guidelines for satisfactory rehabilitation programs negate
vagueness argument.** Simply, the Statute includes No Punitive
elements. The suspension of benefits is not conditioned to
any particular of conduct but applies to all felony crimes
**... even imprisoned felons may obtain disability benefits
if participation in a rehabilitation program is undertaken.**
The Statute rationally rests upon the reasonable attempt by
Congress to provide disability benefit only to those persons
who are deprived of a continuing source of income to satisfy
basic food, clothing, shelter and medical needs. **For some unknown
ignorant reason, most of the Residents are Not being allowed
to collect such SSI, and/or SSD.**

**#14.** In regards to Residents Post-Discharge and/or Release,
this Facility needs  to realize that the State of New Jersey
**No-longer** has administrative enforcement powers, **No-longer** has
any type of authority or hold over (Residents) in preventing
Them from leaving the State of New Jersey to reside elsewhere.
See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super.
181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of
the offender **Not** residing in New Jersey).

**#15.** Nothing is being said about the Medical Nightmares, other
than the pushing of unnecessary  needles & pills on Residents,
and the unsanitary / mishandling of such medication, Medical
Professionals are instructing the Department of Corrections
to take Dying Residents with chest pains to a Hospital up in
Somerset, which is approx. 40 miles away. This is where they
send inmates from Northern State Prison to. Just like what just
happen with the last dying Resident. To Whom Died before leaving
these grounds. Since We Residents are No-Longer inmates, Why
are We Not taken to Hospitals that are much closer? By this,
the Department of Corrections professionals **KILLED** another
Resident by instructing kitchen working Residents to unload
Food Truck **BEFORE** allowing Ambulance to come in to pick up
a Dying Resident with chest pains, Just like what just happen
with one of the last dying Resident. To Whom Died before leaving
these grounds. Is this what Future dying Residents have to look
forward to, the purposely made mis-Judgments BEFORE being
properly considered, and taken care of. There are Now a total
of 41 Residents that had Died within (on the grounds of) this
facility of the Special Treatment Unit. Administration Officials
to this facility has had approx. 36 of these Residents that

Died here at the Special Treatment Unit, release through treatment, and living on the streets.

#16. Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information.** See: <u>Hill v. Sciarrotta</u>, 14 F.3d 210 (2nd Cir. 1998). Residents are being coerced to speak about their **inaccurate** Convicted and Non-Convicted Sex Crimes, if they do not, these Residents are being punish by being put on Treatment Refusal Status. Plus, In the attempt of a Resident speaking with the officials of T.P.R.C. to correct their **inaccurate** records, T.P.R.C. officials refuses to do anything about it and expresses to tell it to the Civil Commitment Court Judge. To where NOTHING is done to correct the matter.

#17. I object to it being brought up that there should be 7-Therapist to every 50 Residents. This include certified Social Workers who think that they are License Therapists? Plus, if this is put in place, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should be canceled for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

#18. Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

#19. In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

#20. What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU. For as it stands right now, they are of No help to a Resident, and cannot be trusted.

#21. New Treatment & Release Plans needs to be establish for ALL Residents after this settlement becomes final.

#22. What is considered as Full Participation and/or Full Cooperation? For under case law of <u>Bender v. New Jersey Department of Corrections</u>, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full Cooperation is based on attendance and the quality of participation, and Not the information that is disclosed during therapy.** Plus, under case law of <u>McKune v. Lile</u>, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), **Prohibits the State from extracting information from a (Resident) about His past criminal history, that is Not the**

**subject of a conviction.** For There are some Residents to whom has Never been Convicted of a Sex Crime Offense, So how can You treat a person who has Never been Convicted of a Sex Crime Offense, when this State's SVPA **appropriately limits it's application to Convicted Sex Offenders?** See: <u>In re Commitment of W.Z.,</u> 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Wouldn't this be a Double Jeopardy, Ex Post Facto, Res Judicada, and Recent Overt Act violations? These Residents **should not have been involuntarily committed where statutory civil commitment procedures were not followed.** See: <u>Matter of D.C.,</u> 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. <u>N.J.Super.A.D. 1995.</u> **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: <u>Mental Hygiene Legal Service v. Cuomo,</u> 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#23.** Some D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: There is the Main building and its Annex to the State of New Jersey's Special Treatment Unit. The Main building was the Rahway State Prison Administration Segregation Detention Center/Prison to house problem State Prisoners, Now it is being used to house the State of New Jersey's Special Treatment Unit Residents. How can this be considered as "Therapeutic" and Not Punitive?

**#24.** Some further D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: Four-Men cubicles; Residents at the Annex building are being warehoused and are being forced to live in approx. 10ft x 10ft Four-Men cubicle space. Inmates in a Prison live better and has more space than the Residents that live at this facility's Annex, in which this Annex building was use to house State inmates on their way out and back into society. How can this be considered as "Therapeutic" and Not Punitive?

**#25.** Residents are being taken to Prison Hospital for Medical special needs special check-ups, and/or special operations. How can being taken to Prison Hospital be considered as "Therapeutic" and Not Punitive?

**#26.** The Procedure to this SVPA Civil Commitment process for it has created a Due Process Violation of the commitment process: Not all "Convicted" Sex Offenders are being served Notice and/or are being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. **Depriving ... of notice would strip them of significant liberty interest;**

and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents **should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#27,** The Procedure to this SVPA Civil Commitment process has created a Unequal application of the Law: "Non-Convicted" Sex Offenders are Not being served Notice, Nor are they being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. **Depriving ... of notice would strip them of significant liberty interest;** and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents **should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#28.** The Question of appropriate treatment plan for committee to psychiatric institution **was not** to await possible rehearing, but required prompt and certain resolution, where evidence suggested that treatment afforded to committee **was not** providing him with meaningful opportunity for cure or improvement. Matter of Commitment of J.L.J., 509 A.2d 184, 210 N.J.Super. 1. N.J.Super.A.D. 1984.

**#29.** An Audit needs to be conducted, for the State of New Jersey Budget Committee had found that there is a Total of approx. $60-Million Dollars that **is missing** in running this State of New Jersey's Special Treatment Unit that houses the State of New Jersey's Sexually Violent Predators. In which, when D.H.S. Officials were asked of what happen to these funds, No answer was given.

**#30.** If this Resident is going to be placed on this Suit as a Plaintiff, He asks to be compensated in the amount of $25 Million Dollars from each listed defendant **in their Personal and Individual Capacities** for the deliberate indifference torment that the listed defendants continues to display towards this Resident/Plaintiff since the time of this Resident's temporary Civil Commitment / Civil Commitment to present date.

I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS MADE BY ME ARE TRUE AND CORRECT.

Date: _5-16-12_

_Kenneth Bell_
Sign Your Name

_KENNETH BELL_
Print Your Name

Resident #_430_

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: _Earthe L. Benjamin_

Signature: _Earthe L. Benjamin_

Resident Identification Number: _491_

Date: _30 APR 12_

Comments:

_It seems as though, dispite many good points in the settlement agreement, the process is still widely open to subjective opinions rather than current objective actuarials & more modern tests._

For those of us who have had treatment specifically at Avenel (A.D.T.C.), it should be mandatory that all positive treatment gains and completions be taken into account. Also, those of us who were taken from the street with no violation of parole or no high risk behavior proven, should have a "fast-track" process available to considerably shorten our length of time here at the S.T.U. Personal fears or bias judgements based on our criminal pasts are not a basis for clinical assesment. For the staff and the court there to turn a blind eye to verifiable, factual information is unconscionable. Such is the case with my personal situation. It should not be so easy to bring someone to the S.T.U. based only on assumptions with no respect to the legal process afforded every other citizen of the United States. I was screened for risk + released from A.D.T.C. in 2007, deemed safe for society. Someone was disatisfied with the decision and unduely influenced the court in Burlington Co. to detain me. That was on July 9th 2008. We desparately need relief from this unjust system.

Sincerely,

Gürthe L Benjamin

2

*Howard Bondurant*

Special Treatment Unit
PO box 905
Avenel, NJ 07001

To: STU Settlement
c/o Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, New Jersey 07102

**Ian Marx, Esq.**
**Greenberg Traurig, LLP**
200 Park Avenue
PO Box 677
Florham Park, NJ 07932

Re: **RAYMOND ALVES, et al, v. MERRILL MAIN, PhD, et al**
**Objection** to **Purpose** Settlement

I am a Resident at the STU, and I object to the Settlement for various reasons.

1. I object to Seton Hall and Gibbons attorneys because Seton Hall representatives were retained to comment and make recommendations on the development of the Sexually Violent Predator Act ("SVPA") in the state of New Jersey. I am gravely concerned that the Settlement Seton Hall has proposed is already tainted, and it is a conflict of interest. Seton Hall representatives, Gibbons attorneys, and the Plaintiffs refused to communicate anything to the STU population about the progress of the Settlement. The STU Residents did not, nor were not allow to give input into the negotiations. The STU Residents is perplexed at how narrow, conditional, and subjective the Settlement is.

2. I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. It is impossible for them to represent the population as it stands. They have not experienced what the separate classes of residents have experienced, therefore, making it highly impossible for them to speak for the population. There should be residents added to the representatives, listed above, that reflect the following Classes of persons; a) Juveniles that were civilly committed; b) Residents that were committed from ADTC who have multiple years of treatment, and have completed levels 4 and 5 while ADTC, and placed on level 1 when they arrived at the STU; c) Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d) People that was home for a few years without

re-committing any crimes, and were civilly committed from the streets; e) Treatment Refusals are not represented; f) MAP residents are not represented; g) South Unit residents are not represented.

3. Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. When a resident has successfully completed the module, there should be some kind of notice given that the resident's risk to re-offend has been mitigated, as well as, his level of dangerousness. This will sequentially, lower the resident's risk assessment. This should be noted and written verification should be given to the resident, in addition to, this verification being placed in the residents' files.

4. The Settlement does not address all STU residents being re-evaluated by neutral, board, certified professionals, impartial, unbiased, and not in concert with the New Jersey Attorney General to keep us imprisoned.

5. Dr. Becker's was contracted by the state to evaluate the STU facility in Kearny, New Jersey, and the facility in Avenel, New Jersey. However, of the approximately 40 recommendations none of them has been intergrated into the Settlement.

6. The Settlement doesnt' address the punitive nature of Temporary Close Custody (TCC) and the Modified Activities Program (MAP). TCC and MAP are tools of DOC, it's not intergrated into any of the other mental facilities in the State of NJ. The residents rights for specific sex offender treatment, and for core modules is denied them while they are on TCC and MAP. They're restricted from participating in the limited recreational services, in the food project, and their visits are limited. Also, they're stripped of their minimum wage for 2 hours a day, 5 days a week. Men who are on MAP, and who are Therapy Refusals (TR) are restricted from meals at certain events where meals are involved. They refuse to provide men restricted from work with a Personal Needs Allowance (PNA), hygiene products, clothing, underware, footwear, and bedding when needed. In Ann Klein Forensic Center men are invited to every event that is under recreational, and the receive a Personal Needs Allowance every month.

7. The Settlement does not address the fact that men civilly committed under the SVPA are not afforded inpatient treatment and rehabilitation services in a least restricted environment, which includes de-escalation which will enable SVPs committed to treatment with a transitional living program where outpatient treatment services is provided, and eventually with full autonomy in their communities.

8. There's inadequate de-de-escalation of restraints. A very small percentage of residents are on levels 4 and 5 after 13 years. Many men who have been committed since 2000-2012 has not advanced from level 2 regardless of their gains in treatment.

9. The Settlement doesn't address the issue about people who are already biased against residents, being transferred from other positions in the facility, to the TPRC and CARP teams, and how it can work against residents. Also, the Settlement doesn't address the issue about unqualified recreation workers and social workers being promoted to position of treatment providers without the proper training. There should be independent people placed on both teams, and there should be people who are properly trained and certified for the positions as treatment providers. The psychiatrist that do yearly evaluations are bias because they work in concert with the TPRC, CARP teams and the AG. The TPRC fabricates reports and incorporate information from one resident's report into another residents' report.

10. The Settlement eliminated any challenges about the inhumane living conditions, the counter-productive and counter-therapeutic environment. It is perplexing because a healthy environment is crucial to positive results in therapy. As noted in Dr. Becker's report, "I do, however, strongly suggest that environment and conditions of confinement matter, both for residents and for staff who work in facilities that appear to be less than therapeutically adequate." Dr. Becker also stated in her report, "The living that I witnessed at both the Annex and the Kearney facilities are among the worst that I have ever seen. Such conditions of confinement have served to lead many of the residents to believe that they are simply being warehoused and punished within deplorable conditions. This belief can lead to a sense of hopelessness and is ultimately counter-therapeutic." Therefore, any issues dealing with the environment should be included in the Settlement.

Cavanaugh rule on two DOC issues: dismissing CMS from the Settlement, and he ruled in DOC favor to transfer us to Rahway. in inhumane, and less than therapeutically adequate environment. Therefore, any issues dealing with the envinronment should be included in the Settlement.

Respectfully Submitted,

STU Resident

cc: file

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Albert Borden

Signature: Albert Borden

Resident Identification Number: #339

Date: 4/14/12

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

From: **MICHAEl Bordo**    # __2__
Print Your Name   and   Number
Special Treatment Unit
8 Production Way, Trl#2
P.O.Box 905
Avenel, New Jersey 07001

To: STU Settlement
c/o Seton Hall University School of Law
Center for Social Justice
833 McCarter Highway
Newark, New Jersey 07102

**Class Member's Objections/Comments Re Proposed Settlement**
**Raymond Alves, et al., v. Merrill Main, PH.D., et al.**

I object to the proposal settlement for the following reasons:

**#1.** SETON HALL - LAW, CENTER for Social Justice needs to be
Dropped from representation in this Law-Suit. For they helped
to create this Sexually Violent Predator Act, and now they want
to represent the Residents against it. They should Not be able
to have it both ways.

**#2.** The proposal shows the increase in program hours, the
increase in therapists, the increase of the potential new therapy
groups all in order to keep the Residents here longer **just
like a concentration camp.** The proposal Fails to show the
increase in of how the therapy will be releasing Residents.
For there are Residents that been here 8 to 12 years already,
would like to go home, This proposal is not showing that chance
of going home.

**#3.** Psycho-Educational Modules: The purposed Settlement does
not address the risk mitigation after the successful completion
of Modules. As the Settlement stands now I do not agree with
module testing only. At the completion of all modules, when
a Resident has successfully completed the module, there should
be some kind of Notice given that the Resident's risk to re-
offend has been mitigated, as well as, His level of
dangerousness. This will sequentially, lower the Resident's
risk assessment. This should be noted and written verification
should be given to the Resident, in addition to, this
verification being laced in the Residents file.

**#4.** Treatment Ombudsperson needs to be impartial, unbiased,
and Not beholden to the STU. Something needs to be implemented
to insure that there is No retaliation from Staff (Director,
Therapist & Social Workers, etc.) for submitting and talking
with the Treatment Ombudsperson about any complaints against
D.H.S., and/or its Staff members.

**#5.** Nothing is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

**#6.** Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; **a**-Juveniles that were civilly committed; **b**-Residents that were committed from the A.D.T.C. that have multiple years of treatment; **c**-Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; **d**-Persons that have been committed from society (that were on the streets) when they were selected for commitment; **e**-Treatment Refusals are not represented; **f**-MAP Residents are not represented; **g**-and South Wing Residents are not represented.

**#7,** Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the fairness of a Release Plan to all Residents. For there are some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

**#8.** In the form of Cruel and unusual punishment, **Residents on South Wing are label as being the "Undesirables"** and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

**#9.** Nothing is said in the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys. They are suppose to be doing this already, but are Not, in which case they erase the tape in front of the Resident.

**#10.** Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said by the Resident in such therapy groups.

**#11.** Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Residents on some sort of Diet.

**#12.** D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

**#13.** Nothing is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law Sidney S. Zipkin v. Margaret M. Heckler, 790 F.2d 16, 1986 U.S. App. LEXIS 24723: The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: Flemming v. Nestor, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); Schweiker v. Wilson, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); Richardson v. Belcher, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); Buccheri-Bianca v. Heckler, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). **Section 202, 42 U.S.C. § 402(x), provides in pertinent part:** (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, **unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual being able to engage in substantial gainful activity upon release and within a reasonable time.** Note: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: Washington v.Secretary of Health and Human Services, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f)(1) (42 U.S.C. 423(f)(1)) DISABILITY

-- SUSPENSION OF BENEFITS FOR INMATES OF PENAL INSTITUTIONS -- CONSTITUTIONALITY 20 CFR 404-468; SSR 83-28c; **The Statue directly provides that imprisoned felons may receive benefits if they are disable and participates in a satisfactory rehabilitation program while confined. The rehabilitation program must be approved by a competent court.** Thus, a person in this situation is endowed with the opportunity completely conforms and suffices for due process considerations. These programs should result in the person being able to engage in substantial gainful activity upon release with a reasonable period of time. **The plain terms Statute as well as its guidelines for satisfactory rehabilitation programs negate vagueness argument.** Simply, the Statute includes No Punitive elements. The suspension of benefits is not conditioned to any particular form of conduct but applies to all felony crimes **... even imprisoned felons may obtain disability benefits if participation in a rehabilitation program is undertaken.** The Statute rationally rests upon the reasonable attempt by Congress to provide disability benefit only to those persons who are deprived of a continuing source of income to satisfy basic food, clothing, shelter and medical needs. **For some unknown ignorant reason, most of the Residents are Not being allowed to collect such SSI, and/or SSD.**

**#14.** In regards to Residents Post-Discharge and/or Release, this Facility needs to realize that the State of New Jersey **No-longer** has administrative enforcement powers, **No-longer** has any type of authority or hold over (Residents) in preventing Them from leaving the State of New Jersey to reside elsewhere. See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super. 181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of the offender Not residing in New Jersey).

**#15.** Nothing is being said about the Medical Nightmares, other than the pushing of unnecessary needles & pills on Residents, and the unsanitary / mishandling of such medication, Medical Professionals are instructing the Department of Corrections to take Dying Residents with chest pains to a Hospital up in Somerset, which is approx. 40 miles away. This is where they send inmates from Northern State Prison to. Just like what just happen with the last dying Resident. To Whom Died before leaving these grounds. Since We Residents are No-Longer inmates, Why are We Not taken to Hospitals that are much closer? By this, the Department of Corrections professionals **KILLED** another Resident by instructing kitchen working Residents to unload Food Truck **BEFORE** allowing Ambulance to come in to pick up a Dying Resident with chest pains, Just like what just happen with one of the last dying Resident. To Whom Died before leaving these grounds. Is this what Future dying Residents have to look forward to, the purposely made mis-Judgments BEFORE being properly considered, and taken care of. There are Now a total of 41 Residents that had Died within (on the grounds of) this facility of the Special Treatment Unit. Administration Officials to this facility has had approx. 36 of these Residents that

Died here at the Special Treatment Unit, release through treatment, and living on the streets.

