Barbara Moses
*Admitted Pro Hac Vice*
Sarah Turk
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
Jennifer Vasquez
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
**SETON HALL UNIVERSITY**
**SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700

Lawrence S. Lustberg
Jonathan M. Manes
*Admission to D.N.J. Pending*
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Plaintiffs*

Jeffrey S. Chiesa
*Attorney General of New Jersey*
Susan J. Dougherty
*Deputy Attorney General*
David L. DaCosta
*Deputy Attorney General*
**NEW JERSEY DIVISION OF LAW**
R.J. Hughes Justice Complex
25 Market Street, 8th Floor
P.O. Box 112
Trenton, NJ 08625
(609) 341-3689

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND ALVES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MERILL MAIN, Ph.D., et al.,<br><br>Defendants. | ***ORAL ARGUMENT REQUESTED***<br>***Motion Day: September 25, 2012***<br><br><br>No. 01 Civ. 0789 (DMC) (MF)<br>(Consolidated) |

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION
## FOR FINAL APPROVAL OF SETTLEMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS AND LAW ...............................................................................2

    A.    The Act ....................................................................................................2

    B.    The STU Today .......................................................................................3

    C.    The STU Treatment Program and Its Deficiencies................................4

    D.    The Settlement .......................................................................................6

    E.    The Law ..................................................................................................6

PROCEDURAL HISTORY .......................................................................................8

ARGUMENT..............................................................................................................12

I.      THE CLASS WAS PROPERLY CERTIFIED. ............................................12

    A.    The Class Representatives ...................................................................13

    B.    Class Counsel........................................................................................15

II.    NOTICE TO THE CLASS WAS PROVIDED IN A REASONABLE MANNER. ........16

III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE. ..........................17

    A.    The Complexity, Expense, and Likely Duration of the Litigation......................18

    B.    The Reaction of the Class to the Settlement........................................19

    C.    The Stage of the Proceedings and the Amount of Discovery Completed ...........23

    D.    The Risk of Establishing Liability.......................................................25

    E.    The Risks of Maintaining the Class through the Trial.........................26

    F.    The Ability of Defendants to Withstand a Greater Judgment .............................27

    G.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of the Attendant Risks of Litigation.................27

    H.    The Opinion of Class Counsel and the Oversight of the Magistrate Judge ..........29

IV.   THE PROPOSED FEE AWARD IS REASONABLE. ....................................30

CONCLUSION............................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

Austin v. Pa. Dep't of Corrections,
    876 F. Supp. 1437, 1472 (E.D. Pa. 1995) ......................................................passim

Canupp v. Sheldon,
    No. 2:04-cv-260-FRM-99DNF, 2009 WL 4042928 (M.D. Fla. Nov. 23, 2009), aff'd sub nom.
    Canupp v. Liberty Behavioral Healthcare Corp.,
    447 F. App'x 976 (11th Cir. 2011) .................................................................passim

City of Riverside v. Rivera,
    477 U.S. 561 (1986) ................................................................................................30

Colon v. Passaic County,
    No. 08-cv-4439, slip op. at 4 (D.N.J. Apr. 24, 2012) (ECF No. 106) .......................17

D.M. v. Terhune,
    67 F. Supp. 2d 401 (D.N.J. 1999) .....................................................................21, 30

Deavers v. Santiago,
    243 F. App'x 719 (3d. Cir. 2007) ...............................................................................7

Estelle v. Gamble,
    429 U.S. 97 (1976) .....................................................................................................7

Freeman v. Berge,
    68 F. App'x 738 (7th Cir. 2003) ..............................................................................26

Georgine v. Amchem Prods., Inc.,
    83 F.3d 610 (3d Cir. 1996), aff'd sub nom. Amchem Prods, Inc. v. Windsor, 521 U.S. 591
    (1997) ....................................................................................................................13, 14

Girsh v. Jepson
    521 F.2d 153, 157 (3d Cir. 1975) ........................................................................passim

Greenfield v. Corzine,
    No. 09-cv-4983 (DMC) (JAD), 2012 WL 1134917 (D.N.J. April 4, 2012).................7

Hargett v. Adams, No. 02-cv-1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005) .........................28

Hawker v. Consovoy,
    198 F.R.D. 619 (D.N.J. 2001) ............................................................................passim

In re Cendant Corp. Litig.,
    264 F.3d 201 (3d Cir. 2001) ..............................................................17, 18, 23, 27

In re Cmty Bank of N. Va & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.,
  418 F.3d 277 (3d Cir. 2005) ...................................................................................14

In re General Motors Pick-Up Truck Fuel Tank Prods. Liab, Litig.,
  55 F.3d 768 (3d Cir. 1995) ...............................................................................12, 20

In re Ikon Office Solutions, Inc.,
  194 F.R.D. 166 (E.D. Pa. 2000)..........................................................................18

In re Prudential Co. of Am. Sales Practices Litig.,
  148 F.3d 283 (3d Cir. 1998) .............................................................................25, 27

In re Warfarin Sodium Antitrust Litig.,
  391 F.3d 516 (3d Cir. 2004) .............................................................................17, 18

Kansas v. Hendricks,
  521 U.S. 346 (1997).............................................................................................7, 22

Kolar v. Rite Aid Corp.,
  No. 01-cv-1229, 2003 WL 1257272 (E.D. Pa. Mar. 11, 2003) ..................................29

Leamer v. Fauver,
  288 F.3d 532, 545 (3d Cir. 2002) ............................................................................7

New Directions Treatment Servs, v. City of Reading,
  490 F.3d 293 (3d Cir. 2007) .............................................................................14, 15

Pack v. Beyer,
  No. 91-3709 (AET), 1995 WL 775360 (D.N.J. Dec. 22, 1995) ...........................19, 30

Reed v. General Motors Corp.,
  703 F.2d 170 (5th Cir. 1983) ...................................................................................19

Salerno v. Corzine,
  449 F. App'x 118 (3d Cir. Oct. 26, 2011) ...............................................................14

Seling v. Young,
  531 U.S. 250 (2001).................................................................................................9

Strutton v. Meade,
  668 F.3d 549 (8th Cir. 2012) .........................................................................7, 25, 28

Strutton v. Meade,
  No. 4:05-cv-2022 ERW, 2010 WL 1253715 (E.D. Mo. Mar. 31, 2010), aff'd by 668 F.3d 549
  (8th Cir. 2012) ......................................................................................................25

Sussex Commons Assocs., LLC v. Rutgers,
  No. A-97, 2012 WL 2579619, at *8 (N.J. July 5, 2012) .........................................16

Turay v. Richards,
    No. 07-35309, 2009 WL 229838 (9th Cir. Jan. 29, 2009), cert. denied, 130 S. Ct. 171 ..........28

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,
    396 F.3d 96, 113 (2d Cir. 2005) ...............................................................14

Walsh v. Great Atl. & Pac. Tea Co.,
    726 F.2d 956 (3d Cir. 1983) ....................................................................29

Youngberg v. Romeo,
    457 U.S. 307 (1982)..................................................................7, 8, 22, 25

## Statutes

N.J.S.A. 30:4-27.24 ........................................................................2

N.J.S.A. 30:4-27.28 ........................................................................2

N.J.S.A. 30:4-27.32 ......................................................................2, 3

N.J.S.A. 30:4-27.34 ......................................................................3, 6

N.J.S.A. 30:4-27.35 ........................................................................3

## Other Authorities

1 William B. Rubenstein,
    Newberg on Class Actions § 3.34 at 278 (5th ed. 2011) ...........................14

John Jacobi & Phillip A. Witt,
    The New Jersey Sexually Violent Predator Act: Analysis and Recommendations for the
    Treatment of Sexual Offenders in New Jersey, 24 Seton Hall Legis. J. 1 (1999) ..................13

John Kip Cornwell,
    The Right to Community Treatment for Mentally Disordered Sex Offenders, 34 Seton Hall L.
    Rev. 1213 (2004) ......................................................................13

Op. 440, Adv. Comm. on Prof'l Ethics,
    104 N.J.L.J. 449 (Nov. 22, 1979) ......................................................16

Settlement Agreement, Colon v. Passaic County,
    No. 08-cv-4439 (D.N.J. Apr. 25, 2012) (ECF No. 108) .........................30

## Rules

Rule 23 ......................................................................................passim

## PRELIMINARY STATEMENT

After a decade of hard-fought and difficult litigation, the parties to this certified class action have reached a settlement ("the Settlement") that will improve both the quantity and the quality of the sex offender-specific mental health treatment offered to the residents of the New Jersey Special Treatment Unit ("STU"), thereby affording them a better opportunity to regain their liberty. The Settlement also provides for an Ombudsman to address the residents' treatment-related grievances, appoints an independent Monitor to oversee compliance, and leaves residents free to pursue claims not alleged in the class complaint. The settling parties now move this Court, pursuant to Federal Rules of Civil Procedure 23(e)(2) and 23(h), to approve the Settlement as fair, reasonable, and adequate, appoint a Monitor to oversee compliance, and award the sum of $78,000 in attorneys' fees to the Center for Social Justice ("CSJ") at Seton Hall University School of Law.

