Barbara Moses
*Admitted Pro Hac Vice*
Sarah Turk
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
Jennifer Vasquez
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
**SETON HALL UNIVERSITY SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700

Lawrence S. Lustberg
Jonathan M. Manes
*Admission to D.N.J. Pending*
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND ALVES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MERILL MAIN, Ph.D., et al., <br><br><br> Defendants. | No. 01 Civ. 0789 (DMC) (MF) (Consolidated) <br><br> **DECLARATION OF BARBARA MOSES** |

BARBARA MOSES, being of full age, hereby declares:

**1.**     I am an attorney at law admitted to practice in California, the District of Columbia and New York, and admitted <u>pro hac vice</u> in this action.  I am a Visiting Clinical Professor at Seton Hall University School of Law and serve as the Director of the Civil Rights and Constitutional Litigation Clinic ("Clinic") at Seton Hall's Center for Social Justice ("CSJ").

Along with Gibbons, P.C. ("Gibbons"), CSJ has been appointed Class Counsel in this action, representing a Class consisting of "all persons who are committed or confined pending commitment to the New Jersey Special Treatment Unit pursuant to the New Jersey Sexually Violent Predator Act, N.J.S.A. §§ 30:4-27.24 et seq." [Dkt. 155] I submit this declaration in support of the joint motion made by Plaintiffs and Defendants (defined below and collectively the "Parties") for an order (1) approving the settlement ("Settlement") entered into by the Parties and memorialized in their February 3, 2102 Settlement Agreement, as modified by a short Settlement Agreement Addendum ("Addendum"; collectively the "Agreement") as fair, reasonable and adequate; (2) appointing an independent Monitor, in accordance with the Agreement, to oversee Defendants' compliance with the Agreement; (3) awarding CSJ the sum of $78,000 in attorneys' fees as agreed to by the Parties; and (4) conditionally dismissing this action in accordance with the Agreement.

2.    A true copy of the Settlement Agreement is attached hereto as **Exhibit A**.  A true copy of the Addendum is attached as **Exhibit B**.

<u>**Negotiation and Approval of the Settlement Agreement**</u>

3.    I joined CSJ in August 2011, stepping in for Baher Azmy, who is on a leave of absence serving as Litigation Director of the Center for Constitutional Rights in New York.  As Director of the Clinic, I became responsible for its active litigation docket, including this action.

4.    When I arrived at CSJ I learned that the parties to this action had already engaged in lengthy and difficult settlement negotiations, overseen by Magistrate Judge Mark Falk, and that a detailed agreement had been reached in principle—subject to client confirmation—to settle, on a class-wide basis, all of plaintiffs' claims regarding the mental health treatment

program at the New Jersey Special Treatment Unit (the "STU").  I also learned that counsel for the settling defendants—that is, the New Jersey officials responsible for the treatment program at the STU—were in the process of presenting the proposed agreement to the necessary agency and government personnel for approval.  The accompanying Declaration of Baher Azmy ("Azmy Decl.") describes the negotiations leading to this agreement.

5.     On September 26, 2011, dismayed at the slow pace of the approval process, CSJ requested a status conference before Judge Falk, which was scheduled for November 4, 2011. Before that date, counsel for the settling defendants informed us that the Department of Human Services ("DHS") and the Division of Mental Health and Addiction Services ("DMHAS") had approved the proposed agreement, but only after making a number of unilateral changes.  Most significantly, these agencies proposed to decrease the presumptive monitoring period from five years to four years. They also sought to insulate the settling defendants from enforcement action resulting from deficiencies found by the Monitor until and unless they failed to cure such deficiencies for two consecutive years.

6.     At the status conference on November 4, 2011, Judge Falk urged the settling parties to continue negotiating, and directed us to report to the Court by December 9, 2011 (later extended to January 10, 2012) whether we had or had not reached agreement on the final terms of a settlement.  He further scheduled an in-person status conference for December 16, 2011 (later extended to January 20, 2012).

7.     In late 2011 and early 2012, counsel for the settling parties (myself, the third-year law students enrolled in the Clinic, our co-counsel at Gibbons, and Deputy Attorneys General Susan J. Dougherty and David L. DaCosta) engaged in intensive and sometimes contentious negotiations, including an in-person meeting, dozens of conference calls, and numerous emails.

During this process we exchanged over half a dozen revised versions of the settlement agreement, as well as many shorter drafts covering particular provisions or paragraphs.

8.      Through these negotiations, plaintiffs regained ground on a number of items that the settling defendants had sought to change.  We also proposed, and obtained, several new provisions benefiting our clients.  For example, we were able to restore the presumptive length of the monitoring period to five years.  We also agreed to provide a "cure" period after each annual report by the Monitor, but in exchange plaintiffs regained the ability to initiate enforcement action, in the event of any uncured deficiencies, without waiting for a second annual report.  And we obtained a new provision (now in section VII.B.4 of the Agreement) extending the monitoring period—with respect to any uncured deficiency—after what would otherwise be the final report.

9.      While engaged in these negotiations, we continued our investigation of conditions at the STU.  In November 2011, with the consent of defendants' counsel and the Department of Corrections ("DOC"), we conducted a tour of the common areas and treatment facilities at the STU.  Thereafter, we met twice in person with our individual clients in the STU—Raymond Alves, Michael Culbreth and Derrick Sessoms—and we also met, outside the STU, with a fourth client—Bruce Abdullah—who had recently been conditionally discharged.

10.      During these meetings and conversations, our clients brought to our attention certain issues not yet addressed in the draft agreement.  Culbreth and Sessoms, who had recently been placed on the Modified Activities Program ("MAP") as a result of non-violent misconduct, not only lost privileges but were prohibited from attending their regular process groups and modules while on MAP.  Alves, who was assigned to living quarters in the South Unit, explained that South Unit residents were prevented from attending modules held

4

elsewhere in the STU, which as a practical matter barred them from many necessary modules and thereby restricted their ability to progress in treatment.  As a result of this client input, we asked for and obtained a provision (now in section VI.B.2 of the Agreement) ensuring that a resident placed on program MAP will continue to attend his regularly-assigned process group sessions and modules, "unless specifically contraindicated in light of the underlying behaviors that resulted in the MAP placement."  In the same section, we obtained language ensuring that the minimum therapeutic programming required by the agreement, including modules, will be made available to all residents "regardless of the location of their living quarters."

