# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RAYMOND ALVES, et al., | : | Civil Action No.: 01-789 (DMC)(MF) |
|  | : | (Consolidated) |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| MERRILL MAIN, Ph.D., et al., | : |  |
|  | : |  |
| Defendants. | : | **Settlement Agreement** |
|  | : |  |

WHEREAS, Plaintiffs, who are persons confined by the State of New Jersey under the New Jersey Sexually Violent Predator Act (N.J.S.A. §§ 30:4-27.24 *et seq.*) ("NJSVPA"), brought this action under 42 U.S.C. § 1983 for declaratory and injunctive relief for violations of the substantive due process guarantee of the Fourteenth Amendment to the United States Constitution, violations of the Fifth and Eighth Amendments to the United States Constitution, violations of the Americans with Disabilities Act (42 U.S.C. § 12132) (the "ADA"), violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), violation of the right to adequate treatment under the New Jersey Constitution, and violations of N.J.S.A. §§ 30:4-24, 30:4-24.1, and 30:4-27.34 against defendants, who are various New Jersey state officials responsible for the implementation of the NJSVPA and the administration of the Special Treatment Unit ("STU"); and

WHEREAS, Defendants Merrill Main, Ph.D., in his official capacity as Director of the STU, Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"), Lynn A. Kovich, M.Ed., in her official capacity as Assistant Commissioner of the New Jersey Division of Mental Health and Addiction Services, and Jeffrey S. Chiesa, in his official capacity as Attorney General of New Jersey (collectively the "Settled Defendants," and together with the Plaintiffs, the "Parties") and Plaintiffs are the sole parties to this Settlement Agreement; and

WHEREAS, Defendants Gary N. Lanigan, in his official capacity as Commissioner of the New Jersey Department of Corrections ("DOC"), and John Does 1-10 are not parties to this Settlement Agreement; and

WHEREAS, nothing in this Settlement Agreement shall release, waive, constitute a waiver of, or in any way affect any claims that Plaintiffs have brought, or may bring, against anyone other than the Settled Defendants; and

WHEREAS the Parties to this Settlement Agreement, through extended negotiations, have determined to resolve this matter; and

WHEREAS this Settlement Agreement will resolve the claims brought by Plaintiffs, on their behalf and on behalf of all others similarly situated, against Settled Defendants, including but not limited to claims under 42 U.S.C. § 1983 for declaratory and injunctive relief for violations of the substantive due process guarantee of the Fourteenth Amendment to the United States Constitution, claims for violations of the Fifth and Eighth Amendments to the United States Constitution, claims for violations of the ADA, claims for violations of Section 504, claims for violation of the right to adequate treatment under the New Jersey Constitution, and claims for violations of N.J.S.A. §§ 30:4-24, 30:4-24.1, and 30:4-27.34 in the above-captioned matter; and

WHEREAS the Parties agree that the resolution of this case is in the best interests of all individuals who are (a) confined by the State of New Jersey and (b) currently committed, are pending commitment, or may in the future be committed pursuant to the NJSVPA; and

WHEREAS, the Parties have consented to the form and entry of this Settlement Agreement;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the Parties agree as follows:

I.      Nothing in this Settlement Agreement shall be construed as an acknowledgment, admission, concession, or evidence of liability of any of the Parties regarding any of these claims, including those under the ADA, Section 504, the Federal or State Constitutions, or Federal or State law, regulations, rules, or policies, and this Settlement Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

II.     Promptly upon execution of this Settlement Agreement, the Parties will file the Second Amended Complaint with the Court, in substantially the form annexed hereto as Exhibit A, together with a stipulation consenting to such filing. Thereafter, in accordance with the direction of the Court, the Parties will file a joint motion, pursuant to Fed. R. Civ. P. 23(c) and 23(e), for (i) certification of a Class, as defined in the Second Amended Complaint and below, (ii) approval of the Settlement Agreement, and (iii) conditional dismissal of the Second Amended Complaint, with the case to remain on the Court's inactive docket during the term of this Settlement Agreement as a means of ensuring compliance of the Parties with the Settlement Agreement. The Parties will cooperate to obtain certification of the Class and approval of the Settlement Agreement, and will also cooperate to provide notice to the Class, as directed by the Court, of this Settlement Agreement and of any Settlement Hearing held in connection with the Parties' joint motion. Plaintiffs will be responsible for preparing the required notices and delivering them to the STU. The Settled Defendants will be responsible for posting any copies of such notices required to be posted at the STU and, to the extent practicable, for distributing any notices required to be sent to Residents through DOC's mail system.

III.    Any action, task, or provision of services the Settled Defendants agree to undertake in this Settlement Agreement shall mean that the Settled Defendants have agreed to undertake that action, task, or provision of services in keeping with "professional judgment" as defined by *Youngberg v. Romeo*, 457 U.S. 307 (1982). To the extent any provision of this Agreement

relating to undertaking an action, task or delivery of services requires that any action be taken or thing be done to a level of quality or in an amount that is not otherwise specified or quantified in the Settlement Agreement, or that is described as "reasonable" or "appropriate," such provision shall be interpreted to mean that level, quality, amount, or timeliness of care, treatment, or services that is consistent with "professional judgment" as enunciated in *Youngberg*.

IV.     The Parties shall comply with all of the requirements of this Settlement Agreement.

V.      The following terms used in this Settlement Agreement, to the extent not defined above, shall have the meanings set forth below:

A.      "Class" means the Class certified by the Court in this action.

B.      "Clinical Assessment Review Committee" ("CARP") means a panel headed by DMHAS Medical Director and DHS Chief Psychologist that oversees levels of privileges in State psychiatric hospitals and the Special Treatment Unit.

C.      "Complaint" means the Second Amended Complaint to be filed in this action substantially in the form of Exhibit A hereto.

D.      "Compliance" means substantial compliance by the Settled Defendants with the material requirements set out in section VI of this Settlement Agreement.

E.      "Comprehensive Treatment Plan" means a list of identified problems along with related objectives, interventions, and projected goal attainment dates. Attainment timelines will focus primarily on the ensuing six-month period. The objectives included will be both general sex offender specific treatment objectives and objectives that are unique to the individual. When attained, objectives will enhance behavioral stability, judgment, impulse control and, accordingly, reduce sexual re-offense risk.

F.      "Confidential Information" means information protected under N.J.S.A. 30:4-24.3, 42 U.S.C. §1320d et seq. ("HIPAA") and 45 C.F.R. §§160, 164 ("HIPAA Privacy Rule").

G.      "Court" means the United States District Court for the District of New Jersey.

H.      "DMHAS" means the New Jersey Division of Mental Health and Addiction Services, or any successor entity responsible for the implementation of treatment of persons either committed or pending commitment under the NJSVPA.

I.      "Effective Date" means the date this Settlement Agreement is finally approved by the Court, and, unless otherwise specified, all time periods contained in this Settlement Agreement shall commence on that date.

J.      "Facility" or "Facilities" means any location in which persons either committed or pending commitment under the NJSVPA are confined by the State of New Jersey.

K.     "Modified Activities Programming" ("MAP") means the component of clinical treatment programming governed by *M.X.L. v. NJDHS/NJDOC*, 379 N.J. Super. 37 (App. Div. 2005), designed to stabilize disruptive and/or dangerous behavior.

L.     "Monitoring Period" means the period commencing on the Effective Date and ending after the Monitor has submitted five (5) annual reports (including any revisions made pursuant to section VII.H) unless the Monitoring Period is extended or shortened pursuant to section VII.B.

M.     "Non-Compliance" means a failure by the Settled Defendants to substantially comply with one or more of the material requirements set out in section VI of the Settlement Agreement. Isolated instances of failing to adhere to a specific material requirement of this Settlement Agreement shall not preclude a finding of Compliance.

N.     "Plaintiffs" means Raymond Alves, Michael Culbreth, and Derrick Sessoms.

O.     "Resident" means any person committed, pending commitment, or who may be committed in the future under the NJSVPA, and confined by the State of New Jersey.

P.     "Resident Guide" means the document entitled "Residents' Guide To The STU."

Q.     "Settlement Hearing" means a hearing to be held by the Court, on notice to the Class, to consider approval of the Settlement Agreement.

R.     "Special Treatment Unit" ("STU") means any location in which persons either committed or pending commitment under the NJSVPA are confined by the State of New Jersey for the purpose of receiving treatment under the NJSVPA. The STU includes but is not necessarily limited to the facility now located at 8 Production Way, Avenel, New Jersey.

S.     "Treatment Probation Status" means the status of a Resident who refuses to participate meaningfully in treatment as defined in the Resident Guide.

T.     "Treatment Progress Review Committee" ("TPRC") means a panel of STU psychologists, supervised by the STU Psychology Director, trained in sex offender assessment. The TPRC conducts evaluations of STU Residents to provide objective and reliable information about the risk-based treatment progress of Residents committed under the NJSVPA.

U.     "Treatment Refusal Status" means the status of a Resident who fails to improve participation in treatment despite placement on Treatment Probation as defined in the Resident Guide.

V.     "Treatment Staff" or "Therapist" means any clinical psychiatrist, clinical psychologist, substance abuse counselor, social worker, teacher, therapy program assistant, senior therapy program assistant, instructor counselor, or other similar clinical direct care staff involved in the delivery of mental health treatment to the Residents. Treatment Staff shall meet all qualifications for their job title as

specified by New Jersey Civil Service standards, including licensure or certification requirements, if any, specified in the Civil Service standards.

W.     "Treatment Team" means the Treatment Staff specifically assigned to work with a particular Resident, and does not include the Resident.

VI.    Unless otherwise provided herein, DMHAS agrees to implement the following within six (6) months of the Effective Date of this Agreement:

A.     Clinical Assessments

1.     <u>Generally</u>

a)     Treatment Staff will adopt and employ clinical assessments and provide individually tailored treatment that adequately meets the therapeutic needs of each Resident, which shall minimally include those outlined in sections VI.A through VI.G below;

b)     Unless otherwise specified in this Settlement Agreement, any final report, recommendation, or determination for treatment, treatment status, phase designation, phase progression, and/or disciplinary action shall be communicated orally and in writing by Treatment Staff to the Resident within fifteen (15) days of such action;

c)     Treatment Staff will adopt objectively measurable pre- and post-module testing, as appropriate to each module offered, within three (3) months of the Effective Date of this Settlement Agreement.

d)     Any pre- and post- module test results, which may include recommendations to either retake a module or proceed to enroll in a successive module, shall be maintained as part of each Resident's clinical record and a copy of the test results shall be provided to the Resident within fifteen (15) days of the completion of post module testing.  Any such test results shall be discussed with the relevant Resident in process group within thirty (30) days of module completion.

e)     Treatment Staff shall not utilize the Hare Psychopathy Checklist-Revised test unless such tests are scored by professionals who have received appropriate training and certification as described by Dr. Richard A. Hare in Hare, R.D., *The Psychopathy Checklist-Revised,* 2nd ed. Toronto: Multi-Health Systems (2003).

f)     Treatment Staff shall not utilize Plethysmography, unless the treatment staff is trained on its use by an individual trained and experienced in the use of Plethysmography.

2.    <u>Upon Admission</u>

a)     Treatment Staff will deliver to each new Resident an accurate and up to date Resident Guide.  The Resident Guide will nonexclusively include the following:

(1)    A description of the general treatment program including process groups, treatment modules, program phases, and the estimated times for completion of each phase;

(2)    Available educational, recreational, and vocational offerings and the manner in which to enroll;

(3)    A description of the six (6) month Treatment Team review process;

(4)    A description of the TPRC review process;

(5)    A description of CARP and its role in therapeutic phrase progression of each Resident;

(6)    A description of the process, timing, and purpose of commitment and recommitment hearings;

(7)    An explanation of the ways in which a Resident may request individual treatment sessions, including but not limited to: direct communication with Therapists; submitting a Social Work Request form; contacting the Resident's attorney(s); or submitting a Resident Remedy Request form;

(8)    An explanation of Treatment Probation Status;

(9)    An explanation of Treatment Refusal Status;

(10)   An explanation of Modified Activities Programming, together with a copy of current MAP policies and procedures; and

(11)   A description of the role and responsibilities of the Treatment Ombudsperson as well as the procedures for initiating a treatment-related complaint with the Treatment Ombudsperson and the provision of the standardized forms for treatment-related complaints.

b)     Treatment Staff will conduct an initial intake meeting with new Residents by 5:00 p.m. on the first business day following admission. During this initial intake meeting the Treatment Staff will:

(1)    Review the contents of the Resident Guide with the Resident;

(2)     Collect information from the Resident that is relevant to potential post-discharge placement and create a file of information relevant to potential discharge in accordance with N.J. STAT. ANN. § 30:4-27.37.