#16. Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information.** See: <u>Hill v. Sciarrotta</u>, 14 F.3d 210 (2nd Cir. 1998). Residents are being coerced to speak about their inaccurate Convicted and Non-Convicted Sex Crimes, if they do not, these Residents are being punish by being put on Treatment Refusal Status. Plus, In the attempt of a Resident speaking with the officials of T.P.R.C. to correct their inaccurate records, T.P.R.C. officials refuses to do anything about it and expresses to tell it to the Civil Commitment Court Judge. To where NOTHING is done to correct the matter.

#17. I object to it being brought up that there should be 7-Therapist to every 50 Residents. This include certified Social Workers who think that they are License Therapists? Plus, if this is put in place, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should be canceled for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

#18. Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

#19. In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

#20. What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU. For as it stands right now, they are of No help to a Resident, and cannot be trusted.

#21. New Treatment & Release Plans needs to be establish for ALL Residents after this settlement becomes final.

#22. What is considered as Full Participation and/or Full Cooperation? For under case law of <u>Bender v. New Jersey Department of Corrections</u>, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full Cooperation is based on attendance and the quality of participation, and Not the information that is disclosed during therapy.** Plus, under case law of <u>McKune v. Lile</u>, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), **Prohibits the State from extracting information from a (Resident) about His past criminal history, that is <u>Not</u> the**

subject of a conviction. For There are some Residents to whom has Never been Convicted of a Sex Crime Offense, So how can You treat a person who has Never been Convicted of a Sex Crime Offense, when this State's SVPA appropriately limits it's application to Convicted Sex Offenders? See: In re Commitment of W.Z., 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Wouldn't this be a Double Jeopardy, Ex Post Facto, Res Judicada, and Recent Overt Act violations? These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#23. Some D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: There is the Main building and its Annex to the State of New Jersey's Special Treatment Unit. The Main building was the Rahway State Prison Administration Segregation Detention Center/Prison to house problem State Prisoners, Now it is being used to house the State of New Jersey's Special Treatment Unit Residents. How can this be considered as "Therapeutic" and Not Punitive?

#24. Some further D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: Four-Men cubicles; Residents at the Annex building are being warehoused and are being forced to live in approx. 10ft x 10ft Four-Men cubicle space. Inmates in a Prison live better and has more space than the Residents that live at this facility's Annex, in which this Annex building was use to house State inmates on their way out and back into society. How can this be considered as "Therapeutic" and Not Punitive?

#25. Residents are being taken to Prison Hospital for Medical special needs special check-ups, and/or special operations. How can being taken to Prison Hospital be considered as "Therapeutic" and Not Punitive?

#26. The Procedure to this SVPA Civil Commitment process for it has created a Due Process Violation of the commitment process: Not all "Convicted" Sex Offenders are being served Notice and/or are being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. Depriving ... of notice would strip them of significant liberty interest;

and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents **should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... **without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#27,** The Procedure to this SVPA Civil Commitment process has created a Unequal application of the Law: "Non-Convicted" Sex Offenders are Not being served Notice, Nor are they being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. **Depriving ... of notice would strip them of significant liberty interest;** and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents **should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#28.** The Question of appropriate treatment plan for committee to psychiatric institution **was not** to await possible rehearing, but required prompt and certain resolution, where evidence suggested that treatment afforded to committee **was not** providing him with meaningful opportunity for cure or improvement. Matter of Commitment of J.L.J., 509 A.2d 184, 210 N.J.Super. 1. N.J.Super.A.D. 1984.

**#29.** An Audit needs to be conducted, for the State of New Jersey Budget Committee had found that there is a Total of approx. $60-Million Dollars that **is missing** in running this State of New Jersey's Special Treatment Unit that houses the State of New Jersey's Sexually Violent Predators. In which, when D.H.S. Officials were asked of what happen to these funds, No answer was given.

#30. If this Resident is going to be placed on this Suit as a Plaintiff, He asks to be compensated in the amount of $25 Million Dollars from each listed defendant **in their Personal and Individual Capacities** for the deliberate indifference torment that the listed defendants continues to display towards this Resident/Plaintiff since the time of this Resident's temporary Civil Commitment / Civil Commitment to present date.


I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS

MADE BY ME ARE TRUE AND CORRECT.

Date: _April 16, 2012_

_Michael Bardo_
Sign Your Name

_Michael Bardo_
Print Your Name

Resident # _2_

Fr: _Michael Bordo SBT# 978081B  (South Unit_
Special Treatment Unit /B.J.S.A-Ad-Seg-unit
8 Production Way, Trl #2
CN 905
Avenel, New Jersey 07001


To:   STU Settlement
      c/o Seton Hall University school of Law
      Center for Social Justice
      833 McCarter Highway
      Newark, New Jersey 07102

      Re: **RAYMOND ALVES, et al, v. MERRILL MAIN, PH.D, et al,.**
          **Objection to Purposed Settlement**


1.  Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives
    of the Class. These residents do not, and cannot, represent the population as it stands. They
    have not experienced what separate classes of residents have experienced, therefore, making
    it impossible for the above named residents to speak on behalf of the population. There
    should be residents added to the representatives, listed above, that reflect the following
    Classes of persons; a) Juveniles that were civilly committed; b) Residents that were
    committed from the A.D.T.C. that have multiple years of treatment; c) Residents that have
    been informed that treatment would not diminish their risk to re-offend, therefore, rendering
    this commitment a life sentence; d) Persons that have been committed from society (that
    were on the streets) when they were selected for commitment; e) Treatment Refusals are not
    represented; f) MAP residents are not represented; g) and South Unit residents are not
    represented.

    _I object to this settlement. I got recommitted for
    having an affair with Dr Natalie Barone. I'm
    already being punished enough after completeing the
    program_

2.  Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation
    after the successful completion of Modules. As the Settlement stands now I do not agree with
    module testing only. At the completion of all modules, when a resident has successfully
    completed the module, there should be some kind of notice given that the resident's risk to
    re-offend has been mitigated, as well as, his level of dangerousness. This will sequentially,
    lower the resident's risk assessment. This should be noted and written verification should be
    given to the resident, in addition to, this verification being placed in the residents file.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: *Roberto BoTA*

Signature: *Roberto Bota*

Resident Identification Number: *371*

Date: *4-16-12*

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." There is a complete lack of objective criteria to determine de-escalation of restraints and timely release. I also completely object to numerous meritorious passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: _Lamont Brooks_

Signature: _Lamont Brooks_

Resident Identification Number: _317_

Date: _4-14-2012_

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement.  You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement.   The Court will not consider issues that are unrelated to the Settlement.  When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU.  The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing.  *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name:  RAMAND TROY BROOKS

Signature:  *Ramand T. Brooks*

Resident Identification Number:  #511

Date:  5/13/12

Comments:

2

From: RAMUNO TROY BROOKS   # 511
　　　　Print Your Name   and   Number
　　　　Special Treatment Unit
　　　　8 Production Way, Trl#2
　　　　P.O.Box 905
　　　　Avenel, New Jersey 07001

To: STU Settlement
　　　c/o Seton Hall University School of Law
　　　Center for Social Justice
　　　833 McCarter Highway
　　　Newark, New Jersey 07102

**Class  Member's  Objections/Comments  Re  Proposted  Settlement**
**Raymond Alves, et al., v. Merrill Main, PH.D., et al.**

I object to the proposal settlement for the following reasons:

**#1.** SETON HALL - LAW, CENTER for Social Justice needs to be Dropped from representation in this Law-Suit. For they helped to create this Sexually Violent Predator Act, and now they want to represent the Residents against it. They should Not be able to have it both  ways.

**#2.** The proposal shows the increase in program hours, the increase in therapists, the increase of the potential new therapy groups all in order to keep the Residents here longer **just like a concentration** camp. The proposal Fails to show the increase in of how the therapy will be releasing Residents. For there are Residents that been here 8 to 12 years already, would like to go home, This proposal is not showing that chance of going home.

**#3.** Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. At the completion of all modules, when a Resident has successfully completed the module, there should be some kind of Notice given that the Resident's risk to re-offend has been mitigated, as well as, His level of dangerousness. This will sequentially, lower the Resident's risk assessment. This should be noted and written verification should be given to the Resident, in addition to, this verification being placed in the Residents file.

**#4.** Treatment Ombudsperson needs to be impartial, unbiased, and Not beholden to the STU. Something needs to be implemented to insure that there is No retaliation from Staff (Director, Therapist & Social Workers, etc.) for submitting and talking with the Treatment Ombudsperson about any complaints against D.H.S., and/or its Staff members.

#5. Nothing is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

#6. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; a-Juveniles that were civilly committed; b-Residents that were committed from the A.D.T.C. that have multiple years of treatment; c-Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d-Persons that have been committed from society (that were on the streets) when they were selected for commitment; e-Treatment Refusals are not represented; f-MAP Residents are not represented; g-and South Wing Residents are not represented.

#7. Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the fairness of a Release Plan to all Residents. For there are some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

#8. In the form of Cruel and unusual punishment, **Residents on South Wing are label as being the "Undesirables"** and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

#9. Nothing is said in the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys. They are suppose to be doing this already, but are Not, in which case they erase the tape in front of the Resident.

#10. Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said by the Resident in such therapy groups.

#11. Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Residents on some sort of Diet.

#12. D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

#13. <u>Nothing</u> is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law <u>Sidney S. Zipkin v. Margaret M. Heckler</u>, 790 F.2d 16, 1986 U.S. App. LEXIS 24723:  The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: <u>Flemming v. Nestor</u>, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); <u>Schweiker v. Wilson</u>, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); <u>Richardson v. Belcher</u>, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); <u>Buccheri-Bianca v. Heckler</u>, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). Section 202, 42 U.S.C. § 402(x), **provides in pertinent part:** (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, **unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual** being able to engage in substantial gainful activity upon release and within a reasonable time. <u>Note</u>: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: <u>Washington v. Secretary of Health and Human Services</u>, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f)(1) (42 U.S.C. 423(f)(1)) DISABILITY

-- SUSPENSION OF BENEFITS FOR INMATES OF PENAL INSTITUTIONS -- CONSTITUTIONALITY 20 CFR 404-468; SSR 83-28c; **The Statue directly provides that imprisoned felons may receive benefits if they are disable and participates in a satisfactory rehabilitation program while confined. The rehabilitation program must be approved by a competent court.** Thus, a person in this situation is endowed with the opportunity completely conforms and suffices for due process considerations. These programs should result in the person being able to engage in substantial gainful activity upon release with a reasonable period of time. **The plain terms Statute as well as its guidelines for satisfactory rehabilitation programs negate vagueness argument.** Simply, the Statute includes No Punitive elements. The suspension of benefits is not conditioned to any particular form of conduct but applies to all felony crimes ... even **imprisoned felons may obtain disability benefits if participation in a rehabilitation program is undertaken.** The Statute rationally rests upon the reasonable attempt by Congress to provide disability benefit only to those persons who are deprived of a continuing source of income to satisfy basic food, clothing, shelter and medical needs. **For some unknown ignorant reason, most of the Residents are Not being allowed to collect such SSI, and/or SSD.**

**#14.** In regards to Residents Post-Discharge and/or Release, this Facility needs to realize that the State of New Jersey **No-longer** has administrative enforcement powers, **No-longer** has any type of authority or hold over (Residents) in preventing Them from leaving the State of New Jersey to reside elsewhere. See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super. 181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of the offender **Not** residing in New Jersey).

**#15.** Nothing is being said about the Medical Nightmares, other than the pushing of unnecessary needles & pills on Residents, and the unsanitary / mishandling of such medication, Medical Professionals are instructing the Department of Corrections to take Dying Residents with chest pains to a Hospital up in Somerset, which is approx. 40 miles away. This is where they send inmates from Northern State Prison to. Just like what just happen with the last dying Resident. To Whom Died before leaving these grounds. Since We Residents are No-Longer inmates, Why are We Not taken to Hospitals that are much closer? By this, the Department of Corrections professionals **KILLED** another Resident by instructing kitchen working Residents to unload Food Truck **BEFORE** allowing Ambulance to come in to pick up a Dying Resident with chest pains, Just like what just happen with one of the last dying Resident. To Whom Died before leaving these grounds. Is this what Future dying Residents have to look forward to, the purposely made mis-Judgments BEFORE being properly considered, and taken care of. There are Now a total of 41 Residents that had Died within (on the grounds of) this facility of the Special Treatment Unit. Administration Officials to this facility has had approx. 36 of these Residents that

Died here at the Special Treatment Unit, release through treatment, and living on the streets.

#16. Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information.** See: Hill v. Sciarrotta, 14 F.3d 210 (2nd Cir. 1998). Residents are being coerced to speak about their **inaccurate** Convicted and Non-Convicted Sex Crimes, if they do not, these Residents are being punish by being put on Treatment Refusal Status. Plus, In the attempt of a Resident speaking with the officials of T.P.R.C. to correct their **inaccurate** records, T.P.R.C. officials refuses to do anything about it and expresses to tell it to the Civil Commitment Court Judge. To where NOTHING is done to correct the matter.

#17. I object to it being brought up that there should be 7-Therapist to every 50 Residents. This include certified Social Workers who think that they are License Therapists? Plus, if this is put in place, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should be canceled for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

#18. Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

#19. In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

#20. What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU. For as it stands right now, they are of No help to a Resident, and cannot be trusted.

#21. New Treatment & Release Plans needs to be establish for ALL Residents after this settlement becomes final.

#22. What is considered as Full Participation and/or Full Cooperation? For under case law of Bender v. New Jersey Department of Corrections, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full Cooperation is based on attendance and the quality of participation, and Not the information that is disclosed during therapy.** Plus, under case law of McKune v. Lile, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), **Prohibits** the State from extracting information from a (Resident) about His past criminal history, that is Not the

subject of a **conviction.** For There are some Residents to whom has Never been Convicted of a Sex Crime Offense, So how can You treat a person who has Never been Convicted of a Sex Crime Offense, when **this** State's SVPA **appropriately limits it's application** to **Convicted Sex Offenders?** See: <u>In re Commitment of W.Z.,</u> 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Wouldn't this be a Double Jeopardy, Ex Post Facto, Res Judicada, and Recent Overt Act violations? These Residents **should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: <u>Matter of D.C.,</u> 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. <u>N.J.Super.A.D. 1995.</u> **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: <u>Mental Hygiene Legal Service v. Cuomo,</u> 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#23. Some D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: There is the Main building and its Annex to the State of New Jersey's Special Treatment Unit. The Main building was the Rahway State Prison Administration Segregation Detention Center/Prison to house problem State Prisoners, Now it is being used to house the State of New Jersey's Special Treatment Unit Residents. How can this be considered as "Therapeutic" and Not Punitive?

#24. Some further D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: Four-Men cubicles; Residents at the Annex building are being warehoused and are being forced to live in approx. 10ft x 10ft Four-Men cubicle space. Inmates in a Prison live better and has more space than the Residents that live at this facility's Annex, in which this Annex building was use to house State inmates on their way out and back into society. How can this be considered as "Therapeutic" and Not Punitive?

#25. Residents are being taken to Prison Hospital for Medical special needs special check-ups, and/or special operations. How can being taken to Prison Hospital be considered as "Therapeutic" and Not Punitive?

#26. The Procedure to this SVPA Civil Commitment process for it has created a Due Process Violation of the commitment process: Not all "Convicted" Sex Offenders are being served Notice and/or are being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. **Depriving ... of notice would strip them of significant liberty interest;**

and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: <u>In re Commitment of M.G.</u>, 751 A.2d 1101, 331 N.J.Super. 365. <u>N.J.Super.A.D. 2000.</u> These **Residents should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: <u>Matter of D.C.</u>, 656 A.2d 861, *281* N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. <u>N.J.Super.A.D. 1995.</u> **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: <u>Mental Hygiene Legal Service v. Cuomo</u>, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#27,** The Procedure to this SVPA Civil Commitment process has created a Unequal application of the Law: "Non-Convicted" Sex Offenders are Not being served Notice, Nor are they being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. **Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. Depriving ... of notice would strip them of significant liberty interest;** and that a **Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP).** See: <u>In re Commitment of M.G.</u>, 751 A.2d 1101, 331 N.J.Super. 365. <u>N.J.Super.A.D. 2000.</u> These **Residents should not have been involuntary committed where statutory civil commitment procedures were not followed.** See: <u>Matter of D.C.</u>, 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. <u>N.J.Super.A.D. 1995.</u> **Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional.** See: <u>Mental Hygiene Legal Service v. Cuomo</u>, 785 F.Sup.2d 205, 2011 *U.S.Dist.LEXIS* 40434 (2011).

**#28.** The Question of appropriate treatment plan for committee to psychiatric institution <u>**was not**</u> to await possible rehearing, but required prompt and certain resolution, where evidence suggested that treatment afforded to committee <u>**was not**</u> providing him with meaningful opportunity for cure or improvement. <u>Matter of Commitment of J.L.J.</u>, 509 A.2d 184, 210 N.J.Super. 1. <u>N.J.Super.A.D. 1984.</u>

**#29.** An Audit needs to be conducted, for the State of New Jersey Budget Committee had found that there **is a Total of approx. $60-Million Dollars** that **is missing** in running this State of New Jersey's Special Treatment Unit that houses the State of New Jersey's Sexually Violent Predators. In which, when D.H.S. Officials were asked of what happen to these funds, No answer was given.

#30. If this Resident is going to be placed on this Suit as a Plaintiff, He asks to be compensated in the amount of $25 Million Dollars from each listed defendant <u>in their Personal and Individual Capacities</u> for the deliberate indifference torment that the listed defendants continues to display *towards* this Resident/Plaintiff since the time of this Resident's temporary Civil Commitment / Civil Commitment to present date.


I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS

MADE BY ME ARE TRUE AND CORRECT.

Date: 4/30/12

_____
Sign Your Name

_____
Print Your Name

Resident # 511

## NOTICE OF PROPOSED SETTLEMENT
### *RAYMOND ALVES, et al. v. MERRILL MAIN, Ph.D. et al.*

This Notice is sent to you by Order of Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey.

PLEASE READ THIS NOTICE CAREFULLY. IT CONTAINS IMPORTANT INFORMATION ABOUT YOUR RIGHTS.

SI USTED NECESITA TRADUCCIÓN DE ESTOS DOCUMENTOS AL ESPAÑOL, POR FAVOR PONGA UNA SOLICITUD PARA OBTENER AYUDA CON LA TRADUCCIÓN EN UNA DE LAS CAJAS DE 'SOLICITUD DE TRABAJADORA SOCIAL' MONTADAS EN LAS UNIDADES DE ALOJAMIENTO STU.

Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey (the "Court") has preliminarily approved a proposed settlement (the "Settlement") in a case entitled *Raymond Alves, et al. v. Merrill Main, Ph.D., et al.*, No. 01-CV-0789 (the "Litigation"). If the Settlement receives final approval from the Court, the New Jersey Division of Mental Health and Addiction Services ("DMHAS"), which is responsible for the mental health treatment program at the Special Treatment Unit (the "STU") will be required to improve both the quantity and the quality of the therapeutic programming provided to residents of the STU. Such programming will be offered to all qualifying residents, regardless of the location of their living quarters. The Settlement also requires increased staffing of the STU, so as to provide a minimum of seven therapists for every fifty residents. In addition, the Settlement requires the STU treatment staff to provide individually tailored treatment that adequately meets the therapeutic needs of each resident; to adopt objectively measurable pre- and post-module testing; to provide test results promptly; and to provide residents, on a regular basis, with an estimate of the time required to complete their treatment goals, modules, and phases. The Settlement provides for the appointment of a Treatment Ombudsperson to investigate and address complaints regarding treatment-related issues. Further, the Court will appoint an independent Monitor who will conduct annual inspections of the treatment program at the STU to determine whether DMHAS is in compliance with the terms of the Settlement.

On August 6, 2012, Judge Cavanaugh will conduct a hearing to determine if the Settlement should be finally approved as fair, adequate, and reasonable (the "Fairness Hearing").

As a resident of the STU, committed or confined pending commitment pursuant to the New Jersey Sexually Violent Predator Act, you are a member of the class that was certified by Judge Cavanaugh on March 29, 2012 (the "Class"). All members of the Class will benefit from the Settlement, and be bound by it, if it is finally approved by the Court. This Notice explains the nature of the Litigation, describes the terms of the proposed Settlement, and informs you of your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing. *Any such objections or comments must be either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012 in order to be considered by Judge Cavanaugh at the Fairness Hearing.*

## FREQUENTLY ASKED QUESTIONS

**1.      What is the purpose of this Notice?**

The purpose of this Notice is to explain the Litigation and inform you of the terms of the proposed Settlement and your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing.

**2.      What is the Litigation about?**

The Litigation is a civil rights class action in which three Representative Plaintiffs—Raymond Alves, Michael Culbreth and Derrick Sessoms—assert claims on behalf of the Class against the New Jersey officials who are responsible for the treatment program at the STU. Plaintiffs allege that these officials have failed to provide the minimally adequate mental health treatment required by federal and state law before the government may subject a person to indefinite civil commitment on the basis of a mental health diagnosis. Plaintiffs further allege that the mental health treatment program at the STU is so inadequate as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Double Jeopardy Clause of the Fifth Amendment; the Cruel and Unusual Punishments Clause of the Eighth Amendment; the Americans with Disabilities Act, 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. § 794; the New Jersey Constitution; and N.J.S.A. §§ 30:4-24, 30:4-24.1 and 30:4-27.34.

**3.      What has happened in the Litigation?**

The Litigation began on March 9, 2001, when STU resident Raymond Alves filed a *pro se complaint* against various New Jersey officials responsible for the STU. On July 17, 2002, at Judge Cavanaugh's request, the Seton Hall University School of Law Center for Social Justice (the "CSJ") agreed to represent Mr. Alves, together with another STU resident, and shortly thereafter the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., now known as Gibbons, P.C. ("Gibbons") joined as co-counsel. An Amended Complaint was filed on October 25, 2002, raising various treatment-related claims against the New Jersey officials responsible for the mental health program at the STU. The Amended Complaint also raised claims against officials and employees of the New Jersey Department of Corrections ("DOC") regarding the living conditions at the STU facility in Kearny, New Jersey, where Mr. Alves resided, and the conduct of certain DOC officers employed there. The defendants moved to dismiss the Amended Complaint. On November 17, 2003, Judge Cavanaugh granted the motion in part and denied it in part.

From 2003 to 2005 the parties engaged in formal discovery. In addition, the plaintiffs retained an expert, Dr. Robert Prentky, who inspected the Kearny facility in May 2004. On October 28, 2004, the plaintiffs filed a motion to amend the Amended Complaint to seek class action status, and to certify a class. On April 12, 2005, in response to a suggestion from the Court, the parties agreed to pursue settlement negotiations, and the plaintiffs withdrew their motion. Counsel for both sides entered into a period of intensive negotiations, supervised by Magistrate Judge Mark Falk. On April 3, 2008, the Court approved the appointment of a joint neutral expert to assist in

2

the settlement process and issued an order governing the manner in which she would conduct her evaluation. On December 29, 2008, the expert, Dr. Judith Becker, issued her final written report.

Settlement negotiations were suspended in the spring of 2010, when Mr. Alves and other residents were moved from the Kearny facility to the current STU in Avenel, New Jersey, but resumed later that year. Based in part on the move, the DOC officials named as defendants in the Amended Complaint took the position that the claims against them were moot. Judge Falk urged the parties to work towards a settlement of the treatment-related claims against the officials responsible for the mental health treatment program at the STU. Counsel then renewed their efforts to reach a settlement with respect to those issues.

On January 20, 2012, at a hearing attended by the Representative Plaintiffs (via video-conference), counsel for both sides informed Judge Falk that they were prepared to execute a formal Settlement Agreement (the "Agreement"), which they did on February 3, 2012. On February 14, 2012, pursuant to the Settlement Agreement, the Second Amended Complaint was filed, formally adding Mr. Culbreth and Mr. Sessoms as named plaintiffs, seeking class action status, and updating the plaintiffs' claims concerning the mental health treatment program at the STU. The defendants named in the Second Amended Complaint are Merrill Main, Ph.D., in his official capacity as Clinical Director of the STU; Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"); Lynn A. Kovich, in her official capacity as the Assistant Commissioner and Deputy Director of the DMHAS; and Jeffrey S. Chiesa, in his official capacity as Attorney General of New Jersey. The Second Amended Complaint does not include any claims against the DOC or its officials, nor any claims concerning the physical facilities at the STU.

On March 29, 2012, Judge Cavanaugh certified the Class, consisting of all persons who are civilly committed or confined pending commitment to the STU pursuant to the NJSVPA, with Messrs. Alves, Culbreth and Sessoms as Representative Plaintiffs. The Court also appointed CSJ and Gibbons as Class Counsel, directed them to send this Notice to each member of the Class, and scheduled the Fairness Hearing to take place on August 6, 2012.

During the pendency of the Litigation, a number of STU residents filed claims that overlapped or were similar to the claims filed by Mr. Alves. Many of these cases were consolidated, in whole or in part, with the Litigation. Other STU residents filed additional documents with the Court, some of them supporting Mr. Alves' position or asserting similar claims of their own.

4.    **Who will be included in the Settlement?**

If the Settlement receives final approval from the Court, it will be binding on all members of the Class and on all of the defendants named in the Second Amended Complaint and their successors in those offices (the "Settled Defendants"). In other words, the Settlement will resolve the claims set forth in the Second Amended Complaint on behalf of every member of the Class. The Settlement will *not* affect claims by individual residents that are outside of the scope of the Second Amended Complaint, such as tort claims, *habeas corpus* petitions, or challenges to civil commitment under the NJSVPA by an individual resident. Nor will the Settlement prevent residents from filing or pursuing claims against DOC officials or employees.

3

5.      **Who is Class Counsel?**

The Court has appointed the CSJ and Gibbons to represent the Class.  If you have any questions, you may contact Class Counsel:

> **Barbara Moses, Esq.**
> **Seton Hall University School of Law**
> **Center for Social Justice**
> 833 McCarter Highway
> Newark, NJ 07102
> (973) 642-8700
>
> **Lawrence S. Lustberg, Esq.**
> **Jonathan Manes, Esq.**
> **Gibbons P.C.**
> One Gateway Center
> Newark, NJ 07102
> (973) 596-4500

6.      **What are the Benefits of the Proposed Settlement?**

The Settlement Agreement is a lengthy and complex document.  You may obtain a copy of the complete Agreement by placing your request in a Social Work Request box at the STU.  This Notice provides a summary of some of the key terms of the Agreement.

   a.   <u>Individually Tailored Treatment</u>

If the Settlement is finally approved by the Court, treatment staff at the STU will be required to adopt and employ clinical assessments and provide individually tailored treatment that adequately meets your therapeutic needs.   Any final report, recommendation, or determination for treatment, treatment status, phase designation, phase progression, and/or disciplinary action must be communicated to you by treatment staff, both orally and in writing, within fifteen (15) days of such action.  Moreover, treatment staff must adopt objectively measurable pre- and post-module testing, provide you with a copy of your test results within fifteen (15) days of the completion of the post-module testing, and discuss your results in process group within thirty (30) days from the completion of the module.

Further, you will be provided with an updated and accurate Residents' Guide which will include, among other things, a description of the treatment program, including process groups, treatment modules, program phases, and the estimated times for completion of each phase.  This Guide will also include an explanation of the ways in which you may request individual treatment sessions.

   b.   <u>Comprehensive Initial Treatment Plan</u>

The treatment staff will be required to produce a comprehensive initial treatment plan for you

4

within forty-five (45) days of entry of an order of final commitment.  If you have already been committed but have not yet received a comprehensive treatment plan, you will be entitled to such a treatment plan within forty-five (45) days after the Settlement is approved.  Your comprehensive initial treatment plan must be tailored to your individual needs as determined by the treatment staff, and will include and incorporate your past treatment progress and evaluations, if available, including prior treatment at the Adult Diagnostic and Treatment Center.  Moreover, you will be provided with specific and individualized recommendations regarding your treatment goals, the objective criteria necessary to meet these goals, and *anticipated time frames for completion of both the objective criteria and your ultimate goals*.

**c.   Six Month Review by Treatment Team**

Your comprehensive treatment plan will be reviewed by your treatment team every six (6) months and will be followed within fifteen (15) days by a meeting with you.  During your meeting, your treatment team will review your progress, discuss new treatment goals for the next six months, including specific curricular recommendations, and provide you with an *estimate of the time for completion of your treatment goals, modules, and phases,* based on an individualized assessment of your participation in treatment, with the assumption that you will fully participate in treatment.

If you were subject to restrictions under modified activities programming ("MAP") at any time during the past six months, your treatment team will review your progress through MAP; the impact, if any, that your time on MAP may have on your phase designation; and the steps that you should take to avoid future MAP restrictions.

Additionally, the treatment team will discuss with you any recommendations made to the Treatment Progress Review Committee ("TPRC") for your progression *in phase designation,* a description of the recommended phases, and your ability to enroll in modules within the recommended phase while official designation change is pending upon TPRC review.

**d.   Annual Review by TPRC**

The Treatment Progress Review Committee ("TPRC") will conduct an annual review of your treatment plan and will produce a written report and recommendation, including a phase designation recommendation.  Recommendations for phase 3 or higher will be submitted to a Clinical Assessment Review Panel ("CARP") for approval.  Your treatment team will deliver the final TPRC report to you within fifteen (15) days of receipt from the TPRC or CARP.  In addition to delivering the written report, the treatment staff will explain it to you, including the following:

(i)   Your current phase designation and any change in designation;

(ii)   The requirements and evaluation criteria for progression in each phase, along with *an estimated time frame in which you can complete your current phase,* based upon an individualized assessment of your participation in treatment with the assumption that you will participate in treatment;

5

 **(iii)** Specific, individualized recommendations for specific treatment goals and an objective criteria necessary for meeting those goals, including an estimate of the time required for you to complete both the objective criteria and the goals;

 **(iv)** Specific curricular recommendations and an estimate of when the recommended module(s) will next be offered and available to you; and

 **(v)** Any recommendations regarding your potential post-discharge placement file or discharge plan.

**e. Overall Course of Treatment Not to be Extended**

The treatment program at the STU is currently divided into five (5) phases, from Phase 1 ("Orientation") to Phase 5 ("Transition"). If the Settlement is finally approved by the Court, DMHAS will be required to notify Class Counsel of any proposed changes to the phase designations in advance, and will not be permitted to use any such changes to extend the overall course of treatment or to keep residents in the program any longer than they would be under the current phase designations.

**f. At Least Twenty Hours of Therapeutic Programming per Week**

If the Settlement is finally approved by the Court, every resident not on Treatment Refusal Status or subject to restrictions under MAP will have the opportunity to receive a minimum of twenty (20) hours per week of professionally led (or in the case of self-help groups, professionally monitored) therapeutic programming. This programming will be made available to you regardless of the location of your living quarters and will encompass sex-offender-specific, mental health, recreational, and rehabilitation/vocational programming, and will include, *at a minimum*:

 **(i)** Three (3) ninety (90) minute process group sessions per week;

 **(ii)** One (1) to two (2) ninety (90) minute modules per week, if therapeutically appropriate;

 **(iii)** Professionally monitored self-help groups for at least ninety (90) minutes per week, provided willing and appropriate Residents are available to facilitate self-help groups; and

 **(iv)** Regularly scheduled community meetings.

Unstructured recreational activity will not count as "therapeutic programming" for purposes of the 20 hour per week minimum. At least eighty-seven percent (87%) of the scheduled process group meetings must actually meet during the calendar year. Such meetings must utilize the full time periods for which they are scheduled and take place in designated meeting rooms providing a reasonable degree of quiet and privacy.

DMHAS will make available a minimum of one (1) to two (2) module(s) in every sixteen (16) week module cycle for residents not on Treatment Refusal Status or MAP, so long as (a) the module is currently recommended in that resident's comprehensive treatment plan, six month review, TPRC review, or has been mandated by court order; and (b) there is sufficient space available in the recommended module (or DMHAS has offered a self-study module).

6

Your post-module testing must be conducted within seven (7) days of completing either a class-based or self-study module.

### g. MAP Groups

If you are subject to Tier or Wing MAP, you will be placed in a MAP Group that meets at least twice per week. *If you are subject to Program MAP, you will continue to attend all of your regularly-assigned process group sessions and modules*, unless specifically contraindicated in light of the underlying behaviors that resulted in the MAP placement. In such cases, you will be informed of the reasons for the treatment restrictions, in writing, as part of your initial MAP Placement Review and at least every thirty (30) days thereafter so long as the restrictions remain in place. Further, you will be placed in a MAP Group that meets at least twice per week until such time as you are permitted to resume attendance at all of your regularly-assigned process group sessions and modules.

### h. Increased Staff Ratios

If the Settlement is finally approved by the Court, DMHAS will be required to hire and retain sufficient additional treatment staff to maintain a ratio of seven (7) therapists for every fifty (50) residents who are actively participating in treatment. Treatment staff must meet all qualifications for their job titles (including licensure or certification, where required) specified in the New Jersey Civil Service standards.

### i. Vocational Training

DMHAS will conduct individualized vocational assessments of each resident within 45 days of final commitment, evaluate his skills and strengths, and develop a plan for building on them through vocational training. All residents who are not on Treatment *Refusal Status* or *subject to* MAP will be offered an average of ten (10) hours of vocational activities per week, including institutional jobs. Additionally, DMHAS will solicit and arrange for outside vendors to provide onsite vocational offerings (to be paid for by interested residents), provided physical plant space is available.

### j. Educational Opportunities

You will be entitled to pursue an educational curriculum for *at least* ten (10) hours per week, including formal instruction, homework time, and self-help programming. If you are interested in remedial education or GED coursework, you will be provided such education within six (6) months of your initial request. If you wish to pursue post-secondary education within the facility (*e.g.*, college courses), you may do so, as long as DMHAS is not required to pay for the program and it does not interfere with your therapeutic goals.

### k. Recreational Opportunities

DMHAS will conduct annual surveys to assess your desired recreational activities. Staffing will be provided for professionally facilitated recreational activities six (6) days per week.

7

**l.   Post-Discharge Preparation**

If the Settlement is finally approved, social work staff will be required to use the information contained in your potential post-discharge placement file to develop a discharge plan for you: when recommended by the TPRC, when ordered by a court, or when you reach Phase 4.  In developing the discharge plan, the social work staff must assist you in finding housing and obtaining support.

**m. Treatment Ombudsperson**

If the Settlement is finally approved, a Treatment Ombudsperson will be appointed and will establish a resident complaint system for treatment issues.  The Treatment Ombudsperson will establish and implement procedures for eliciting, receiving, processing, responding to, and resolving complaints from you, your family members, and other interested citizens concerning treatment conditions at the STU. DMHAS will create a standardized form for treatment-related complaints and provide this form to any resident upon request. Further, DMHAS will submit resident complaint forms directly to the Treatment Ombudsperson.

The Treatment Ombudsperson will determine whether a complaint is within the scope of the Settlement and send the resident a standard notice of this determination within thirty (30) days of receipt of the complaint form.  The Treatment Ombudsperson will then investigate any complaints within the scope of the Settlement and take action appropriately tailored to the nature of the resident complaint, which may include:

(i)     Communicating with the appropriate administrator or staff at the STU;

(ii)    Gathering information from the appropriate administrator or staff at the STU;

(iii)   Informing the appropriate administrator or staff of the resident's complaint;

(iv)   Communicating with the complaining resident to further investigate the nature of complaint; and/or

(v)    Taking such other measures as the Treatment Ombudsperson deems appropriate to investigate or resolve the resident complaint.

The complaining resident will be timely notified by the Treatment Ombudsperson of any additional information or results obtained. Moreover, the Treatment Ombudsperson will correspond with the Director of the STU regarding issues in the treatment program that are sufficiently systemic from a review of the residents' complaints.

In addition to documenting all oral correspondence, the Treatment Ombudsperson will attend a community meeting at least twice a year in order to explain his or her role, answer questions, and inform you of the status of any systemic treatment problems reported to the Director of the STU.

**n.   Independent Monitor**

If the Settlement is finally approved, *an independent Monitor will be appointed by the Court* to monitor the Settled Defendants' compliance with the terms of the Agreement.  No

8

person who has been associated with the underlying Litigation, or who has a business relationship with the Settling Defendants, may be appointed as the Monitor.

The independent Monitor will conduct five (5) annual inspections of the STU (unless the monitoring period is shortened or lengthened in accordance with the Agreement) to determine whether the Settled Defendants are in compliance or not in compliance with the requirements of the Agreement. The first annual inspection will be conducted no later than nine (9) months from the final approval of the Settlement. Each inspection may last up to five (5) business days and will be followed by a written report determining whether DMHAS *is in compliance* with each material provision of the Agreement, describing the steps taken by DMHAS to achieve compliance, describing any change in circumstances affecting DMHAS's ability to comply, summarizing information learned from the residents, and summarizing information learned from DMHAS staff. During the inspections:

(i)     The Monitor will have *full access* to the facility. The Monitor may not be denied entry to the STU or any portion thereof except for reasons of security, in which case the Monitor must be given full access as soon as soon as the circumstances that caused the security concern have been abated.

(ii)    The Monitor will have *full access* to the residents who are members of the Class, may review their treatment records, and may conduct interviews with residents.