As shown in more detail below, the factors set out in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), on balance, weigh strongly in favor of approving the Settlement, which was reached only after arms-length and often contentious negotiations between experienced counsel, presided over by a Magistrate Judge of this Court. The Settlement achieves much of the relief sought by plaintiffs while avoiding the costs, delays, and risks attendant upon litigating their claims through dispositive motions, trial, and appeal. Moreover, the proposed fee award is exceedingly modest. The settling parties therefore believe that, after considering all timely objections at the hearing now scheduled for September 25, 2012 (the "Fairness Hearing"), this Court will have no difficulty in concluding that the Settlement should be approved.

## THE PARTIES

The parties to the Settlement are plaintiffs Raymond Alves, Michael Culbreth and Derrick Sessoms (collectively "Plaintiffs"), on behalf of themselves and a Class ("the Class")

consisting of all persons involuntarily confined to the STU under the New Jersey Sexually Violent Predator Act, N.J.S.A. 30:4-27.24, et seq. ("NJSVPA" or "Act"), and defendants Merrill Main, Ph.D., in his official capacity as Clinical Director of the STU, Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"), Lynn A. Kovich, in her official capacity as Assistant Commissioner of the New Jersey Division of Mental Health and Addiction Services ("DMHAS"), and Jeffrey S. Chiesa, in his official capacity as Attorney General of New Jersey (collectively "Defendants").  The Settlement Agreement executed by the Parties on February 3, 2012, and a short Settlement Agreement Addendum executed on July 19, 2012 (collectively the "Agreement") are attached to the accompanying Declaration of Barbara Moses ("Moses Decl.") as **Exhibits A** and **B**, respectively.

**RELEVANT FACTS AND LAW**

### A.     The Act

The NJSVPA, enacted in 1999, authorizes the indefinite civil commitment of "sexually violent predators."   N.J.S.A. 30:4-27.24 et seq.  A "sexually violent predator" is defined as a person who has been convicted of (or in some cases charged with but not convicted of) at least one sexually violent offense and who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26.[1]

Once committed to the STU, a person who has been adjudicated a sexually violent predator remains there until such time as a state court finds that he "will not be likely to engage

---

[1] Commitment to the STU is a two-step process.  On ex parte motion by the Attorney General and a finding of probable cause, a judge may temporarily commit an alleged sexually violent predator to the STU "pending the final hearing."  N.J.S.A. 30:4-27.28.  Thereafter, the detainee is provided with counsel and a non-jury hearing is held to determine whether he "needs involuntary confinement as a sexually violent predator."  N.J.S.A. 30:4-27.32(a).   In most cases, the Attorney General begins the process at or near the date on which a person convicted of a sex offense would otherwise be released from prison.

in acts of sexual violence," in which case he may be "conditionally discharged" in accordance with a "plan to facilitate [his] adjustment and reintegration into the community."  N.J.S.A. 30:4-27.32(c)(1).  In other words, in order to regain his liberty, even conditionally, the ex-offender must establish that he has been successfully treated for the mental abnormality or personality disorder that was the basis for his confinement to the STU.

DHS, through DMHAS, is responsible for providing mental health treatment to the residents of the STU.  The New Jersey Department of Corrections ("DOC") is responsible for the physical facilities at the STU and for security at the institution.  N.J.S.A. 30:4-27.34.

**B.**     **The STU Today**

Before enactment of the NJSVPA, DHS and DOC estimated that it would cost $9.6 million annually (not including legal costs) to maintain a 150-bed "sexual predator unit" and provide the necessary custodial and treatment staff.  See Assembly Appropriations Committee Statement to Senate, No. 895, L. 1998, c. 71.  By the end of June 2012, the State was holding 469 men in a sprawling STU facility in Avenel.  Moses Decl. ¶ 22(d).  Some of them have been there since 1999, the year the STU was opened, and approximately 165 have spent ten years or more in the STU, including all three Plaintiffs.  Id. ¶¶ 22(d), 46.  Plaintiff Alves, now age 70, was committed to the STU in March 2000.  Plaintiff Culbreth, age 48, was committed in August 2001.  Plaintiff Sessoms, age 41, was committed in August 2002.[2]

Although they are entitled by statute to annual court hearings to determine whether they may safely be discharged, see N.J.S.A. 30:4-27.35, very few STU residents have thus far won their release.  Updated statistics recently provided in discovery by Defendants show that from

---

[2] Sessoms was sent to the STU on the basis of a "predicate" conviction for a sexual assault that he committed at age 16.  He served 15 years in prison prior to his civil commitment, during which time he was not offered any sex offender treatment.  As a result, Sessoms has now spent 25 of his 41 years behind bars.

1999 through June 26, 2012, only 47 of the 525 men committed to the STU (less than 9%) were discharged to the community, in most cases subject to stringent conditions including parole supervision and community-based therapy. Moses Decl. ¶¶ 22(a), 46. Over the same period, another 46 men died in the STU, were discharged to hospices or nursing homes (or otherwise discharged for medical reasons), were transferred to state prison, or were deported. Id. ¶ 22(b).[3]

### C.   The STU Treatment Program and Its Deficiencies

As set forth in further detail in the accompanying Declaration of Merrill Main, Ph.D. ("Main "Decl."), the treatment program at the STU incorporates elements of each of the three dominant models in the field of sex offender treatment: the risk-need-responsivity model, the relapse prevention model, and cognitive-behavioral treatment model. Main Decl. ¶ 3. The primary therapy provided to Class Members is a form of group therapy administered in "process groups," supplemented, for some residents, by psycho-educational "modules" devoted to topics such as victim empathy, relapse prevention, and arousal reconditioning.

When the STU staff believes that a resident has made sufficient gains in treatment such that further involuntary commitment is unnecessary, the staff recommends conditional discharge from the STU, in accordance with the NJSVPA. Main Decl. ¶ 5. Detailed discharge information recently provided by Defendants to Class Counsel confirms that progression through treatment is correlated with discharge. Of the 47 men committed to the STU since 1999 and later discharged to the community, 28 were in the Phase 5, the highest phase of the treatment program, and had been recommended for discharge by their treatment team. Moses Decl. ¶ 22(a). As of May 4,

---

[3] For those provisionally detained pending their final commitment hearings, the inception-to-date statistics are equally bleak. These statistics, drawn from information produced by Defendants in response to discovery demands served by Plaintiffs on May 4, 2012, see Moses Decl. ¶ 22, show that approximately 86% (525 of 611) are ultimately committed, at which point they too become subject to indefinite confinement until such time as a judge agrees that they are no longer likely to reoffend. Moses Decl. ¶ 22(c).

2012, there were 5 Class Members in phase 5 (but not yet discharged) and 20 in phase 4, according to documents produced by Defendants in response to discovery requests. Id. ¶ 22(d).

Although successful treatment is, in most cases, a predicate to release from the STU, the Class Members have long complained about the shortcomings of the treatment offered to them. The Second Amended Complaint ("SAC") alleges, among other things:

- That Defendants offer Class Members a maximum of two 90-minute process groups per week, and that the groups are often overcrowded, start late, or end early, further reducing therapy time (SAC ¶¶ 32-33);

- That Defendants prevent many Class Members from enrolling in the modules they need in order to progress in treatment by failing to offer those modules at all or offering them too infrequently (SAC ¶¶ 34-35);

- That Defendants arbitrarily restrict certain Class Members (particularly those housed in the South Unit) from enrolling in therapy sessions that meet elsewhere in the STU, thus preventing them from completing modules prescribed for them and necessary for advancement (SAC ¶¶36-37);

- That Defendants improperly withhold therapy as punishment for infraction of STU rules (SAC ¶ 38);

- That Defendants fail to give Class Members timely and concrete information concerning the criteria used to evaluate their treatment progress and readiness for release, the goals they must accomplish in order to progress towards discharge, and the time it will take to do so, leading to confusion, frustration, and a counter-therapeutic sense of hopelessness throughout the STU (SAC ¶ 42);

- That Defendants fail to assist Class Members with the discharge planning that is crucial to convince a court that they can in fact be safely released (SAC ¶ 43);

- That treatment is not adequately tailored to the specific needs of each Class Member, as required by the NJSVPA (SACD ¶ 31);

- That these deficiencies are caused in part by Defendants' failure to hire and retain sufficient qualified mental health professionals with training in sex offender-specific treatment (SAC ¶ 33);

- That as a result of these deficiencies, few Class Members have been able to regain their liberty, even conditionally, and few are now sufficiently advanced in the treatment program to have a reasonable hope of discharge in the foreseeable future (SAC ¶39-41); and

- That although the DOC has appointed an ombudsman to address complaints about the STU facilities or security issues, there is no comparable mechanism for addressing complaints regarding the treatment program, leading to frustration — and a large number of pro se complaints by STU residents (SAC ¶ 44).