11.    During a meeting at the STU on December 21, 2011, Alves, Culbreth and Sessoms authorized us to execute a settlement agreement on the terms set forth in the then-current draft, which named them as prospective class representatives.  Thereafter, we continued fine-tuning the language of the document with defense counsel.  On January 10, 2012, the settling parties advised Judge Falk by letter that we were prepared to execute that agreement.

12.    The following day, I received a letter from Alves, Culbreth and Sessoms, dated January 8, 2012.  In that letter, the clients informed us that defendant Merrill Main, Ph.D., the Clinical Director of the STU, had just announced changes to the phase system used in the treatment program, potentially making it more difficult to gain release.  Historically, the treatment program was divided into five phases, from phase 1 ("orientation") to phase 5 ("transition"), and a resident was generally expected to progress to phase 5 before being recommended for discharge.  Dr. Main proposed to divide the program into six phases, such that a resident would be expected to progress to phase 6 before being recommended for discharge.  In our clients' view, this change would vitiate many of the reforms negotiated by counsel (in particular, those provisions tying certain rights and privileges to treatment phases)

and, perhaps more fundamentally, indicated that the STU administration could not be trusted. Consequently, the clients revoked their authorization to accept the settlement.

13.     We immediately contacted counsel for the settling defendants, who—after consulting their own clients—informed us that Dr. Main's initiative had been misconstrued. The intent of the proposed new phase numbering system, counsel explained, was not to lengthen the overall course of the treatment but to make more precise distinctions among the residents, especially those who had spent many years in phase 3 ("core/intensive").  Counsel further explained that Dr. Main believed it would be helpful to the more advanced residents in phase 3 to receive some official recognition of their progress, even if they were not yet ready for what was traditionally considered phase 4 ("advanced/honor").

14.     Upon receipt of this information, we asked for, and ultimately obtained, two new guarantees (now in section VI.B.1):  that any changes from the traditional 1-5 phase numbering system "will not be used to extend the overall course of treatment," and that Class Counsel will be given advance notice, in writing, of any such changes.

15.     On January 18, 2012, we returned to the STU.  After a lengthy discussion, our clients authorized us to execute a revised settlement agreement including the newly-negotiated phase language.  At no time were the clients offered any inducement or consideration to settle their claims—other than the improvements to the STU treatment program that will be made available to all residents if the Settlement is approved by the Court.

16.     On January 20, 2102, counsel attended a status conference before Judge Falk to report that their respective clients were ready to sign or had authorized counsel to sign the agreement.  All three proposed class representatives—Alves, Culbreth, and Sessoms—attended the hearing by videoconference from the STU.  Judge Falk told them, among other things, that

he had overseen the negotiations leading to the proposed settlement and believed it to be fair, though the final decision would be made by District Judge Dennis M. Cavanaugh.

17.     On February 3, 2012, after additional proof-reading and clerical corrections, I signed the final Agreement (Exhibit A) on behalf of Alves, Culbreth and Sessoms (collectively "Plaintiffs").  DHS Commissioner Jennifer Velez signed the Settlement Agreement on behalf of herself and the other settling defendants:   Dr. Main; Lynn A. Kovich, the Assistant Commissioner of the DMHAS; and Jeffrey S. Chiesa, the Attorney General of New Jersey (collectively "Defendants").   In July, 2012 (as further described in paragraph 23, below), Commissioner Velez and I signed a short Addendum (Exhibit B).

## The Settlement

18.    The Settlement requires  Defendants to improve both the quantity and quality of the sex offender-specific mental health treatment offered to Class Members, thereby affording them a better opportunity to regain their liberty.   Towards that end, Defendants must offer Class Members more treatment; must give them more timely and more specific feedback as to their progress and prospects; must hire and train additional, qualified treatment staff; must bring in outside experts on a quarterly basis to evaluate the program and provide in-service staff training; and must designate a Treatment Ombudsperson to review and respond to treatment-related complaints by Class Members.   Moreover, an independent, Court-appointed Monitor will inspect the STU annually for a period of five years (unless shortened or extended as provided in the Agreement) to oversee Defendants' compliance.   Defendants will have six months from the final approval of the Settlement to make most of the necessary changes.

19.     The Agreement is lengthy and detailed.   For the convenience of the Court, we summarize its key provisions, in broad outline, as follows:

a. <u>Individualized Treatment Plans</u>.  If the Settlement is approved, Defendants must provide individually-tailored treatment to each person committed to the STU, beginning with a comprehensive initial treatment plan within 45 days of commitment and continuing with a review of that plan every six months by the resident's treatment team and every year by the Treatment Progress Review Committee ("TPRC").

b. <u>At Least Twenty Hours of Therapy</u>.  If the Settlement is approved, Defendants must offer every Class Member (including detainees not yet committed who nonetheless wish to commence treatment, but excluding residents who refuse treatment and those on MAP) a minimum of 20 hours per week of professionally-led or professionally monitored therapeutic programming, regardless of the location of a resident's living quarters.  The therapy offered must include, at a minimum, three 90-minute process group sessions per week, one to two psycho-educational modules, if recommended for that resident, and a 90-minute self-help group (provided willing and appropriate residents are available to facilitate such groups).  If a module recommended to a resident in phase 3 or higher is unavailable, Defendants must provide that resident with the equivalent self-study materials.  Although residents on program MAP may not be entitled to the full 20 hours of therapy, they will continue to attend their core therapy, consisting of regularly-scheduled process groups and modules, unless therapeutically contraindicated. Residents on tier or wing MAP (generally reserved for those displaying more volatile or problematic behavior) will be offered a twice-weekly MAP process

group.