3.     <u>Upon Entry of An Order of Final Commitment</u>:

a)     Treatment Staff will produce a comprehensive initial treatment plan for each Resident within forty-five (45) days of entry of an order of final commitment.  For any Resident who has already been committed, and who has not yet received a comprehensive treatment plan, treatment staff will produce such a treatment plan for each such Resident within forty-five (45) days of the Effective Date of this Settlement Agreement. The comprehensive initial treatment plan shall:

(1)     Be tailored to the individual needs of each Resident as determined by the Treatment Staff;

(2)     Include and incorporate past treatment progress and evaluations (unless the past treatment progress and evaluations are unavailable due to no fault of DMHAS); such past treatment progress shall include prior treatment at the Adult Diagnostic and Treatment Center ("ADTC") (*e.g.,* recommended phase designation, as described below in section VI.A.3.a.5), to the extent the ADTC provides the necessary documentation;

(3)     Make specific and individualized recommendations regarding treatment goals, the objective criteria necessary to meet those goals, and anticipated time frames for completion of both the objective criteria and the ultimate goals;

(4)     Include an assessment of a Resident's need for individual therapy related to issues other than sex offender specific issues, and document any recommendations for such individual therapy; and

(5)     Recommend a phase designation as that term is defined in the Resident Guide.

(a)     If the recommendation is for Phase 2-Rapport Building, it will be subject to review by the TPRC within sixty (60) days of the date of the recommendation, but may be implemented without the approval of CARP.

(b)     If the recommendation is for Phase 3-Core/Intensive or higher, the TPRC and CARP shall review the phase designation recommendation.   CARP shall make a final decision within sixty (60) days of the recommendation date.    CARP's decision regarding treatment phase designation shall be communicated to the Resident in writing within fifteen (15) days of the decision by CARP.

b)     A Resident's Treatment Team will conduct a review of each Resident's comprehensive treatment plan every six (6) months (*i.e.*, twice annually), to be followed within fifteen (15) days by a meeting with the Resident to review the treatment plan.  The comprehensive treatment plan will include, and the Treatment Team will review with the Resident at the meeting, the following:

(1)     Past treatment progress in process groups, modules and individualized therapy, if any.

(2)     Current phase designation.

(3)     If the resident was subject to restrictions under MAP at any time during the past six months, the resident's progress through MAP, the impact, if any, the resident's time on MAP may have on his phase designation, and steps the resident should take to avoid future MAP restrictions.

(4)     New treatment goals for the next six months, including specific curricular recommendations (*i.e.*, specific psycho-educational module classes).

(5)     Estimate of the time for completion of treatment goals, modules, and phases based upon an individualized assessment of the Resident's participation in treatment with the assumption that the Resident will fully participate in treatment.

(6)     Any recommendations for additional privileges (*e.g.*, increased privileges in visitation, recreation, living arrangements, freedom of movement, etc.).

(7)     Any recommendations made to the TPRC for progression in phase designation, a description of the recommended phase, and the Resident's ability to enroll in modules within the recommended

phase while official designation change is pending upon the TPRC review, if applicable to a Resident at the time of the review.

(8)      Any requests the Resident has made for individual therapy related to issues other than sex offender specific issues made by any means delineated in the Resident Guide; the review will include a detailed explanation of why the request was denied, if it was denied.

(9)      Information in the STU's records regarding potential post-discharge placement.  The Treatment Staff will verify with the Resident that the information on hand is current and accurate, and will supplement the record when necessary with additional information provided by the Resident.  The records themselves shall be available, upon proper request, to a resident's attorney but shall not otherwise be available to the Resident.

c)      The TPRC shall conduct an annual review of each Resident's treatment plan and produce a report and recommendation.  The review process shall include an evaluation of each Resident's current treatment plan, treatment progress notes, and any pre- or post-module diagnostic testing results.  It shall also include an interview with each Resident and with the Resident's treatment team.  Based on this evaluation, the TPRC shall produce a report containing recommendations for treatment until the next annual review period and a phase designation recommendation.  The TRPC shall submit to CARP for approval any recommended phase designation of Phase 3-Core/Intensive or higher. CARP shall make a final decision within sixty (60) days of the recommendation date.  The CARP's decision regarding treatment phase designation shall be communicated to the Resident in writing within fifteen (15) days of the decision by CARP.

d)      Treatment Staff will deliver to each Resident the final TPRC written report within fifteen (15) days of receipt from the TPRC or CARP. Concurrent with delivery, the Treatment Staff will explain the written report with the Resident, specifically but not exclusively explaining:

(1)      The Resident's current phase designation, and any change thereof;

(2)      The requirements and evaluation criteria for progression in each phase along with an estimated time frame in which a Resident can complete the Resident's current phase based upon an individualized assessment of the Resident's participation in

treatment with the assumption that the Resident will fully participate in treatment;

(3)      Specific, individualized recommendations for specific treatment goals, the objective criteria necessary for meeting those goals, and an estimate of the time required to complete both the objective criteria and the long term goals;

(4)      Specific curricular recommendations (*i.e.*, specific psycho-educational module classes) and an estimate of when the recommended module(s) will next be offered; and

(5)      Any recommendations regarding the adequacy of the information in the potential post-discharge placement file or any discharge plan developed pursuant to DMHAS's obligation under N.J. STAT. ANN. § 30:4-27.37.

B.     Program Phases/Treatment Time

1.      The parties agree that, as of the date of execution of this Settlement Agreement, the treatment program at the STU consists of five phases, known as Phases 1 through 5, and described in the most recent (June 30, 2006) revision of the Resident Guide as follows:

Phase 1 - Orientation
Phase 2 - Rapport Building
Phase 3 - Core/Intensive
Phase 4 - Advanced/Honor
Phase 5 - Transition

The parties further agree that if any changes are made to the designation and/or description of these program phases:

a)      Such changes will not be used to extend the overall course of treatment or to keep residents in the program any longer than they would be under the program phases listed above and described in the June 30, 2006 Resident Guide; and

b)      The Settled Defendants shall notify Plaintiffs' counsel of such changes in writing, and shall provide plaintiffs' counsel with the corresponding revision(s) to the portion of the Resident Guide describing the program phases, at least sixty (60) days before the changes are implemented at the STU, whereupon counsel for the Parties shall confer in good faith to determine which phases most closely match the phases described above for purposes of sections VI.A.3.a.5, VI.A.3.c, VI.B.9,

VI.D.1, VI.D.3.a and VI.G of this Settlement Agreement.  If counsel for the Parties reach agreement, they shall memorialize that agreement in writing and make it available to the Monitor prior to the Monitor's next annual inspection. If counsel for the Parties fail to reach agreement, they shall so advise the Monitor prior to the Monitor's next annual inspection, and the Monitor may consider the parties' disagreement when determining whether the Settled Defendants are in Compliance or Non-Compliance with this Settlement Agreement.

2.      Subject to section VIII of this Settlement Agreement and availability of staff and physical plant space, DMHAS agrees to make available to each Resident who is not on Treatment Refusal Status, or subject to restrictions under MAP, the opportunity for a minimum of twenty (20) sixty-minute hours per week of professionally led (or in the case of self-help groups, professionally monitored) therapeutic programming.  This programming shall be made available to all qualifying residents, regardless of the location of their living quarters, and shall encompass sex-offender-specific, mental health, recreational, and rehabilitation/vocational programming and minimally include:

a)      Three (3) ninety (90) minute process group sessions per week;

b)      One (1) to two (2) ninety (90) minute modules per week, if therapeutically appropriate;

c)      Professionally monitored self-help groups for at least ninety (90) minutes per week, provided willing and appropriate Residents are available to facilitate self-help groups; and

d)      Regularly scheduled community meetings.

Unstructured recreational activity does not count as "therapeutic programming" for purposes of the 20 hours per week of therapeutic programming.

A resident subject to Tier or Wing MAP will be placed in a MAP Group that meets at least twice per week.  A resident subject to Program MAP will continue to attend all of his regularly-assigned process group sessions and modules, unless specifically contraindicated in light of the underlying behaviors that resulted in the MAP placement.  In such cases the resident (a) will be informed of the reasons for the treatment restrictions, in writing, as part of that resident's Initial MAP Placement Review and at least every 30 days thereafter so long as the restrictions remain in place, and (b)  will be placed in a MAP Group that meets at least twice per week until such time as he is permitted to resume attendance at all of his regularly-assigned process group sessions and modules.

3.     DMHAS will require each Therapist, other than psychiatrists and those psychologists whose primary responsibility is to perform assessments for court hearings, to maintain a minimum of sixteen (16) hours of direct Resident-Therapist contact time per week, except that social workers with case management responsibilities will maintain a minimum of ten (10) hours of direct Resident-Therapist contact time per week and a minimum of six (6) hours of social work functions on behalf of Residents including, but not limited to, discharge planning.   For purposes of calculating the minimum contact time requirements for Therapists, treatment sessions are to be measured in keeping with industry standards of forty-five (45) to fifty (50) minutes of face-to-face contact constituting a one-hour treatment session.   Examples of direct Resident-Therapist contact are:

a)     Running process groups;

b)     Teaching psycho-education treatment modules;

c)     Conducting other educational programs, recreational activities and community meetings;

d)     Conducting individual therapy;

e)     Reviewing the comprehensive treatment plan and TPRC reports with Residents; and

f)     Conducting any tutoring in connection with a Resident's sex offender treatment.

4.     DMHAS will institute and enforce a policy requiring that at least eighty-seven (87) percent of the scheduled process group meetings actually meet during the calendar year, and that such meetings (a) utilize the full time periods for which they are scheduled and (b) take place in designated meeting rooms providing a reasonable degree of quiet and privacy.

5.     Treatment staff will maintain accurate and complete written and/or electronic records for each process group meeting in the format presently used, which includes written notes on an individual Resident only when he does something staff deems clinically noteworthy.

6.     For each Resident who is not on Treatment Refusal Status or subject to restrictions under MAP, DMHAS will make available a minimum of one (1) to two (2) modules in every sixteen (16) week module cycle.   In order to comply with this subsection, a module is made available to a particular Resident only if:

a)      The module offered is currently recommended in that Resident's comprehensive treatment plan, six month review, TPRC review, or has been mandated by court order; and

b)      There is sufficient space available for the Resident in the recommended module, or DMHAS has offered a self-study module to the Resident.

7.      Post-module testing of a Resident is conducted within seven (7) days of completing either a class-based or self-study module.

8.      DMHAS will permit Residents who are not on Treatment Refusal Status or subject to restrictions under MAP to enroll in up to three (3) modules during any sixteen (16) week module cycle, including self-study modules.

9.      If a recommended module is unavailable for a Resident designated Phase 3-Core/Intensive or higher, DMHAS will provide the Resident with the appropriate materials to complete the module in self-study during that module cycle.

10.     Treatment Staff will conduct at least one (1) substance abuse related psycho-educational treatment module instructed by a certified or licensed alcohol and drug counselor Treatment Staff member, and at least one (1) psycho-educational treatment module unrelated to substance abuse, instructed by a Treatment Staff member certified as a counselor in the relevant subject, in every sixteen (16) week module cycle.

11.     Treatment Staff will maintain a master record, updated at least annually, of each Resident's current phase designation, in an effort to document and evaluate trends in Resident phase progression.

12.     Treatment Staff will maintain a master record, updated at least annually, of each Resident's recommended psycho-educational treatment modules, compiled from each Resident's six (6) month evaluations, and TPRC reports, in an effort to schedule module offerings consistent with the Residents' treatment needs.

C.    Treatment Staff

Subject to section VIII and the availability of qualified applicants after reasonable recruitment efforts, DMHAS will:

1.    Hire sufficient additional Treatment Staff members to maintain a staffing pattern of seven (7) Therapists (not including clinical psychiatrists) for every fifty (50) Residents who are actively participating in treatment; and

2.    Continue to employ sufficient Treatment Staff in order to comply with all material terms of this Settlement Agreement.

D.    Resident Vocational Training

1.    DMHAS will conduct individualized vocational assessments of each Resident within forty-five (45) days of final commitment; evaluate each Resident's existing skills and strengths; and develop a plan for building on some or all of those existing skills and strengths through vocational training. DMHAS will update the assessment as needed, and when each Resident enters Phase 4-Advanced/Honor.

2.    DMHAS will offer vocational training that takes into account the need to provide basic "job skills" (including skills that can be utilized at the STU, *e.g.*, barber, cook, librarian, paralegal), "life skills" (including skills necessary upon release, *e.g.*, basic personal finance, budgets, banking/ATM use, job search skills, resume writing, interviewing skills, employment counseling, and relationship/social skills), and Residents' general interests, subject to availability of staff and physical plant space.

3.    DMHAS will make available to Residents who are not on Treatment Refusal Status or subject to restrictions under MAP an average of ten (10) hours of vocational activities per week, including institutional jobs, subject to section VIII and availability of staff and physical plant space. In addition:

a)    DMHAS will permit Residents in Phase 5-Transition to pursue vocational skills training outside of the STU, where appropriate; and

b)    DMHAS will solicit and arrange for outside vendors to provide onsite vocational offerings to be paid for by interested Residents, taking into account availability of physical plant space. Any DMHAS solicitation must follow State procurement guidelines.

E.     Resident Education

    1.     Residents may pursue an educational curriculum for at least ten (10) hours per week, including formal instruction, homework time, and self-help programming.

    2.     Interested Residents will be provided remedial education training or GED course offerings within six (6) months of their initial request.

    3.     DMHAS will permit, but not pay for, Residents to pursue post-secondary education within the facility.  DMHAS will not unreasonably withhold approval of a post-secondary educational program proposed by one or more Residents, so long as DMHAS is not required to pay for the program and the program does not interfere with or conflict with therapeutic goals of the STU or of the Residents involved.