(iii)   The Monitor may interview any DMHAS employee working at the facility, including treatment staff, administrative staff, medical services staff, and vocational instructors. *All DMHAS employees must communicate and cooperate with the Monitor.*

## 7.     What is NOT Included in the Settlement?

The Settlement deals specifically with the treatment program at the STU. The Settlement will not require any changes to the physical facility, nor to the conduct of the DOC personnel responsible for security at the STU. This does not mean that residents will be required to give up any claims they may have against the DOC, its officials, or its employees. Those claims are simply not part of the Settlement and must be pursued through separate litigation.

## 8.     Who Will Pay for the Settlement?

The Settled Defendants will be responsible for the costs of the Settlement, including the cost of the Monitor, subject to appropriation of sufficient funding by the New Jersey Legislature. The Agreement requires the Settled Defendants to seek such funding from the Legislature as one of DHS's top priorities. The Agreement also contains provisions specifying the parties' rights and obligations in the event the Legislature fails to appropriate the necessary funds, including the plaintiffs' right to declare the Agreement void, and resume litigation, with respect to any provision that the Settled Defendants do not comply with as a result of a budget shortfall or otherwise.

9

9.      **How is Class Counsel being paid?**

If the Settlement is finally approved by the Court, the Settled Defendants will pay CSJ the sum of seventy-eight thousand dollars ($78,000.00) in attorneys' fees. This represents a small fraction of the actual costs and fees accrued by CSJ over the course of the Litigation.

10.     **When is the Fairness Hearing?**

A Fairness Hearing will be held to determine whether final approval of the Settlement should be granted. At the Fairness Hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate, and will consider any timely objections made concerning the Settlement. The hearing will take place before Judge Cavanaugh on August 6, 2012, at 9:30 a.m., or as soon thereafter as practicable, in the United States District Court for the District of New Jersey, U.S. Post Office and Courthouse, 1 Federal Square, Newark, New Jersey, 07101, Court Room PO 4. The time and date of this hearing may be continued or adjourned. **YOU ARE NOT REQUIRED TO ATTEND THIS HEARING. ANY AND ALL PROPERLY SUBMITTED OBJECTIONS BY CLASS MEMBERS WILL BE PRESENTED TO THE COURT AND CONSIDERED, REGARDLESS OF WHETHER OR NOT THE OBJECTOR PERSONALLY APPEARS.**

11.     **How Can I Object to the Proposed Settlement?**

If you want to object to or comment on the Settlement, you may complete the enclosed form entitled Class Member's Objections/Comments re Proposed Settlement, and mail it to Class Counsel at the following address:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

You may also deposit your written objections/comments in a Social Work Request box at the STU, in which case the staff of the STU will mail it for you, free of charge. Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Your objections/comments will not be considered unless they are either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012.*

12.     **What if I Have More Questions?**

If you have questions about this Notice, or want additional information, you may contact Class Counsel. You may also consult your personal counsel, if any. If you want to see the complete Settlement Agreement, you may place your request in a Social Work Request box. *You should not contact the Court, the Settled Defendants, or their counsel.*

10

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Charlie Brown

Signature: Charlie Brown

Resident Identification Number: 605

Date: 18 april 2012

Comments:

any objections are as follows: I should have been notified in enough time before my maximum release date that I was being considered for an involuntary commitment to give me enough time to retain counsel. If sex offender therapy was required then it should have been offered to me in the D.O.C.

As an inmate having served (20) twenty years I should have been offered some kind of out-patient program as opposed to being confined even longer than the punitive aspect of my sentence. Having been sentenced before the enactment of the S.V.P. act I should have been immune of its consequences. There is no time criteria for completion of this program, therefore without saying I have been delivered from the exhaustion of one sentence to serving life on another. The opinions of the therapists who have not had the opportunity to spend more time than (30) thirty mins with me is hardly enough evidence to warrent a hearing for an involuntary civil committment. All terms of my sentence were met by me all the way to the exhaustion of that sentence, the S.V.P act is an intruder on my sentence, if the state will not allow me to take anything away from my sentence, than likewise the state should not be allowed to make any additions to the same. Therapy here at the S.T.U. is a joke & I cannot imagine how any therapeutic progress can take place in such a hostile ambiesed. Family & friends consult the internet regarding my whereabouts & every database has me listed as "released" There are so many more objections that I have, however here are just a few off of the top of my head & I don't want to take up too much more of your time & Thanks for your help ....

2

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: *Keith Caldwell*

Signature: *[signature]*

Resident Identification Number: *428*

Date: *4-15-2012*

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Michael Cantrell

Signature: Michael Cantrell

Resident Identification Number: 301

Date: 4/14/12

Comments:

There's no Mention of Halfway Houses being built, just for Sex offenders.
No Mention of being Placed in unhealthy Living Conditions, 'Readville' which was a Condemned building.

This place is designed more for Punishment than Treatment, theres More Razor wire Around this Prison than any other that I've been in. Doc. Controls everything Here, And they shouldnt be Here at all if This is Truly a Theurapetic Setting.

The Food is Prison Food.

The Rules Are Prison Rules

the Bottom line is I feel like we've been Sold out! More Treatment with less Pay out. I dont see Any Fairness at All, I've been doing this for 27 years Now, when is enough! enough.

2

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: David A. Carson

Signature: David A. Carson

Resident Identification Number: 000016

Date: 4/27/2012

Comments:

I object to the treatment Altogether for my religious right Treatment is in opposition to the word of god. I refused since 1999 by signing A bonding legal document which says It's my right to do so, yet they keep me

civilly committed each year by saying I'm a untreated sex-offender. Attached is the consent form which is the Legal binding document, saying, the Court will rely on record reviews since I don't attend treatment to whether I should remain civilly committed. I have been A role model resident according to there record reviews jet I'm still civilly confined for 13 years. What have I done wrong to remain civilly committed. According to them without even participating in treatment, I'm A low risk to re-offend under their scale. I have been punished by DHS all these years even without a job because I'm A treatment refusal. Where did my money go. Who spent it. No where on the Consent form does it say I will be deprived with a Job (livillyhood) if I don't participate in treatment. This is false confinement for me All these years and Job fairness since this is the land of opportunity and not used as an incentive to Attend treatment. Attached Also is proof of my clean slate all these years. Plus newspaper article.

2

## SPECIAL OFFENDERS UNIT
### INFORMED CONSENT FORM

I, _____DAVID CARSON_____ understand that I have been civilly committed to the Northern Regional Unit for Special Offenders. I further understand that the information I provide to any staff member can become part of written reports, and/or of oral testimony as a means of providing the court with information to use in its decision as to whether I should remain civilly committed.

By signing below, I understand that the information I provide will not be kept confidential. Finally, by signing below, I waive my right to have an attorney present at this time.

_____
Resident's Signature

_____
Date

_____
Staff Member's Signature and Title

_____
Witness

I _____DAVID CARSON_____ am refusing to participate in the evaluation/ assessment/ treatment process. I further understand that staff will rely on record reviews and on observation as a means of providing the court with information to use in its decision as to whether I should remain civilly committed.

_David A Carson_____
Resident's Signature

_10/19/99_____
Date

_Jackson T. Bond   Psy. D.__
Staff Member's Signature and Title   psycholo.

_Pete Cummilla   Un_____
Witness   program coordinator
                  Admissions

R 1 JD
1.4/01

convincing evidence exists that D.A.C. is likely to engage in future acts of sexual violence. Additionally, the court records suggests that more weight was given to the fact that D.A.C. continued to refuse to participate in treatment (which is his right to do so) then to the actual results of the evaluations by the states experts.  The court gave little credibility to the undisputed fact that D.A.C.'s behavior since his commitment in 1999, even without treatment, is a strong indicator that he is not likely to re-offend.  This important factor serves to reinforce the results of the Static-99 objective test. The offenses for which D.A.C. remains committed occurred some eighteen years earlier and to date D.A.C.'s incarceration and commitment record clearly reflects that he has been for all intents and purposes been a model inmate; following all the rules of the STU and has consistently attributed his refusal to participate in treatment as to his religious beliefs.  Yet even without any such treatment D.A.C.'s Static-99 score places him in the medium to low risk for reoffense.  Furthermore, despite the objective evaluation evidence of the Static-99 Dr. Freibusch in his testimony stated that D.A.C. was "highly likely" to reoffend.  Clearly, this subjective conclusion is at direct odds with the objective clinical findings.

. In the present matter the court failed to undertake the necessary analysis by disregarding the objective clinical reports and allowing the experts to substitute their subjective beliefs that notwithstanding the low to medium risk assessment, D.A.C. is highly likely to re-offend.

# Arrest of offenders bring call to toughen Megan's Law

THE STAR-LEDGER
by: Michael Reilly, Staff
Tuesday, July 26, 2005

### State senator and Woodbridge mayor want wider notification rule, but critics see constitutional issues

Following the arrest of two registered sex offenders in Woodbridge last week, Mayor Frank G. Pelzman and Senator Joseph Vitale (D-Middlesex) yesterday proposed changes they said would strengthen Megan's Law.

Vitale said the proposed legislation would broaden towns' abilities to notify residents that registered sex offenders are living in their neighborhood. The legislation would also call for mandatory therapy sessions for convicted sex offenders while they are in jail.

"I believe that someone who is convicted of sexual assault, no matter what degree, should not be released (from prison) unless he agrees to counseling and therapy, which is now offered, but not required," while the offender is in jail, said Vitale, whose district includes Woodbridge.

Pelzman emphasized the notification aspect of the proposal, which calls for a comprehensive policy that would allow towns to directly notify their residents of any sex offender living in the area. That provision is currently reserved for offenders who are deemed at the highest risk of repeating a sex crime.

"I want to do what any mayor would," Pelzman said. "I want to have the power to tell the people where sex offenders are living. In my opinion, the notification process leaves a lot to be desired."

Critics of the proposal, however , said the notification aspect may be struck down in federal court.

"Every time we get one of these proposals, its always about notification. I believe notification is the least effective part of Megan's Law," said state Assistant Deputy Public Defender Carol Sands, who has worked on Megan's Law cases for the past six years.

Though not familiar with the details, she said, "from what I hear about this proposal, it sounds unconstitutional."

Since Megan's Law was passed in 1994, the notification aspect of the measure has been challenged in federal court on constitutional grounds. IN 2003, the 3rd Circuit Court of Appeals in Philadelphia cleared the way for New Jersey to put sex offenders' addresses on its Internet registry, ruling that the right of the public to know, outweighs offenders' right to privacy.

The call for strengthening Megan's Law came just days after Woodbridge police arrested James Young and Kenneth Stanhope, two registered sex offenders who had been living next door to each other.

Young was charged with conspiracy to lure children and Stanhope was charged with luring children after a local woman, April Amodea, noticed Stanhope talking to her child and acting suspiciously.

"He never spoke to me or any of the neighbors. There was no neighbor contact. He would only talk to the children," she said. "It must've been a motherly instinct. It just didn't sit right."

Amodea said that she looked up Stanhope on the state's Internet registry. When she didn't find his name there, she contacted the county Department of Adult Corrections, which confirmed that Stanhope is a registered sex offender, prompting Amodea to call the police.

"Thanks to April's vigilance, we dodged a bullet," Pelzman said.

"What's most upsetting is that there are so many sex offenders that are out there that we don't know and can't know about, she said.

As Megan's Law is currently structured, each convicted sex offender is assigned one of three "tiers" based on how likely a given offender is to commit another crime.  Tier one offenders are deemed to be at low risk of repeating a crime, tier two are moderate risk, and tier three offenders are considered high risk.  Generally, tiers also correspond to the severity of the crime in which an offender has been convicted.  Young is classified as a tier two offender. Stanhope's tier could not be determined yesterday.

While some tier two and tier three offenders are posted on the Internet registry, local communities are authorized to notify residents only of tier three offenders living in their midst, an arrangement that Vitale and Pelzman hope will change.

"If I'm a parent living near a sex offender, tier tow or tier three is meaningless," Vitale said, adding, "I thing it's dangerous" to have residents unaware that offenders are living near them.

Regardless of the tier assigned an offender, Pelzman said, "I still should have the ability to let residents know that they're there."

But Sands said that changing the notification laws is among the worst ways to combat sex offensive in New Jersey.

She also cautioned that the Internet sex offender registry can do more harm than good, especially if it is expanded to include all tier two and three offenders.

If you put the tier two and three offenders on the Internet, those who have steady jobs are going to get fired.  And if they can't get a job, they will lose their homes and be more likely to turn to substance abuse and other behaviors" that caused them to commit a crime in the first place, she said.

"Homeless sex offenders are obviously more dangerous than ones with a more stable life," Sands said.

With regards to mandatory therapy, though, Sands was largely in agreement with Vitale.

"Therapy is shown to have a 25 percent reduction in re-offense among sex offenders," she said, but she added that the rate of repeat offense among sex offenders is only 6 percent statewide.

"One of the myths is that these people never get cured, but 94 percent don't re-offend," she said.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERILL MAIN, PH.D., et al.*

Lawrence S. Lustbert, Esq.
Jonathan Manes, Esq.
Gibbons P.C.
One Gateway Center
Newark NJ 07102

Print Name: _David A. Carson_

Signature: _David A. Carson_

Resident Identifacation Number: #000016

Date: 5/1/2012

Phone me anytime at: 732-574-8239

Comments:

I object to the treatment altogether for
my religious rights. Treatment is in opposition
to the word of God. I refused since 1999 by
signing a bonding legal document by the treatment
team which says its my right to do so whether I
consent or not yet they keep me civilly committed
each year by saying I'm a untreated sex offender.
Attached is the consent form which is the legal
bonding document, saying the Court will rely on
record reviews since I don't attend treatment as
to whether I should remain civilly committed. This
clearly proves that treatment is not mandatory
for my release. I have been a role model/
resident according to their record reviews yet
I'm still civilly committed and confined for 13 years.
What have I done wrong to remain civilly committed
according to them, without me even participating
in the treatment. I'm a low risk to re-offend
under their scale. Attached is that document as well.
I have also been punished by DHS all these years even
without a job because I'm a treatment refusal. Na where
on the consent form does it say I will be deprived
from a livelyhood of income if I don't
participate in treatment. This is false confinement

OVER →

FOR ME ALL THESE YEARS AND JOB FAIRNESS SINCE this is the land of opportunity and not using Treatment as an incentive, and forethactic to stay and chase them to attend Treatment, you cabot forseeeed a baby so how are to going to forse a grown man, but this is what they use to stay in business, I've had a clean slate all these years an still contined. Treatment wasnt even mandatory in prison and I should have been released while in prison, Attached is that Newpaper article as well that its not mandatory just like its not mandatory under Civil confinement so why am I here. It spells false confinement without any justification even in your their laws.

# SPECIAL OFFENDERS UNIT
## INFORMED CONSENT FORM

I, _DAVID CARSON_ _____ understand that I have been civilly committed to the Northern Regional Unit for Special Offenders. I further understand that the information I provide to any staff member can become part of written reports, and/or of oral testimony as a means of providing the court with information to use in its decision as to whether I should remain civilly committed.

By signing below, I understand that the information I provide will not be kept confidential. Finally, by signing below, I waive my right to have an attorney present at this time.

Resident's Signature _____

Date _____

Staff Member's Signature and Title _____

Witness _____

I _DAVID CARSON_ _____ am refusing to participate in the evaluation/ assessment/ treatment process. I further understand that staff will rely on record reviews and on observation as a means of providing the court with information to use in its decision as to whether I should remain civilly committed.

_David A Carson_
Resident's Signature

10/19/99
Date

_Jackson T. G. Bond_  Psy. D.
Staff Member's Signature and Title psycholo.

_Felix Gumula_
Witness program coordinator admissions

R I ID
1.4/01

convincing evidence exists that D.A.C. is likely to engage in future acts of sexual violence. Additionally, the court records suggests that more weight was given to the fact that D.A.C. continued to refuse to participate in treatment (which is his right to do so) then to the actual results of the evaluations by the states experts.  The court gave little credibility to the undisputed fact that D.A.C.'s behavior since his commitment in 1999, even without treatment, is a strong indicator that he is not likely to re-offend.  This important factor serves to reinforce the results of the Static-99 objective test. The offenses for which D.A.C. remains committed occurred some eighteen years earlier and to date D.A.C.'s incarceration and commitment record clearly reflects that he has been for all intents and purposes been a model inmate; following all the rules of the STU and has consistently attributed his refusal to participate in treatment as to his religious beliefs.  Yet even without any such treatment D.A.C.'s Static-99 score places him in the medium to low risk for reoffense.  Furthermore, despite the objective evaluation evidence of the Static-99 Dr. Freibusch in his testimony stated that D.A.C. was "highly likely" to reoffend.  Clearly, this subjective conclusion is at direct odds with the objective clinical findings.

 In the present matter the court failed to undertake the necessary analysis by disregarding the objective clinical reports and allowing the experts to substitute their subjective beliefs that notwithstanding the low to medium risk assessment, D.A.C. is highly likely to re-offend.

# Arrest of offenders bring call to toughen Megan's Law

THE STAR-LEDGER
by: Michael Reilly, Staff
Tuesday, July 26, 2005

**State senator and Woodbridge mayor want wider notification rule, but critics see constitutional issues**

Following the arrest of two registered sex offenders in Woodbridge last week, Mayor Frank G. Pelzman and Senator Joseph Vitale (D-Middlesex) yesterday proposed changes they said would strengthen Megan's Law.

Vitale said the proposed legislation would broaden towns' abilities to notify residents that registered sex offenders are living in their neighborhood. The legislation would also call for mandatory therapy sessions for convicted sex offenders while they are in jail.

"I believe that someone who is convicted of sexual assault, no matter what degree, should not be released (from prison) unless he agrees to counseling and therapy, which is now offered, but not required," while the offender is in jail, said Vitale, whose district includes Woodbridge.

Pelzman emphasized the notification aspect of the proposal, which calls for a comprehensive policy that would allow towns to directly notify their residents of any sex offender living in the area. That provision is currently reserved for offenders who are deemed at the highest risk of repeating a sex crime.

"I want to do what any mayor would," Pelzman said. "I want to have the power to tell the people where sex offenders are living. In my opinion, the notification process leaves a lot to be desired."

Critics of the proposal, however , said the notification aspect may be struck down in federal court.

"Every time we get one of these proposals, its always about notification. I believe notification is the least effective part of Megan's Law," said state Assistant Deputy Public Defender Carol Sands, who has worked on Megan's Law cases for the past six years.

Though not familiar with the details, she said, "from what I hear about this proposal, it sounds unconstitutional."

Since Megan's Law was passed in 1994, the notification aspect of the measure has been challenged in federal court on constitutional grounds. IN 2003, the 3rd Circuit Court of Appeals in Philadelphia cleared the way for New Jersey to put sex offenders' addresses on its Internet registry, ruling that the right of the public to know, outweighs offenders' right to privacy.