**D.      The Settlement**

The Settlement requires Defendants to improve both the quantity and quality of the mental health treatment offered in the STU, thereby affording the Class Members a better opportunity to regain their liberty.   Toward that end, Defendants must offer Class Members more treatment, including three 90-minute process groups a week and improved access to modules; must make therapy available regardless of housing assignments; must give Class Members more timely and more specific feedback as to their progress and prospects, including concrete treatment goals and estimates of the time it will take to achieve them; must hire and train additional, qualified treatment staff; must bring in outside experts on a quarterly basis to evaluate the program and provide in-service staff training; and must designate a Treatment Ombudsperson to review and respond to treatment-related complaints by Class Members.   Moreover, an independent, Court-appointed Monitor will inspect the STU annually for a period of five years (unless shortened or extended as provided in the Agreement) to oversee Defendants' compliance.[4]

**E.      The Law**

The NJSVPA provides Class Members the right to adequate mental health treatment specifically tailored for sex offenders.   N.J.S.A. 30:4-27.34(b) & (d).   This requirement also serves to distinguish civil commitment from additional "punishment," after the conclusion of an offender's criminal sentence, which is forbidden by the Double Jeopardy Clause.   See Kansas v.

---

[4] See also Moses Decl. ¶¶ 18(a)-(1).   A more detailed summary of the Settlement terms appears in the Notice [Dkt. 153-4] that was approved by this Court on March 29, 2012 [Dkt. 155], and thereafter distributed to all Class Members and posted in the STU.   See Declaration of Barbara Moses regarding Notice and Objections, filed June 12, 2012 ("June 12 Decl."), ¶¶ 4-5. [Dkt. 177]

Hendricks, 521 U.S. 346, 365–69 (1997).  In addition, the Cruel and Unusual Punishment Clause requires that involuntarily confined persons be provided with adequate medical treatment, including mental health treatment.  See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976).

"Minimally adequate" treatment is also required by the Due Process Clause, which prohibits state entities and officials from depriving a person of his liberty due to a treatable mental health condition, without making reasonable efforts to treat that condition, so as to provide the person with a meaningful opportunity to regain his freedom.  See Youngberg v. Romeo, 457 U.S. 307, 318–22 (1982) (holding that an individual involuntarily confined to an institution for the mentally retarded has a fundamental liberty interest in "minimally adequate training," defined as "such training as an appropriate professional would consider reasonable" to facilitate his freedom from restraint); Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002) (applying Youngberg to inmate confined under New Jersey's former sex offender statute, which conditioned parole on successful treatment for the inmate's "mental aberration"); Deavers v. Santiago, 243 F. App'x 719, 722 (3d. Cir. 2007) (applying Youngberg to STU resident committed under NJSVPA).  Most recently, in Greenfield v. Corzine, No. 09-cv-4983 (DMC) (JAD), 2012 WL 1134917 (D.N.J. April 4, 2012), this Court adopted the report and recommendation of Magistrate Judge Joseph Dickson, stating:

> The substantive Due Process component of the Fourteenth Amendment requires that when state officials impose substantial deprivations of liberty associated with civil commitment, they must also provide access to mental health treatment that gives those committed a realistic chance to be cured or to improve the medical condition for which they were confined.  Youngberg, 457 U.S. at 319-22.

2012 WL 113491, at *22.[5]

---

[5] The Eighth Circuit, by way of contrast, recently held that civilly committed sex offenders have no constitutional right to mental health treatment, adequate or otherwise.  Strutton v. Meade, 668 F.3d 549, 556 (8th Cir. 2012).

The "minimally adequate" standard, however, does not require state institutions to provide state-of-the-art treatment. In <u>Youngberg</u>, the Court held that an institutional treatment decision, if made by a professional, will be invalidated only if "it is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." 457 U.S. at 323. Although many Class Members have filed challenges to the treatment program and other conditions at the STU, the <u>Youngberg</u> standard has made it difficult for them to prevail.[6]

## **PROCEDURAL HISTORY**[7]

Plaintiff Alves filed a <u>pro se</u> complaint on March 9, 2001. The following year, at the request of the Court, the CSJ agreed to represent Alves <u>pro bono</u>, and shortly thereafter the firm now known as Gibbons, P.C. ("Gibbons"), joined as co-counsel. Declaration of Baher Azmy ¶¶ 3, 6 ("Azmy Decl.")

On October 25, 2002, Alves filed an Amended Complaint asserting claims against both the DHS officials responsible for the mental health program at the STU and the DOC officials responsible for the condition of the STU facility in Kearny, New Jersey, where Alves was

---

[6] <u>See</u>, <u>e.g.</u>, <u>Belton v. Singer</u>, 2011 WL 2690595 (D.N.J. July 8, 2011) (failed challenge by Class Member to being housed in a prison facility with leaking toilets and ceilings and subject to prison rules); <u>Barber v. Sharp</u>, 2011 WL 2223651 (D.M\N.J. June 2, 2011) (same); <u>Bondurant v. Christie</u>, 2010 WL 4869094 (D.N.J. Nov. 22, 2010) (failed challenge by Class Member to STU policy of providing only "segregated" therapy to South Unit residents). Similarly, in <u>Deavers</u>, 243 Fed. Appx. at 722, the court dismissed a Class Member's challenge to the Modified Activities Program ("MAP") used at the STU, and in <u>Greenfield</u>, 2012 WL 1134917, at *14-16, this Court dismissed with prejudice a Class Member's challenge to his segregation in the South Unit and his claim that the vocational and educational offerings at STU were inadequate, while permitting him to replead his claims concerning the mental health treatment program.

[7] A more detailed history appears in the Memorandum of Law in Support of Joint Motion to Certify Class, Schedule a Settlement Fairness Hearing, and Approve the Form and Manner of Notice to the Class, filed March 22, 2012 (the "March 22 Joint Memo"), at 10-14. [Dkt. 154] The history of the case, including a description of the lengthy settlement negotiations, is detailed in the Declarations of Barbara Moses, Baher Azmy, and David DaCosta.

confined.  [Dkt. 26]; Azmy Decl. ¶¶ 7-11.  On November 17, 2003, the Court granted a portion

of defendants' motion to dismiss the Amended Complaint, ruling that the NJSVPA was non-

punitive on its face and that after Seling v. Young, 531 U.S. 250 (2001), a plaintiff could not

state a viable claim under the Double Jeopardy Clause on the theory that the Act was punitive

"as applied."  See Opinion [Dkt. 47] at 9-11.  The Court also dismissed plaintiff's claim under

the Equal Protection Clause.  Id. at 14.

From 2003 to 2005 the parties engaged in vigorous discovery, including written

discovery and the deposition of an STU administrator.  Azmy Decl. ¶¶ 14-26.  Plaintiff's counsel

also retained two experts, who inspected the Kearny facility and prepared written reports, and

interviewed numerous STU residents, some of whom wished to become additional plaintiffs.

Azmy Decl. ¶¶ 23-26.

On April 12, 2005, during a conference call with the Court, the parties agreed to suspend

active litigation and concentrate on negotiation, with the goal of resolving the case on behalf of

all STU residents.  [Dkt. 59]  Accordingly, on May 16, 2005, Alves withdrew his motion to

amend the pleadings and certify a class [Dkt. 60], and counsel entered into a period of intensive

negotiations overseen by the Honorable Mark Falk, United States Magistrate Judge.  Azmy Decl.