c. <u>Program Phases</u>.  If the Settlement is approved, Defendants must advise Class Counsel in advance of any changes to the program phases, and may not use such changes to extend the overall course of treatment.

d. <u>Feedback</u>.   If the Settlement is approved, the treatment plans, six-month reviews and TPRC reviews must include specific and individualized recommendations for each resident's treatment goals.   Residents must be informed of the objective criteria needed to meet those goals (for example, completion of certain modules and successful post-module testing) and must be given anticipated time frames for completion of the objective criteria and for attainment of their ultimate treatment goals.   Similarly, the TPRC reports must include an anticipated time frame for promotion to the next phase of the program.   In addition, Defendants must adopt objectively measurable pre- and post-module testing and provide residents with their results within 15 days of the test.  Defendants must also inform the residents of any significant decision regarding their treatment (including reports, recommendations, phase designations and discipline), both orally and in writing, within 15 days.

e. <u>Post-Discharge Preparation</u>.  If the Settlement is approved, the social work staff at the STU must develop a discharge plan for residents in phase 4 or higher (earlier if recommended by the TPRC or ordered by a court).   In developing these plans, the social work staff must assist residents in finding housing and obtaining the support necessary for discharge.

f. <u>Vocational, Educational and Recreational Opportunities</u>.  If the Settlement is

approved, Defendants must conduct an individualized vocational assessment of each resident within 45 days of final commitment, develop a plan for building on his skills and strengths, and offer each resident not on MAP or treatment refusal ("TR") status an average of 10 weekly hours of institutional (paid) work or other vocational activities.  Residents will also be entitled to ten hours of educational activities per week, including GED coursework. Those who wish to pursue college work may do so at their own expense. Recreational activities must be available six days per week.

g.  Increased Staff Ratios.  If the Settlement is approved, Defendants must hire and retain sufficient additional treatment staff, properly licensed or certified for their positions, to maintain a ratio of 8 therapists for every 50 residents in active treatment.  (This ratio was stated in the Settlement Agreement as 7 therapists to every 50 residents in active treatment, but as a result of supplementary discovery obtained by Plaintiffs thereafter the ratio was increased to 8 therapists for every 50 residents in active treatment, as memorialized in the Addendum.)  Therapists must spend 16 hours a week in direct contact with residents (10 hours per week for social workers).

h.  Staff Training and Independent Evaluation.  If the Settlement is approved, DMHAS must contract with independent experts in the field of sex offender treatment and assessment and arrange for one such expert to visit the STU each quarter. The expert will evaluate segments of the program (assigned on a rotating basis), report his or her findings and recommendations to the STU administration, and conduct a half-day of in-service training for STU staff,

thus ensuring that the STU program is based on current treatment techniques and knowledge and keeping the STU staff updated on such treatment techniques and knowledge.

i.  <u>Treatment Ombudsperson</u>.  If the Settlement is approved, Defendants must appoint a Treatment Ombudsperson to establish a resident complaint system for treatment issues.  The Ombudsperson must investigate all treatment-related complaints within the scope of the Settlement, notify the complaining residents of the results, and attend a community meeting at least twice a year to speak with residents and discuss any systematic treatment problems.

j.  <u>Independent Monitor</u>.  If the Settlement is approved, Defendants must pay for an independent Monitor—selected and appointed by the Court—to oversee compliance with the treatment, staffing and funding obligations set forth in the Agreement.  The Monitor will conduct annual inspections to determine whether Defendants are or are not in compliance, during which he or she will be given full access to the STU, including the records of Class Members, and may conduct interviews of residents and staff.  The Monitor will prepare a written report each year to set forth his or her findings and provide it to counsel for Plaintiffs and Defendants.  After an objection period, the Monitor may revise the report.  If the Monitor's report (after any revisions) concludes that Defendants are non-compliant with one or more provisions of the Agreement, Defendants may attempt to cure the deficiency.  If they do so to the Monitor's satisfaction within 75 days, they will be deemed to be in compliance with respect to the year in question.  If Defendants fail to cure the

deficiency, and are deemed non-compliant, Plaintiffs may either seek enforcement of the Agreement with respect to the provisions as to which Defendants are non-compliant or may declare such provisions void and resume litigation regarding such issues.   The monitoring period will presumptively be five years.   However, if Defendants are found to be in compliance with respect to any material provision of the Agreement for three consecutive years, the monitoring period will then be concluded with respect to that provision.   If, on the other hand, Defendants are found to be non-compliant with one or more provisions of the Agreement in what would otherwise be the Monitor's last report, the monitoring period will continue for another year with respect to such provisions.

k.   <u>Funding</u>.   If the Settlement is approved, DHS will be required to seek appropriations sufficient to fund the Settlement as "one of its top priorities." In the event of insufficient funding, the Agreement prescribes a meet-and-confer process, after which Plaintiffs, if not satisfied with Defendants' plans for implementing the available funding, may declare the provisions of the Agreement impacted by the budget limitations void and may resume litigation with respect to such issues.

l.   <u>Term</u>.   The Agreement will terminate 60 days after the end of the Monitoring Period, unless extended in writing by the Parties.

## **Class Certification and Notice**

**20.**   On March 21, 2012, the Parties filed a joint motion for an order certifying the Class, approving the Notice to be given to Class Members, and scheduling a fairness hearing.