    4.     DMHAS will conduct annual surveys on topics of interest to Residents in the area of general health education.

    5.     DMHAS will conduct general health education modules on topics suited to Residents' appropriate interests, as reflected in survey results.

    6.     DMHAS will continue to employ a minimum of one (1) teacher at each facility, certified by the State of New Jersey Department of Education, to coordinate Resident educational efforts, subject to availability of qualified instructors after reasonable recruitment efforts.

F.     Recreational Therapy

    1.     DMHAS will conduct annual surveys to assess Residents' desired recreational activities, and will make an effort to offer popular activities, where appropriate, taking into account funding and availability of physical plant space.

    2.     In furtherance of its agreement to provide recreational programming as stated in section VI.B.1, DMHAS will provide staff for professionally facilitated recreational activities six (6) days per week.

G.     Relapse Prevention Preparation and Post-Discharge Programming

Social work staff shall use the information contained in the potential post-discharge placement file to develop a discharge plan for each Resident, pursuant to the obligation under N.J. Stat. Ann. § 30:4-27.37, when court-ordered, when recommended by the TPRC, or when a Resident reaches Phase 4-Advanced/Honor of the treatment program.  In developing the discharge plan, the social work staff shall assist a Resident in finding housing and obtaining support.

H.    Independent Expert Consultants/Trainers

Subject to the availability of qualified, willing candidates, DMHAS will retain Independent Experts in the field of sex offender treatment and assessment as delineated in Exhibit B.  A "qualified" candidate shall have expertise and experience in the area of sex offender management and treatment, as set forth in Exhibit B.

I.    Treatment Ombudsperson

1.    Subject to section VIII, DMHAS will provide funding for and facilitate the appointment of a Treatment Ombudsperson responsible for establishing and implementing procedures for eliciting, receiving, processing, responding to, and resolving complaints from Residents, their family members, and other interested citizens concerning treatment conditions at the STU.  In order to effectuate the appointment of the Treatment Ombudsperson, DMHAS and the Office of the Corrections Ombudsperson shall enter into a memorandum of agreement substantially in the form of Exhibit C hereto within 60 days of the Effective Date.

2.    DMHAS shall:

a)    Initiate a Resident complaint system for treatment related issues.

b)    Create a standardized form for treatment related complaints and provide this form to any Resident upon request.

c)    Submit completed Resident complaint forms directly to the Treatment Ombudsperson.

3.    The Treatment Ombudsperson shall:

a)    Determine whether the complaint is within or without the scope of this Agreement, and send the Resident a standard notice of this determination within thirty (30) days of receipt of the complaint form. Complaints within the scope of this Agreement shall relate only to the process by which treatment is provided, and not the need for or efficacy of the treatment provided.

b)    Examples of complaints within the scope of this Agreement include, but are not limited to, complaints regarding module availability, polygraph examination availability, cancellation of process group meetings, requests for individual therapy, vocational and educational opportunities, and treatment staff.  Examples of complaints outside the scope of this Agreement are complaints regarding the necessity for a specific treatment modality or appropriateness or effectiveness of the treatment provided by DMHAS staff. All such complaints shall be directed to the Resident's attorney.

c)      The Treatment Ombudsperson will investigate any complaints within the scope of this Agreement and take action appropriately tailored to the nature of the Resident complaint.  Examples of appropriate action include, but are not limited to:

  (1)    Communicating with the appropriate administrator or staff at the Facility;

  (2)    Gathering  information  from  the  appropriate administrator or staff at the Facility;

  (3)    Informing the appropriate administrator or staff of the Resident's complaint;

  (4)    Communicating with the complaining Resident to further investigate the nature of the complaint; and/or

  (5)    Taking such other measures as the Treatment Ombudsperson deems appropriate to investigate or resolve the Resident complaint.

d)      The Treatment Ombudsperson will send the Resident an initial written response to the Resident complaint within thirty (30) days of sending the standard notice as described in section VI.I.3.a.  The response will document the Treatment Ombudsperson's efforts to investigate and resolve the complaint, and any results obtained.

e)      The Treatment Ombudsperson will timely notify the Resident, in writing, of any additional information or results obtained after sending the initial written response as described in section VI.I.3.d.

f)      The Treatment Ombudsperson will correspond with the Director of the STU regarding issues in the treatment program the Treatment Ombudsperson deems sufficiently systemic from a review of the Residents' complaints.

g)      The Treatment Ombudsperson will document all oral correspondence.

h)      The Treatment Ombudsperson will attend a Resident community meeting at least twice a year in order to:

  (1)    Explain the role of the Treatment Ombudsperson to the Residents;

(2)    Answer any questions regarding the practices and procedures of the Treatment Ombudsperson; and

(3)    Inform the Residents of the status of any systematic treatment problems reported to the Director of the STU.

VII.    Plaintiffs and the Settled Defendants stipulate to the appointment of a Monitor to facilitate the implementation of the Settlement Agreement by rendering determinations as to whether DMHAS is in Compliance or Non-Compliance with each requirement contained in section VI.

A.    <u>Identity of Monitor:</u>   Plaintiffs and the Settled Defendants agree that the Court shall appoint such person as the Court deems qualified to serve as the Monitor during the Term of the Settlement Agreement.

1.    If the Monitor appointed by the Court is unable to serve as the Monitor during the Term of the Settlement Agreement, the Court will appoint a successor Monitor, upon notice to the Parties' counsel.

2.    The Court may replace the Monitor in the event of death or unforeseen permanent unavailability, or on motion noticed by Plaintiffs or the Settled Defendants for good cause shown.  For purposes of this subsection, good cause shown means a showing by a preponderance of the credible evidence that the Monitor was engaged in corruption, misfeasance or nonfeasance that is so severe as to preclude effective implementation of and compliance with the terms of this Settlement Agreement.

3.    No person who has been associated with or served as an expert in any capacity in the underlying litigation or who has a business relationship with DMHAS may be appointed as a Monitor.

B.    <u>Duration:</u>

1.    The Monitor shall serve throughout the Monitoring Period.

2.    To ensure the Monitor is able to complete the stipulated five (5) annual reviews in accordance with section VII.C-VII.E, and produce five (5) annual reports in accordance with the provisions of section VII.G, wherein the Monitor renders compliance determinations pursuant to section VII.H, the Monitoring Period may be extended under the following circumstances:

a)    Should the Settled Defendants notify Plaintiffs pursuant to section VIII that there are insufficient funds to meet the treatment and staffing goals set forth in sections VI.A-VI.G or the funding obligations set forth in section VI.I;

b)      By Agreement of the parties;

c)      Pursuant to section VII.B.4 below; or

d)      By Order of the Court upon good cause shown.

3.      Notwithstanding the provisions of section VII.B.2, in the event that the Monitor has found DMHAS to be in Compliance with any material provision of section VI of this Settlement Agreement in three (3) consecutive annual reports, the Monitor's service shall be terminated with respect to that provision. Such finding of Compliance shall be a final and binding determination of Compliance, if made after the process provided in VII.H has been either waived or exhausted.

4.      In the event that the Monitor has found that DMHAS is not in Compliance with any material provision of this Settlement Agreement in what would otherwise be the Monitor's final report, and in the event DMHAS is unable to cure the deficiency within the period provided by section VII.H.2, then the Monitoring Period shall automatically extend with respect to that provision, until such time as the Monitor has conducted an additional annual inspection and issued an additional final annual report making a finding of Compliance with respect to that provision.

C.      <u>Length and Frequency of Inspections:</u>

1.      Subject to the provisions of section VII.B above, the Monitor shall complete five (5) annual inspections to facilitate his or her assessment of the Settled Defendants' Compliance with the material terms of this Settlement Agreement that are subject to monitoring in section VI.

2.      The first annual inspection shall be conducted no earlier than six (6) months and no later than nine (9) months from the Effective Date; each subsequent inspection shall occur approximately one (1) year after the previous inspection until the Monitoring Period ends in accordance with section VII.B.

3.      Each inspection shall presumptively last no longer than five (5) business days. However, if the Monitor has been prevented from or is otherwise unable to complete the inspection, the Monitor shall be permitted additional time to do so. The inspections shall presumptively be conducted between the hours of 9:00 a.m. and 5:00 p.m. with the understanding that the inspections shall be conducted at the convenience of the Monitor but with reasonable effort made to minimize disruptions to treatment.

4.      The Monitor shall not be denied entry to the STU or any portion thereof except for reasons of security including, but not limited to, riot, lockdown or

unforeseen events requiring enhanced security measures. If the Monitor is denied access to a facility or any portion thereof for reasons of security, the Monitor shall be permitted access as soon as the circumstances that have caused the security concern have been abated. If time is lost due to an unforeseen interruption, the Monitor shall be able to make up the lost time at a time convenient to the Monitor. A general explanation for the denial of access due to security shall be forwarded to the Monitor and counsel for Plaintiffs as soon as DMHAS determines that this disclosure would not negatively impact the security of the facilities. The fact that access has been denied will not, by itself, negatively affect the Monitor's compliance determination.

5.      Prior to commencing the first inspection, the Monitor shall execute a confidentiality agreement acceptable in form and substance to counsel for the Settled Defendants and counsel for Plaintiffs.

D.      <u>Access to Residents and their Treatment Records:</u>  As part of the inspection process, the Monitor shall have access to and may review the treatment records of Class Members on-site.

1.      If the Monitor seeks to review the treatment records of a Resident who asserts that he is not a Class Member and who has not provided the Monitor with a release, the DMHAS representative accompanying the Monitor shall make a determination, after a review of the Resident's records, whether the Resident falls within the defined Class. The Monitor shall be permitted to review the treatment records if the Resident falls within the Class definition.

2.      The Monitor may conduct interviews with Residents in a manner mutually convenient to the Monitor and the Administrator of the facility where the Resident is housed.

3.      The Monitor shall keep a record of all documentation reviewed and interviews conducted pursuant to the Settlement Agreement.

E.      <u>Representatives at Inspections and Access to Treatment Staff:</u>

1.      Prior to the first inspection, the Monitor shall hold a pre-inspection conference with counsel for Plaintiffs and the Settled Defendants.

2.      Within one (1) week after each inspection, the Monitor shall conduct a post-inspection conference call with counsel for Plaintiffs and the Settled Defendants.

3.      The Monitor has the discretion to initiate a telephone conference call with both counsel for Plaintiffs and the Settled Defendants at any other time the Monitor deems necessary.

4.      Neither counsel for Plaintiffs nor counsel for the Settled Defendants shall accompany the Monitor during on-site inspections.

5.      During the inspection, the Monitor may be accompanied by a non-attorney DMHAS representative for the sole purpose of facilitating access to facilities, personnel and records.

6.      All DMHAS employees shall communicate and cooperate with the Monitor.

7.      During the inspection, the Monitor may interview any DMHAS employees working at the facility where the Monitor is conducting the inspection, including but not limited to:

      a)      Treatment Staff;

      b)      Administrative Staff;

      c)      Medical Services Staff; and

      d)      Vocational Instructor(s).

F.      <u>Contact with the Monitor:</u> Absent a mutual agreement between Plaintiffs and the Settled Defendants to the contrary, or where otherwise provided in the Settlement Agreement, there shall be no oral or written communication between the Monitor, Plaintiffs' counsel, and the Settled Defendants' counsel aside from the pre- and post-inspection telephone conferences during which Plaintiffs' counsel and the Settled Defendants' counsel are participating or a telephone conference initiated by the Monitor. In addition, there shall be no contact between the Monitor and the Residents except when initiated by the Monitor.

G.      Substance of Monitor's Report:

      1.      The purpose of the monitoring is to facilitate and ensure compliance with the terms of the Settlement Agreement.  The Monitor shall memorialize his or her findings on an annual basis by way of a written report.  Reports shall be organized according to the categories set forth in section VI of the Settlement Agreement and shall also contain the following:

          a)      A finding with respect to whether DMHAS is in Compliance or Non-Compliance with each material provision of section VI of the Settlement Agreement.

          b)      A description of the steps taken by DMHAS since the Monitor's last report to implement each of the provisions of Section VI of the Settlement Agreement in which DMHAS has not yet achieved Compliance;

          c)      A description of any changes in circumstances occurring prior to the Monitor's most recent inspection which affected DMHAS's ability to implement any of the provisions of section VI of the Settlement Agreement;

          d)      A summary of relevant information obtained from Resident interviews conducted by the Monitor; and

          e)      A summary of relevant information obtained from DMHAS employee interviews conducted by the Monitor.

      2.      Unless otherwise agreed to by the Parties, the Monitor shall provide a copy of his or her report simultaneously to counsel for Plaintiffs and counsel for the Settled Defendants within thirty (30) days of the conclusion of the on-site inspections that form the basis of the report.

H.      Compliance and Non-Compliance:   Compliance shall be determined on a provision-by-provision basis.  The provisions to be evaluated are those identified in section VI.  The Monitor may not retain an expert to assist in the determination of Compliance.