The call for strengthening Megan's Law came just days after Woodbridge police arrested James Young and Kenneth Stanhope, two registered sex offenders who had been living next door to each other.

Young was charged with conspiracy to lure children and Stanhope was charged with luring children after a local woman, April Amodea, noticed Stanhope talking to her child and acting suspiciously.

"He never spoke to me or any of the neighbors. There was no neighbor contact. He would only talk to the children," she said. "It must've been a motherly instinct. It just didn't sit right."

Amodea said that she looked up Stanhope on the state's Internet registry. When she didn't find his name there, she contacted the county Department of Adult Corrections, which confirmed that Stanhope is a registered sex offender, prompting Amodea to call the police.

## CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT
### *RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

**Print Name:** Benito Castro

**Signature:** _____

**Resident Identification Number:** 440

**Date:** 4/16/12

**Comments:**

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." There is a complete lack of objective criteria to determine de-escalation of restraints and timely release. I also completely object to numerous meritorious issues passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: *DONALD CHAPMAN*

Signature: *Donald Chapman*

Resident Identification Number: *048*

Date: *4-15-2012*

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: _James Cline_

Signature: _James Cline_

Resident Identification Number: _537_

Date: _4-15-2012_

Comments:

I completely object to the settlement. It does not comport ~~with the report of Dr. Becker (the authority nominated by the~~ Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues ~~passed over.~~

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Alberto Colón

Signature: Alberto Colón

Resident Identification Number: 36

Date: April 11, 2012

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues overlooked.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Terry Conn

Signature: Terry Conn

Resident Identification Number: 416

Date: 04-16-12

Comments:

MAP Group Are giving one A week MAP placement should only be two Month. Also people who is on tier MAP or Wing MAP need to have job working while on MAP please look into this MANNer thank you.

People who go to Lockup need two have a fair trail because the treatment staff dont give people a change to please their case.

2

William Conover #449
Special Treatment Unit- Annex
P.O. Box 905
Avenel, NJ 07001

STU-Settlement
c/o Seton Hall University, School of Law
Center for Social Justice
Newark, NJ 07102

May 6, 2012

Re: Alves V. Merrill Main, PH.D, ET AL. 01-cv-789(DMC)
    Objection to Proposed Settlement

1. Class Certification:  I object to Alves, Sessoms, and Culbreth being named representatives of the Class.  These residents do not and cannot represent the population as it stands.  They have not experienced what separate classes of Residents have experienced thereby making it impossible for the above named residents to speak on behalf of the population.  Additional residents need to be added to the above list that reflect the following areas: (a) Juveniles that were civilly committed, (b) Residents that were committed from the Adult Diagnostic Treatment Center ("ADTC") that have numerous years of treatment, (c) Residents that have been informed that treatment would not diminish their risk to re-offend thereby rendering their commitment a life sentence, (d) Persons that have been civilly committed directly from the streets, (e) Treatment refusals (not presently represented), (f) MAP Residents are not represented, (g) residents from the "South" unit (considered undesirables) are not represented.

2. Claims Regarding the Department of Corrections ("DOC"): By declaring claims against DOC to be moot, the Court would be ignoring numerous violations of substantive Due Process rights under the Fourteenth Amendment to the united States Constitution, violations of the Eighth and Fifth Amendments of the United States Constitution; and violations of rights protected by the Rehabilitation Act, New Jersey Constitution, and the New Jersey Sexually Violent Predator Act ("SVPA") itself.  Far from rendering the claims moot, the move of civilly committed

civilians to a prison detention center eliminates some claims but aggravates and exacerbates others. DOC exercises control over all medical treatment, including the administration of medication prescribed as part of sex offender treatment. DOC is in charge of transportation to all outside courts, medical and furlough trips, which it currently conducts in extremely punitive vehicles intended for the transport of prisoners. Civilian "Residents" are stuffed into a box physically resembling a dog kennel, in which they are handcuffed and shackled, regardless of treatment level and/or medical needs. Residents (e.g. those in wheelchairs) refusing this indignity and/or potential injury are denied all access to the outside court, medical and furlough trips, with no DHS input or recourse.

3. Exercise and Physical Therapy: Access to, and the physical construction and composition of, all exercise facilities is solely controlled by DOC. Residents who are aged or infirm, diabetic, and/or suffering form injuries requiring physical therapy must depend upon DOC for adequate access to those facilities, often this is scheduled with no regard for a Resident's sex offender treatment schedule. Additionally inadequate access to such facilities contributes to depression and other mental health issues known to affect the outcome of any mental health treatment, Sex Offender specific or otherwise.

4. Psycho-Educational Modules: The proposed settlement does not address the risk mitigation upon successful completion of Modules. As the Settlement now stands, I object to module "testing" only. There additionally ought to be an objective note in the Resident's record that his risk level of re-offending and his level of dangerousness has been reduced. This will sequentially and objectively lower the Resident's risk assessment. This should be so noted in the Resident's record and written verification should be provided to the resident.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Emmanuel Cortez

Signature: *[signature]*

Resident Identification Number: 154

Date: 4-12-12

Comments:

I completely object to the settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the "worst she had ever seen." I also completely object to numerous issues passed over.

## CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT
### *RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing *address is:*

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Mark CREVELING

Signature: *Mark Creny*

Resident Identification Number: 161

Date: 4/12/2012

Comments:

Dear Judge CAVanaugh,

I Object to this Settlement, because I was not informed of the Settlement, if I was informed I

would NEVEr agree to it, because
it Does not benefitt all of us.
it has all the BECKEr Report
out of it.

I want what is in the
BECKEr rEport.

I want to go to trial.

2

Fr: *Richard Cross #444*
    Special Treatment Unit
    8 Production Way, Trl #2
    CN 905
    Avenel, New Jersey 07001


To:    STU Settlement
    c/o Seton Hall University school of Law
    Center for Social Justice
    833 McCarter Highway
    Newark, New Jersey 07102

**Re: RAYMOND ALVES, et al, v. MERRILL MAIN, PH.D, et al,.**
    **Objection to Purposed Settlement**


1. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of residents have experienced, therefore, making it impossible for the above named residents to speak on behalf of the population. There should be residents added to the representatives, listed above, that reflect the following Classes of persons; a) Juveniles that were civilly committed; b) Residents that were committed from the A.D.T.C. that have multiple years of treatment; c) Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d) Persons that have been committed from society (that were on the streets) when they were selected for commitment; e) Treatment Refusals are not represented; f) MAP residents are not represented; g) and South Unit residents are not represented.

*At this time the Treatment team is forcing me into the substance Abuse program, when I do NOT have a substance abuse problem. They Threaten to "Lock me up" &/or Take my job if I Refuse to Attend The S.A. Meetings.*

2. Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. At the completion of all modules, when a resident has successfully completed the module, there should be some kind of notice given that the resident's risk to re-offend has been mitigated, as well as, his level of dangerousness. This will sequentially, lower the resident's risk assessment. This should be noted and written verification should be given to the resident, in addition to, this verification being placed in the residents file.

*Eric Cruz #14*

Special Treatment Unit
PO box 905
Avenel, NJ 07001

**To: Ian Marx, Esq.**
**Greenberg Traurig, LLP**
Gibbons P.C.
One Gateway Plaza
Newark, NJ 07102

STU Settlement
c/o Seton Hall University School of Law
Cebter for Social Justice
833 McCarter Highway
Newark, New Jersey 07102

4/11/12

**Re: RAYMOND ALVES, et al, v. MERRILL MAIN, PhD, et al**
**Objection to Purpose Settlement**

I am a Resident at the STU, and I object to the Settlement for
various reasons.

1. I object to Seton Hall and Gibbons attorneys because Seton
Hall representatives were retained to comment and make
recommendations on the development of the Sexually Violent
Predator Act ("SVPA") in the state of New Jersey. I am gravely
concerned that the Settlement Seton Hall has proposed is already
tainted, and it is a conflict of interest. Seton Hall
representatives, Gibbons attorneys, and the Plaintiffs refused
to communicate anything to the STU population about the progress
of the Settlement. The STU Residents did not, nor were not
allow to give input into the negotiations. The STU Residents
is perplexed at how narrow, conditional, and subjective the
Settlement is.

2. I object to Alves, Sessoms, and Culbreth being named as
representatives of the Class. It is impossible for them to
represent the population as it stands. They have not experienced
what the separate classes of residents have experienced,
therefore, making it highly impossible for them to speak for
the population. There should be residents added to the
representatives, listed above, that reflect the following Classes
of persons; a) Juveniles that were civilly committed; b)
Residents that were committed from ADTC who have multiple years
of treatment, and have completed levels 4 and 5 while ADTC,
and placed on level 1 when they arrived at the STU; c) Residents
that have been informed that treatment would not diminish their
risk to re-offend, therefore, rendering this commitment a life
sentence; d) People that was home for a few years without

re-committing any crimes, and were civilly committed from the streets; e) Treatment Refusals are not represented; f) MAP residents are not represented; g) South Unit residents are not represented.

3. Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. When a resident has successfully completed the module, there should be some kind of notice given that the resident's risk to re-offend has been mitigated, as well as, his level of dangerousness. This will sequentially, lower the resident's risk assessment. This should be noted and written verification should be given to the resident, in addition to, this verification being placed in the residents' files.

4. The Settlement does not address all STU residents being re-evaluated by neutral, board, certified professionals, impartial, unbiased, and not in concert with the New Jersey Attorney General to keep us imprisoned.

5. Dr. Becker's was contracted by the state to evaluate the STU facility in Kearny, New Jersey, and the facility in Avenel, New Jersey. However, of the approximately 40 recommendations none of them has been intergrated into the Settlement.

6. The Settlement doesnt' address the punitive nature of Temporary Close Custody (TCC) and the Modified Activities Program (MAP). TCC and MAP are tools of DOC, it's not intergrated into any of the other mental facilities in the State of NJ. The residents rights for specific sex offender treatment, and for core modules is denied them while they are on TCC and MAP. They're restricted from participating in the limited recreational services, in the food project, and their visits are limited. Also, they're stripped of their minimum wage for 2 hours a day, 5 days a week. Men who are on MAP, and who are Therapy Refusals (TR) are restricted from meals at certain events where meals are involved. They refuse to provide men restricted from work with a Personal Needs Allowance (PNA), hygiene products, clothing, underware, footwear, and bedding when needed. In Ann Klein Forensic Center men are invited to every event that is under recreational, and the receive a Personal Needs Allowance every month.

7. The Settlement does not address the fact that men civilly committed under the SVPA are not afforded inpatient treatment and rehabilitation services in a least restricted environment, which includes de-escalation which will enable SVPs committed to treatment with a transitional living program where outpatient treatment services is provided, and eventually with full autonomy in their communities.

8. There's inadequate de-de-escalation of restraints.  A very small percentage of residents are on levels 4 and 5 after 13 years. Many men who have been committed since 2000-2012 has not advanced from level 2 regardless of their gains in treatment.

9.  The Settlement doesn't address the issue about people who are already biased against residents, being transferred from other positions in the facility, to the TPRC and CARP teams, and how it can work against residents.  Also, the Settlement doesn't address the issue about unqualified recreation workers and social workers being promoted to position of treatment providers without the proper training.  There should be independent people placed on both teams, and there should be people who are properly trained and certified for the positions as treatment providers.  The psychiatrist that do yearly evaluations are bias because they work in concert with the TPRC, CARP teams and the AG.  The TPRC fabricates reports and incorporate information from one resident's report into another residents' report.

10.  The Settlement eliminated any challenges about the inhumane living conditions, the counter-productive and counter-therapeutic environment.  It is perplexing because a healthy environment is crucial to positive results in therapy. As noted in Dr. Becker's report, "I do, however, strongly suggest that environment and conditions of confinement matter, both for residents and for staff who work in facilities that appear to be less than therapeutically adequate." Dr. Becker also stated in her report, "The living that I witnessed at both the Annex and the Kearney facilities are among the worst that I have ever seen.  Such conditions of confinement have served to lead many of the residents to believe that they are simply being warehoused and punished within deplorable conditions. This belief can lead to a sense of hopelessness and is ultimately counter-therapeutic." Therefore, any issues dealing with the environment should be included in the Settlement.

Cavanaugh rule on two DOC issues: dismissing CMS from the Settlement, and he ruled in DOC favor to transfer us to Rahway. in inhumane, and less than therapeutically adequate environment. Therefore, any issues dealing with the envinronment should be included in the Settlement.

                              Respectfully Submitted,

                              _____
                                   STU Resident

cc: file

From: *Eric Cruz* _____ # *14* _____ S.U.P.A. 14-99
Print Your Name   and   Number
Special Treatment Unit
8 Production Way, Trl#2
P.O. Box 905
Avenel, New Jersey 07001

To: STU Settlement
    c/o Seton Hall University School of Law
    Center for Social Justice
    833 McCarter Highway
    Newark, New Jersey 07102


**Class  Member's  Objections/Comments  Re  Proposted  Settlement
Raymond Alves, et al., v. Merrill Main, PH.D., et al.**

I object to the proposal settlement for the following reasons:

#1.  SETON HALL - LAW, CENTER for Social Justice needs to be Dropped from representation in this Law-Suit. For they helped to create this Sexually Violent Predator Act, and now they want to represent the Residents against it. They should Not be able to have it both  ways.

#2.  The proposal shows the increase in program hours, the increase in therapists, the increase of the potential new therapy groups all in order to keep the Residents here longer just like a concentration camp. The proposal Fails to show the increase in of how the therapy will be releasing Residents. For there are Residents that been here 8 to 12 years already, would like to go home, This proposal is not showing that chance of going home.

#3.  Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing  only. At the completion of all modules, when a Resident has successfully completed the module, there should be some kind of Notice given that the Resident's risk to re-offend has been mitigated, as well as, His level of dangerousness. This will sequentially, lower the Resident's risk assessment. This should be noted and written verification should be given to the Resident, in addition to, this verification being placed in the Residents file.

#4.  Treatment Ombudsperson needs to be impartial, unbiased, and Not beholden to the STU. Something needs to be implemented to insure that there is No retaliation from Staff (Director, Therapist & Social Workers, etc.) for submitting and talking with the Treatment Ombudsperson about any complaints against D.H.S., and/or its Staff members.

#5. <u>Nothing</u> is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

#6. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; a-Juveniles that were civilly committed; b-Residents that were committed from the A.D.T.C. that have multiple years of treatment; c-Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d-Persons that have been committed from society (that were on the streets) when they were selected for commitment; e-Treatment Refusals are not represented; f-MAP Residents are not represented; g-and South Wing Residents are not represented.

#7, Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the fairness of a Release Plan to all Residents. For there are some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

#8. In the form of Cruel and unusual punishment, Residents on South Wing are label as being the "Undesirables" and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

#9. <u>Nothing is said in</u> the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys. They are suppose to be doing this already, but are Not, in which case they erase the tape in front of the Resident.

#10. Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said by the Resident in such therapy groups.

#11. Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Residents on some sort of Diet.

#12. D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

#13. Nothing is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law Sidney S. Zipkin v. Margaret M. Heckler, 790 F.2d 16, 1986 U.S. App. LEXIS 24723: The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: Flemming v. Nestor, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); Schweiker v. Wilson, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); Richardson v. Belcher, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); Buccheri-Bianca v. Heckler, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). Section 202, 42 U.S.C. § 402(x), provides in pertinent part: (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual being able to engage in substantial gainful activity upon release and within a reasonable time. Note: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: Washington v. Secretary of Health and Human Services, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f)(1) (42 U.S.C. 423(f)(1)) DISABILITY

-- SUSPENSION OF BENEFITS FOR INMATES OF PENAL INSTITUTIONS -- CONSTITUTIONALITY 20 CFR 404-468; SSR 83-28c; The Statue directly provides that imprisoned felons may receive benefits if they are disable and participates in a satisfactory rehabilitation program while confined. The rehabilitation program must be approved by a competent court. Thus, a person in this situation is endowed with the opportunity completely conforms and suffices for due process considerations. These programs should result in the person being able to engage in substantial gainful activity upon release with a reasonable period of time. The plain terms Statute as well as its guidelines for satisfactory rehabilitation programs negate vagueness argument. Simply, the Statute includes No Punitive elements. The suspension of benefits is not conditioned to any particular form of conduct but applies to all felony crimes ... even imprisoned felons may obtain disability benefits if participation in a rehabilitation program is undertaken. The Statute rationally rests upon the reasonable attempt by Congress to provide disability benefit only to those persons who are deprived of a continuing source of income to satisfy basic food, clothing, shelter and medical needs. For some unknown ignorant reason, most of the Residents are Not being allowed to collect such SSI, and/or SSD.

#14. In regards to Residents Post-Discharge and/or Release, this Facility needs to realize that the State of New Jersey No-longer has administrative enforcement powers, No-longer has any type of authority or hold over (Residents) in preventing Them from leaving the State of New Jersey to reside elsewhere. See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super. 181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of the offender Not residing in New Jersey).

#15. Nothing is being said about the Medical Nightmares, other than the pushing of unnecessary needles & pills on Residents, and the unsanitary / mishandling of such medication, Medical Professionals are instructing the Department of Corrections to take Dying Residents with chest pains to a Hospital up in Somerset, which is approx. 40 miles away. This is where they send inmates from Northern State Prison to. Just like what just happen with the last dying Resident. To Whom Died before leaving these grounds. Since We Residents are No-Longer inmates, Why are We Not taken to Hospitals that are much closer? By this, the Department of Corrections professionals KILLED another Resident by instructing kitchen working Residents to unload Food Truck BEFORE allowing Ambulance to come in to pick up a Dying Resident with chest pains, Just like what just happen with one of the last dying Resident. To Whom Died before leaving these grounds. Is this what Future dying Residents have to look forward to, the purposely made mis-Judgments BEFORE being properly considered, and taken care of. There are Now a total of 41 Residents that had Died within (on the grounds of) this facility of the Special Treatment Unit. Administration Officials to this facility has had approx. 36 of these Residents that

Died here at the Special Treatment Unit, release through treatment, and living on the streets.

#16. Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information**. See: <u>Hill v. Sciarrotta</u>, 14 F.3d 210 (2nd Cir. 1998). Residents are being coerced to speak about their **inaccurate** Convicted and Non-Convicted Sex Crimes, if they do not, these Residents are being punish by being put on Treatment Refusal Status. Plus, In the attempt of a Resident speaking with the officials of T.P.R.C. to correct their **inaccurate** records, T.P.R.C. officials refuses to do anything about it and expresses to tell it to the Civil Commitment Court Judge. To where NOTHING is done to correct the matter.

#17. I object to it being brought up that there should be 7-Therapist to every 50 Residents. This include certified Social Workers who think that they are License Therapists? Plus, if this is put in place, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should be canceled for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

#18. Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

#19. In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

#20. What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU. For as it stands right now, the Social Workers and the Therapist are of No help to a Resident, and they both cannot be trusted.