¶¶ 27-38; Declaration of David DaCosta ¶¶ 3-4 ("DaCosta Decl.").[8]

The negotiations were hard-fought and often contentious.  Azmy Decl. ¶¶ 27-38; Moses

Decl. ¶¶ 6-9; Da Costa Decl. ¶¶ 5-6.  Counsel exchanged detailed settlement demands and

---

[8]   The participants in these negotiations included lawyers from Greenberg Traurig LLP
("Greenberg Traurig"), appointed to represent a group of STU residents led by Richard Bagarozy
(the "Bagarozy Plaintiffs").  A more detailed description of the Bagarozy litigation, as well as
other cases consolidated with Alves, appears in the March 22 Joint Memo, at 12-13.  Since then,
yet another case has been consolidated with this action:  Oliver v. Dow, No. 2:10-cv-01542.
Oliver is represented by counsel but—like some of the Bagarozy Plaintiffs—has also written
directly to the Court and attempted to file documents pro se.

responses, engaged in informal information exchanges, consulted frequently with their respective clients, and met periodically with Judge Falk to work on open issues. In 2008, after the parties had reached an impasse concerning what would constitute an adequate treatment program at the STU, Judge Falk approved the appointment of a joint neutral expert, Judith Becker, Ph.D., to evaluate the existing program. [Dkt. 78]; Azmy Decl. ¶¶ 36-38; DaCosta Decl. ¶ 7. On December 29, 2008, Dr. Becker issued her final written report, which was closely analyzed by all counsel and their clients. Azmy Decl. ¶¶ 39-43; DaCosta Decl. ¶ 8-13. .

Settlement negotiations continued throughout 2009, DaCosta Decl. ¶¶ 12-15, Azmy Decl. ¶¶ 42-49, but were suspended in the spring of 2010 when Alves and others were moved from the Kearny facility to the current STU in Avenel, New Jersey.[9] Based in part on this relocation, the DOC-affiliated defendants argued that the claims against them were moot. Azmy Decl. ¶¶ 50-51. For this and other reasons, Judge Falk urged the plaintiffs to work towards a settlement of the treatment-related claims against the DHS-affiliated defendants. Id. ¶ 51. Heeding this recommendation, counsel for Alves and for the DHS-affiliated defendants redoubled their efforts to reach a settlement. Id. ¶¶ 51-52.

By the spring of 2011, counsel reported to Judge Falk that they had reached an agreement in principle, subject to their clients' approval. Azmy Decl. ¶ 52. Thereafter, counsel worked to obtain the necessary approvals, and, in the process, refined and fine-tuned certain aspects of the Settlement. Moses Decl. ¶ 15. On January 20, 2012, counsel informed Judge Falk that they had client authority to execute the Agreement, and on February 3, 2102, they did so. Id. ¶¶ 16-17 & Ex. A. Alves, Culbreth and Sessoms — who had agreed to serve as named plaintiffs and Class Representatives — attended the January 20 hearing by videoconference. Id. ¶ 16.

---

[9] Through counsel, the Bagarozy Plaintiffs moved, unsuccessfully, for a preliminary injunction to prevent the move. [Dkt. 116]

By Order dated March 29, 2012, as modified on April 4, 2012 [Dkt. 158], the Court certified the Class; designated Plaintiffs as Class Representatives; appointed Gibbons and CSJ as Class Counsel; approved the form and manner of notice to be given to the Class, including a deadline for Class Members to submit objections to the Settlement; and scheduled the Fairness Hearing for August 6, 2012 (it has since been rescheduled to September 25, 2012).

Before filing their joint motion for class certification, the Parties agreed that Plaintiffs could obtain limited additional discovery to update their investigation and confirm the fairness of the Settlement.  See Brief in Support of Joint Motion to Certify Class, Schedule a Settlement Fairness Hearing, and Approve the Form and Manner of Notice to Class ("March 22 Joint Memo"), at 28 n.14 [Dkt. 153-1].  Thereafter, Defendants produced over 7000 additional pages and provided updated program statistics and other information.  Moses Decl. ¶¶ 22-24. Defendants declined to produce Dr. Main for deposition, and on June 19, 2012, Judge Falk denied Plaintiffs' motion to compel him to appear.  Judge Falk also ruled that no additional discovery was needed in light of the lengthy history of the case, the substantial formal and informal investigation already undertaken, and the "arduous settlement negotiations," during which "exhaustive information was exchanged" and because "it was patently obvious to the Court that all counsel were apprised of the relevant facts."  [Dkt.179]

As a result of the documents and information produced in response to their written discovery demands, Plaintiffs were able to identify an inaccuracy in the Settlement Agreement, and counsel was able to correct the Settlement with respect to the guaranteed minimum ratio of therapists to residents actively participating in treatment.  Moses Dec. ¶¶ 23 & Ex. B (raising required therapist to resident ratio from 7:50 to 8:50).

On June 12, 2012, Class Counsel filed declarations documenting the distribution of the

Notice to the Class as ordered by the Court. In addition, Class Counsel catalogued and submitted each timely objection and comment received from Class Members. [Dkt. 177-4, 177-5][10]

## ARGUMENT

## I.    THE CLASS WAS PROPERLY CERTIFIED.

As noted above, this Court certified the Class, designated the Class Representatives, and appointed Class Counsel on March 29, 2012. Significantly, the parties did not seek "conditional" or "provisional" certification, contingent upon approval of the Settlement. Cf. In re General Motors Pick-Up Truck Fuel Tank Prods. Liab, Litig., 55 F.3d 768 (3d Cir. 1995) (discussing special problems of "settlement-only" classes). Thus, even if the Settlement is not approved, the case will proceed as a certified class action.

Plaintiffs have already demonstrated, and this Court has agreed, that all of the requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy — are satisfied and that this case also satisfies Rule 23(b)(2), which permits class actions seeking equitable relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." See March 22 Joint Memo, at 15-24. However, certain objectors now complain that Alves, Culbreth and Sessoms are atypical or inadequate because they have not shared the specific experiences of other Class Members.[11] Others assert that the

---

[10]    The most frequently-raised objections are described in paragraphs 31-35 of the Moses Declaration.

[11]    For example, what has been denominated Form Letter B complains that the Class Representatives "have not experienced what separate classes of Residents have experienced thereby making it impossible for [them] to speak on behalf of the population." Form Letter B requests that additional representatives be named, including "[j]uveniles that were civilly committed," "[p]ersons that have been committed from society (that were on the streets)," "Treatment Refusals [sic]," "MAP residents," and "South Unit residents" [Doc 177-5 at 7] The drafter of Form Letter B may not have been aware that Sessoms was a juvenile when he committed his predicate sex offense; that Alves was released from prison and on the streets before being re-arrested and committed to the STU; that all three Class Representatives have

CSJ has a "conflict of interest," either because Seton Hall law professors have written scholarly articles concerning the SVPA[12] or because former New Jersey State Senator Robert Martin, who sponsored the bill that became the NJSVPA, is on the Seton Hall Law School faculty.[13]   Still others, who feel that the Settlement does not go far enough to redress their grievances, assert that the Class Representatives and/or Class Counsel are for this reason inadequate.[14]   We briefly address each of these contentions.

A.    **The Class Representatives**

Under Rule 23(a)(3), a representative plaintiff need not share the precise experiences of or possess the exact assortment of legal claims as every member of the Class.  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631–32 (3d Cir. 1996), aff'd sub nom. Amchem Prods, Inc. v. Windsor, 521 U.S. 591 (1997).  Rather, the "typicality" requirement acts as a bar to class certification only when "the legal theories of the named representatives potentially conflict with

---

been assigned to the South Unit at one point or another; and that both Culbreth and Sessoms were at one point placed on MAP.  See SAC ¶¶ 11, 36, 38.

[12] For example, Form Letter A states, "Seton Hall representatives were retained to advise how New Jersey's Sexually Violent Predator Act ('SVPA') ought to be constructed.  This connection creates a conflict of interest."  [Dkt. 177-5 at 15]  This appears to be a reference to 1999 article, written by two Seton Hall law professors and a clinical psychologist, which analyzed the newly-enacted NJSVPA and made recommendations as to how it should be implemented.  See John Kip Cornwell, John Jacobi & Phillip A. Witt, The New Jersey Sexually Violent Predator Act: Analysis and Recommendations for the Treatment of Sexual Offenders in New Jersey, 24 Seton Hall Legis. J. 1 (1999).  Professor Cornwell later wrote another article, in which he critiqued the slow rate of discharge under the sexually violent predator laws of various states and urged the courts to make discharge easier by requiring the states to provide post-discharge community treatment.  John Kip Cornwell, The Right to Community Treatment for Mentally Disordered Sex Offenders, 34 Seton Hall L. Rev. 1213 (2004).  Unfortunately (from the perspective of Class Counsel), this is a recommendation that the courts, for the most part, have not embraced.