[Dkt. 153]  In an order dated March 29, 2012, modified by an order dated April 3, 2012, the Court granted the motion, certified the Class, appointed Plaintiffs as Class Representatives, designated CSJ and Gibbons as Class Counsel, approved the Notice, and set deadlines for delivery of the Notice to the Class, submission of objections by Class Members, and presentation of such objections to the Court.  [Dkt. 155, 158]

**21.**   On June 12, 2012, the undersigned filed a declaration (the "June 12 Declaration") confirming that a copy of the Notice was provided to each Class Member as directed by the Court, along with instructions for submitting objections or comments and a pre-addressed envelope to be used for that purpose.  [Dkt. 177 through 177-3]  Also on June 12, Class Counsel filed copies of all timely objections and comments received from or on behalf of Class Members concerning the Settlement, along with a chart summarizing the nature of the objections.  [Dkt. 177-4 through 177-8]

<u>**Additional Discovery**</u>

**22.**   Before filing their joint motion for certification of the Class, the Parties agreed that, in light of the gap since formal discovery was suspended in this action, Plaintiffs would take limited additional discovery to update their factual investigation and confirm their good-faith belief that the Settlement is fair, reasonable and adequate.  [Dkt. 154 at 28]   Thereafter, Plaintiffs served document requests and interrogatories, to which Defendants responded with over 7000 pages of newly-produced documents and detailed statistical information.   This discovery revealed the following facts:

      a.   As of June 26, 2012—thirteen years after the STU opened in 1999—less than 9% of the individuals finally committed under the NJSVPA (47 out of 525) had been released to the community.  Of these 47 men, 28 were discharged by

the court, in accordance with the recommendation of their treatment team, upon having reached phase 5 of the treatment program. The other 19 men were discharged by the court at phases 1 through 4 of the treatment program, nearly always over the objection of the treatment team.

b. Over the same time period, another 46 men died in the STU, were discharged to hospices or nursing homes (or otherwise discharged for medical reasons), were transferred to state prison, or were deported.

c. From the STU's inception in 1999 through June 26, 2012, 637 men have been confined, at one time or another, to the facility. Of these, 26 men are temporarily detained at the STU awaiting a final determination as to whether they will be committed. Of the remaining 611 men, 86% (525 of 611) were finally committed, meaning that they became subject to indefinite confinement until such time as a judge agrees that they are no longer likely to reoffend.

d. As of June 26, 2012, the total population at the STU stood at 469. 165 of these men have been continuously confined to the STU for 10 years or more. As of May 4, 2012, there were 5 men confined to the STU who had reached phase 5 of the treatment program and 20 men in phase 4.

23. Defendants' interrogatory answers also confirmed that the staffing levels mandated in the Settlement will constitute increases over pre-settlement levels. In fact, as a result of our supplementary discovery, we learned that in order to properly staff the additional therapy to be provided, including the increased number of process groups and modules, the STU will need to increase the ratio of therapists to residents in active treatment so that it is 8 to

50. Section VI.B.1 of the original Settlement Agreement required a ratio of 7 to 50. We therefore insisted, and Defendants agreed, that the document be modified by way of an Addendum to memorialize the higher ratio requirement. For the avoidance of doubt—and in light of some of the objections received to the Settlement—the Addendum also makes it clear that nothing in the Agreement requires a Class Member to participate in therapy.

24. As part of the supplementary discovery, Plaintiffs also sought a deposition of Dr. Main. Defendants objected. On June 19, 2012, Magistrate Judge Falk denied Plaintiff's application for an order compelling Dr. Main to appear, ruling that no additional discovery was needed in light of the lengthy history of the case and the substantial formal and informal investigations already undertaken. [Dkt. 179 at 5-6] Judge Falk went on to note that during the "arduous settlement negotiations, exhaustive information was exchanged and it was patently obvious to the Court that all counsel were apprised of the relevant facts." [Dkt.179 at 6]

## Objections

25. We counted a total of 156 Class Members (approximately one-third of the Class) as objecting to the Settlement. This number includes all timely comments received from or on behalf of a Class Member that appeared to express dissatisfaction with the Settlement, in whole or in part. Where it was not clear whether the writer intended to object, we erred on the side of caution and included his comments as an objection. For example, we included:

   a. Comments from Michael Auxner [Dkt. 177-5 at 20-21] complaining about many aspects of the treatment program at the STU (and about the commitment and recommitment process used under the NJSVPA, which is not the subject of this action), and stating, among other things, "More therapy is not going to work in a setting like this." Auxner does not expressly state whether he is

opposed to the Settlement.

b.  Comments from David A. Carson [Dkt. 177-5 at 145-56], who states that he objects to sex offender treatment altogether because it is in opposition to the word of God, and contends that he should not have been committed to the STU in the first instance.  Carson does not state whether he objects to the Settlement itself (which as noted above does not require him or any other Class Member to accept treatment) or, if so, on what ground.

c.  A letter from John S. Furlong, Esq., counsel for Class Member William Moore and his fiancée Maryann Hysler [Dkt. 177-7 at 51-56], objecting to the Settlement "insofar as [Moore and Hysler] have causes of action distinct from other class members, namely, their claims for deprivation of the right to marry and exercise religious liberty."  Counsel does not express any objection to the actual terms of the Settlement, which, in any event, will not bar the independent claims of his clients.

d.  Comments from George Zimmer [Dkt. 177-8 at 92-93], complaining about his life in the STU but going on to say that he does not wish to escape and that if the doors were opened he would get some burgers but return to the STU to eat them.  It is not clear whether Zimmer intended to object to the Settlement.