      1.      If the Monitor finds Compliance in any category identified in section VI, Plaintiffs' counsel shall have twenty (20) calendar days from receipt of the report to serve objections to the Monitor's report on the Monitor and counsel for the

Settled Defendants.  Counsel for the Settled Defendants shall have ten (10) calendar days from receipt of the objections to serve a response upon the Monitor and the Plaintiffs' counsel.  Within twenty (20) calendar days from receipt of the Settled Defendants' response, the Monitor shall consider the Plaintiffs' objections and the Settled Defendants' response, and notify the Parties of his or her findings. If the Monitor, upon consideration of the objections and responses, revises his or her finding to one of Non-Compliance, the procedures set forth in VII.H.2(a)-(c) below shall apply.

2.      If the Monitor finds Non-Compliance in any category identified in section VI, counsel for the Settled Defendants shall have twenty (20) calendar days from receipt of the report to serve objections to the Monitor's report on the Monitor and Plaintiffs' counsel.  Plaintiffs' counsel shall have ten (10) calendar days from receipt of the objections to serve a response upon the Monitor and Settled Defendants.   Within twenty (20) calendar days from receipt of Plaintiffs' response, the Monitor shall consider Settled Defendants' objections and Plaintiffs' response, and notify the Parties of his or her findings.  If the Monitor, upon consideration of the objections and responses, revises his or her finding to one of Compliance, the effective date of the revised finding of Compliance shall be the date of the inspection that gave rise to the initial finding of Non-Compliance, and the initial finding of Non-Compliance shall not negatively affect the period of continuous Compliance.

a)      If the Monitor's finding of Non-Compliance remains unchanged, then Settled Defendants shall be entitled to cure any deficiencies noted in the report within seventy-five (75) calendar days from receipt of the report. For the purpose of counting the seventy-five (75) calendar days, the time the Monitor spends considering objections and responses provided under section VII.H.2 shall not be counted.

(1)      Counsel for the Settled Defendants must submit written documentation to the Monitor and Plaintiffs' counsel of any attempt to cure any deficiencies pursuant to section VII.H.2.a.

(2)      If the Monitor can determine from written documentation provided by Settled Defendants and copied to Plaintiffs' counsel that the deficiency has been cured to his or her satisfaction, then the Monitor shall issue a revised finding of Compliance within ten (10) days of receipt of such written documentation.  The effective date of the revised finding of Compliance shall be the date of the

inspection that gave rise to the initial finding of Non-Compliance and the initial finding of Non-Compliance shall not negatively affect the period of continuous Compliance.

(3)     If the Monitor cannot determine from written documentation that the deficiency has been cured, such that a further on-site inspection of the subject facility is necessary, the Monitor shall so notify counsel for the Parties within ten (10) calendar days of receipt of such written documentation, and the Settled Defendants shall have the option of paying for additional on-site inspection(s) at the facility where the deficiency occurred. Any additional inspections and revised findings issued by the Monitor as a result of those inspections must be completed within forty-five (45) calendar days after such notification. If, after such additional on-site inspection(s), the Monitor finds Compliance, the Monitor shall issue a revised report that includes a revised finding of Compliance and the effective date of the revised finding of Compliance shall be the date of the inspection that gave rise to the finding of Non-Compliance and the initial finding of Non-Compliance shall not negatively affect the period of continuous Compliance.

b)     Settled Defendants shall be deemed to remain in continuous Compliance notwithstanding the Monitor's initial finding of Non-Compliance if the Monitor determines that Settled Defendants have remedied the deficiencies found by the Monitor during the seventy-five (75) day cure period.

c)     In the event that Settled Defendants have not cured a deficiency identified by the Monitor with respect to any particular provision of section VI to the satisfaction of the Monitor within the time provided by section VII.H.2.a, Plaintiffs may resort to the enforcement provisions of section X.

3.     An independent decision of any individual DMHAS employee not to speak with the Monitor shall not result in a finding of Non-Compliance so long as the Monitor is able to obtain the information he or she is seeking from another source in a timely manner. In the event any DMHAS employee refuses to speak with the Monitor, the Monitor shall so notify counsel for DMHAS as soon as

practicable to allow counsel for DMHAS to make arrangements for the Monitor to receive the information he or she is seeking by other means.

I.      Documents and the Enforcement of the Settlement Agreement:

    1.      The Monitor's report shall be confidential and shall not be introduced as evidence in any other proceeding or form the basis of any proceeding other than in an action to enforce the Settlement Agreement.

    2.      Any redacted portions of documents, or other evidence or categories of evidence that DMHAS has refused to give the Monitor, may not be offered by DMHAS as evidence in opposition to an action to enforce the Settlement Agreement.

    3.      Any factual information not presented to the Monitor by DMHAS in the course of the proceedings described herein will not be admitted as evidence in an action to enforce the Settlement Agreement unless DMHAS can demonstrate that the factual information had been overlooked despite DMHAS's best efforts. DMHAS shall have the burden of demonstrating best efforts.

J.      Reporting Requirements:

    1.      The Monitor can request, and Plaintiffs and DMHAS shall negotiate, any other documents or reports that would assist the Monitor in performing his or her duties under the terms of the Settlement Agreement.

    2.      In the event that DMHAS decides to produce a previously redacted document or previously withheld document, then this category of document will be produced thenceforth in the same manner.

K.      Costs: DMHAS shall pay the reasonable fees and costs of the Monitor described above. However, in no event shall the costs exceed $100,000 annually, unless the Settled Defendants have invoked their option to request additional on-site inspections in accordance with section VII.H.2.a(3).

## VIII.  Funding

A.      The Settled Defendants assert that their ability to meet the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I is subject to appropriation of funding by the New Jersey Legislature and the availability of such funds. For each year that the Settlement Agreement is in effect, the Settled Defendants will seek as one of DHS's top priorities an amount sufficient to meet the treatment and staffing goals set forth in sections VI.A through VI.G and the funding

obligations set forth in section VI.I. The Settled Defendants assert, however, that while they will seek as one of DHS's top priorities an amount sufficient to continue to fulfill the requirements set forth in section VI, the Governor, upon receiving various agencies' budget requests and top priorities, has the sole discretion to determine which of those agencies' budget priorities will be included in his budget for a given fiscal year and, if included, at what level of funding. Furthermore, to the extent that the Governor includes funding at any level for this Settlement Agreement in his or her future budgets, Settled Defendants assert that the Legislature is not bound by the Governor's proposal in determining the level of funding. Therefore, the Settled Defendants assert that they cannot guarantee the amount of funding that will be appropriated in subsequent fiscal years in order to implement the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I. The Parties agree that to the extent that (i) the Governor does not submit a budget with sufficient funds to enable Settled Defendants to meet the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I, (ii) the Legislature does not appropriate sufficient funds to enable Settled Defendants to meet the numerical and percentage goals and time frames set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I, or (iii) the Governor requires Settled Defendants to reduce spending during the fiscal year such that Settled Defendants may not have sufficient funds to meet the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I, Plaintiffs and Settled Defendants shall institute the applicable process set forth in section VIII.A.1, and Plaintiffs shall be limited by section VIII.B and to the remedies set forth in section X.

    1.    In the event that either (i) the Settled Defendants conclude that an annual appropriation is insufficient to meet the treatment and staffing goals set forth in sections VI.A through VI.G, or (ii) Settled Defendants are ordered to reduce spending such that funds may not be available to meet the treatment and staffing goals set forth in sections VI.A through VI.G, the following shall occur:

    a)    Settled Defendants shall notify Plaintiffs of any funding issues in writing within the first three months of the fiscal year or within thirty (30) days of being ordered to reduce spending. In that writing, Settled Defendants shall (i) identify the amount of funds available; (2) describe in detail the plan for expenditure of the available funds to continue implementation of the Settlement Agreement, and (3) specify the resulting impact, if any, on the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I. Settled Defendants shall include with that notice all underlying documents they are relying on to support their assertions. If Settled Defendants do not provide the requisite notice set forth in this section, then Settled

Defendants may not assert insufficiency of funding by the Governor or Legislature as a defense in any reinstituted or other litigation filed by Plaintiffs in accordance with section X with respect to the particular fiscal year at issue.

b)     The Parties shall meet within thirty (30) days of this notification, or at such other time as the Parties have agreed, to discuss the amount of funds available and the plan for expenditure of these funds to continue implementation of the Settlement Agreement and the resulting effect, if any, on the treatment and staffing goals set forth in sections VI.A through VI.G and the funding obligations set forth in section VI.I.   At that meeting, Settled Defendants shall provide all additional underlying documents upon which they are relying to support their assertions.

c)     Only if the Parties agree that such a meeting will not resolve the matter, may they agree in writing to waive this meeting and Plaintiffs may proceed according to section VIII.B.

d)     If, at the meeting, the Parties do not come to an agreement as to how Settled Defendants will proceed to implement the Settlement Agreement, Plaintiffs may invoke the enforcement process pursuant to section VIII.B.

e)     If Plaintiffs do not invoke the terms of section VIII.B within thirty (30) days of the meeting held pursuant to section VIII.A.1.b, or if the Parties have agreed to waive the meeting pursuant to section VIII.A.1.c within thirty (30) days of the waiver, Plaintiffs will be deemed to have agreed that Settled Defendants' revised plan for expenditure of the available State funds contained in the notice sent pursuant to section VIII.A.1.a and Settled Defendants' execution of that plan shall constitute Compliance with this Settlement Agreement for that fiscal year and that the treatment and staffing goals set forth in sections VI.A through VI.G, shall be adjusted accordingly, which may have the effect of requiring the Parties to agree to extend monitoring under this Settlement Agreement in accordance with section VII.B.

B.     If this matter is not resolved as a result of the process in sections VIII.A.1.a or VIII.A.1.b, then those provisions of the Settlement Agreement that are impacted by the budgetary constraints shall be void and Plaintiffs may pursue enforcement pursuant to section X.

## IX.   Scope

Nothing in this Agreement shall waive or constitute a waiver or in any way affect any present or future claims brought by a Class Member against the Settled Defendants not alleged in the Second Amended Complaint filed in this action, including, but not limited to, tort claims, *habeas corpus* petitions or challenges to civil commitment under the NJSVPA.

## X.   Enforcement

A.     DMHAS's failure to meet staffing and treatment goals due to inadequate funding under section VIII or a finding of Non-Compliance with any provision of this Settlement Agreement under section VII.H.2 shall permit Plaintiffs to resume the litigation with respect to the specific provision or provisions upon forty-five (45) days notice to the Settled Defendants.  Resumption of litigation with respect to a specific provision shall have the effect of voiding that provision of the Settlement Agreement.

B.     Plaintiffs are entitled to apply for attorneys' fees and costs that are incurred after the Effective Date of the Settlement Agreement in connection with the Settled Defendants' Non-Compliance with any provision of this Settlement Agreement and that are necessary for the enforcement of the Settlement Agreement if:

1.     Plaintiffs are the prevailing party; or

2.     DMHAS fails to present factual information to the Monitor under the terms set forth in sections VII.D and VII.H.3, and the Court determines that such failure caused Plaintiffs to file the motion or action for enforcement of the Settlement Agreement.

C.     Nothing in this Agreement shall be construed to limit any of Settled Defendants' defenses, and specifically, Settled Defendants may raise insufficient appropriations as a defense in the reinstituted or other litigation filed by Plaintiffs, unless prohibited pursuant to section VIII.A.1.a.

## XI.   Confidentiality

A.     Until Plaintiffs file a report of the Monitor with the Court in connection with a motion or action to enforce the Settlement Agreement, all reports of the Monitor shall be designated confidential and shall be disclosed only to the following persons:

1.     Any of the Settled Defendants, including their directors, officers, employees, agents and personnel or any administrative personnel of the DOC who are determined by Settled Defendants to be necessary to assist in the implementation of the Settlement Agreement;

2.    Counsel for the Plaintiffs and Settled Defendants, including partners, associates, law clerks, law students, secretaries, paralegal assistants and employees of such counsel to the extent reasonably necessary to render professional services with respect to the Settlement Agreement;

3.    The Plaintiffs identified in section V.N, except that until a report of the Monitor is filed with the Court in connection with a motion or action to enforce the Settlement Agreement, a Plaintiff may only review such report in the presence of his counsel, and may not retain or possess a copy (paper, electronic or otherwise) of such report; and

4.    Former employee witnesses, outside non-party consultants or experts retained for the purpose of assisting counsel regarding the Settlement Agreement.

B.    A Monitor's report filed with the Court is presumptively a public document, unless otherwise agreed to by Plaintiffs and the Settled Defendants or ordered by the Court.

1.    All Confidential Information shall be redacted from the Monitor's report before the report is filed with the Court.  An unredacted copy of the Monitor's Report shall simultaneously be filed with the Court under seal.  Plaintiffs and DMHAS agree to use a key that permits the identification of the Residents by pseudonym.

C.    All documents identified in this Settlement Agreement and produced to and reviewed by the Monitor, with the exception of treatment records and Confidential Information, are deemed public documents.

D.    If Plaintiffs decide to file a copy of any of the Monitor's reports with the Court in connection with a motion or action to enforce the Settlement Agreement, Plaintiffs shall notify the Settled Defendants at least twenty (20) days prior to the filing of the report. Upon receipt of such notice the Settled Defendants shall have fourteen (14) days to seek redaction of portions of the report which threaten security, contain the name, number and other identifying information of the Resident who is the subject of the record (with the understanding that the sole purpose for redacting identifying information is to protect a Resident's privacy), or contain information set forth in confidential records.