#21. New Treatment & Release Plans needs to be establish for ALL Residents after this settlement becomes final.

#22. What is considered as Full Participation and/or Full Cooperation? For under case law of <u>Bender v. New Jersey Department of Corrections</u>, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full** Cooperation is based on attendance and the quality of participation, and **Not** the information that is disclosed during therapy. Plus, under case law of <u>McKune v. Lile</u>, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), Prohibits the State from extracting information from a

(Resident) about His past criminal history, that is Not the subject of a conviction. For There are some Residents to whom has Never been Convicted of a Sex Crime Offense, So how can You treat a person who has Never been Convicted of a Sex Crime Offense, when this State's SVPA appropriately limits it's application to Convicted Sex Offenders? See: In re Commitment of W.Z., 339 N.J.Super. 549, 773 A.2d 97 (A.D.2001), certification granted, 169 N.J. 611, 782 A.2d 428, affirmed as modified 173 N.J. 109, 801 A.2d 205. Wouldn't this be a Double Jeopardy, Ex Post Facto, Res Judicada, and Recent Overt Act violations? These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

#23. Some D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: There is the Main building and its Annex to the State of New Jersey's Special Treatment Unit. The Main building was the Rahway State Prison Administration Segregation Detention Center/Prison to house problem State Prisoners, Now it is being used to house the State of New Jersey's Special Treatment Unit Residents. How can this be considered as "Therapeutic" and Not Punitive?

#24. Some further D.O.C. issues needs to be argued and/or addressed. For example the Punitive, Depressing, Prison like Housing: Four-Men cubicles; Residents at the Annex building are being warehoused and are being forced to live in approx. 10ft x 10ft Four-Men cubicle space. Inmates in a Prison live better and has more space than the Residents that live at this facility's Annex, in which this Annex building was use to house State inmates on their way out and back into society. How can this be considered as "Therapeutic" and Not Punitive?

#25. Residents are being taken to Prison Hospital for Medical special needs special check-ups, and/or special operations. How can being taken to Prison Hospital be considered as "Therapeutic" and Not Punitive?

#26. The Procedure to this SVPA Civil Commitment process for it has created a Due Process Violation of the commitment process: Not all "Convicted" Sex Offenders are being served Notice and/or are being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. Depriving

... of notice would strip them of significant liberty interest; and that a Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP). See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#27,** The Procedure to this SVPA Civil Commitment process has created a Unequal application of the Law: "Non-Convicted" Sex Offenders are Not being served Notice, Nor are they being informed of the potential possibility in being Civilly Committed after the completion of their term of incarceration. Not being served Notice to a Probable Cause Hearing, Not having a Probable Cause Hearing, and Not being served Notice to a Temporary Civil Commitment Hearing. **Depriving** ... of notice would strip them of significant liberty interest; and that a Probable Cause Hearing ... MUST BE HELD prior to commitment of alleged sexually violent predator (SVP). See: In re Commitment of M.G., 751 A.2d 1101, 331 N.J.Super. 365. N.J.Super.A.D. 2000. These Residents should not have been involuntary committed where statutory civil commitment procedures were not followed. See: Matter of D.C., 656 A.2d 861, 281 N.J.Super. 102, reversed 679 A.2d 634, 146 N.J. 31. N.J.Super.A.D. 1995. Automatic detention ... without a judicial proceeding to determine dangerousness ... is unconstitutional on its face, and that the determination that They may be a Sex Offender needs to be made Beyond a Reasonable Doubt, and that the lower Clear and Convincing Evidence standard in the law is also unconstitutional. See: Mental Hygiene Legal Service v. Cuomo, 785 F.Sup.2d 205, 2011 U.S.Dist.LEXIS 40434 (2011).

**#28.** The Question of appropriate treatment plan for committee to psychiatric institution **was not** to await possible rehearing, but required prompt and certain resolution, where evidence suggested that treatment afforded to committee **was not** providing him with meaningful opportunity for cure or improvement. Matter of Commitment of J.L.J., 509 A.2d 184, 210 N.J.Super. 1. N.J.Super.A.D. 1984.

**#29.** An Audit needs to be conducted, for the State of New Jersey Budget Committee had found that there is a Total of approx. $60-Million Dollars that is missing in running this State of New Jersey's Special Treatment Unit that houses the State of New Jersey's Sexually Violent Predators. In which, when D.H.S. Officials were asked of what happen to these funds, No answer

was given.

#30.  If this Resident is going to be placed on this Suit as a Plaintiff, He asks to be compensated in the amount of $25 Million Dollars from each listed defendant in their Personal and Individual Capacities for the deliberate indifference torment that the listed defendants continues to display towards this Resident/Plaintiff since the time of this Resident's temporary Civil Commitment / Civil Commitment to present date.

I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS

MADE BY ME ARE TRUE AND CORRECT.

Date: _04-26-12_

_____
Sign Your Name

_____
Print Your Name

Resident # _14_

Fr:        Phillip A. Cunningham
           Special treatment Unit
           8 Production Way, Trl #2
           CN 905

To:        STU Settlement
           c/o Seton Hall University, School of Law
           Center for Social Justice
           833 McCarter Highway
           *Newark*, New Jersey    07102

           Re: **RAYMOND ALVES, et al, v. MERRILL MAIN, PH.D, ET AL.**
           **Objection to Proposed Settlement**

      This facility is supposedly preparing Residents for life
out in the world.  The administration will allow us to take
college courses if we are willing to pay for them.  But the
administration is unwilling to let us have computers even if we
pay for them.  This is grossly unfair.  Convicted sex offenders
in Federal Penitentiaries, still doing time for rape and
molestation, some of them with no hope of ever getting out, are
allowed personal computers, as well as access to a limited form
of Internet.  They are allowed to buy and use educational
software, to send and receive e-mails, and to chat with family
members, friends, and legal and other consultants.


      The outside world has become a computer-dependent society
and Residents, if we hope to compete in the job market or
participate in normal, social activities, need to be computer
literate at the very least.  I am not saying we should be
granted unlimited access to the Internet but the security staff
already conducts random searches of all of our other property.
Why do they believe this would create an additional burden?

                        page 1 of 3

Screening for illicit materials requires skills now possesed by doting grandmothers, not just technical analysts.

Additionally, typewriters and word processors are so technologically antiquated that they now cost more than most computers, even with the added cost of printers.  I am writing this on a Brother DP-540-CJ, a word processor originally built in 1995, originally costing $350; I paid $1,000 for it. Replacement parts are no longer available so that, if a word processor or typewriter breaks down, it usually has to be replaced, rather than repaired.  The administration has restricted us to a technology which is fast fading from the world.  Our data is stored on 3½" disks which the industry announced they were no longer manufacturing as of 2010.  Any Resident found to be in possession of a flash drive, like the kind used by most people these days, risks confiscation of all of the electronics in his cell, including radio and TV.

Also, as concerned as the facility claims to be with the efficient use of space, how much less room would we take up if we were afforded computers on which to do our written assignments and e-books and SD memory cards on which to keep our libraries?  From a security perspective, how much easier is it to conduct a physical search of a desktop or laptop computer and a printer, than a typewriter and several crates of paperwork and books?  Or is the goal of this facility to have the few who do manage to leave here do so with as many social and technical

page 2 of 3

handicaps as they can manage?

I'm not asking for us to be permitted state-of-the-art training facilities on the State's dime.  I'm not asking for us to be allowed anything we would not be paying for ourselves.  I am *asking* for us to be granted a level of treatment and access provided to inmates doing time, not civilly committed individuals who have, supposedly, completed the punitive part of their sentences.


Sincerely,

_____  5/09/2012  _____
Philip A. Cunningham


page 3 of 3

Fr:       Phillip A. Cunningham
          Special treatment Unit
          8 Production Way, Trl #2
          CN 905


To:       STU Settlement
          c/o Seton Hall University, School of Law
          Center for Social Justice
          833 McCarter Highway
          Newark, New Jersey   07102

        Re: **RAYMOND ALVES**, et al, v. **MERRILL MAIN, PH.D, ET AL.**
            Objection to Proposed Settlement


1. Class Certification: I object to Alves, Sessoms, and
   Culbreth, being named representatives of the Class.  These
   Residents do not, and cannot, represent the population as
   it stands.  They have not experienced what separate classes
   of Residents have experienced, therefore, making it
   impossible for the above named Residents to speak on behalf
   of the population.  There should be Residents added to the
   representatives, listed above, that reflect the following
   Classes of persons: (a) Juveniles that were civilly
   committed; (b) Residents that were committed from the
   A.D.T.C. that have numerous years of treatment; (c)
   Residents that have been informed that treatment would not
   diminish their risk to reoffend, therefore, rendering this
   commitment a life-sentence; (d) Persons that have been
   committed from society (that were on the streets when they
   were selected for civil commitment); (e) Treatment Refusals
   are not represented; (f) MAP Residents are not represented;
   and (g) South Unit Residents, described by Dr. Main as "the
   Undesirables" are not represented.

2. Psycho-Educational Modules:  The proposed Settlement does
   not address the risk mitigation after the successful
   completion of Modules.  As the Settlement now stands, I do
   not agree with module testing only.  There should be some
   kind of notice given that the Resident's risk to reoffend
   has been mitigated, as well as his level of dangerousness.
   This will, sequentially, lower the Resident's risk
   assessment.  This should be noted and written verification
   should be given to the Resident, as well as this
   verification being placed in the Resident's file.

3. Admission of Guilt:  The supposed goal of the therapy in
   this facility is to help the Residents become unlikely to
   commit sexually violent offenses.  This facility has taken
   to browbeating Residents into admitting guilt to any and
   all allegations on their record. Some therapists have even
   gone so far as to state "For purposes of therapy, we
   consider you to be guilty of everything you were ever

accused of." In at least one case, a Resident was browbeaten continuously for eight and a half years because he refused to admit to crimes which he was eventually able to demonstrate existed only as a misreading of the record. The compounded waste in spending more than eight years attempting to coerce a confession which would have necessarily been false, as well as the psychological and emotional torment, inflicted on the Resident, in pursuit of a false admission is mind-boggling, especially in light of the progress that might have been made had the time not been wasted on offense he had not committed.

4. "Catch-22": Many Residents of this facility receive medication for chronic care of long-term medical conditions, including diabetes. As a result of this, when complying with the mandatory drug screening (through urine analysis), more than one Resident has shown a false positive for illicit drugs, like THC (marijuana). My recent experience is submitted here as an example but is far from the only instance. I have no drug offenses on my record and have, in fact, never used recreational drugs. After receiving an ambiguous result, rather than proceeding to more definite tests, the administration forced me to sign a statement in which the administration acknowledges that the false positive was a result of medication prescribed by the medical staff, however, if I tested positive in any future screening, I agreed to be held culpable for the test and may be punished for drug abuse. I was threatened with MAP placement and lock up if I refused to sign the document, a copy of which is appended to these remarks. This forces a Resident to choose between taking the medication *prescribed by the facility, for the Resident's own health*, or be punished for abusing drugs which the Resident need not have touched. The staff freely admits that the screening can result in false positives but still wants to hold Residents culpable for the inaccuracy of its testing system.

5. Vague Objectivity: The settlement purports to hold Residents to objective standards. I worry that those standards may be false. That is: I worry that Residents may well be held to standards which, at first blush, may seem objective but which, upon closer examination, are actually highly subjective. These include passing a polygraph test, which is subjective to the examiner, not objective to the device; "Resident shows remorse," which is determined by the opinion of the psychologist, therefore subjective, not objective; or "Resident understands that what he did is wrong" or "Resident understands the gravity of his offensive behavior:" conditions for which there are no objective criteria. I worry that the therapists might require Residents to shed tears for their victims, reducing therapeutic progress not to those who understand that what they've done is wrong but to Residents who can cry well on cue.

2

6. Socio-Technical Impediments:  This facility is supposedly preparing Residents for life out in the world.  They will allow us to take college courses if we are willing to pay for them.  But the administration is unwilling to let us have computers even if we pay for them.  This is grossly unfair.  Convicted sex offenders in Federal Penitentiaries, still doing time for rape and molestation, some of them with no hope of ever getting out, are allowed personal computers, as well as access to a limited form of Internet.  They are allowed to buy and use educational software.  The outside world has become a computer-dependent society and Residents, if we hope to compete in the job market or participate in normal, social activities, need to be computer literate at the very least.  I am not saying we should be granted unlimited access to the Internet and the security staff already conducts random searches of all of our other property, so what's the big deal?  Screening for illicit materials requires skills now possesed by doting grandmothers, not technical analysts.  Additionally, typewriters and word processors are so technologically antiquated that they now cost more than most computers, even with the added cost of printers.  Replacement parts are no longer available so that, if a word processor or typewriter breaks down, it usually has to be replaced, rather than repaired.  The administration has restricted us to a technology which is fast fading from the world.  Our data is stored on $3\frac{1}{2}$" disks which the industry announced they were no longer manufacturing as of 2010.  Also, as concerned as the facility claims to be with the efficient use of space, how much less room would we take up if we were afforded computers on which to do our written assignments and e-books and SD memory cards on which to keep our libraries?  Or is the goal of this facility to have the few who leave here do so with as many social and technical handicaps as they can manage?

7. Unreal Standards of Conduct:  This facility is teaching us to adopt principles of behavior which range from ludicrous to insane.  Two examples of this are from my own experience.  On one occasion, I was told that my belief that my being at the head of a line meant I should therefore be first to get what we were standing in line for (as opposed to someone behind me in line cutting in front of me) was a thinking distortion of entitlement; think about that when you're in line at the movies or the grocery store.  On another occasion, I was told that expecting a person to do the job for which I had paid him was an example of the thinking distortion of entitlement; meaning workers are under no obligation to do the jobs for which they've been hired.  Who comes up with this stuff and why are we being asked to adopt these positions?

3

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Joseph J D'Amico

Signature: Joseph J D'Amico

Resident Identification Number: 5461

Date: 4~14~2012

Comments:

I completely object to the settlement. It does not comport
~~with the report of Dr. Becker (the authority nominated by the~~
Attorney General) who described this program as the "worst she
had ever seen." I also completely object to numerous issues
~~passed over.~~

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> STU Settlement
> c/o Seton Hall University School of Law
> Center for Social Justice
> 833 McCarter Highway
> Newark, NJ 07102

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: Darryl Davis

Signature: *Darryl Davis*

Resident Identification Number: 000174

Date: May 13, 2012

Comments:

_____

_____

_____

_____

_____

2

## NOTICE OF PROPOSED SETTLEMENT
### *RAYMOND ALVES, et al. v. MERRILL MAIN, Ph.D. et al.*

**This Notice is sent to you by Order of Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey.**

**PLEASE READ THIS NOTICE CAREFULLY. IT CONTAINS IMPORTANT INFORMATION ABOUT YOUR RIGHTS.**

**SI USTED NECESITA TRADUCCIÓN DE ESTOS DOCUMENTOS AL ESPAÑOL, POR FAVOR PONGA UNA SOLICITUD PARA OBTENER AYUDA CON LA TRADUCCIÓN EN UNA DE LAS CAJAS DE 'SOLICITUD DE TRABAJADORA SOCIAL' MONTADAS EN LAS UNIDADES DE ALOJAMIENTO STU.**

Judge Dennis M. Cavanaugh of the United States District Court for the District of New Jersey (the "Court") has preliminarily approved a proposed settlement (the "Settlement") in a case entitled *Raymond Alves, et al. v. Merrill Main, Ph.D., et al.*, No. 01-CV-0789 (the "Litigation"). If the Settlement receives final approval from the Court, the New Jersey Division of Mental Health and Addiction Services ("DMHAS"), which is responsible for the mental health treatment program at the Special Treatment Unit (the "STU") will be required to improve both the quantity and the quality of the therapeutic programming provided to residents of the STU. Such programming will be offered to all qualifying residents, regardless of the location of their living quarters. The Settlement also requires increased staffing of the STU, so as to provide a minimum of seven therapists for every fifty residents. In addition, the Settlement requires the STU treatment staff to provide individually tailored treatment that adequately meets the therapeutic needs of each resident; to adopt objectively measurable pre- and post-module testing; to provide test results promptly; and to provide residents, on a regular basis, with an estimate of the time required to complete their treatment goals, modules, and phases. The Settlement provides for the appointment of a Treatment Ombudsperson to investigate and address complaints regarding treatment-related issues. Further, the Court will appoint an independent Monitor who will conduct annual inspections of the treatment program at the STU to determine whether DMHAS is in compliance with the terms of the Settlement.

On August 6, 2012, Judge Cavanaugh will conduct a hearing to determine if the Settlement should be finally approved as fair, adequate, and reasonable (the "Fairness Hearing").

As a resident of the STU, committed or confined pending commitment pursuant to the New Jersey Sexually Violent Predator Act, you are a member of the class that was certified by Judge Cavanaugh on March 29, 2012 (the "Class"). All members of the Class will benefit from the Settlement, and be bound by it, if it is finally approved by the Court. This Notice explains the nature of the Litigation, describes the terms of the proposed Settlement, and informs you of your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing. *Any such objections or comments must be either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012 in order to be considered by Judge Cavanaugh at the Fairness Hearing.*

## FREQUENTLY ASKED QUESTIONS

**1.     What is the purpose of this Notice?**

The purpose of this Notice is to explain the Litigation and inform you of the terms of the proposed Settlement and your rights as a member of the Class, including your right to submit objections or comments regarding the Settlement in advance of the Fairness Hearing.

**2.     What is the Litigation about?**

The Litigation is a civil rights class action in which three Representative Plaintiffs—Raymond Alves, Michael Culbreth and Derrick Sessoms—assert claims on behalf of the Class against the New Jersey officials who are responsible for the treatment program at the STU. Plaintiffs allege that these officials have failed to provide the minimally adequate mental health treatment required by federal and state law before the government may subject a person to indefinite civil commitment on the basis of a mental health diagnosis. Plaintiffs further allege that the mental health treatment program at the STU is so inadequate as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the Double Jeopardy Clause of the Fifth Amendment; the Cruel and Unusual Punishments Clause of the Eighth Amendment; the Americans with Disabilities Act, 42 U.S.C. § 12132; the Rehabilitation Act, 29 U.S.C. § 794; the New Jersey Constitution; and N.J.S.A. §§ 30:4-24, 30:4-24.1 and 30:4-27.34.

**3.     What has happened in the Litigation?**

The Litigation began on March 9, 2001, when STU resident Raymond Alves filed a *pro se* complaint against various New Jersey officials responsible for the STU. On July 17, 2002, at Judge Cavanaugh's request, the Seton Hall University School of Law Center for Social Justice (the "CSJ") agreed to represent Mr. Alves, together with another STU resident, and shortly thereafter the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., now known as Gibbons, P.C. ("Gibbons") joined as co-counsel. An Amended Complaint was filed on October 25, 2002, raising various treatment-related claims against the New Jersey officials responsible for the mental health program at the STU. The Amended Complaint also raised claims against officials and employees of the New Jersey Department of Corrections ("DOC") regarding the living conditions at the STU facility in Kearny, New Jersey, where Mr. Alves resided, and the conduct of certain DOC officers employed there. The defendants moved to dismiss the Amended Complaint. On November 17, 2003, Judge Cavanaugh granted the motion in part and denied it in part.