[13] For example, Rayford Smith asserts that "Seton Hall played a role in putting this SVPA into existence."  [Dkt. 177-7 at 161]

[14]  For example, Form Letter A states, "STU Residents are so troubled by the narrowness of the settlement and how vague, conditional and subjective it is, that many are concerned that the plaintiffs of Alves received some 'enticement' in order to manipulate their surrender to such a narrow set of agreements."  [Dkt. 177-5 at 15]  There were no such enticements.  Moses Decl. ¶ 31.

those of the absentees." <u>Georgine</u>, 83 F.3d at 631; <u>accord</u> 1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3.34 at 278 (5th ed. 2011).  Thus, "[t]he mere fact that some members of the class may have additional state or federal law claims, not asserted by the named plaintiffs, does not preclude a finding of typicality."   <u>In re Cmty Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.</u>, 418 F.3d 277, 303 (3d Cir. 2005).

Similarly, in order to be an "adequate" representative for purposes of Rule 23(a)(4), a plaintiff "must not have interests antagonistic to those of the class."  <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007) (internal citations omitted).  Because adequacy is "determined by the alignment of interest of class members, not proof of vigorous pursuit of the claim," <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96 (2d Cir. 2005), unhappiness with the substantive terms of a settlement agreement cannot be bootstrapped, retroactively, into an argument that the Class Representatives must have been inadequate.

Here, there is no conflict between the Class Representatives' claims and the claims of other Class Members.  Regardless of why each Class Member is confined in the STU, and notwithstanding any variance in their individual treatment progression, they are all subject to the same treatment program, and its inadequacies adversely impact all of them.  Plaintiffs Alves, Culbreth, and Sessoms seek a mental health program that offers them a reasonable prospect of being successfully treated for the conditions that led to their confinement and therefore affords them a better opportunity to regain their liberty.  This goal does not and cannot conflict with that of any other Class Member, because no Class Member has any interest in an inadequate treatment program.[15]  For these reasons, the Class Representatives satisfy the typicality and

---

[15] At present, 31 Class Members are treatment refusers ("TRs"), who decline to participate in the therapy offered at the STU, in most cases because progression in treatment requires them to discuss their sexual histories and, in some cases, admit to offenses of which they were not

adequacy requirements of Rule 23(a)(3) and (a)(4).

## B.      Class Counsel

In determining the adequacy of Plaintiffs as Class Representatives, this Court also necessarily determined that Class Counsel are "qualified, experienced, and generally able to conduct the proposed litigation."  New Directions, 490 F.3d at 303 (internal citations omitted). The objectors who now complain about Class Counsel do not challenge their qualifications, experience or abilities.   Moreover, for the reasons set forth above, unhappiness with the substantive terms of a settlement agreement is not a basis for impugning the adequacy of Class Counsel.   To the contrary:   "In determining the fairness of a proposed settlement, the Court should attribute significant weight to the belief of experienced counsel that the settlement is in the best interest of the class."  Austin v. Pa. Dep't of Corrections, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995) (approving settlement in prison conditions case, despite 457 objections from class members, where the settlement was the product of arms-length negotiations by "highly experienced and able counsel" whose recommendation was "entitled to great weight").

Nor, of course, is it a "conflict of interest" for Seton Hall law professors to serve as Class Counsel (through CSJ) simply because other Seton Hall law professors supported the passage of the NJSVPA in 1999 or expressed views, in their academic writings, with which some Class Members disagree.   None of the professors accused of creating a "conflict" has ever represented

---

convicted.  While these individuals  may have less interest in the claims asserted in the Second Amended Complaint than residents fully engaged in therapy, the TRs do not — and, we think, could not — argue that they are harmed in any way by an improved treatment program open to all those who seek to participate.  There is thus no conflict between the Class Representatives and the TRs.  Moreover, two TRs—both objectors—have filed separate actions that directly address the concerns of those who refuse to participate in treatment.  See Salerno v. Corzine, 449 F. App'x 118 (3d Cir. Oct. 26, 2011).  The claims that the Third Circuit cleared to proceed in Salerno seek relief that does not conflict in any way with the relief sought here; nor will those claims be barred or extinguished by the proposed Settlement.

the Defendants in litigation, and none of them has ever been a part of CSJ, much less worked on this case.  Azmy Decl. ¶ 3.  See generally Op. 440, Adv. Comm. on Prof'l Ethics, 104 N.J.L.J. 449 (Nov. 22, 1979) (no conflict presented by Seton Hall's sponsorship of two juvenile justice clinics representing opposing sides); Sussex Commons Assocs., LLC v. Rutgers, No. A-97, 2012 WL 2579619, at *8 (N.J. July 5, 2012) ("not even the University, let alone any government agency, controls the manner in which clinical professors and their students practice law").  See SAC ¶ 68.[16]

## II.    NOTICE TO THE CLASS WAS PROVIDED IN A REASONABLE MANNER.

Class Counsel and Defendants' counsel cooperated to provide notice to the Class as directed by the Court.  By April 12, 2012, individual copies of the Notice were delivered to every resident of the STU (except for one seriously ill resident hospitalized offsite), including objection forms and envelopes properly addressed to the CSJ.  See June 12 Decl. ¶¶ 4-5 & Exs. A-C.  In addition, STU personnel posted copies of the Notice in all of the public areas of the STU, and made complete copies of the Agreement available on request.  Id. ¶ 5 & Ex. B.   On May 1, 2012, Class Counsel visited the STU to present information concerning the Settlement and answer questions from all interested Class Members.  Id. ¶ 6.  Thereafter, Class Counsel mailed additional copies of the complete Agreement to residents who requested them.  Id.

---

[16] After the deadline for objections passed, Class Member Lorenzo Oliver sought to file a pro se Motion to Dismiss Class Counsel (ultimately filed on July 12, 2012 as an attachment to a letter from his counsel), based on Class Counsel's asserted failure to negotiate better settlement terms. [Dkt. 189-1]  The Motion, which includes a petition containing 218 unique signatures, lists four issues that, in Mr. Oliver's view, Class Counsel failed to negotiate properly, including two that Mr. Oliver raised in his timely objection [Dkt. 177-7 at 67] and two additional issues that he did not raise in his objection but that other Class Members did raise in theirs.   Although the Parties respectfully submit that the Motion itself amounts to an untimely objection, Part III.B of this Memorandum, infra, which addresses the timely objections of Class Members, also addresses the substantive issues raised in the Motion.  Class Counsel is prepared to more fully brief Mr. Oliver's Motion if the Court wishes.

Notice of a proposed class settlement must be provided "in a reasonable manner to all class members who would be bound." Fed. R. Civ. P. 23(e).  In this case — as confirmed by the high response rate — the notice given was more than sufficient under Rule 23(e).

**III.  THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.**

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  <u>Girsh v. Jepson</u>, 521 F.2d at 156.  In exercising that discretion, a district court should consider the nine factors enumerated in <u>Girsh</u>:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>Id.</u> at 157.  The <u>Girsh</u> factors are to be balanced; a finding that one or two factors do not weigh in favor of approval does not preclude the Court from ultimately finding the settlement fair, reasonable, and adequate.  <u>See</u> <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 243 (3d Cir. 2001) (approving settlement where "balance" of <u>Girsh</u> factors weighed in favor of approval).   In addition, as noted above, a district court, faced with a proposed settlement, should consider whether the settlement is proposed by experienced counsel who reached the agreed-upon terms through arms-length bargaining.  <u>See</u> <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004) (noting that a presumption of fairness may apply when, among other things, the proponents of the settlement are "experienced in similar litigation and the negotiations "occurred at arms' length") (quoting <u>In re Cendant Corp.</u>, 264 F.3d at 232 n.18).  Of course, the Court is also "free to consider other relevant circumstances and facts involved in this settlement."  <u>Colon v. Passaic County</u>, No. 08-cv-4439, slip op. at 4 (D.N.J. Apr. 24, 2012) (ECF No. 106).

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." In re General Motors, 55 F.3d at 784. In weighing the Girsh factors and other considerations, a district court should keep in mind that it "must not hold counsel to an impossible standard, as settlement is virtually always a compromise." Hawker v. Consovoy, 198 F.R.D. 619, 627 (D.N.J. 2001) (quoting In re Ikon Office Solutions, Inc., 194 F.R.D. 166, 179 (E.D. Pa. 2000)).