26.  Some Class Members stated that they wished to object to the Settlement but did not provide any reasons.  For example, Derrick Sessoms—one of the two Class Representatives who submitted objections—wrote as follows:  "I don't agree with the Settlement I believe we should go to trial."  [Dkt. 177-7 at 152]

27.  As explained in more detail in the June 12 Declaration [Dkt. 177 ¶ 12], other

Class Members submitted form letters which appear to have been circulated widely within the STU. For example, Raymond Alves—the second Class Representative who submitted objections—signed a form that we have designated Form Letter F and that we believe was written by Gilbert Greenfield. [Dkt. 177-5 at 4-6, 177-6 at 50-53] The most commonly-used model was Form Letter D, submitted by 39 Class Members. Form letter D states succinctly: "I completely object to the Settlement. It does not comport with the report of Dr. Becker (the authority nominated by the Attorney General) who described this program as the 'worst she had ever seen.' I also completely object to numerous issues passed over." [Dkt. 177-5 at 2]

28.   Some of the objecting Class Members may also have been motivated by a flyer, described in the June 12 Declaration, posted in the STU. The flyer urged all residents to challenge the Settlement, stating: "Counsel has told us that the more residents make valid challenges, the better chance we have of getting a better deal." [Dkt. 177 ¶ 7]

29.   Class Counsel do not suggest that it was inherently improper for one or more Class Members to urge others to join them in objecting to the Settlement. We describe the campaign merely because, given these efforts—combined with the large number of Class Members who requested complete copies of the Agreement and/or attended  information sessions held by Class Counsel—it seems highly unlikely that any resident with serious reservations about the Settlement failed to express them. Thus, we believe that approximately two-thirds of the Class favors the Settlement. See Pack v. Beyer, 1995 WL 775360, at *6 (D.N.J. Dec. 22, 1995) (approving prison conditions settlement over objections from approximately 40% of the class because, among other things, "a clear majority of the class favors the settlement agreement"). And while we did not expressly solicit expressions of support, we nonetheless received several—notwithstanding what appears to have been some

anti-Settlement pressure within the STU.  For example, Thomas M. Parker wrote simply, "Please help us, we desperately need it."  [Dkt. 177-7 at 70]  Another Class Member, Glenn Rogers, wrote, "I feel as though if reached it will be a benefit to residents like myself."  [Dkt. 177-7 at 120]

**30.**    Notwithstanding the advice set forth in the STU flyer ("the more residents make valid challenges, the better chance we have of getting a better deal"), Class Counsel have no confidence that a better deal is possible.  The negotiations that led to the final Agreement were lengthy and frequently contentious.  Impasses were common and often difficult to bridge.  To the extent Class Counsel did not achieve additional reforms, beyond those now memorialized in the Agreement, it was not for lack of trying.  Moreover, Defendants' counsel have repeatedly voiced their willingness to proceed to trial (after first attempting to dispose of this case through motion practice) rather than make additional concessions.

## Common Objections

**31.**    Many of the objections received from Class Members, although heartfelt, appear to be "the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the legal ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations."  Hawker v. Consovoy, 198 F.R.D. 619, 628 (D.N.J. 2001) (approving prison conditions settlement over objections from 250 inmates, including class representatives).  For example:

a. Many Class Members, such as Joseph Aruanno, seek "significant monetary and punitive damages."  [Dkt. 177-5 at 17]  John Banda asks for "$25 million dollars from each listed defendant in their Personal and Individual Capacities."  [Dkt. 177-5 at 91]  However, this action is certified under Fed.

R. Civ. P. 23(b)(2) because it seeks only declaratory and injunctive relief.  See Hawker, 198 F.R.D. at 630 (where complaint did not seek damages, "the absence of an award of monetary damages is neither unfair nor unreasonable").    Moreover, section IX of the Agreement specifically preserves the right of Class Members to seek damages with respect to any claims "not alleged in the Second Amended Complaint," including tort claims.

b.  Similarly, a number of Class Members seek to challenge the commitment provisions of the NJSVPA, their own commitment to the STU, the actuarial instruments relied upon at commitment and re-commitment hearings, or even the conditions of their pre-STU prison terms.  For example, Charlie Brown argues that he should have been notified of his potential civil commitment sufficiently further in advance of the end of his prison sentence, and goes on to criticize the manner in which he was committed, arguing that the State should not have been permitted to lengthen his incarceration beyond his criminal sentence.  [Dkt. 177-5 at 140-41]  Other Class Members, including those who signed Form Letter A, object to "the improper manner in which actuarial instruments have been and are being used to commit residents." [Dkt. 177-6 at141]  This lawsuit, however, focuses on what happens to Class Members in the STU—not in court.  Plaintiffs do not challenge the NJSVPA on its face.  After Kansas v. Hendricks, 521 U.S. 346 (1997), and Seling v. Young, 510 U.S. 250 (2001), such a challenge would likely fail.    As this Court stated in Fournier v. Corzine, 2007 WL 2159584, at *10 (D.N.J. July 27, 2007), "the New Jersey SVPA is essentially the same as the Kansas and

19

Washington statutes that were examined and upheld by the United States Supreme Court in Hendricks and Seling, respectively." Nor do Plaintiffs here challenge the in-court use of actuarial instruments that have previously survived judicial scrutiny. See , e.g., In re Commitment of R.S., 173 N.J. 134 (2002) (permitting the admission and use of actuarial instruments notwithstanding the "critics who challenge [their] validity and predictability"); Oliver v. Dow, 2012 WL 1883921 (D.N.J. May 22, 2012) (holding that counseled Class Member Lorenzo Oliver failed for the second time to state a cognizable claim based in part on the actuarial instruments used at commitment and re-commitment hearings). Rather, Plaintiffs allege that the *treatment program* offered at the STU is inadequate—and specifically allege, among other things, that Defendants have violated the NJSVPA itself "by failing to provide treatment to plaintiffs and other members of the Class 'appropriately tailored' to their specific needs." SAC ¶ 68. Commitment issues, in short, are "outside the scope of this litigation" and therefore these objections, however forceful, are not relevant to the fairness of the Settlement. See D.M. v. Terhune, 67 F. Supp. 2d 401, 406 (D.N.J. 1999) (approving prison conditions settlement over objections concerning parole eligibility, which was not the subject of the lawsuit).

c. Other Class Members seek immediate release from the STU, release after a certain amount of time in the program, or release by a certain age. For example, Tyrone Hill writes that he wishes to go to trial unless (among other things) the settlement agreement makes "[a]ge a significant factor for release

with 60 the maximum age of release." [Dkt. 177-6 at 88 ] However, in Hendricks, 521 U.S. at 363-5, the Supreme Court expressly upheld the indefinite civil commitment of persons adjudicated "sexually violent predators" until such time as a judge determines that they are safe to release. Since Class Counsel could not reasonably expect the Court to order the residents released—even after a successful trial—the objectors cannot realistically expect to achieve that relief though settlement.