1.    If Plaintiffs and the Settled Defendants are able to mutually agree to the redactions, then those portions of the documents that are the subject of the redactions shall be filed with the court under seal.

2.      If Plaintiffs and the Settled Defendants are unable to mutually agree to the redaction, then the Party seeking the disputed redaction shall apply to the Court for a Protective Order regarding the redacted portion(s) of the report within fourteen (14) days of the date of filing of the action to enforce the Settlement Agreement.  Pending resolution of the Settled Defendants' motion for a Protective Order, any Monitor's report filed with the Court by Plaintiffs shall bear all requested redactions.

E.     Until Plaintiffs file a report of the Monitor containing treatment records with the Court in connection with a motion or action to enforce the Settlement Agreement, all treatment records shall be designated Confidential Information and shall be disclosed only to the following persons:

1.      DMHAS, including its directors, officers, employees, agents and personnel or any administrative personnel who is determined by DMHAS to be necessary to assist in implementing the Settlement Agreement;

2.      Counsel for the Plaintiffs and the Settled Defendants, including attorneys, law clerks, law students, secretaries, paralegal assistants and employees of such counsel to the extent reasonably necessary to render professional services with respect to the Settlement Agreement;

3.      Former employee witnesses, outside non-party consultants or experts retained for the purpose of assisting counsel regarding the Settlement Agreement; and

4.      The Monitor selected in accordance with the terms of this Settlement Agreement.

F.     If any treatment records are filed with the Court, including treatment records in the Monitor's report, they shall be redacted by the offering Party to eliminate the name, number and other identifying information of the Resident who is the subject of the record.  During any court proceeding, Plaintiffs and DMHAS agree to use a key that permits the identification of the Residents by pseudonym.

G.     If Plaintiffs' counsel decide to file treatment records, including those contained in the Monitor's report, with the Court in connection with a motion or action to enforce the Settlement Agreement, Plaintiffs shall notify DMHAS at least twenty (20) days prior to the filing of the records.  Upon receipt of such notice, DMHAS shall have fourteen (14) days to seek redaction of the record which threatens security, or contains the name,

number and other identifying information of the Resident who is the subject of the record, with the understanding that the sole purpose for redacting identifying information is to protect the Resident's privacy.

1.      If Plaintiffs and DMHAS are able to mutually agree to the redactions, then those portions of the documents which are the subject of the redactions shall be filed with the Court under seal.

## XII.   Attorney Fees

A.      Settled Defendants agree to pay the Seton Hall University School of Law Center for Social Justice the amount of seventy-eight thousand dollars ($78,000.00) as attorneys' fees within thirty days of the Court's approval of this Settlement Agreement, which represents a small fraction of actual costs and fees accrued by the Center for Social Justice from the time of commencing this action to execution and Court approval of the Settlement Agreement.

B.      Settled Defendants acknowledge that the Seton Hall University School of Law Center for Social Justice may separately pursue costs and attorneys' fees to enforce the provisions of this Settlement Agreement pursuant to section X.

## XIII.   Miscellaneous Provisions

A.      This Settlement Agreement shall automatically terminate sixty days after the end of the Monitoring Period, without the need for any action on behalf of any Party, unless the Parties have agreed in writing to extend the Settlement Agreement beyond that date.

B.      All notices and reports to be sent pursuant to this Settlement Agreement shall be sent by U.S. Mail, return receipt requested or by hand delivery with a signed confirmation, to:

For Plaintiffs:

Seton Hall University
School of Law
Center for Social Justice
833 McCarter Highway
Newark, NJ 07102
Att'n:  Director,
Civil Rights and Constitutional
Litigation Clinic

Lawrence S. Lustberg, Esq.
Gibbons, P.C.
One Gateway Center
Newark, NJ 07102

For Settled Defendants:

Commissioner
New Jersey Department
of Human Services
PO Box 700
Trenton, New Jersey 08625-0700

Assistant Commissioner
New Jersey Division
of Mental Health Services
P.O. Box 727
Trenton, New Jersey 08625-0727

C.     The Parties at all times shall remain bound to comply with applicable New Jersey and federal law.

D.     This Settlement Agreement is enforceable only by the Parties and Class Members and is binding upon the Parties and Class Members, by and through their officials, agents, employees, and successors.  No other person or entity is intended to be a third-party beneficiary of the provisions of this Settlement Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity other than the Parties and Class Members may assert any claim or right as a beneficiary or protected class under this Settlement Agreement in any civil, criminal, or administrative action.

E.     This Settlement Agreement supersedes any previous agreements, oral or written, between the Parties and shall constitute the entire, integrated Settlement Agreement of the Parties.  No prior contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

F.     This is a mutually binding Settlement Agreement.

G.     This Agreement may be executed and delivered in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes.

By their signatures, each signatory to this Settlement Agreement represents and warrants that he or she is authorized to execute this Settlement Agreement on behalf of the Party or Parties listed below.

For Plaintiffs:

_____

Barbara Moses
Seton Hall University School of Law
Center for Social Justice

_____

Date

For Settled Defendants:

_____

Jennifer Velez
Commissioner
New Jersey Department of Human Services

_2. 3. 12_____

Date

Page 33 of 33

By their signatures, each signatory to this Settlement Agreement represents and warrants that he or she is authorized to execute this Settlement Agreement on behalf of the Party or Parties listed below.

For Plaintiffs:

_____

Barbara Moses
Seton Hall University School of Law
Center for Social Justice

_____2-3-2012_____

Date

For Settled Defendants:

_____

Jennifer Velez
Commissioner
New Jersey Department of Human Services

_____

Date

## EXHIBIT A

**Barbara Moses**
*Admitted Pro Hac Vice*
**Kimberly Krone**
*Legal Intern, D.N.J. L. Civ. R. 101.1(h)*
**Desiree Sedehi**
*Legal Intern, D.N.J. L. Civ. R. 101.1(h)*
**Thomas Wester**
*Legal Intern, D.N.J. L. Civ. R. 101.1(h)*
**SETON HALL UNIVERSITY SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700

**Lawrence S. Lustberg**
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND ALVES, MICHAEL CULBRETH, and DERRICK SESSOMS, individually and on behalf of all persons similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MERRILL MAIN, Ph.D., in his official capacity as Clinical Director of the Special Treatment Unit, JENNIFER VELEZ, in her official capacity as Commissioner of the New Jersey Department of Human Services, LYNN A. KOVICH, in her official capacity as Assistant Commissioner and Deputy Director of the New Jersey Division of Mental Health and Addiction Services, and JEFFREY S. CHIESA, in his official capacity as Attorney General of the State of New Jersey,<br><br>    Defendants. | No. 01 Civ. 789 (DMC) (MF) (Consolidated)<br><br><br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs Raymond Alves, Michael Culbreth, and Derrick Sessoms, individually and on behalf of all persons similarly situated, by their attorneys, the Seton Hall University School of Law Center for Social Justice and Gibbons P.C., for their complaint against defendants, allege as follows:

## PRELIMINARY STATEMENT

1.      This action is brought on behalf of all persons who are civilly committed or confined pending commitment to New Jersey's Special Treatment Unit ("STU") pursuant to the New Jersey Sexually Violent Predator Act ("NJSVPA" or the "Act"), N.J.S.A. §§ 30:4-27.24 et seq.  Plaintiffs seek declaratory and injunctive relief against the New Jersey officials who are responsible for the treatment program at the STU.  These defendants have consistently and repeatedly failed to provide the minimally adequate treatment required by both federal and state law to justify the indefinite civil confinement of persons who have completed their prison sentences, and would therefore be free men, but for a judicial determination that they suffer from a "mental abnormality or personality disorder" that requires "care" and "treatment."

2.      Plaintiffs Raymond Alves, Michael Culbreth, and Derrick Sessoms are long-time involuntary residents of the STU.  They bring this action, individually and on behalf of all persons similarly situated:  (a) pursuant to 42 U.S.C. § 1983 for violations of the substantive due process guarantee of the Fourteenth Amendment to the United States Constitution; (b) pursuant to 42 U.S.C. § 1983 for violations of the Fifth Amendment to the United States Constitution; (c) pursuant to 42 U.S.C. § 1983 for violations of the Eighth Amendment to the United States Constitution; (d) pursuant to 42 U.S.C. § 1983 for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132; (e)

pursuant to 42 U.S.C. § 1983 for violations of section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (f) for violations of the right to adequate treatment under the New Jersey Constitution; and (g) for violations of the rights of civilly committed persons under N.J.S.A. §§ 30:4-24, 30:4-24.1 and 30:4-27.34.

3.     Defendants, who are sued in their official capacities, have failed and refused to provide residents of the STU, including plaintiffs, with adequate treatment to address the mental abnormalities and/or personality disorders that caused them to be committed (or confined pending commitment), thus depriving them of a realistic opportunity to reintegrate into society.  Among other things:

a.     Defendants have failed and refused to provide residents of the STU with minimally sufficient group therapy, and have further failed and refused to provide any meaningful individual therapy.

b.     Defendants have failed and refused to staff the STU with a sufficient number of qualified therapists and other mental health professionals to treat the residents, whose numbers continue to grow.

c.     Defendants have failed and refused to provide for the continuing education and training of the existing STU clinical staff, such that what therapy the residents receive is often administered by poorly trained and/or incompetent clinicians using outmoded or discredited techniques.

d.     Defendants have failed and refused to explain adequately to residents the standards and criteria used to evaluate their progress through the treatment program and their readiness for conditional discharge.

e.      Defendants have failed and refused to provide residents with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program.

f.      Defendants have failed and refused to provide residents with any internal complaint system or other mechanism (short of formal legal proceedings) to communicate complaints concerning their mental health treatment.

g.      Defendants have failed and refused to comply with their own internal management policies and procedures, many of which are outdated and some of which they simply ignore without bothering to revise.

h.      Defendants have failed and refused to assist the residents with meaningful discharge planning, notwithstanding their acknowledged legal obligation to do so, thus reducing the chances for residents to obtain conditional release even if they are able to progress successfully through the treatment program.

i.      Defendants have failed and refused to provide minimally adequate job training and educational opportunities within the STU, further reducing the chances that residents will ever be able to reintegrate into society regardless of their mental health.

## JURISDICTION AND VENUE

4.      This action is authorized under 42 U.S.C. § 1983 for declaratory and injunctive relief against the defendants in their official capacities.  The Court has subject-matter jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3) and (a)(4).  The Court may exercise supplemental jurisdiction over

the state law claims pursuant to 28 U.S.C. §1367(a).   Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this District and, on information and belief, defendants reside in this District.

## THE PARTIES

### Plaintiffs

6.      Plaintiff Raymond Alves is sixty-nine years old.  He was involuntarily committed pursuant to the NJSVPA in March 2000, twelve days after he completed a term of thirty years in state prison.  Plaintiff Alves has now been civilly confined for almost twelve years.  He suffers from a number of serious medical conditions, some of them age-related and others caused or exacerbated by the years of harsh treatment he received in prison and in the STU.

7.      When plaintiff Alves was initially committed, he was housed at an STU facility within a prison complex known as the Northern Regional Unit in Kearny, New Jersey.  Defendants maintained a second STU, known as the Special Treatment Unit Annex, in a portion of the East Jersey State Prison in Avenel, New Jersey.  In May 2010, the Kearny facility was closed and its residents, including plaintiff Alves, were all moved to the Avenel facility.  To accommodate the influx, the Avenel facility was hastily expanded into the former Administrative Close Supervision Unit ("ACSU") of the East Jersey State Prison.  Since then, the expanded Avenel facility has served as New Jersey's sole STU, and it houses all of the members of the class on whose behalf this action is brought.

8.     Plaintiff Michael Culbreth is forty-eight years old. He was involuntarily committed pursuant to the NJSVPA in August 2001, immediately after serving a term of nine and a half years in state prison, and has now been civilly confined for ten and a half years.   The State of New Jersey has thus kept him behind bars for more than twice as long as the prison term to which he was sentenced for his crime.

9.     When plaintiff Culbreth was initially committed, he was housed at the facility in Kearny, New Jersey.  In May 2010, he was moved to the Avenel facility.

10.     Plaintiff Derrick Sessoms is forty-one years old. He was involuntarily committed pursuant to the NJSVPA in August 2002, after serving a term of fifteen years in state prison, and has now been civilly confined for nine and a half years.

11.     Plaintiff Sessoms was fifteen years old when he committed the sole sexual offense on which his civil commitment was based.  He was prosecuted as an adult, and was sixteen years old when he began his prison term.  At the end of his prison term, when plaintiff Sessoms was thirty-one years old, he believed that he was being released, and was in fact processed for release by the prison.  Instead, he was immediately transferred for civil commitment under the NJSVPA.  Thus, as a result of a single sexual offense committed at the age of fifteen, plaintiff Sessoms has now been involuntarily confined by the State of New Jersey for a total of almost twenty-five years, which represents approximately 60% of his life thus far.

12.     When plaintiff Sessoms was initially committed under the NJSVPA, he was housed at the facility in Kearny, New Jersey.  In May 2010, he was moved to the Avenel facility.

6

**Defendants**

13.     Defendant Merrill Main, Ph.D. is the Clinical Director of the STU and is responsible for developing and administering the treatment program at the STU, recruiting, training, and supervising the clinical staff, and providing adequate mental health treatment to each resident in an appropriately therapeutic environment. He is also responsible for developing and maintaining written policies and procedures for the operation of the treatment program. N.J.A. C. § 10A:35-1.5. Defendant Main is sued in his official capacity.