From 2003 to 2005 the parties engaged in formal discovery. In addition, the plaintiffs retained an expert, Dr. Robert Prentky, who inspected the Kearny facility in May 2004. On October 28, 2004, the plaintiffs filed a motion to amend the Amended Complaint to seek class action status, and to certify a class. On April 12, 2005, in response to a suggestion from the Court, the parties agreed to pursue settlement negotiations, and the plaintiffs withdrew their motion. Counsel for both sides entered into a period of intensive negotiations, supervised by Magistrate Judge Mark Falk. On April 3, 2008, the Court approved the appointment of a joint neutral expert to assist in

2

the settlement process and issued an order governing the manner in which she would conduct her evaluation. On December 29, 2008, the expert, Dr. Judith Becker, issued her final written report.

Settlement negotiations were suspended in the spring of 2010, when Mr. Alves and other residents were moved from the Kearny facility to the current STU in Avenel, New Jersey, but resumed later that year. Based in part on the move, the DOC officials named as defendants in the Amended Complaint took the position that the claims against them were moot. Judge Falk urged the parties to work towards a settlement of the treatment-related claims against the officials responsible for the mental health treatment program at the STU. Counsel then renewed their efforts to reach a settlement with respect to those issues.

On January 20, 2012, at a hearing attended by the Representative Plaintiffs (via video-conference), counsel for both sides informed Judge Falk that they were prepared to execute a formal Settlement Agreement (the "Agreement"), which they did on February 3, 2012. On February 14, 2012, pursuant to the Settlement Agreement, the Second Amended Complaint was filed, formally adding Mr. Culbreth and Mr. Sessoms as named plaintiffs, seeking class action status, and updating the plaintiffs' claims concerning the mental health treatment program at the STU. The defendants named in the Second Amended Complaint are Merrill Main, Ph.D., in his official capacity as Clinical Director of the STU; Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"); Lynn A. Kovich, in her official capacity as the Assistant Commissioner and Deputy Director of the DMHAS; and Jeffrey S. Chiesa, in his official capacity as Attorney General of New Jersey. The Second Amended Complaint does not include any claims against the DOC or its officials, nor any claims concerning the physical facilities at the STU.

On March 29, 2012, Judge Cavanaugh certified the Class, consisting of all persons who are civilly committed or confined pending commitment to the STU pursuant to the NJSVPA, with Messrs. Alves, Culbreth and Sessoms as Representative Plaintiffs. The Court also appointed CSJ and Gibbons as Class Counsel, directed them to send this Notice to each member of the Class, and scheduled the Fairness Hearing to take place on August 6, 2012.

During the pendency of the Litigation, a number of STU residents filed claims that overlapped or were similar to the claims filed by Mr. Alves. Many of these cases were consolidated, in whole or in part, with the Litigation. Other STU residents filed additional documents with the Court, some of them supporting Mr. Alves' position or asserting similar claims of their own.

4.      Who will be included in the Settlement?

If the Settlement receives final approval from the Court, it will be binding on all members of the Class and on all of the defendants named in the Second Amended Complaint and their successors in those offices (the "Settled Defendants"). In other words, the Settlement will resolve the claims set forth in the Second Amended Complaint on behalf of every member of the Class. The Settlement will *not* affect claims by individual residents that are outside of the scope of the Second Amended Complaint, such as tort claims, *habeas corpus* petitions, or challenges to civil commitment under the NJSVPA by an individual resident. Nor will the Settlement prevent residents from filing or pursuing claims against DOC officials or employees.

3

**5.      Who is Class Counsel?**

The Court has appointed the CSJ and Gibbons to represent the Class.  If you have any questions, you may contact Class Counsel:

> **Barbara Moses, Esq.**
> **Seton Hall University School of Law**
> **Center for Social Justice**
> 833 McCarter Highway
> Newark, NJ 07102
> (973) 642-8700
>
> **Lawrence S. Lustberg, Esq.**
> **Jonathan Manes, Esq.**
> **Gibbons P.C.**
> One Gateway Center
> Newark, NJ 07102
> (973) 596-4500

**6.      What are the Benefits of the Proposed Settlement?**

The Settlement Agreement is a lengthy and complex document.  You may obtain a copy of the complete Agreement by placing your request in a Social Work Request box at the STU.  This Notice provides a summary of some of the key terms of the Agreement.

### a.   Individually Tailored Treatment

If the Settlement is finally approved by the Court, treatment staff at the STU will be required to adopt and employ clinical assessments and provide individually tailored treatment that adequately meets your therapeutic needs.   Any final report, recommendation, or determination for treatment, treatment status, phase designation, phase progression, and/or disciplinary action must be communicated to you by treatment staff, both orally and in writing, within fifteen (15) days of such action.   Moreover, treatment staff must adopt objectively measurable pre- and post-module testing, provide you with a copy of your test results within fifteen (15) days of the completion of the post-module testing, and discuss your results in process group within thirty (30) days from the completion of the module.

Further, you will be provided with an updated and accurate Residents' Guide which will include, among other things, a description of the treatment program, including process groups, treatment modules, program phases, and the estimated times for completion of each phase.  This Guide will also include an explanation of the ways in which you may request individual treatment sessions.

### b.   Comprehensive Initial Treatment Plan

The treatment staff will be required to produce a comprehensive initial treatment plan for you

4

within forty-five (45) days of entry of an order of final commitment. If you have already been committed but have not yet received a comprehensive treatment plan, you will be entitled to such a treatment plan within forty-five (45) days after the Settlement is approved. Your comprehensive initial treatment plan must be tailored to your individual needs as determined by the treatment staff, and will include and incorporate your past treatment progress and evaluations, if available, including prior treatment at the Adult Diagnostic and Treatment Center. Moreover, you will be provided with specific and individualized recommendations regarding your treatment goals, the objective criteria necessary to meet these goals, and *anticipated time frames for completion of both the objective criteria and your ultimate goals*.

**c.  Six Month Review by Treatment Team**

Your comprehensive treatment plan will be reviewed by your treatment team every six (6) months and will be followed within fifteen (15) days by a meeting with you. During your meeting, your treatment team will review your progress, discuss new treatment goals for the next six months, including specific curricular recommendations, and provide you with an *estimate of the time for completion of your treatment goals, modules, and phases*, based on an individualized assessment of your participation in treatment, with the assumption that you will fully participate in treatment.

If you were subject to restrictions under modified activities programming ("MAP") at any time during the past six months, your treatment team will review your progress through MAP; the impact, if any, that your time on MAP may have on your phase designation; and the steps that you should take to avoid future MAP restrictions.

Additionally, the treatment team will discuss with you any recommendations made to the Treatment Progress Review Committee ("TPRC") for your progression in phase designation, a description of the recommended phases, and your ability to enroll in modules within the recommended phase while official designation change is pending upon TPRC review.

**d.  Annual Review by TPRC**

The Treatment Progress Review Committee ("TPRC") will conduct an annual review of your treatment plan and will produce a written report and recommendation, including a phase designation recommendation. Recommendations for phase 3 or higher will be submitted to a Clinical Assessment Review Panel ("CARP") for approval. Your treatment team will deliver the final TPRC report to you within fifteen (15) days of receipt from the TPRC or CARP. In addition to delivering the written report, the treatment staff will explain it to you, including the following:

(i)     Your current phase designation and any change in designation;

(ii)    The requirements and evaluation criteria for progression in each phase, along with *an estimated time frame in which you can complete your current phase*, based upon an individualized assessment of your participation in treatment with the assumption that you will participate in treatment;

5

(iii)    Specific, individualized recommendations for specific treatment goals and an objective criteria necessary for meeting those goals, including an estimate of the time required for you to complete both the objective criteria and the goals;

(iv)    Specific curricular recommendations and an estimate of when the recommended module(s) will next be offered and available to you; and

(v)    Any recommendations regarding your potential post-discharge placement file or discharge plan.

**e.  Overall Course of Treatment Not to be Extended**

The treatment program at the STU is currently divided into five (5) phases, from Phase 1 ("Orientation") to Phase 5 ("Transition"). If the Settlement is finally approved by the Court, DMHAS will be required to notify Class Counsel of any proposed changes to the phase designations in advance, and will not be permitted to use any such changes to extend the overall course of treatment or to keep residents in the program any longer than they would be under the current phase designations.

**f.  At Least Twenty Hours of Therapeutic Programming per Week**

If the Settlement is finally approved by the Court, every resident not on Treatment Refusal Status or subject to restrictions under MAP will have the opportunity to receive a minimum of twenty (20) hours per week of professionally led (or in the case of self-help groups, professionally monitored) therapeutic programming. This programming will be made available to you regardless of the location of your living quarters and will encompass sex-offender-specific, mental health, recreational, and rehabilitation/vocational programming, and will include, *at a minimum*:

(i)    Three (3) ninety (90) minute process group sessions per week;

(ii)    One (1) to two (2) ninety (90) minute modules per week, if therapeutically appropriate;

(iii)    Professionally monitored self-help groups for at least ninety (90) minutes per week, provided willing and appropriate Residents are available to facilitate self-help groups; and

(iv)    Regularly scheduled community meetings.

Unstructured recreational activity will not count as "therapeutic programming" for purposes of the 20 hour per week minimum. At least eighty-seven percent (87%) of the scheduled process group meetings must actually meet during the calendar year. Such meetings must utilize the full time periods for which they are scheduled and take place in designated meeting rooms providing a reasonable degree of quiet and privacy.

DMHAS will make available a minimum of one (1) to two (2) module(s) in every sixteen (16) week module cycle for residents not on Treatment Refusal Status or MAP, so long as (a) the module is currently recommended in that resident's comprehensive treatment plan, six month review, TPRC review, or has been mandated by court order; and (b) there is sufficient space available in the recommended module (or DMHAS has offered a self-study module).

6

Your post-module testing must be conducted within seven (7) days of completing either a class-based or self-study module.

**g.  MAP Groups**

If you are subject to Tier or Wing MAP, you will be placed in a MAP Group that meets at least twice per week. *If you are subject to Program MAP, you will continue to attend all of your regularly-assigned process group sessions and modules*, unless specifically contraindicated in light of the underlying behaviors that resulted in the MAP placement.  In such cases, you will be informed of the reasons for the treatment restrictions, in writing, as part of your initial MAP Placement Review and at least every thirty (30) days thereafter so long as the restrictions remain in place.  Further, you will be placed in a MAP Group that meets at least twice per week until such time as you are permitted to resume attendance at all of your regularly-assigned process group sessions and modules.

**h.  Increased Staff Ratios**

If the Settlement is finally approved by the Court, DMHAS will be required to hire and retain sufficient additional treatment staff to maintain a ratio of seven (7) therapists for every fifty (50) residents who are actively participating in treatment.  Treatment staff must meet all qualifications for their job titles (including licensure or certification, where required) specified in the New Jersey Civil Service standards.

**i.  Vocational Training**

DMHAS will conduct individualized vocational assessments of each resident within 45 days of final commitment, evaluate his skills and strengths, and develop a plan for building on them through vocational training.  All residents who are not on Treatment Refusal Status or subject to MAP will be offered an average of ten (10) hours of vocational activities per week, including institutional jobs.  Additionally, DMHAS will solicit and arrange for outside vendors to provide onsite vocational offerings (to be paid for by interested residents), provided physical plant space is available.

**j.  Educational Opportunities**

You will be entitled to pursue an educational curriculum for *at least* ten (10) hours per week, including formal instruction, homework time, and self-help programming.  If you are interested in remedial education or GED coursework, you will be provided such education within six (6) months of your initial request.  If you wish to pursue post-secondary education within the facility (*e.g.*, college courses), you may do so, as long as DMHAS is not required to pay for the program and it does not interfere with your therapeutic goals.

**k.  Recreational Opportunities**

DMHAS will conduct annual surveys to assess your desired recreational activities.  Staffing will be provided for professionally facilitated recreational activities six (6) days per week.

**l.   Post-Discharge Preparation**

If the Settlement is finally approved, social work staff will be required to use the information contained in your potential post-discharge placement file to develop a discharge plan for you: when recommended by the TPRC, when ordered by a court, or when you reach Phase 4.  In developing the discharge plan, the social work staff must assist you in finding housing and obtaining support.

**m.  Treatment Ombudsperson**

If the Settlement is finally approved, a Treatment Ombudsperson will be appointed and will establish a resident complaint system for treatment issues.  The Treatment Ombudsperson will establish and implement procedures for eliciting, receiving, processing, responding to, and resolving complaints from you, your family members, and other interested citizens concerning treatment conditions at the STU. DMHAS will create a standardized form for treatment-related complaints and provide this form to any resident upon request. Further, DMHAS will submit resident complaint forms directly to the Treatment Ombudsperson.

The Treatment Ombudsperson will determine whether a complaint is within the scope of the Settlement and send the resident a standard notice of this determination within thirty (30) days of receipt of the complaint form.  The Treatment Ombudsperson will then investigate any complaints within the scope of the Settlement and take action appropriately tailored to the nature of the resident complaint, which may include:

(i)     Communicating with the appropriate administrator or staff at the STU;
(ii)    Gathering information from the appropriate administrator or staff at the STU;
(iii)   Informing the appropriate administrator or staff of the resident's complaint;
(iv)   Communicating with the complaining resident to further investigate the nature of complaint; and/or
(v)    Taking such other measures as the Treatment Ombudsperson deems appropriate to investigate or resolve the resident complaint.

The complaining resident will be timely notified by the Treatment Ombudsperson of any additional information or results obtained. Moreover, the Treatment Ombudsperson will correspond with the Director of the STU regarding issues in the treatment program that are sufficiently systemic from a review of the residents' complaints.

In addition to documenting all oral correspondence, the Treatment Ombudsperson will attend a community meeting at least twice a year in order to explain his or her role, answer questions, and inform you of the status of any systemic treatment problems reported to the Director of the STU.

**n.  Independent Monitor**

If the Settlement is finally approved, *an independent Monitor will be appointed by the Court* to monitor the Settled Defendants' compliance with the terms of the Agreement.  No

8

person who has been associated with the underlying Litigation, or who has a business relationship with the Settling Defendants, may be appointed as the Monitor.

The independent Monitor will conduct five (5) annual inspections of the STU (unless the monitoring period is shortened or lengthened in accordance with the Agreement) to determine whether the Settled Defendants are in compliance or not in compliance with the requirements of the Agreement. The first annual inspection will be conducted no later than nine (9) months from the final approval of the Settlement. Each inspection may last up to five (5) business days and will be followed by a written report determining whether DMHAS is in compliance with each material provision of the Agreement, describing the steps taken by DMHAS to achieve compliance, describing any change in circumstances affecting DMHAS's ability to comply, summarizing information learned from the residents, and summarizing information learned from DMHAS staff. During the inspections:

(i)     The Monitor will have *full access* to the facility. The Monitor may not be denied entry to the STU or any portion thereof except for reasons of security, in which case the Monitor must be given full access as soon as soon as the circumstances that caused the security concern have been abated.

(ii)    The Monitor will have *full access* to the residents who are members of the Class, may review their treatment records, and may conduct interviews with residents.

(iii)   The Monitor may interview any DMHAS employee working at the facility, including treatment staff, administrative staff, medical services staff, and vocational instructors. *All DMHAS employees must communicate and cooperate with the Monitor.*

## 7.     What is NOT Included in the Settlement?

The Settlement deals specifically with the treatment program at the STU. The Settlement will not require any changes to the physical facility, nor to the conduct of the DOC personnel responsible for security at the STU. This does not mean that residents will be required to give up any claims they may have against the DOC, its officials, or its employees. Those claims are simply not part of the Settlement and must be pursued through separate litigation.

## 8.     Who Will Pay for the Settlement?

The Settled Defendants will be responsible for the costs of the Settlement, including the cost of the Monitor, subject to appropriation of sufficient funding by the New Jersey Legislature. The Agreement requires the Settled Defendants to seek such funding from the Legislature as one of DHS's top priorities. The Agreement also contains provisions specifying the parties' rights and obligations in the event the Legislature fails to appropriate the necessary funds, including the plaintiffs' right to declare the Agreement void, and resume litigation, with respect to any provision that the Settled Defendants do not comply with as a result of a budget shortfall or otherwise.

9

**9.     How is Class Counsel being paid?**

If the Settlement is finally approved by the Court, the Settled Defendants will pay CSJ the sum of seventy-eight thousand dollars ($78,000.00) in attorneys' fees.  This represents a small fraction of the actual costs and fees accrued by CSJ over the course of the Litigation.

**10.    When is the Fairness Hearing?**

A Fairness Hearing will be held to determine whether final approval of the Settlement should be granted. At the Fairness Hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate, and will consider any timely objections made concerning the Settlement.  The hearing will take place before Judge Cavanaugh on August 6, 2012, at 9:30 a.m., or as soon thereafter as practicable, in the United States District Court for the District of New Jersey, U.S. Post Office and Courthouse, 1 Federal Square, Newark, New Jersey, 07101, Court Room PO 4. The time and date of this hearing may be continued or adjourned. **YOU ARE NOT REQUIRED TO ATTEND THIS HEARING.   ANY AND ALL PROPERLY SUBMITTED OBJECTIONS BY CLASS MEMBERS WILL BE PRESENTED TO THE COURT AND CONSIDERED, REGARDLESS OF WHETHER OR NOT THE OBJECTOR PERSONALLY APPEARS.**

**11.    How Can I Object to the Proposed Settlement?**

If you want to object to or comment on the Settlement, you may complete the enclosed form entitled Class Member's Objections/Comments re Proposed Settlement, and mail it to Class Counsel at the following address:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

You may also deposit your written objections/comments in a Social Work Request box at the STU, in which case the staff of the STU will mail it for you, free of charge.  Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Your objections/comments will not be considered unless they are either postmarked or deposited in a Social Work Request box at the STU by May 14, 2012.*

**12.    What if I Have More Questions?**

If you have questions about this Notice, or want additional information, you may contact Class Counsel.  You may also consult your personal counsel, if any.  If you want to see the complete Settlement Agreement, you may place your request in a Social Work Request box.  *You should not contact the Court, the Settled Defendants, or their counsel.*

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: JASON DAVIS

Signature: Jason Davis

Resident Identification Number: 208

Date: 4/12/12

Comments:

1. Regarding Treatment: Dr. Becker said in her report regarding having process groups for those who have learning disabilities and housing to fit the same category so that these type of people do not get preyed upon while trying to do treatment.