### A.     The Complexity, Expense, and Likely Duration of the Litigation

The first Girsh factor "'captures the probable costs, in both time and money, of continued litigation.'" In re Warfarin, 391 F.3d at 534 (quoting In re Cendant Corp., 264 F.3d at 233). When "continuing litigation through trial would . . . require[] additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial," the first Girsh factor favors settlement. In re Warfarin, 391 F.3d at 536.

As the Court is well aware, the Parties have already spent eleven years and thousands of hours of attorney time on this litigation. See Azmy Decl. ¶¶ 3, 60; Moses Decl. ¶¶ 48-51. Absent settlement, additional discovery would be required, including multiple fact depositions, followed by updated expert reports and, in all likelihood, summary judgment motions. Trial (assuming the case survived summary judgment) would take weeks, followed by post-trial briefs, appeals, and the difficult task of crafting appropriate remedial orders. All of this would be further complicated by the presence of numerous consolidated cases, many of them brought by pro se plaintiffs with a diverse mix of claims — some against parties not named as Defendants in the Second Amended Complaint.[17] Thus, as the district court stated in Canupp v. Sheldon, No.

---

[17] The Parties are aware of only one case in which a class of civilly committed sex offenders prevailed at trial on inadequate treatment claims. In Turay v. Weston, No. C91-664WWD (W.D. Wash.), the plaintiffs' 1994 trial win was followed by fifteen years of post-trial litigation, including the appointment of a special master, contempt proceedings, motions to modify or lift

2:04-cv-260-FRM-99DNF, 2009 WL 4042928 (M.D. Fla. Nov. 23, 2009), aff'd sub nom.

Canupp v. Liberty Behavioral Healthcare Corp., 447 F. App'x 976 (11th Cir. 2011):

> There is no question that the trial in this case would have been complex, would have required significant expense to the parties, and would have required substantial judicial labor. Therefore, this factor also weighs in favor of approval of the settlement.

Id. at *12 (approving settlement of class action brought by involuntary residents of the Florida

Civil Commitment Center alleging inadequacies in that state's sex offender treatment program).

### B.    The Reaction of the Class to the Settlement

The second Girsh factor requires the district court to "evaluate both the nature and

number of objections. However, the mere fact that there is opposition, even from class

representatives,[18] does not necessitate rejection of the settlement." Austin, 876 F. Supp. at 1458.

(approving prison-conditions settlement over the objections of 457 class members).  See also

Reed v. General Motors Corp., 703 F.2d 170 (5th Cir. 1983) (approving Title VII settlement over

objections of more than 40% of the class and 23 out of 27 named plaintiffs); Pack v. Beyer, No.

91-3709 (AET), 1995 WL 775360, at *5 (D.N.J. Dec. 22, 1995) (approving prison conditions

settlement over objections from 41% of the class); Hawker, 198 F.R.D. at 628 (approving prison

conditions settlement over objections from 250 class members, including class representatives).

---

the court's injunction, and numerous appeals.  While those proceedings were ongoing, the Supreme Court held in Seling v. Young, supra, that Washington State's civil commitment law was in fact civil, and therefore withstood Double Jeopardy challenges, regardless of whether it was applied in a punitive fashion.  531 U.S. at 263.  The Turay injunction was ultimately dissolved in 2009.  Turay v. Richards, 2009 WL 229838 (9th Cir. Jan. 29, 2009), cert. denied, 130 S. Ct. 1171 (2009).  As of 2011, Turay himself was still confined in the Washington Special Commitment Center.  See Moses Decl. ¶ 45.

[18] In Hawker, the court approved a prisoner civil rights settlement over objections from 250 inmates, including the class representatives, who wrote to the court claiming that class counsel had not acted in the best interest of the class.  The court noted, among other things, that the named plaintiffs' objections "were not entitled to additional weight because of their status as representative parties." 198 F.R.D. at 628 n.13.

In this case, Class Counsel received 156 timely objections from Class Members, representing approximately one-third of the Class.  See Moses Decl. ¶¶ 25-27; Declaration of Barbara Moses Regarding Notice and Objections, filed on June 12, 2012 (the "June 12 Decl.") ¶¶ 9-14 & Ex. E [Dkt. 177].  This relatively high objection rate may be related, at least in part, to a vigorous anti-Settlement campaign within the STU, including bulletin board notices and form objection letters circulated widely for signature.  See Moses Decl. ¶ 28; June 12 Decl. ¶ 12 & Ex. D.  Since it is unlikely in this atmosphere that any Class Member with serious reservations about the Settlement would have failed to express them, this Court may safely conclude, as in Pack v. Beyer, that "the clear majority of the class favors approval of the settlement agreement."  1995 WL 775360, at *6.[19]  See also In re General Motors, 55 F.3d at 812 (silence of class members given proper notice and an opportunity to object "constitutes tacit consent to the agreement").

Moreover, many of the objections are "the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the legal ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations." Hawker, 198 F.R.D. at 628.  For example, many Class Members demand monetary damages, see Moses Decl. ¶ 31a, even though this case is certified under Rule 23(b)(2) because it seeks only equitable relief.  See Hawker, 198 F.R.D. at 630 (where complaint did not seek damages, "the absence of an award of monetary damages is neither unfair nor unreasonable").[20]  Others demand changes to the commitment provisions of the NJSVPA, even though this case, which  focuses on

---

[19] The bulletin board notice suggested a strategic approach, advising Class Members that "the more residents make valid challenges, the better chance we have of getting a better deal."  June 12 Decl. ¶ 7.  Class Counsel do not believe, however, that a "better deal" is possible, and Defendants' counsel have repeatedly stated that it is not.  See Moses Decl. ¶ 30.

[20] Moreover, the Agreement specifically preserves the right of Class Members to seek damages with respect to any claims "not alleged in the Second Amended Complaint," including tort claims.  Moses Decl. Ex. A § IX.

what happens to men in the STU, not how they got there, never asserted any claims that could lead to such relief.   See Moses Decl. ¶ 31b; D.M. v. Terhune, 67 F. Supp. 2d 401, 406 (D.N.J. 1999) (approving prison conditions settlement over objections concerning parole eligibility, which was "outside of the scope of this litigation" and therefore not relevant to the fairness of the settlement); Canupp, 2009 WL 4042928, at 13* (rejecting objections that sought "more relief than was encompassed in the allegations of the complaint").   In a similar vein, many residents demand improvements to the prison-like physical facilities and security regimen at the STU, notwithstanding that those claims are properly brought against the DOC, which is not a party to the Settlement.   See Moses Decl. ¶ 31e; D.M. v. Terhune, 67 F. Supp. 2d at 406 (objections based on parole eligibility issues disregarded where Parole Board was not a party to the case).[21]

In some cases, objectors raise issues which do relate to the claims actually alleged in this action — that the mental treatment program at the STU is inadequate — but which are based upon "unrealistic or overly optimistic expectations."  Hawker, 198 F.R.D. at 628.  Thus, for example, a number of individuals object to the Settlement because it does not mandate release from the STU at a certain age or after a certain number of years, while others object because the Agreement does not require Defendants to provide Class Members with outpatient treatment or halfway houses instead of an inpatient program at the STU.  See Moses Decl. ¶¶ 31c.  In

---

[21] It bears emphasis that the Agreement does not prevent any Class Member from asserting these issues independently.  Indeed, a significant number of Class Members, including the Bagarozy Plaintiffs, have already filed complaints asserting various facilities-based claims against the DOC or its officials.  These claims will not be extinguished by the Settlement, nor will future claims against DOC officials be barred if otherwise meritorious.  See Moses Decl. Ex. A, at 1 ("nothing in this Settlement Agreement shall release, waive, constitute a waiver of, or in any way affect any claims that Plaintiffs have brought, or may bring, against anyone other than the Settled Defendants"); Austin, 876 F. Supp. at 1468 (approving settlement over objections based on the poor physical condition and filth of the Pennsylvania prisons, in part because the objectors "will not be precluded from bringing an independent action" on the same basis).

Hendricks, however, the Supreme Court upheld the indefinite civil commitment of "sexually violent predators" in an inpatient facility until a judge determines that they are safe to release. 521 U.S. at 363-5.  Since Class Counsel could not reasonably expect this Court to order the residents released or relocated to halfway houses — even assuming that it was established at trial that Defendants' program is inadequate — the Class Members cannot realistically expect to achieve that relief through settlement.  See also Canupp, 2009 WL 4042928, at *13 (disregarding objections "outside the scope of what Plaintiffs' attorneys thought they could establish as a constitutional minimum at trial"); Colon, No. 08-cv-4439 , slip op. at 6 (D.N.J. Apr. 24, 2012) (ECF No. 106) (disregarding objections by inmates that prison should be closed entirely as "such a result could not reasonably be achieved").