d.  Some Class Members seek to replace the NJSVPA with a different statutory scheme altogether. For example, Michael Hasher filed a pro se "motion for leave to file an amended complaint" (which this Court deemed an objection to the Settlement) in which he proposes that the "Texas Civil Commitment Program should be replicated in New Jersey" and argues that the Texas program is better than the NJSVPA because, among other things, it provides for outpatient treatment rather than institutionalization of former sex offenders. [Dkt. 177-6 at 66-85] In a similar vein, many Class Members are unhappy with the Settlement because it does not mandate that more advanced residents be placed in halfway houses or other community-based programs. While programs relying more heavily on community-based treatment may indeed be superior to the NJSVPA, they do not appear to be constitutionally mandated. See, e.g., Fournier, 2007 WL 2159584, at *8 (rejecting arguments by Class Members that the fact that "SVPs are not permitted to transfer to halfway houses," among other things, renders the NJSVPA impermissibly punitive). As noted above, the Supreme Court has upheld the constitutionality

of an inpatient program much like New Jersey's.  <u>Hendricks</u>, 521 U.S. at 370.

    e.   A large number of Class Members object to the Settlement on the ground that it does not require improvements to the prison-like physical facilities at the STU, the food served, the conduct of DOC security personnel, or other aspects of the institution that are the responsibility of the DOC.  For example, Richard Bagarozy, who submitted what appears to be an extended  version of Form Letter A, states that he "strenuously object[s] to the elimination of the ability to challenge the housing facilities."  [Dkt. 177-5 at 22-31]  However, the Second Amended Complaint does not state any claims against the DOC or its officials.  <u>See</u> <u>D.M. v. Terhune</u>, 67 F. Supp. 2d at 407 (parole reforms could not be expected in prison conditions settlement where the Board of Parole "was not a defendant" in the case).  Moreover, many Class Members— including Bagarozy, who is represented by his own counsel—have filed individual complaints which do state such claims.  The Settlement will not extinguish such claims, nor bar new ones.  Thus, it does not "eliminate" any Class Member's ability to challenge the housing facilities.  <u>See</u> <u>Austin v. Pa. Dep't of Corrections</u>, 876 F. Supp. 1437, 1468 (E.D. Pa. 1995)  (approving settlement over 457 objections, including objections based on the poor physical condition and filth of the Pennsylvania prisons, in part because objectors "will not be precluded from bringing an independent action").

**32.**    In addition to the objections set forth above, many Class Members assert that the Settlement fails to implement all of the recommendations made by Judith Becker, Ph.D., in her expert report dated December 29, 2008.  [Dkt. 108-3]  However, to the extent Dr. Becker noted

problems with the STU facility in Kearny, those issues became moot in 2010, when that facility was emptied and the residents were moved to the current STU.  Indeed, the most frequently-quoted sentence from Dr. Becker's report—that the living conditions in the STU were "the worst I have ever seen"—was a reference to the physical facilities, not the treatment program, and was based in part on the condition of the former Kearny STU, where (at that time) a majority of the residents were housed.  [Dkt. 108-3 at 9]  Moreover, many of the deficiencies noted by Dr. Becker are within the control of the DOC rather than the Defendants.

**33.**   Most significantly, many—though not all—of Dr. Becker's recommendations are in fact incorporated into the Settlement.  By way of example only:

a.   <u>Clinical Assessments</u>.  Dr. Becker recommended that each resident receive a comprehensive psychological examination upon commitment, that pre- and post-module testing be done, and that various instruments including the Psychopathy Checklist Revised ("PCL-R") and penile plethysmography should be utilized to assess treatment progress.  [Dkt. 108-3 at 12-13, 27] Sections VI.A.3.a, VI.A.3.c, and VI.A.3.e of the Agreement incorporate these recommendations.

b.   <u>Program Phases</u>.  Dr. Becker recommended that the residents be provided with additional therapy hours and "clear criteria" for phase progression, and that individual therapy be available for those who would benefit from it.  [Dkt. 108-3 at 15, 27]  Sections VI.A.3.a.3 and VI.B.2 of the Agreement incorporate these recommendations.

c.   <u>Process Groups and Modules</u>.  Dr. Becker recommended that more process groups and more modules be offered, so that each resident is provided a

23

"minimum of 15 to 20 hours in direct clinical service."  Sections VI.B.2, VI.B.3 and VI.B.10 of the Agreement incorporate these recommendations.

d.  <u>MAP</u>.  Dr. Becker recommended that residents on MAP "receive more in the way of therapeutic contact time."  [Dkt. 108-3 at 27]  Section VI.B.2 of the Agreement incorporates this recommendation.

e.  <u>Vocational, Recreational and Educational Therapy</u>.  Dr. Becker recommended that a comprehensive vocational evaluation be conducted of each resident on admission, that more recreational activities be offered, and that residents be surveyed to assess the types of recreation most desired.  [Dkt. 108-3 at 18-19]  Sections VI.B.2.a.2, VI.D and VI.E of the Agreement incorporate these recommendations.

f.  <u>Release Preparation and Programming</u>.  Dr. Becker noted that a number of men on conditional release were required to find housing and jobs on their own.  Section VI.G of the Agreement addresses this problem.

g.  <u>Staff</u>.  Dr. Becker opined that "more clinical and custody staff are needed at the facility."  [Dkt. 108-3 at 26]  Section VI.C of the Settlement Agreement, as modified by the Addendum, requires Defendants to hire and retain additional qualified therapists.

h.  <u>Ombudsman</u>.  Dr. Becker recommended that an Ombudsman be appointed.  [Dkt. 1-8-3 at 28]  Section VI.I of the Agreement does so.

i.  <u>Paper vs. Reality</u>.  Dr. Becker noted that certain STU programs or procedures that appeared satisfactory on paper were not being properly carried out or fully implemented within the STU.  [Dkt. 108-3 at 16]  Section VII of the

Agreement requires the appointment of a Monitor to ensure that Defendants honor their written commitments.