14.     Defendant Jennifer Velez is the Commissioner of the Department of Human Services ("DHS"), which is responsible (together with the Department of Corrections and the Attorney General) for formulating, promulgating and enforcing regulations governing the rights of and rules of conduct for residents of the STU. Pursuant to N.J.S.A. § 30:4-27.34(d), such regulations must "take into consideration the rights of patients as set forth in [N.J.S.A. § 30:4-24.2] but shall specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." Defendant Velez is sued in her official capacity.

15.     Defendant Lynn A. Kovich, M.Ed., is the Assistant Commissioner and Deputy Director of the New Jersey Division of Mental Health and Addiction Services ("DMHAS"), which is required by statute and by regulation to provide or arrange for treatment for all persons committed pursuant to the Act. N.J.S.A. § 30:4-27.34(b); N.J.A.C. § 10A:35-1.1(b). Such treatment must be "appropriately tailored to address the specific needs of sexually violent predators." N.J.S.A. § 30:4-27.34(b). The Assistant Commissioner and Deputy Director of DMHAS is responsible for, among other things,

overseeing the development and administration of the treatment program at the STU, overseeing the recruitment, training, and supervision of the clinical staff, and ensuring that each resident receives adequate mental health treatment in an appropriately therapeutic environment. Defendant Kovich is sued in her official capacity.

16.     Defendant Jeffrey S. Chiesa is the Attorney General of the State of New Jersey and is responsible for commencing civil commitment proceedings under the NJSVPA, for "presenting the case for . . . involuntary commitment" to the court, N.J.S.A. § 30:4-27.29(b), and for the continued enforcement of the Act.  N.J.S.A. § 52:17a-4. Defendant Chiesa is sued in his official capacity.

## CLASS ALLEGATIONS

17.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") consisting of all persons who are civilly committed or confined pending commitment to the STU pursuant to the NJSVPA.

18.     The Class consists of over 450 individuals now housed at the STU in Avenel, New Jersey, and is therefore so numerous that joinder of all members is impracticable.

19.     Material questions of law and fact are common to the Class, including whether defendants violated plaintiffs' rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, the ADA, the Rehabilitation Act, the New Jersey Constitution, and N.J.S.A. §§ 30:4-24, 30:4-24.1, and 30:4-27.34 by:  (a) failing to provide residents of the STU with minimally sufficient group therapy or any meaningful individual therapy; (b) failing to staff the STU with a sufficient number of

8

qualified therapists and other mental health professionals to treat the residents; (c) failing to provide for the continuing education and training of the existing STU clinical staff; (d) failing to explain adequately to residents the standards and criteria used to evaluate their progress through the treatment program and their readiness for conditional discharge; (e) failing to provide residents with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program; (f) failing to provide the residents with any internal complaint system or other mechanism (short of formal legal proceedings) to communicate complaints concerning their mental health treatment; (g) failing to comply with their own internal management policies and procedures; (h) failing to assist the residents with meaningful discharge planning; and (i) failing to provide minimally adequate job training and educational opportunities within the STU.

20.     The claims of the representative plaintiffs are typical of the claims of the entire Class.  The representative plaintiffs, like all Class members, claim that defendants have violated their rights under the United States Constitution, the ADA, the Rehabilitation Act, and New Jersey law.  All Class members reside in the same facility and are subject to the same inadequacies of the treatment program at the STU.

21.     The representative plaintiffs will fairly and adequately protect the interests of the class and have no interests antagonistic to those of the class.

22.     The representative plaintiffs' counsel, Seton Hall University School of Law Center for Social Justice, is experienced in civil rights litigation.  The representative plaintiffs' co-counsel, Gibbons P.C., is experienced in litigating class actions in a wide range of public interest and constitutional matters.   The representative plaintiffs'

attorneys will vigorously prosecute this action or otherwise seek to resolve it in a manner that is in the best interests of the Class.

23.     The prosecution of separate actions by individual Class members as to the issues framed by this Complaint would create the risk of inconsistent judgments that could establish incompatible standards of conduct for defendants.   In addition, the prosecution of separate actions by individual members of the Class as to the issues framed by this Complaint would create a risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

24.     Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate injunctive and declaratory relief with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

25.     In 1999, long after plaintiffs were criminally convicted and sentenced, the New Jersey Legislature enacted the New Jersey Sexually Violent Predator Act, N.J.S.A. §§ 30:4-27.24 et seq.  The Act authorizes the involuntary civil commitment of "sexually violent predators" for an indefinite period of time.  A "sexually violent predator," under the Act, is a person who has been convicted of (or in certain cases charged with but not convicted of) a sexually violent offense and who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment."  N.J.S.A. § 30:4-27.26.

26.     Once committed to the STU, a person who has been adjudicated a sexually violent predator remains there until such time as a state court finds that he "will not be likely to engage in acts of sexual violence." N.J.S.A. § 30:4-27.32(c)(1).  In other words, in order to regain his liberty, the involuntarily committed ex-offender must establish that he has been successfully treated for the mental abnormality or personality disorder that was the basis for his confinement to the STU.

27.     DHS, through DMHAS, is required to "provide or arrange for treatment for a person committed pursuant to the [Act]."     N.J.S.A. § 30:4-27.34(b).     Such treatment must be "appropriately tailored to address the specific needs of sexually violent predators."  *Id.*  DHS is also required to promulgate regulations governing the treatment of residents of the STU.  Such regulations must take into consideration the rights of all New Jersey mental health patients and must "specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. § 30:4-27.34(d).

28.     The treatment requirement written into the NJSVPA serves, among other things, to distinguish civil commitment under the NJSVPA from "punishment," which is forbidden by the Double Jeopardy Clause, contained in the Fifth Amendment to the United States Constitution.  Adequate treatment of plaintiffs' mental health conditions is also required by the Due Process Clause, contained in the Fourteenth Amendment to the United States Constitution, which prohibits state entities and officials from depriving a person of his liberty due to a treatable mental health condition without also making reasonable efforts to treat that condition, so as to afford the affected person a meaningful opportunity to regain his liberty.  In addition, the Eighth Amendment to the United States

Constitution, which prohibits cruel and unusual punishments, requires that persons who are involuntarily confined due to an asserted mental health disorder be provided with adequate treatment for that disorder.

29.    Plaintiffs also have a right to adequate mental health treatment pursuant to the New Jersey Constitution, the ADA, the Rehabilitation Act, N.J.S.A. §§ 30:4-24 and 30:4-24.1 and, as set forth above, the Act itself.

30.    Notwithstanding their legal obligations to plaintiffs and the Class, defendants have failed and refused to provide even minimally adequate treatment to the residents of the STU for the mental abnormalities and personality disorders with which they were diagnosed as a precondition to commitment.

31.    Although the NJSVPA mandates that treatment be "tailored" to the "specific" needs of the residents of the STU, virtually no individual therapy is offered.

32.    The primary mental health treatment provided to residents of the STU is a form of group therapy administered in "process groups." Indeed, this is the only therapy provided to residents assigned to certain living quarters, including the former ACSU cells in the South Wing. At best, residents of the STU are assigned to two 90-minute process group sessions per week, for a total of three hours of therapy per week. Moreover, many process groups fail to meet when scheduled, start late, and/or end early, thus further reducing the residents' therapy time.

33.    To be effective, process groups must be small in size, must focus on sex offender-specific issues, and must be led by mental health professionals with training in sex offender-specific treatment. In fact, process groups at the STU are overcrowded – sometimes including 20 residents or more – unfocused, and poorly managed, in part

because they are facilitated by under-qualified and/or poorly-trained psychologists or social workers, some of whom have little or no background in sex offender-specific treatment. The few licensed psychiatrists employed by the STU are used primarily to diagnose and evaluate residents, such as in connection with the residents' periodic re-commitment hearings. Other than prescribing drugs, they do not provide any direct patient care.

34.    Some residents of the STU are also enrolled in psycho-education "modules" designed to address specific topics or skills, such as "relapse prevention," "victim empathy," "arousal reconditioning," "relationship skills," "anger management," and "substance abuse." When offered, such modules typically meet once a week for sixteen weeks, after which the residents are told whether they have "passed" or "failed" the module.

35.    Although residents must successfully complete all modules recommended for them in order to progress towards discharge, defendants frequently prevent them from doing so by failing to offer necessary modules at all, or by offering them only to a limited number of residents, ignoring others who have been told to take the same module. The lack of sufficient modules is due in part to defendants' failure to recruit and train enough qualified mental health professionals to lead them. Some of the staff members who do lead modules are unqualified to do so. Moreover, the STU staff often instructs residents to retake modules they have already passed – sometimes two or three times – simply because no other modules are available. Plaintiff Sessoms, for example, has taken and passed both "victim empathy" and "arousal reconditioning" numerous times.

36.     The residents' ability to take the modules recommended for them, and therefore to progress in treatment, is further hampered by defendants' arbitrary policy of prohibiting certain residents from enrolling in modules based purely on where they are housed.  For example, residents housed in the former ACSU cells on the South Wing, such as plaintiff Alves, are unable to enroll in any modules because no modules meet in the South Wing and because South Wing residents are not permitted to travel to other portions of the STU for treatment.  Similarly, residents housed in the former ACSU cells in the West Wing, such as plaintiff Culbreth, are not permitted to travel to the Annex for treatment.  As a result of being moved to the West Wing, plaintiff Culbreth has been unable to complete two modules that he has been told he is required to pass in order to progress in treatment.

37.     Until very recently, the North, South, East and West Wings did not even contain the physical facilities necessary to hold process groups, modules or other group therapy programs.  In or about December 2011, after numerous delays, four small classrooms (each capable of holding approximately ten to twelve residents in folding chairs) were opened in each Wing.  However, defendants still offer no modules in the South Wing, few modules elsewhere, and restrict the travel of residents assigned to the Wings, as described above, making it difficult or impossible for them to enroll in the modules they are required to pass in order to work towards conditional discharge.

38.     Defendants also improperly withhold therapy, including modules, as punishment for infractions of STU rules.  For example, in November 2011, a number of residents were subjected to urine tests and some tested positive for banned substances.  Such residents were placed on "Program MAP" ("MAP" stands for Modified Activities

Programming) and lost various privileges. They also lost the right to attend any modules, including substance abuse modules, notwithstanding that the STU's written policies and procedures state that while on Program MAP residents "continue to attend all of their assigned treatment groups unless specifically contraindicated."

39.    The treatment program at the STU is divided into five phases, from Phase 1 ("Orientation") to Phase 5 ("Transition"). According to the Residents' Guide to the STU, successful completion of Phase 5 "suggests that a Resident is a viable candidate for monitored release to the community." The Residents' Guide also states that the staff of the STU, including defendant Main, "anticipate recommending many Residents for discharge."

40.    In fact, defendants have rarely, if ever, recommended a resident for discharge. Members of the STU clinical staff who advocate internally for such recommendations tend to lose their jobs. A handful of residents have been discharged by the courts over defendants' objections. However, on information and belief, more residents have died in the STU since 1999 than have been returned to the community.

41.    Few residents even get to Phase 4 of the program ("Advanced/Honors"), and fewer still advance to Phase 5. After almost twelve years in the STU, plaintiff Alves remains in Phase 2 of the program, due in part to his inability to enroll in any modules. Plaintiff Culbreth has been in Phase 3 for the past six years, while plaintiff Sessoms – who has not committed a sexual offense since he was fifteen years old – has now spent eight years in Phase 3.

42.    The residents' inability to make meaningful progress towards discharge is due in substantial part to the treatment shortfalls outlined above. Those inadequacies are

exacerbated by defendants' persistent failure to explain adequately to plaintiffs the standards and criteria used to evaluate their progress and their readiness for conditional discharge. For example, although the Residents' Guide promises residents that they will receive regular reviews and updated treatment reports, these reviews and reports – when they occur – are often perfunctory and fail to provide the residents with timely and accurate feedback concerning their treatment progress, their goals for future treatment, and their prognosis for future advancement through the program.

43.     Another barrier to discharge is defendants' failure to meaningfully assist residents with discharge planning. Under the NJSVPA, a resident may be conditionally discharged only when a court finds that he is "amenable to and highly likely to comply with a plan to facilitate [his] adjustment and reintegration into the community." N.J.R.S.A. § 30:4-27.32(c)(1). Absent a detailed discharge plan, covering matters such as where the person will live, where he will obtain continuing therapy, and how he will pursue employment or job training, a resident cannot hope to satisfy this standard. And absent meaningful assistance from the STU staff, a resident who has been in prison and/or the STU for decades – and who has no access to the internet or to most other forms of modern communication – cannot hope to prepare such a plan. Yet the staff routinely refuses to provide such assistance.

44.     Defendants have also failed and refused to provide the residents with minimally adequate job training and educational opportunities within the STU, further reducing the chances that they will ever be able to reintegrate into society regardless of their mental health. The minimum-wage jobs available within the STU (during limited hours) are largely limited to kitchen and janitorial work. Moreover, there is no internal

complaint system or other mechanism (short of formal legal proceedings) available within the STU for complaints concerning the treatment program.