2. Being here at the S.T.U. Annex, I have seen very few people leave through treatment. In fact 40 people have passed away since I have been here, some of who could have been discharged to their respectful families. Also, there are halfway houses that are available throughout the state of N.J. so there is no excuse as to why people are not being released.

3. In regards to the medical department, I got better care when I was at ADTC as a prisoner. In 2006, I suffered a seizure when here at the STU. I was taken to Rahway General to be stabilized and a couple of weeks later saw a neurologist down at St. Francis. This happened for about a year. Then it abruptly stopped because they said I was no longer considered an "emergency" case even though I was diagnosed with Mild Chiari Malformation. The report even states from Rahway Hospital that if I am having migraine headaches on a regular basis that the Medical department is supposed to bring me back to the hospital. That does not happen. Any how Dr. Becker's report clearly states that this facility is one of the worst she has seen throughout the U.S. therefore on the statement alone, [2] I am refusing this settlement unless all of her report is documented & signed.

**CLASS MEMBER'S OBJECTIONS/COMMENTS RE PROPOSED SETTLEMENT**
*RAYMOND ALVES, et al. v. MERRILL MAIN, PH.D., et al.*

You may use this form to set out any objections or make any comments concerning the proposed Settlement. You may attach additional sheets, if necessary, but please limit your objections and comments to the Settlement. The Court will not consider issues that are unrelated to the Settlement. When you have completed this form, you may either mail it directly to Class Counsel or deposit it in a Social Work Request box at the STU. The mailing address is:

> **STU Settlement**
> **c/o Seton Hall University School of Law**
> **Center for Social Justice**
> **833 McCarter Highway**
> **Newark, NJ 07102**

Class Counsel will submit all timely objections and comments to the Court in advance of the Fairness Hearing. *Because your objections and comments will be submitted to the Court and disclosed to opposing counsel, they will not be considered privileged attorney-client communications.*

*Your objections and comments will not be considered unless they are either postmarked or deposited in a Social Work Request box by May 14, 2012.*

Print Name: _Johnny DeGaglia_

Signature: _Johnny DeGaglia_

Resident Identification Number: _115_

Date: _4/14/12_

Comments:

I completely object to the settlement.   It does not comport
~~with the report of Dr. Becker (the authority nominated by the~~
Attorney General) who described this program as the "worst she
had ever seen."   I also completely object to numerous issues
~~passed over.~~

GAMALIEL B. DELGADO
Special Treatment Unit
P.O. Box 905
Avenel, NJ 07001

To: Lawrence S. Lustberg, Esq. and
Johnathan Manes, esq.
Gibbons  P.C.
One Gateway Plaza
Newark, NJ  0710                                  Date: APRIL 25, 2012
*To: Ian Marx, Esq.*
Greenberg Traurig, LLP
200 Park Ave.; P.O. Box 677
Florham Park, NJ 07932-0677

Presiding Judge: Hon. Dennis M. Cavanaugh, U.S.D.J.
U.S. District Court of New Jersey
451 U.S. Post Office Courthouse Bldg.
P.O. Box 999
Federal Square
Newark, NJ 07101-0999

RE: Objections to settlement in Alves v. Ferguson 01-cv-789 (DMC) (MF)

I am the STU Resident identified at the top of this page, and I strenuously object to the above captioned settlement on numerous grounds, but especially for three main reasons: **First**, because the settlement as proposed completely ignores and eliminates significant, crucial, meritorious issues that we have been asserting for years and **Second**: because the settlement doesn't comport in many areas with the report of authority Dr. Judith Becker, who was the chosen expert of the Attorney General.

**ALSO**

Residents have objected to Seton Hall personnel and Gibbons attorneys for years in that Seton Hall representatives were retained to advise how New Jersey's Sexually Violent Predator Act ("SVPA") ought to be constructed.  This connection creates a conflict of interest.  The fact that they are now involved in generating such a narrow settlement in spite of the numerous significant meritorious issues that have been presented, indicates that our worries about a conflict of interest may be warranted and is cause for grave concern.

1

*Seton Hall's voluntary surrender on the issue of compelling the State to create half way houses for STU residents.  This "surrender" additionally flies in the face of Dr. Becker's call for de-escalation of restraints.  Also, again, Seton Hall was retained to advise how to create New Jersey's SVPA, and this is surrender is a conflict of interest.

*The literally pervasive presence of the Department of Corrections ("DOC") in a treatment facility has a counter-therapeutic effect and creates a highly restrictive and counter-therapeutic environment which continues to exist at the STUs and has gotten worse since Dr. Becker's visit.  Mr. Marx had committed in writing to challenge this condition (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy) and we request that he further develops this issue in his reply.
*We seek significant monetary punitive and compensatory damages for the additional years of lost liberty and other emotional and psychological harm residents have suffered due to inadequate treatment, the lack of qualified treatment personnel (Doctors), and un-constitutional, inhumane, counter-productive, counter-therapeutic conditions as outlined in Dr. Becker's report, the **"worst she has ever seen."**  Monetary damages have been a part of <u>Bagarozy</u> from its inception, Mr. Marx has committed in writing to seek such monetary damages, we seek to go to trial on this and the other issues, and I request that Mr. Marx further develop this issue our behalf.

*Because Dr. Barone, a previous Director of Psychology at the STU, was fired for conduct that was completely inappropriate, we submit that her judgment was fatally flawed and that she was patently unfit to judge who should be civilly committed.  In view of this, we request that every resident that she had a hand in committing be re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Mr. Marx committed in writing that he would seek this (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

*We have also asked Mr. Marx to make constitutional arguments on our behalf, including: <u>**Double Jeopardy**</u>, <u>**Ex Post Facto**</u>, and <u>**Res Judicada**</u> as well as those mentioned below (See the contract agreement signed by Mr. Marx in the objection submitted by Bagarozy).

    <u>a)</u> A concentrated challenge of the Due Process violations of the initial commitment process:

**b)** A concentrated challenge against the arbitrary, unequal application of the law for individuals under the same class and circumstances:

**c)** A concentrated effort, in view of item "**b**" above and all the abuses that residents have been subjected to as a whole, to have the civil commitment of every resident presently being held in the STUs re-evaluated by professionals recognized by the American Psychiatric and Psychological Associations (and Dr. Becker) as impartial, unbiased and not beholden to the New Jersey Attorney General.  Towards this end, we seek timely Discovery from DOC, including the specific records of each sex offender released over the past ten (10) years who the two doctors were not sent to evaluate prior to their release.

**d)** We seek a comprehensive investigation and challenge to the improper manner in which actuarial instruments have been and are being used to commit residents.

**e)** A concentrated challenge of the denial of <u>Trial by Jury</u>.  The claim is being made that a jury is not required because this commitment is "civil and not criminal." However, crucial liberty interests are involved to a degree that is above and beyond any criminal case.

<u>Third</u>, Because of all of the above reasons and because in numerous areas the proposed settlement does <u>not</u> comport with the report of Dr. Judith Becker, the authority chosen by the Attorney General, we ask the court to dismiss it.

Respectfully submitted,

_____

STU Resident

3

From: *Wilfredo Diaz*   #*000004*
Print Your Name   and   Number
Special Treatment Unit
8 Production Way, Trl#2
P.O.Box 905
Avenel, New Jersey 07001

To: STU Settlement
    c/o Seton Hall University School of Law
    Center for Social Justice
    833 McCarter Highway
    Newark, New Jersey 07102

**Class Member's Objections/Comments Re Proposed Settlement
Raymond Alves, et al., v. Merrill Main, PH.D., et al.**

I object to the proposal settlement for the following reasons:

**#1.** SETON HALL - LAW, CENTER for Social Justice *needs* to be Dropped from representation in this Law-Suit. For they helped to create this Sexually Violent Predator Act, and now they want to represent the Residents against it. They should Not be able to have it both ways.

**#2.** The proposal shows the increase in program hours, the increase in therapists, the increase of the potential new therapy groups all in order to keep the Residents here longer **just** l**i**ke a **concentration camp.** The proposal Fails to show the increase in of how the therapy will be releasing Residents. For there are Residents that been here 8 to 12 years already, would like to go home, This proposal is not showing that chance of going home.

**#3.** Psycho-Educational Modules: The purposed Settlement does not address the risk mitigation after the successful completion of Modules. As the Settlement stands now I do not agree with module testing only. At the completion of all modules, when a Resident has successfully completed the module, there should be some kind of Notice given that the Resident's risk to re-offend has been mitigated, as well as, His level of dangerousness. This will sequentially, lower the Resident's risk assessment. This should be noted and written verification should be given to the Resident, in addition to, this verification being placed in the Residents file.

**#4.** Treatment Ombudsperson needs to be impartial, unbiased, and Not beholden to the STU. Something needs to be implemented to insure that there is No retaliation from Staff (Director, Therapist & Social Workers, etc.) for submitting and talking with the Treatment Ombudsperson about any complaints against D.H.S., and/or its Staff members.

#5. <u>Nothing</u> is mention of how the Therapy groups is going to reduce Residents treatment and advance forward to the potential possibility of discharge.

#6. Class Certification: I object to Alves, Sessoms, and Culbreth being named as representatives of the Class. These Residents do not, and cannot, represent the population as it stands. They have not experienced what separate classes of Residents have experienced, therefore, making it impossible for the above named Residents to speak on behalf of the population. There should be Residents added to the representative, listed above, that reflect the following Classes of persons; a-Juveniles that were civilly committed; b-Residents that were committed from the A.D.T.C. that have multiple years of treatment; c-Residents that have been informed that treatment would not diminish their risk to re-offend, therefore, rendering this commitment a life sentence; d-Persons that have been committed from society (that *were* on the streets) when they were selected for commitment; e-Treatment Refusals are not represented; f-MAP Residents are not represented; g-and South Wing Residents are not represented.

#7, Re-assessments & Re-evaluations of ALL Residents needs to be conducted by the American Psychiatric and Psychological Association to whom are impartial, unbiased, and Not beholden to the State of New Jersey Attorney General. To insure the <u>fairness</u> of a Release Plan to all Residents. For there are some Residents that were rail-roaded into this Treatment, for crimes that were Not considered to be Sex Crimes in their respected Criminal Court at the time of their sentencing, and They were Never notified of the potential possibility of being Civilly Committed after the completion of their term of incarceration.

#8. In the form of Cruel and unusual punishment, **Residents on South Wing are label as being the "Undesirables"** and are being isolated from the rest of population, all because most of the Residents on South Wing are either Treatment Refusals, or on some sort of Modified Activities Programming (MAP). Those South Wing Residents recently had their outside vender Pizza delivered to them by D.H.S. Staff in one of the other wings Trash Bin.

#9. Nothing is said in the proposal of having the State Doctors recording the interviews, and sending that tape to the Residents Attorneys. They are suppose to be doing this already, but are Not, in which case they erase the tape in front of the Resident.

#10. Nothing is said in the proposal, of stopping the Facilitators who are running the therapy groups of recording by their hand what is and is not said by the Resident in such therapy groups.

#11. Nothing is said in the proposal, of the needed improvement of the food that is being served to the Residents, even for those Residents that are on some sort of diet. Most of the time, the diets are Not served the proper food for them to eat.

Dietitians only show up for work, they do not properly prepare the food that is being served to the Residents & Residents on some sort of Diet.

**#12.** D.O.C. issues and matters needs to be put back in place into this Law Suit. For after D.H.S. leaves for the day, All Residents have to deal with, and put up with the prejudice abuse and mis-treatment by the D.O.C. Officers, by handcuffing a problem Resident and have approx. 20 D.O.C. officers come in and beat up on the handcuffed problem Resident. Plus, D.O.C. is suppose to be here for security purposes. Where is the security when D.O.C. either sleep on the job when D.H.S. is on the Wing, watch tv either in the control booth or on the Wing, when D.H.S. is on the Wing, walk off the Wing, when D.H.S. is on the Wing.

**#13.** <u>Nothing</u> is being said in this proposal about the care for Treatment Refusals. How are they going to support themselves in order to live without any funds? Especially when Nothing is being provided for them!!! (No clothes, No hygiene cosmetics, No Sheets, etc., etc., etc...); By this proposed settlement, All Treatment Refusal Residents are being forced to accept that They will have No work hours, Nor funds to support themselves. Some sort of Personal Needs Allowance needs to be implemented and/or put in place for those Treatment Refusal Residents who choose to be Treatment Refusals (for either some Legal or Health or another reason), to have funds to support themselves to Live. For instance, allow Residents to collect SSI. For under case Law <u>Sidney S. Zipkin v. Margaret M. Heckler</u>, 790 F.2d 16, 1986 U.S. App. LEXIS 24723: The withholding of a noncontractual benefit such as the Social Security Retirement benefit is unconstitutional only where the Statute manifests a patiently arbitrary classification, utterly lacking in rational justification. See: <u>Flemming v. Nestor</u>, 363 U.S. 603, 611, 4 L.Ed.2d 1435, 80 S.Ct. 1367 (1960); <u>Schweiker v. Wilson</u>, 450 U.S. 221, 230, 67 L.Ed.2d 186, 101 S.Ct. 1074 (1981); <u>Richardson v. Belcher</u>, 404 U.S. 78, 81, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971); <u>Buccheri-Bianca v. Heckler</u>, 768 F.2d 1152, slip op. at 8 (10th Cir. 1985). **Section 202, 42 U.S.C. § 402(x), provides in pertinent part:** (x)(1) Notwithstanding any other provision of the title, No monthly benefits shall be paid under this section or under section 223 to any individual for any month during which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of an offense which constituted a felony under applicable law, **unless such individual is actively and satisfactorily participating in a rehabilitation program which has been approved for such individual being able to engage in substantial gainful activity upon release and within a reasonable time.** <u>Note</u>: Courts have consistently upheld the amendment as it applies to the suspension of disability benefits. See: <u>Washington v.Secretary of Health and Human Services</u>, 718 F.2d 608 (3rd Cir. 1983). And Statute: SSR 83-28c: SECTION 223(f(1) (42 U.S.C. 423(f)(1)) DISABILITY

-- SUSPENSION OF BENEFITS FOR INMATES OF PENAL INSTITUTIONS -- CONSTITUTIONALITY 20 CFR 404-468; SSR 83-28c; The Statue directly provides that imprisoned felons may receive benefits if they are disable and participates in a satisfactory rehabilitation program while confined. The rehabilitation program must be approved by a competent court. Thus, a person in this situation is endowed with the opportunity completely conforms and suffices for due process considerations. These programs should result in the person being able to engage in substantial gainful activity upon release with a reasonable period of time. The plain terms Statute as well as its guidelines for satisfactory rehabilitation programs negate vagueness argument. Simply, the Statute includes No Punitive elements. The suspension of benefits is not conditioned to any particular form of conduct but applies to all felony crimes ... even imprisoned felons may obtain disability benefits if participation in a rehabilitation program is undertaken. The Statute rationally rests upon the reasonable attempt by Congress to provide disability benefit only to those persons who are deprived of a continuing source of income to satisfy basic food, clothing, shelter and medical needs. For some unknown ignorant reason, most of the Residents are Not being allowed to collect such SSI, and/or SSD.

#14. In regards to Residents Post-Discharge and/or Release, this Facility needs to realize that the State of New Jersey No-longer has administrative enforcement powers, No-longer has any type of authority or hold over (Residents) in preventing Them from leaving the State of New Jersey to reside elsewhere. See: Sanchez v. New Jersey State Parole Board, 368 N.J.Super. 181, 845 A.2d 687, 2004 N.J.Super.Lexis 129. (in support of the offender Not residing in New Jersey).

#15. Nothing is being said about the Medical Nightmares, other than the pushing of unnecessary needles & pills on Residents, and the unsanitary / mishandling of such medication, Medical Professionals are instructing the Department of Corrections to take Dying Residents with chest pains to a Hospital up in Somerset, which is approx. 40 miles away. This is where they send inmates from Northern State Prison to. Just like what just happen with the last dying Resident. To Whom Died before leaving these grounds. Since We Residents are No-Longer inmates, Why are We Not taken to Hospitals that are much closer? By this, the Department of Corrections professionals KILLED another Resident by instructing kitchen working Residents to unload Food Truck BEFORE allowing Ambulance to come in to pick up a Dying Resident with chest pains, Just like what just happen with one of the last dying Resident. To Whom Died before leaving these grounds. Is this what Future dying Residents have to look forward to, the purposely made mis-Judgments BEFORE being properly considered, and taken care of. There are Now a total of 41 Residents that had Died within (on the grounds of) this facility of the Special Treatment Unit. Administration Officials to this facility has had approx. 36 of these Residents that

Died here at the Special Treatment Unit, release through treatment, and living on the streets.

**#16.** Nothing is being said about how Residents are, **Being punish on the basis of inaccurate information.** See: Hill v. Sciarrotta, 14 F.3d 210 (2nd Cir. 1998). Residents are being coerced to speak about their **inaccurate** Convicted and Non-Convicted Sex Crimes, if they do not, these Residents are being punish by being put on Treatment Refusal Status. Plus, In the attempt of a Resident speaking with the officials of T.P.R.C. to correct **their inaccurate** records, T.P.R.C. officials refuses to do anything about it and expresses to tell it to the Civil Commitment Court Judge. To where NOTHING is done to correct the matter.

**#17.** I object to it being brought up that there should be 7-Therapist to every 50 Residents. This include certified Social Workers who think that they are License Therapists? Plus, if this is put in place, License Therapists needs to run the therapy groups, Not the self-proclaimed, wanna-be Therapists (certified Social Workers who think that they are License Therapists). Furthermore, when there is No License Therapists available to run whatever therapy group, then that particular therapy group should be canceled for that day. In meaning No substitutes (certified Social Workers who think that they are License Therapists).

**#18.** Individually Tailored Treatment of Pre- & Post-Module Testing, consists of what? And how is this going to improve a Residents chances in being discharged?

**#19.** In regards to the Treatment Staff at the STU will be required to adopt an employ clinical assessments an provide individually tailored treatment that adequately meets a Residents needs. What if the Resident is not in such agreement of such treatment, then what?

**#20.** What authority will Social Workers have over Residents? They too will need to be impartial, unbiase, and Not beholden to the STU. For as it stands right now, the Social Workers and the Therapist are of No help to a Resident, and they both cannot be trusted.

**#21.** New Treatment & Release Plans needs to be establish for ALL Residents after this settlement becomes final.

**#22.** What is considered as Full Participation and/or Full Cooperation? For under case law of Bender v. New Jersey Department of Corrections, 356 N.J.Suer. 432, 812 A.2d 1154, N.J.Super.LEXIS 10, **Full Cooperation is** based on **attendance and the quality of participation, and Not the information that is disclosed during therapy.** Plus, under case law of McKune v. Lile, 536 U.S. 24, 153 L.Ed.2d 47, 122 S.Ct. 2017 (2002), **Prohibits the State from extracting information from a**