Likewise, the Class Members cannot reasonably expect a bargained-for Settlement to incorporate each and every one of the recommendations made by Judith Becker, Ph.D., in her 2008 expert report.[22]  A number of Dr. Becker's recommendations dealt with deficiencies within the control of DOC rather than DHS, while others addressed problems at the former STU facility in Kearny, which is no longer used.  See Moses Decl. ¶ 32.   More fundamentally, Dr. Becker's evaluation was based on her views as a clinician and "the professional standards [she] believe[d] relevant and applicable."  See Order Governing Settlement Procedures, April 4, 2008.  [Dkt. 78] Thus, Defendants took the position — from the moment Dr. Becker's report was issued — that she had gone beyond the Youngberg standard and recommended improvements not required by law.  See DaCosta Decl. ¶ 11; Azmy Decl. ¶ 41.   Notwithstanding Defendants' position in this regard, Class Counsel were able to implement many of Dr. Becker's recommendations in the

---

[22] Although many objectors complain that the Settlement does not implement all of Dr. Becker's recommendations, some of them also wish to prohibit components of the STU treatment program that Dr. Becker enthusiastically endorsed, including the use of penile plethysmography, polygraph exams, and other assessment methods.  See Moses Decl. ¶ 34.

Settlement, thereby effecting material improvements to the STU treatment program   See Moses Decl. ¶¶ 33a-33i.

Finally, a number of Class Members object to the fact that the Agreement requires Defendants to seek funding for the agreed-upon reforms but does not guarantee that adequate funds will be appropriated by the Legislature.   Plaintiffs' counsel vigorously sought such a guarantee, but after many rounds of negotiation, and with New Jersey's budget crisis deepening, Defendants became firmly entrenched on this issue.   Azmy Decl. ¶ 55; DaCosta Decl. ¶ 15. With the guidance of Judge Falk, Plaintiffs secured an alternate enforcement mechanism: the ability to declare the Settlement void and resume litigation if and to the extent Defendants fail to secure the funds to pay for the negotiated reforms.   See Moses Decl. Ex. A § VIII.

A similar mechanism was approved in  Austin, 876 F. Supp. at 1448, where the entire settlement — not just the funding provisions — was unenforceable.   "In the event the DOC fails to perform its obligations . . ., plaintiffs' only remedy is to reinstitute suit."   Id.   Many of the 457 objectors in Austin argued that without enforceable obligations the settlement would be "worth little or nothing."   Id. at 1468.   The court, however, ruled that plaintiffs' ability to reinstitute suit "if defendants fail to meet their obligations" gave defendants "a clear incentive to achieve full compliance."   Id.   In this case, it is clear that Defendants have a similar incentive; indeed, they have already begun to budget for the Settlement.   See Main Decl. ¶¶ 8-9.

**C.      The Stage of the Proceedings and the Amount of Discovery Completed**

The third Girsh factor requires a district court to consider "the degree of case development that class counsel have accomplished" before settling.   In re Cendant, 264 F.3d at 235. "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case."   Id.

In this action, Class Counsel engaged in three years of motion practice and formal

discovery, including an expert inspection, before commencing serious settlement negotiations. Azmy Decl. ¶ 5-35. Thereafter, the Parties engaged in additional, informal discovery throughout the extended period of negotiations. Perhaps most significantly, Defendants made thousands of pages of documents available to the neutral expert, Dr. Becker (and to Class Counsel), and cooperated to permit her to interview numerous STU residents, former residents, and staff members. See Azmy Decl. ¶¶ 36-39; DaCosta Cert. ¶ 8. After the Settlement Agreement was executed, and notwithstanding the substantial amount of information already exchanged, Class Counsel obtained additional discovery to update their factual understanding and confirm their good-faith belief that the Settlement is fair. See Moses Dec. ¶¶ 22-24. After Defendants turned over more than 7000 additional pages and answered interrogatories, Class Counsel were able to strengthen the Settlement with respect to the staff/resident ratio. Id. ¶ 23.

The only discovery that Plaintiffs sought but were unable to obtain was the deposition of Dr. Main. In denying Plaintiffs' motion to compel that deposition, Judge Falk wrote:

> The facts and merits of this case have been investigated, pored over, and discussed in depth for more than 10 years, including through STU facility changes and changes in administration. There were at least three full years of formal fact discovery. In addition, in a searching and lengthy process supervised by the Court, a neutral expert approved by both sides did an unprecedented, and for the most part unlimited, investigation of the conditions and the treatment program at the STU [which] involved numerous on-site visits, interviews with staff and residents, and the review of countless documents. During this process, the Court resolved any disputes on a real time basis, so that the investigation could proceed. This investigation resulted in a 27 page, single spaced report on the STU. The Court cannot imagine any "discovery" that would even approach this delving investigation and report, which certainly aided the contentious settlement process.

[Dkt. 179 at 5-6] Judge Falk went on to note that during the "arduous settlement negotiations, exhaustive information was exchanged and it was patently obvious to the Court that all counsel were apprised of the relevant facts." [Dkt. 179 at 6] On this record, there is simply no doubt but that Class Counsel "had an adequate appreciation of the merits of the case." Cendant, 264 F.3d

24

at 235.

### D.      The Risk of Establishing Liability

The fourth and fifth Girsh factors, taken together, "survey the possible risks of litigation in order to balance the likelihood of success and the potential . . . award if the case were taken to trial against the benefits of an immediate settlement." In re Prudential Co. of Am. Sales Practices Litig., 148 F.3d 283, 319 (3d Cir. 1998).[23]   These factors, too, support approval of the Settlement.

As in any case, Plaintiffs here face risks in establishing liability.   Although courts in the Third Circuit apply the Youngberg standard to the STU, Youngberg requires only "minimally adequate" treatment.   This means that, to establish liability, Plaintiffs must show that the STU's policies and programs "are such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Canupp, 2009 WL 4042928, at *11 (quoting Youngberg, 457 U.S. at 323).

There is great disparity among professionals as to what constitutes adequate sex offender treatment.   Dr. Main, for example, has testified as an expert that a program offering only one weekly process group (one-third of what the Settlement requires), and no modules at all, would nonetheless be adequate.   See Strutton v. Meade, No. 4:05-cv-2022 ERW, 2010 WL 1253715, at *17-18 (E.D. Mo. Mar. 31, 2010), aff'd by 668 F.3d 549 (8th Cir. 2012), .[24]   Thus, although Class Counsel are confident that they could establish the material factual allegations  of the

---

[23]  In this case, because Plaintiffs sought only injunctive relief, the fifth factor "does not merit discussion." Hawker, 198 F.R.D. at 632.

[24]  The district court in Strutton ultimately granted judgment to the defendants after a non-jury trial, ruling that the adequacy of the treatment offered to civilly committed sex offenders in Missouri was irrelevant because such persons have "no fundamental right" to any sex offender treatment, adequate or otherwise. 2010 WL 1253715, at *34-35.   The Eighth Circuit affirmed. Strutton v. Meade, 668 F.3d 549, 557 (8th Cir. 2012) ("The district court was correct that Strutton does not have a fundamental right to sex offender treatment").

Second Amended Complaint, it is less certain that Plaintiffs' proofs would result in a finding of liability.  Further, even assuming that liability is established, there is a risk that the resulting injunction would not go as far as the Settlement.  <u>See</u> Moses Decl. ¶¶ 40-42.

Significantly, while many of the objectors complain that the Settlement is unsatisfactory, few of them argue — and none argued convincingly — that the Agreement will allow the treatment program at the STU "to remain below constitutional standards."  <u>Freeman v. Berge</u>, 68 F. App'x 738, 741 (7th Cir. 2003) (approving prison conditions settlement over 20% objection rate).  Moreover, there is an enormous value to the Class in implementing the Settlement now, given the significant delays inherent in continued litigation.  <u>See</u> Moses Decl. ¶¶ 43-46.  Just as "[a] parole hearing is worth more to an inmate than the same parole hearing next year," <u>Hawker</u>, 198 F.R.D. at 627 (internal quotation marks omitted), improvements to the treatment program at the STU are worth much more to the Class Members this year than next year or the year after that.  Indeed, the most common complaint of STU residents, which is borne out by the statistics recently produced by Defendants, is that they have been there too long.  Class Counsel believe that more treatment — not more litigation — is the best way to address this complaint.