34.   It should probably be noted that many objectors are somewhat selective in their embrace of the Becker report.  For example, Gilbert Greenfield objects that the Settlement does not comport with Dr. Becker's report, but also argues that under no circumstances should Defendants be permitted to use plethysmography (which directly measures male sexual arousal).  [Doc 177-6 at 52]   Dr. Becker, however, strongly criticized the STU for *failing* to use plethysmography, because she views it as an "objective measure of sexual arousal patterns" and because "the recidivism literature informs us that deviant sexual arousal is highly predictive of recidivism."   [Dkt. 108-3 at 11-12]   Section VI.A.1.f of the Agreement permits plethysmography, but only if the treatment staff is properly trained on its use.

35.   Finally, a number of Class Members point out that while the Agreement requires Defendants to seek funding for the agreed-upon reforms, it does not guarantee that adequate funds will be appropriated by the Legislature.  As set forth in more detail in the Azmy Declaration, Plaintiffs' counsel vigorously sought such a guarantee.  But after many rounds of negotiation, and with New Jersey's budget crisis deepening, Defendants became firmly entrenched on this issue.  With the guidance of Judge Falk, Plaintiffs secured an alternate enforcement mechanism: the ability to declare the Settlement void and resume litigation if and to the extent Defendants fail to secure the funds to pay for the negotiated reforms.

36.   A similar mechanism was approved as fair, reasonable and adequate in Austin, supra, 876 F. Supp. at 1448.  Indeed, funding was not the only contingency in Austin.  Not a single provision of the settlement agreement in that case was enforceable by the court.  "In the event the DOC fails to perform its obligations . . . , plaintiffs' only remedy is to reinstitute

suit." <u>Id</u>.  Many of the 457 objectors in <u>Austin</u> argued that without enforceable obligations the settlement would be "worth little or nothing."  <u>Id</u>. at 1468.  The court, however, was untroubled by this feature of the bargain, ruling that plaintiffs' ability to monitor settlement compliance and to reinstitute suit "if defendants fail to meet their obligations" gave defendants "a clear incentive to achieve full compliance."  <u>Id</u>.

37.    In this case, Defendants are already responding to the incentives built into the Agreement.  As set forth in the accompanying Declaration of Merrill Main, Ph.D. ("Main Decl."), administrators and treatment staff at the STU have taken a number of steps to implement the Settlement in advance of the Fairness Hearing.  Among other things, they are developing pre- and post-module testing, revising the Resident Guide, implementing a newly-developed comprehensive treatment plan, providing MAP groups twice a week instead of once, and conducting individualized vocational assessments for residents.  Main Decl. ¶ 8  STU administrators have received the necessary approvals to hire additional treatment staff, including nine additional psychologists.  <u>Id</u>. ¶ 9.

<b><u>Reasons for Class Counsel's Support</u></b>

38.    The Settlement in this action, like all settlements, "represents a compromise between the parties, where Plaintiffs yielded their highest hopes of achievements in exchange for certainty and resolution."  <u>D.M. v. Terhune</u>, 67 F. Supp. at 411.  "[A] settlement agreement, like life itself, is not perfect."  <u>Pack v. Beyer</u>, 1995 WL 775360, at *5.

39.    On some issues—like funding—Class Counsel were "constrained by what defendants would concede in negotiations."  <u>Austin</u>, 876 F. Supp. at 1461.

40.    On other issues, counsel were constrained by the law itself, which is generally less favorable to the Class than most Class Members (and their lawyers) believe it should be.

Courts in this Circuit recognize that individuals civilly committed pursuant to the NJSVPA have a fundamental liberty interest in minimally adequate mental health treatment.  However, adequacy is measured by the standard set forth in <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), which held that an institutional treatment decision will be invalidated only if it "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." <u>Id</u>. at 323.  This standard, in turn, often leads the courts to conclude that treatment which is significantly sub-optimal is nonetheless legally permissible.  <u>See</u>, <u>e.g.</u>, <u>Deavers v. Santiago</u>, 243 Fed. Appx. 719, 722 (3d Cir. 2007) (affirming dismissal of case brought by Class Member Robert Deavers because his rights were not violated when he was placed in Temporary Close Custody, and then on Restricted Activities Programming (now called MAP), with no opportunity to contest the accusation made against him); <u>Belton v. Singer</u>. 2011 WL 2690595 (D.N.J. July 8, 2011) (dismissing case brought by Class Member Jamal Belton because his rights were not violated when he was placed in a prison facility with leaky ceilings, leaky toilets, and bed bugs, and subjected to prison policies including strip searches and interception of mail); <u>Bondurant v. Christie</u>, 2010 WL 4869094, at *6 (D.N.J. Nov. 22, 2010) (dismissing case brought by Class Member Howard Bondurant because his rights were not violated when he was placed on the South Unit and "limited to segregated activities").

    **41.**   Results are similar in other jurisdictions.  For example, in <u>Hargett v. Adams</u>, 2005 WL 399300, *18 (N.D. Ill. Jan. 5, 2005), the court noted that "the Constitution does not require optimal treatment."  It then granted summary judgment against a class of civilly committed individuals on the ground that their rights were not violated by high-security prison-like conditions, nor by various deficiencies in the treatment program, including questionable drug

therapies, the lack of even one full-time psychiatrist on staff,  inadequate provisions for family participation, unsatisfactory grievance procedures, lack of individual treatment plans, poor discharge planning, and a "notably low" release rate.   Id. at *18-20.