45. As a result of defendants' failure to provide adequate mental health treatment, and defendants' related misconduct as described above, plaintiffs and the Class have been deprived of their liberty and denied rights to which they are entitled under the constitutional and statutory laws of the United States and New Jersey.

46. Plaintiffs and the Class have no adequate remedy at law to redress these wrongs. They have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, practices, and conduct of defendants unless granted the relief sought herein.

## FIRST CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Violation of the Fourteenth Amendment to the United States Constitution

47. Plaintiffs restate and re-allege paragraphs 1 through 46 as if fully set forth herein.

48. Defendants have deprived plaintiffs and other STU residents of their liberty on the basis of treatable mental health conditions but have failed and refused to make reasonable efforts to treat those conditions. Defendants have thereby denied the residents any meaningful opportunity to regain their liberty, in violation of the Due Process Clause of the Fourteenth Amendment.

49. Defendants' conduct also demonstrates a deliberate indifference to the well-being of plaintiffs and the other members of the Class.

50.     As a result of defendants' acts, omissions, practices and conduct, plaintiffs and the other members of the Class have been deprived of their constitutionally protected liberty interest in receiving adequate treatment.

## SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Violation of the Fifth Amendment to the United States Constitution

51.     Plaintiffs restate and re-allege paragraphs 1 through 50 as if fully set forth herein.

52.     By involuntarily confining plaintiffs and other STU residents at the conclusion of their criminal sentences, due to asserted mental health disorders, but withholding adequate treatment for those disorders, defendants have demonstrated that the NJSVPA as applied is punitive in nature, and therefore violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

53.     As a result of defendants' acts, omissions, practices and conduct, plaintiffs and the other members of the Class have been deprived of their constitutionally protected right to be free of double punishments for the same crime.

## THIRD CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Cruel and Unusual Punishment
Violation of the Eighth Amendment to the United States Constitution

54.     Plaintiffs restate and re-allege paragraphs 1 through 53 as if fully set forth herein.

55.     The Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments, requires that persons who are involuntarily confined due to an asserted mental health disorder be provided with adequate treatment for that

disorder.  By failing to provide such treatment for plaintiffs and other members of the Class, defendants have violated the Eighth Amendment.

56.     Defendants' conduct also demonstrates a deliberate indifference to the well-being of plaintiffs and the other members of the Class.

57.     As a result of defendants' acts, omissions, practices and conduct, plaintiffs and the other members of the Class have been deprived of their constitutionally protected right to be protected from cruel and unusual punishments.

## FOURTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Violation of the Americans With Disabilities Act, 42 U.S.C. §12132

58.     Plaintiffs restate and re-allege paragraphs 1 through 57 as if fully set forth herein.

59.     The mental abnormalities and personality disorders that formed the basis for the civil commitment of plaintiffs and the other STU residents constitute disabilities as that term is used in the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12102.

60.     Defendants have discriminated against plaintiffs and the other Class members, in violation of the ADA, because they have failed and refused to reasonably accommodate their handicaps by providing adequate mental health care; they have denied plaintiffs and the Class access to mental health treatment and educational, vocational and physical fitness programs afforded generally to other civilly committed persons; they have excluded plaintiffs and the Class from participation in and denied them the benefits of the services, programs, or activities of a public entity on the basis of disability; and they have failed to administer services, programs and activities in the most

integrated setting appropriate to the needs of qualified individuals with disabilities in violation of 28 C.F.R. § 35.130(d).

## FIFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

61.     Plaintiffs restate and re-allege paragraphs 1 through 60 as if fully set forth herein.

62.     Defendants have discriminated against plaintiffs and other members of the Class in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987, by failing to reasonably accommodate their handicaps, failing to provide adequate mental health care; excluding them from participation in and denying them the benefits of programs for which they would otherwise be qualified, by reason of their disability; subjecting them to discrimination based on their disabilities; and denying them access to mental health treatment, educational, vocational and physical fitness programs.

## SIXTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

Violation of the Right to Adequate Treatment
Under the New Jersey State Constitution

63.     Plaintiffs restate and re-allege paragraphs 1 through 62 as if fully set forth herein.

64.     Defendants have failed to provide plaintiffs and the other members of the Class with adequate mental health treatment, thereby depriving them of a meaningful opportunity to cure or improve their condition, or regain their liberty, in violation of the New Jersey Constitution.

## SEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Violation of Civil Rights of Civilly Committed Persons
### N.J.S.A §§ 30:4-24, 30:4-24.1, and 30:4-27.34

65.     Plaintiffs restate and re-allege paragraphs 1 through 64 as if fully set forth herein.

66.     Defendants have violated N.J.S.A. § 30:4-24 by failing to provide for the prompt and effective diagnosis, care, treatment, training and rehabilitation of plaintiffs and the other members of the Class, and by failing to uphold their human dignity and honor their moral and constitutional rights.

67.     Defendants have violated N.J.S.A. § 30:4-24.1 by failing to ensure that the fundamental civil rights of plaintiffs and the other members of the Class are protected, failing to ensure that plaintiffs and the other members of the Class receive mental health care and other professional services in accordance with accepted professional standards, and failing to allow plaintiffs and the other members of the Class to participate meaningfully in planning for their own treatment.

68.     Defendants have violated N.J.S.A. § 30:4-27.34(b) by failing to provide treatment to plaintiffs and the other members of the Class "appropriately tailored" to their specific needs.

## PRAYER FOR RELIEF

Wherefore, plaintiffs request that this Court:

a.     Adjudge and declare that the acts, omissions, policies and practices of the Defendants violate the Fifth, Eighth, and Fourteenth Amendments to the United States

Constitution; the Americans with Disabilities Act; the Rehabilitation Act; the New Jersey

Constitution; and N.J.S.A. §§ 30:4-24, 30:4-24.1, and 30:4-27.34.

b.       Enjoin defendants, together with their agents, officials, employees and all

persons acting in concert with them, under color of state law or otherwise, from

continuing the unconstitutional and illegal acts, conditions and practices described herein;

c.       Order defendants, together with their agents, officials, employees and all

persons acting in concert with them, under color of state law or otherwise, to take all

necessary actions to:  (1) provide residents of the STU with sufficient and effective group

therapy for their mental abnormalities and personality disorders, together with

meaningful individual therapy where clinically indicated; (2) staff the STU with an

adequate number of qualified therapists and other mental health professionals to treat the

residents; (3) provide for the continuing education and training of the STU clinical staff;

(4) explain adequately to residents the standards and criteria used to evaluate their

progress through the treatment program and their readiness for conditional discharge; (5)

provide residents with timely and accurate feedback concerning their treatment progress,

their goals for future treatment, and their prognosis for future advancement through the

program; (6) provide residents with an internal complaint system or other mechanism to

communicate complaints concerning their mental health treatment; (7) comply with their

own internal management policies and procedures; (8) assist the residents with

meaningful discharge planning; and (10) provide minimally adequate job training and

educational opportunities within the STU;

d.       Award reasonable attorneys' fees and expenses to plaintiffs' counsel

pursuant to 42 U.S.C. §1988; and

e.      Grant such other relief as the Court deems just and proper.

## TRIAL BY JURY DEMANDED

Plaintiffs demand a trial by jury as to all matters so triable.

Dated: February 2, 2012
       Newark, New Jersey

 

**SETON HALL UNIVERSITY SCHOOL OF LAW
CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, NJ 07102-5210
(973) 642-8700
Barbara.Moses@shu.edu

**GIBBONS P.C.**

By:   /s/ Lawrence S. Lustberg
      Lawrence S. Lustberg
      One Gateway Center
      Newark, New Jersey 07102-5310
      (973) 596-4500
      LLustberg@gibbonslaw.com

*Attorneys for Plaintiffs Raymond Alves, Michael
Culbreth and Derrick Sessoms*

## EXHIBIT B

### Independent Experts

**Goal:**

The purpose of contracting with Independent Experts is to provide the Division of Mental Health and Addiction Services ("DMHAS") with periodic input from experts in the field of sex offender management and treatment to ensure that the treatment program at the Special Treatment Unit ("STU") is based upon current treatment techniques and knowledge, and to help keep STU staff current in such knowledge and techniques.

**Objective:**

Treatment and assessment of sexual offenders is an established and developing sub-specialty of forensic mental health practice that requires both general and sex offender specific expertise and ongoing training.   On a quarterly basis, STU Administration will arrange for an Independent Expert from outside of the STU to enter the STU.  The Expert will evaluate segments of the STU program and report findings and recommendations to the STU Administration.  The Expert will also provide at least a half-day in-service training for STU treatment staff.  That in-service training will focus on a topic in which the Expert has recognized expertise and which may or may not be directly related to the segments of the STU program that the Expert is evaluating. The Independent Expert will dedicate one to two full days to evaluating the STU program.  On a rotating basis, the STU will assign three of the "Areas of Annual Evaluation," as delineated below, to each Expert such that all of the areas are evaluated each year.  The Independent Expert will provide the Administration of the STU with feedback and suggestions regarding the policies and practices of the treatment program.  That feedback will address, but not be limited to, the assigned areas of evaluation.

While input from such experts is valued and will be seriously considered by the Administration of the STU, the Experts are not authorized to direct or change the treatment program at the STU. None of the findings of the Experts shall be released to Plaintiffs or their counsel, or to the Monitor appointed pursuant to Section VII of that Agreement, except that the Monitor may have access to the findings of the Experts for the sole purpose of determining whether DMHAS is complying with Section VI.H of the Settlement Agreement.  In addition, none of the findings of the Experts may be admitted as evidence in any litigation, and none of the Experts may be called as a witness to testify in any litigation about his or her involvement with the STU or any findings of the Expert with respect to the STU.  Moreover, the STU Administration's failure to implement any suggestion of the Expert will not be grounds for reopening this lawsuit.  Upon completion of each quarterly Expert evaluation and in-service training, the Settled Defendants shall promptly provide to Plaintiffs' counsel a written notice stating: (1) the Expert's name, title, and professional affiliation(s), (2) the date(s) and times of the evaluation, (3) the date(s) and times of the in-service training, and (4) the three "Areas of Annual Evaluation" assigned to such Expert.

**Selection of Experts:**

Experts will be selected for their expertise and experience in the area of sex offender management and treatment based on demonstrable expertise shown in areas such as relevant publications, presentations, design and administration of programs, expertise/design of treatment paradigms, expertise/design of assessment methods, leadership roles in relevant professional organizations.  The Experts will be selected by DMHAS.  Any Expert chosen by DMHAS shall not have any actual or potential conflicts of interest with DMHAS or the Administration of the STU.  A conflict of interest is defined as a private or personal interest sufficient to appear to influence the objective exercise of an individual's official duties as a professional.  Each Expert shall serve no more frequently than once during the year and not on consecutive years.  Each Expert will be paid a consulting fee of $5,000 per consultation, or such greater amount as DMHAS in its sole discretion deems appropriate.

**Practices and Procedures of the Independent Experts:**
**I.   Independent Experts Scope of Review:**

On a rotating basis, the STU will assign three "Areas of Annual Evaluation," as delineated below, to each Expert such that all of the areas are evaluated each year.  The Experts shall not be precluded from having access to such related parts of the facilities that, in conducting the evaluation, the Experts deem to be reasonably appropriate, connected to the enumerated areas, and necessary for the completion of their reports.   The Experts shall conduct program evaluations by doing each of the following:

1.  Touring such facilities, including treatment space, educational and vocational resources, housing areas and kitchen, recreation facilities, and other parts of the facilities as the Expert deems necessary;

2.  Reviewing the treatment program (as evidenced by the current Written Plan, current Resident Handbook, and Resident evaluations), training program and materials, syllabus, process group and module scheduling, and program of supervision;

3.  Reviewing clinical assessments and evaluations and individualized treatment plans for a representative sample of Residents as deemed adequate by the Expert;

4.  Interviewing a representative sample of Residents as deemed adequate by the Expert, or attending a community meeting of the Residents at each facility during which the Residents may voice any concerns or questions they may have to the Expert;

5.  Interviewing a reasonable number of clinical staff members as determined by the Expert, from each of the facilities, as well as interviewing other professional staff, including vocational teachers, GED teachers, recreational therapists, and other program directors, outside the presence of their supervisors.  The Expert will arrange interviews at mutually agreeable times so as to minimize disrupting the operation of the facilities;

6.  Attending clinical, educational, recreational, or vocational programming meeting at each facility;

7. Attending a grand rounds session, clinical supervision meeting, or treatment team meeting at each facility.

## II. Areas of Expert Evaluation:

On an annual basis the Independent Experts shall prepare reports opining on each of the following topics:

1. **Overall Therapeutic and Rehabilitative Milieu:** Assessment of staff and administration efforts to oversee a program and foster an environment that provides Residents with a reasonable opportunity to have the conditions for which they are committed sufficiently managed in order to be reintegrated into society. In addition, measure whether the environment is sufficiently therapeutic or counter-therapeutic, considering the role of the DOC;

2. **Clinical Assessments, Evaluations, and Treatment Team Reports:** Assessment of whether they are timely performed, individually tailored (including detailed notations regarding the sufficiency of individual treatment), contain objectively measurable criteria and suggestions for advancement, are communicated in a comprehensible way to Residents, and are otherwise in accordance with relevant clinical standards;

3. **Program Phases:** Assessment of each Resident's program completion as compared to the estimated timeframes for completion listed in the current Written Plan;

4. **Process Groups and Modules:** Assessment of whether process groups and modules are made sufficiently available to Residents in accordance with prevailing institutional and therapeutic standards. Assessment of whether their curriculum and execution is in accordance with relevant clinical standards;

5. **Educational, Recreational, and Vocational Therapy:** Assessment of whether each is made sufficiently available to all Residents;

6. **Release Preparation and Programming:** Assessment of whether it is in accordance with relevant clinical standards, including adequacy of the pre-release risk assessment process;

7. **Therapist Training and Supervision:** Assessment of whether the curriculum and actual training are in accordance with relevant clinical standards and otherwise occur on a regularized basis;

8. **Therapeutic Community:** Assessment of whether a therapeutic community is reasonably available to eligible Residents and operated in accordance with relevant clinical standards;

9. **Confidentiality:** Assessment of whether client confidences are adequately protected during the sessions, and as a part of recommitment hearings, consistent with the relevant professional clinical and legal standards;

10. **Gradual De-escalation of Restraints:** Measure compliance of the program with current therapeutic standards, case law and assessment of the use of de-escalation of restraints throughout the Treatment Manual, Resident Handbook, and overall program;

11. **Increased Visitation:** Assessment of the consideration and use of social support, including participation of a Resident's significant other(s) and family, as part of the gradual de-escalation program;

12. **Availability of Psychiatric Counseling:** Assessment of the availability and quality of available psychiatric services for population's needs.