### E.    The Risks of Maintaining the Class through the Trial

Since the Class was properly certified in accordance with Rule 23(b)(2), without any conditions, Class Counsel do not foresee any legal difficulty in maintaining the case as a class action through trial.  As noted above, however, the existence of numerous consolidated complaints, many of them filed <u>pro se</u> and many seeking relief on different theories and against different defendants, would likely give rise to procedural difficulties, including but not limited to motions to decertify the Class brought by members dissatisfied with the Class Representatives, Class Counsel, or both.

**F.     The Ability of Defendants to Withstand a Greater Judgment**

The seventh Girsh factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement."  In re Cendant, 264 F.3d at 244.  Because the Defendants here are state officials sued in their official capacities, the State of New Jersey would ultimately bear the financial responsibility for complying with any injunction issued after trial.  If the Settlement is not approved, the State would also be responsible for funding the defense of this action through trial, appeals, and any other post-trial proceedings.  The State is not bankrupt, and therefore would presumably meet its financial obligations either way, rendering this factor neutral.  New Jersey's financial difficulties, however, had an impact on the settlement negotiations, see Azmy Decl. ¶¶ 54, 59, and could also impact the speed and thoroughness with which the State is able to comply with any post-trial injunction.

**G.     The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of the Attendant Risks of Litigation**

The last two Girsh factors evaluate whether the settlement represents "a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  In re Prudential, 148 F.3d at 322.  In a case seeking injunctive and declaratory relief, these factors require the court to evaluate the relief obtained through settlement against the possibility that a better result could be obtained through trial, as well as the risk that continued litigation would jeopardize the negotiated gains.  Hawker, 198 F.R.D. at 634.

In this case, as noted above, continued litigation would involve considerable risk, including the risk that success at trial could nonetheless produce less relief than the Settlement provides, while requiring the Class to wait longer for it.  As for the "best possible recovery," the

calculation is extraordinarily difficult.  See Canupp, 2009 WL 4042928, at *11 ("[i]t is difficult to gauge the range of possible recovery in an injunctive case for an area of law that is not well-litigated").  Few comparable cases have been tried, and where they have been litigated to conclusion the results have not, thus far, been encouraging.  See Strutton, 668 F.3d at 557 (affirming entry of judgment for defendants after trial); Hargett v. Adams, No. 02-cv-1456, 2005 WL 399300, *18 (N.D. Ill. Jan. 14, 2005) (granting summary judgment for defendants).  Even in Turay v. Weston, No. C91-664WD (W.D. Wash.), where a jury found the treatment offered to Washington's civilly committed sex offenders constitutionally inadequate, it took another 15 years before the courts agreed that defendants had adequately implemented the relatively modest reforms ordered by the trial judge.  See Turay v. Richards, No. 07-35309, 2009 WL 229838 (9th Cir. Jan. 29, 2009), cert. denied, 130 S. Ct. 171; Moses Decl. ¶¶ 44-45.[25]

The Agreement, by way of contrast, will mandate material improvements to the treatment program at the STU within six months.  The reforms will alleviate most of the problems identified in the Second Amended Complaint and make it easier for Class Members to regain their liberty by progressing in treatment.  See Moses Decl. ¶¶ 42-43.  Moreover, the Settlement will bring an independent Monitor into the STU to ensure that Defendants do what they have agreed to do.  As the court explained in Hawker:

> Although it is possible that the class could achieve more favorable relief through further litigation, a better outcome is improbable, mostly due to the risks associated with establishing liability and the fact that additional delays in the resolution of this action tend to reduce the value of any future equitable relief.

198 F.R.D. at 634.

---

[25] In this district, during the pendency of this action, dozens of other cases have been filed by STU residents attacking the treatment program.  Some of those plaintiffs are represented by counsel.  To date, however, none of them — individually or in combination — has brought about any reform.  See Moses Decl. ¶ 40.

**H.**      **The Opinion of Class Counsel and the Oversight of the Magistrate Judge**

In addition to the Girsh factors, courts in this Circuit traditionally "attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class." Austin, 876 F. Supp. at 1472.   This factor becomes even more important where, as here, a number of Class Members have objected to the Settlement.  As the Court of Appeals explained in Walsh v. Great Atl. & Pac. Tea Co., "Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors."  726 F.2d 956, 964 (3d Cir. 1983) (affirming district court decision denying named plaintiff's motion to dismiss class counsel, denying motion to appoint additional counsel for objectors, and approving settlement over objections from named plaintiff).  In this case, Class Counsel have reviewed all of the objections and have spoken to a large number of Class Members about the Settlement, both in person and via telephone.  See Moses Decl. ¶¶ 25-37.  Notwithstanding the number and vigor of those objections, Class Counsel continue to sincerely believe, for the reasons set out above and in their declarations, that the Settlement is in the best interest of the Class as a whole.

In this case, the Parties also benefitted from the  involvement of  a judicial officer in shaping the Settlement.  Judge Falk intensely supervised most of the settlement negotiations, frequently pushed one side or the other to make what he believed to be reasonable concessions, and several times convinced opposing counsel to return to the table when they believed they were too far apart to continue negotiating.  See Azmy Decl,. ¶¶ 4, 21, 27, 31, 34, 36-37, 44-46, 49, 51-52.  If not for his efforts, the always adversarial and often contentious negotiations might never have  resulted  in  any  agreement.  Id.   Judge Falk's involvement furnishes additional assurance that the Settlement in this action is fair, reasonable and adequate.  See Kolar v. Rite Aid Corp., No. 01-cv-1229, 2003 WL 1257272, at *3 (E.D. Pa. Mar. 11, 2003).

## IV.     THE PROPOSED FEE AWARD IS REASONABLE.

Where, as here, civil rights plaintiffs obtain substantial relief through a settlement agreement, their attorneys are entitled to a reasonable fee award.  See 42 U.S.C. § 1988; Austin, 876 F. Supp. at 1469.  If no award is agreed upon between the parties, the district court ordinarily begins with a "lodestone" figure, calculated by multiplying the hours properly expended on the case by a reasonable hourly rate.  City of Riverside v. Rivera, 477 U.S. 561, 568 (1986).

In this case, the $78,000 award sought by CSJ, and agreed to by Defendants, represents a small fraction of the value of the legal services provided over the course of this litigation.  See Azmy Decl. ¶¶ 60-61; Moses Decl. ¶¶ 48-51.   The proposed award is also modest in comparison to the fees awarded in comparable cases.  See, e.g., Austin, 876 F. Supp. at 1469-70 ($1.4 million, after five years of litigation, where "lodestar" figure was approximately $2.8 million); D.M. v. Terhune, 67 F. Supp. 2d at 411-12 ($1.22 million, after three years of litigation, which was "well below the cap allowed by the PLRA"); Pack v. Beyer ($150,000, after four years of litigation on behalf of 99 class members). Most recently, in Colon, this Court awarded $325,000 to CSJ after four years of litigation over the conditions at the Passaic County Jail.  See Settlement Agreement at 19-22, Colon, No. 08-cv-4439 (D.N.J. Apr. 25, 2012) (ECF No. 108). The Parties therefore submit that the proposed award here is reasonable.

## CONCLUSION

For all of the reasons set forth above, the Parties respectfully request that the Court approve the Settlement as fair, reasonable, and adequate; appoint an independent Monitor, in accordance with the Agreement, to oversee Defendants' compliance with its terms; award the Center for Social Justice the sum of $78,000 in attorneys' fees as negotiated by the Parties; and conditionally dismiss this action, in accordance with the Agreement, with the case to remain on the Court's inactive docket during the term of the Agreement.

Dated: July 20, 2012
Newark, New Jersey

Respectfully submitted,

**SETON HALL UNIVERSITY SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700

and

**GIBBONS P.C.**

By:   /s/ Lawrence S. Lustberg
      Lawrence S. Lustberg
      One Gateway Center
      Newark, New Jersey 07102
      (973) 596-4500

      *Attorneys for Plaintiffs and the Class*

**NEW JERSEY DIVISION OF LAW**

By:   /s/ David L. DaCosta
      David L. DaCosta
      R.J. Hughes Justice Complex
      25 Market Street, 8th Floor
      P.O. Box 112
      Trenton, NJ  08625
      (609) 341-3689

      *Attorneys for Defendants*