**42.**    Many STU residents are prolific pro se litigators, and some have secured counsel to assist them.   Against this background, we believe it is significant that the proposed Settlement (which among other things requires reforms to MAP procedures and better treatment of South Unit residents) achieves more for the Class than any of its members have been able to achieve, singly or in combination, since the NJSVPA was enacted in 1999. Moreover, many provisions in the Settlement—including the guarantee of 20 hours of therapeutic activities per week, the restrictions on unilateral changes to the phase system, the requirement that residents be given concrete treatment goals and time estimates for achieving them, the mandated increases in staff/resident ratios, and the appointment of a Treatment Ombudsman—go well beyond what the Defendants believe to be constitutionally mandated. Taken as a whole, the Settlement will require material improvements to the status quo at the STU.

**43.**    Perhaps most importantly, if the Settlement  is approved, these changes must be implemented within six months.   Rejection of the Settlement, by way of contrast, would likely mean additional years of litigation, a lengthy trial, and—if Plaintiffs prevail—a series of appeals.   We note, in this regard,  that the one case we are aware of in which a class of civilly committed former sex offenders prevailed at trial is not encouraging.

**44.**    Richard Turay was a civilly committed resident of the Washington State Special Corrections Center ("SCC").   He filed suit in 1991, and after a 1994 trial, the jury agreed that the treatment program at the SCC was constitutionally inadequate.   The district judge issued a

broad and somewhat vague injunction (for example, it directed the defendants to "[d]evelop individual treatment plans for each resident to measure progress," without further detail), and then appointed a special master.  See Sharp v. Weston, 233 F.3d 1166, 1169 (9th Cir. 2000) (reciting history of case to date, including the filing and consolidation of related cases).  Four years later—after 14 reports from the special master and a three-day evidentiary hearing—the district judge issued a somewhat more specific order describing what the defendants were actually required to do.  Id.  That order was affirmed on appeal, id. at 1174, but further district court proceedings followed, including contempt hearings, which generated additional appeals. In 2001—seven years after plaintiffs won at trial—the district judge ordered the defendants to provide less restrictive alternative ("LRA") facilities to individuals in transition back to society, and in 2003, after further intervening motion practice, the Ninth Circuit affirmed on this issue. See Order, Turay v. Seling, No. C91-664R (W.D. Wash. Aug. 14, 2001); Cunningham v. David Special Commitment Ctr., 56 Fed. Appx. 393, 394 (9th Cir. 2003).  Significantly, however, the Washington civil commitment statute expressly contemplated conditional release to LRAs.  See R.C.W. §§ 71.09.090-.098.   There is no such provision in the NJSVPA.

**45.**   The Turay injunction was ultimately dissolved, over plaintiffs' objections, in 2007, which led to another, unsuccessful appeal.  See Turay v. Richards, 2009 U.S. App. LEXIS 1930 (9th Cir.), cert. denied, 130 S. Ct. 171 (2009).  As recently as 2011, Richard Turay remained a resident of the Washington SCC—20 years after he first filed his complaint.  See Turay v. Cunningham, 2011 WL 1059171 (W.D. Wash. March 22, 2011).

**46.**   Just as "[a] parole hearing is worth more to an inmate than the same parole hearing next year," Hawker, 198 F.R.D. at 627 (internal quotation marks omitted), improvements to the treatment program at the STU are worth much more to the Class Members

this year than next year or the year after that.  Indeed, the most common complaint of STU residents—borne out by the statistics recently produced by Defendants—is that they have been there too long.  The Class Representatives have all been committed for ten years or more, and none of them has yet progressed beyond phase 3 of the program.  Their story is not unusual.  Of the 258 men sent to the STU before July 20, 2002, 170 of them are still there.  Of the 525 men finally committed since 1999, only 47 (less than 9%) had been discharged to the community, with or without conditions, through June 26 of this year.  (This figure does not include deaths, transfers to prison or to the immigration authorities, or medical discharges to hospitals or nursing homes.)

47.    Discovery also confirms that treatment is the most reliable path to discharge from the STU.  Of the 47 men who have been discharged to the community after commitment to the STU, 28 were in phase 5 at the time of discharge, including all of those who were discharged on the recommendation of their treatment teams.  Thus, while the Settlement does not guarantee release for any Class Member, Class Counsel believe that the bargained-for improvements to the quantity and quality of the mental health treatment offered at the STU— overseen by an independent Monitor—will enable the Class Members to progress more rapidly and regain their freedom more quickly.

## Attorneys' Fees

48.    Section XII of the Agreement calls for an award of $78,000 in attorneys' fees to CSJ.  This sum does not begin to cover the work performed over the past decade by the CSJ law professors, fellows and law students who have pursued this litigation.  In the last year alone, since I joined CSJ, I have spent over 400 hours working on this case.  In addition, seven law students have worked on it under my supervision, including two over the summer of 2012

who assisted, among other things, in the preparation of these papers.  The total amount of student time spent on this matter since I joined CSJ is well over 1000 hours.

**49.**    My ordinary billing rate for CSJ matters is $375 per hour, which is significantly less than my billing rate in commercial matters.  The ordinary billing rate for third-year Seton Hall students working on CSJ matters is $100 per hour.  Thus, in the past year alone, CSJ personnel have devoted over $250,000 worth of attorney time to this action.

**50.**    Professor Azmy, who served as lead counsel for the Plaintiffs from 2002 through mid-2011, estimates that he spent in excess of 1500 hours on this case over that period, representing over $560,000 worth of attorney time at his CSJ billing rate of $375 per hour.  See Azmy Decl. ¶ 59.  This figure does not include the time of the many law students who devoted thousands of hours to this case under the supervision of Professor Azmy.  Id.

**51.**    Our co-counsel also invested a significant amount of time and money in this case. I am informed and I believe, based on billing records provided to me by Gibbons, that Lawrence S. Lustberg, Esq. and other Gibbons attorneys have spent over 700 hours working on this case since 2003.  Gibbons has also spent $39,936.31 in direct disbursements, including expert fees.  However, Gibbons does not seek any award for its service on this case.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 19,

2012, at Otisfield, Maine.

Barbara Moses