**Substantive Evaluation Criteria**

The Independent Experts, in their reports, should assess the State's performance in the evaluation criteria above in conjunction with the professional standards that are relevant and applicable to the STU program. In producing the feedback reports, each Expert will follow reasonable professional standards and include as many of the following as possible: (i) detailed narrative of the Expert's conclusion, including specific facts or examples supporting the conclusion; (ii) the reasons for the conclusion; (iii) the information used or data/documents/persons examined to devise the conclusion; and (iv) specific recommendations made by the Expert as to how the STU can improve in those areas if the Expert believes improvement is necessary. These specific recommendations will include a list of both in-state and out-of-state training opportunities that are then currently available to the STU's treatment staff, as well as any new or updated sex offender specific literature that may add to their training. The Expert will be informed of the portion of the annual budget allocated to training opportunities prior to drafting the report, in order to better inform the recommendations and allow for creative solutions to budgetary constraints.

**III. Training Component of the Independent Expert Consultation**

The Independent Experts will conduct at least a half-day training session, either as part of grand rounds or otherwise, for the clinical staff members at each facility. Each Expert, in consultation with STU Administration, will determine the subject matter and content of each session, based on either (i) areas of training that the Expert has found deficient at the STU during the evaluation or (ii) newly developed areas of sex offender management and treatment. All subject matter and content will be consistent with relevant clinical standards. The Expert will arrange training at mutually agreeable times so as not to interrupt the operation of the facilities.

EXHIBIT C

**MEMORANDUM OF AGREEMENT BETWEEN THE
DIVISION OF MENTAL HEALTH AND ADDICTION SERVICES,
DEPARTMENT OF HUMAN SERVICES AND THE
OFFICE OF THE CORRECTIONS OMBUDSPERSON**

**I. PURPOSE**

This Memorandum of Agreement between the Division of Mental Health and Addiction Services, Department of Human Services ("DMHAS") and the Office of the Corrections Ombudsperson ("OCO") is entered into in order to formalize, clarify and effectuate the timely and efficient delivery of services provided to residents of the Special Treatment Unit at Avenel, New Jersey by the OCO. This Memorandum of Agreement is entered into on the part of OCO pursuant to N.J.S.A. 52:27EE-26, et seq. (L.2005, c. 155, secs. 26-28), which transfers all functions, powers and duties now vested in the Corrections Ombudsperson in the Department of the Public Advocate to the Corrections Ombudsperson in, but not of, the Department of the Treasury, and on the part of DMHAS pursuant to the Sexually Violent Predator Act (hereinafter "SVPA"), N.J.S.A. 30:4-27.24 et seq., which provides for the involuntary civil commitment of persons deemed to be sexually violent predators.

In enacting the SVPA, the Legislature determined that sexually violent predators require treatment in a facility specifically designated for their control, care and treatment. N.J.S.A. 30:4-27.25. The statute defines a sexually violent predator as one who has been convicted of, or found not guilty by reason of insanity or incompetent to stand trial for, a sexually violent offense as defined in the SVPA. N.J.S.A. 30:4-27.26. The Legislature also recognized that the nature of the mental conditions from which sexually violent predators suffer and the danger they present

make it necessary to house those identified as sexually violent predators in an environment separate from patients generally civilly committed or otherwise confined.

The SVPA provides for the custody, care and treatment of sexually violent predators ("SVPs" or "residents") in a secure environment, with the Department of Corrections ("DOC") responsible for the operation of a secure treatment facility where SVPs are separated from other offenders in the custody of the DOC, and with DMHAS responsible to provide or arrange for treatment for SVPs.

The OCO, created pursuant to N.J.S.A. 52:27EE-26 et seq., and having the authority and duties set forth in N.J.S.A. 52:27EE-28, has the authority to establish and implement procedures for eliciting, receiving, processing, responding, and resolving complaints from interested persons, including SVPs, concerning the treatment related issues covered by this Memorandum of Agreement.

## II. DEFINITIONS

**"Corrections Ombudsperson"** means the person appointed by the Governor pursuant to N.J.S.A. 52:27EE-26 to perform the duties within his jurisdiction as defined in N.J.S.A. 52:27EE-27 and N.J.S.A. 52:27EE-28.

**"Effective Date"** means the date the Settlement Agreement entered into in the matter captioned Raymond Alves, et al. v. Merrill Main, Ph.D., et al., Civil Action No. 01-789, United States District Court for the District of New Jersey (the "Settlement Agreement"), is finally approved by the Court.

**"STU"** means the Special Treatment Unit where persons who have been civilly committed under the SVPA reside.

- 2 -

"**Treatment Ombudsperson**" means a member of the staff of the OCO with the Civil Service title of "Assistant Ombudsperson" designated to perform the OCO's obligations under this Memorandum of Agreement.  Solicitations to fill the position will be posted in accordance with applicable civil service procedures and the Corrections Ombudsperson will select the appropriate candidate who has the education and experience necessary to successfully complete the duties outlined in this Memorandum of Agreement.

### III.    GENERAL PROVISIONS

**A.    Mutual Covenants**

1.    **DMHAS** agrees to:

(a)    Initiate a resident complaint system for treatment related issues;

(b)    Create a standardized form for treatment related complaints.  Treatment staff will provide this form to a resident upon request;

(c)    Provide completed resident complaint forms directly to the Treatment Ombudsperson;

(d)    Provide the Treatment Ombudsperson with the current Residents' Guide to the STU and other current materials on SVP treatment process and protocols, including but not limited to the Settlement Agreement;

(e)    Consider and timely respond to any correspondence from the Treatment Ombudsperson pursuant to Section III.A.2(f) of this Memorandum of Agreement.

2.    The **OCO** agrees that:

(a)    It shall post solicitations to fill the position of Treatment Ombudsperson with the Civil Service title of "Assistant Ombudsperson" in accordance with applicable civil service procedures, and the Corrections Ombudsperson will select the appropriate candidate who

- 3 -

has the education and experience necessary to successfully complete the duties outlined in this agreement.

(b)      The Treatment Ombudsperson will determine whether the complaint is within or without the scope of this Memorandum of Agreement, and send the resident a standard notice of this determination within thirty (30) days of receipt of the complaint form.  Complaints within the scope of this Agreement shall relate only to the process by which treatment is provided, and not the need for or efficacy of the treatment provided.

(c)      Examples of treatment complaints <u>within</u> the scope of this Memorandum of Agreement include, but are not limited to, complaints regarding module availability, polygraph examination availability, cancellation of process group meetings, requests for individual therapy, vocational and educational opportunities, and treatment staff.  Examples of treatment complaints <u>without</u> the scope of this Memorandum of Agreement are complaints regarding the necessity for a specific treatment modality or appropriateness or effectiveness of the treatment provided by DMHAS staff.  All such complaints shall be directed to the resident's attorney.

(d)      The Treatment Ombudsperson will investigate any complaints within the scope of this Memorandum of Agreement and take action appropriately tailored to the nature of the resident complaint taking into account information contained in the Residents' Guide to the STU and other materials on SVP treatment process and protocols, including but not limited to the Settlement Agreement.  Examples of appropriate action include, but are not limited to:

> (i)      Communicating with the appropriate DMHAS administrator or staff at the treatment facility;
>
> (ii)     Gathering information from the appropriate administrator or staff at the treatment facility;

      (iii)    Informing the appropriate administrator or staff of the resident complaint;

      (iv)    Communicating with the complaining resident to further investigate the nature of the complaint; and/or

      (v)    Taking such other measures as the Treatment Ombudsperson deems appropriate to investigate or resolve the resident complaint.

(e) The Treatment Ombudsperson will send the resident an initial written response to the resident complaint within thirty (30) days of sending the standard notice as described in Section III.A.2(a).   The response will document the Treatment Ombudsperson's efforts in investigating and resolving the complaint, and any results obtained.

(f)    The Treatment Ombudsperson will timely notify the resident, in writing, of any additional information or results obtained after sending the initial written response as described in Section III.A.2(d).

(g)    The Treatment Ombudsperson will from time to time correspond with the Director of the STU regarding issues in the treatment program the Treatment Ombudsperson deems sufficiently systemic from a review of the residents' complaints.

(h)    The Treatment Ombudsperson will document all oral correspondence from the residents.

(i)    The Treatment Ombudsperson will attend a resident community meeting at least twice a year in order to:

      (i)    Explain the role of the Treatment Ombudsperson to the residents;

      (ii)    Answer any questions regarding the practices and procedures of the Treatment Ombudsperson; and

      (iii)    Inform the residents of the status of any systematic treatment problems reported to the Director of the STU.

- 5 -

(j)     The OCO will maintain all records of complaints and resolutions for a period of seven years consistent with the OCO's document retention and destruction schedule.  OCO will, upon request, make any records available to DMHAS and its counsel.

3.      DMHAS and the OCO jointly agree to establish and maintain all necessary lines of communication with each other and do all things necessary to implement the terms of this Memorandum of Agreement.

**B.      Budget and Fiscal**

DMHAS and the OCO acknowledge that funding sufficient to fund one full-time staff position within the OCO is necessary in order to provide the services of the Treatment Ombudsperson contemplated under this Memorandum of Agreement.  DMHAS agrees that, for each year that this Memorandum of Agreement is in place, it shall seek as one of its top priorities an amount (from or through DOC) sufficient to fund one full-time staff position within the OCO to perform the functions of the Treatment Ombudsperson.  If, however, despite DMHAS's best efforts:

(a)  no funding for the Treatment Ombudsperson is included in the State Appropriations Act for a given year, the OCO shall have no obligation to provide the services of the Treatment Ombudsperson for that year; or

(b)  insufficient funding for the full-time staff position is included in the State Appropriations Act for a given year, the OCO's responsibility to provide the Treatment Ombudsperson shall be decreased proportionately, and the duties and timeframes set forth in Section III.A.2, above, shall be appropriately adjusted by agreement of the parties.

C.      **Payment**

Assuming DMHAS receives funding through or from DOC pursuant to Section III.B, and that funding is not appropriated directly to the OCO, DMHAS shall timely arrange for the funding received to be transferred or made available to OCO to implement this Agreement. DMHAS and the OCO jointly agree to take whatever steps are necessary to ensure that any funding received by DMHAS pursuant to Section III.B is transferred or made available to OCO to implement this Memorandum of Agreement.

D.      **Severability**

If any section or clause of this Memorandum of Agreement, or application thereof to any person, is adjudged unconstitutional or invalid by a court of competent jurisdiction, such judgment shall be confined in its operation to the section, clause or application directly involved in the controversy in which such judgment shall have been rendered, and it shall not affect or impair the remainder of this Memorandum of Agreement or the application thereof to other persons.

E.      **Revisions**

Any changes to the terms of this Memorandum of Agreement shall be in writing and signed by the parties.

F.      **No Third Party Beneficiaries**

The parties to this Memorandum of Agreement do not intend to create any third party beneficiaries of this Memorandum of Agreement and do not intend any third party to have a right to enforce its terms.

**G.**     **Duration of Memorandum of Agreement**

This Memorandum of Agreement shall remain in effect until otherwise amended or until the Settlement Agreement entered into in the matter captioned <u>Raymond Alves, et al. v. Merrill Main, Ph.D., et al.</u>, Civil Action No. 01-789, United States District Court for the District of New Jersey, expires or until terminated by both parties in writing.

**H.**     **Signatures**

DIVISION OF MENTAL HEALTH AND
ADDICTION SERVICES

DATE:_____          By:_____
                                    Lynn A. Kovich, M.Ed.
                                    Assistant Commissioner


OFFICE OF THE CORRECTIONS
OMBUDSPERSON

DATE:_____          By:_____
                                    Dan DiBenedetti
                                    Corrections Ombudsman