Barbara Moses
*Admitted Pro Hac Vice*
Sarah Turk
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
Jennifer Vasquez
*Legal Intern, D.N.J.L. Civ. R. 101.1(h)*
**SETON HALL UNIVERSITY SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700

Lawrence S. Lustberg
Jonathan M. Manes
*Admission to D.N.J. Pending*
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND ALVES, et al., | |
| Plaintiffs, | |
| v. | No. 01 Civ. 0789 (DMC) (MF) (Consolidated) |
| MERILL MAIN, Ph.D., et al., | **DECLARATION OF BAHER AZMY** |
| Defendants. | |

BAHER AZMY, being of full age, hereby declares:

1.      I am the Legal Director of the Center for Constitutional Rights, on leave from Seton Hall University School of Law, where I was a Professor of Law and the Director of the Civil Rights and Constitutional Litigation Clinic at Seton Hall's Center for Social Justice

("CSJ"). I am an attorney in good standing in the Bar of this Court. I submit this declaration in support of the parties' joint motion for judicial approval of the proposed settlement of this action.

2. From 1999 until August 2011, I taught Constitutional Law at Seton Hall and directed a clinic which provided opportunities for third year law students to work on live cases on behalf of real clients. The clinic focused on civil rights, prisoners' rights, immigrants' rights and international human rights law.

3. From October 2002, when I accepted a request from the Court to get involved in this case, until August 2011, when I went on leave from Seton Hall in 2011, I was counsel of record and served as lead counsel for the plaintiffs in this case—with the exception of one year when I was on academic sabbatical from August 2008 to August 2009. Along with co-counsel at Gibbons, P.C., and my clinic students at Seton Hall, I filed an amended complaint; filed briefs in opposition to defendants' motions to dismiss and for summary judgment; reviewed thousands of documents produced by defendants in the course of discovery; studied the voluminous literature on therapeutic treatment for so-called "sexually violent predators" (a term with which I take issue) as well as the case law governing judicial standards for assessing adequacy of mental health treatment in facilities for civilly committed former sex offenders; formally consulted with three sex-offender treatment experts (and informally consulted with many more); toured the facilities of the New Jersey Special Treatment Unit ("STU") several times, both in Kearny and in Avenel; reviewed state-by-state variations in treatment programs for civilly-committed former sex offenders; toured a similar facility in Bridgewater, Massachusetts and interviewed the superintendent and clinical director of that facility; interviewed dozens of STU residents; visited the STU many times for these interviews and to consult with our clients; and supervised all aspects of the litigation in this case. The litigation was conducted under the auspices of the

Center for Social Justice, which is distinct from and operates independently of the general faculty of Seton Hall University Law School.  At no point did Seton Hall professors Kip Cornwell, John Jacobi, or Robert Martin—all of whom appear to have opined on New Jersey's SVP law in their academic or professional work—have any substantive input whatsoever into the litigation.

4.      As described in more detail below, I also led the settlement negotiations with opposing counsel.  These negotiations involved several expert visits and reports relating to the STU; the exchange of dozens of demands and counter-demands over the course of years; numerous in-person and by-phone settlement negotiations with opposing counsel (which were uniformly adversarial and often contentious); and numerous settlement conferences with Magistrate Judge Mark Falk, who supervised the negotiations.  Accordingly, I submit this declaration based on substantial personal knowledge of this case and the settlement process that has led to the filing of the proposed joint settlement proposal.

5.      Specifically, in this declaration I address: (a) the early litigation and procedural history of this case; (b) the early settlement processes and obstacles; (c) the more recent settlement efforts, including comprehensive settlement demands by plaintiffs, the solicitation of an independent expert analysis by Judith V. Becker, Ph.D., the difficulty of the negotiation process, the concessions we ultimately obtained from defendants, and the reasons we were unable to obtain the defendants' agreement to several of our demands; and (d) the reasons I believe that, on balance, and in light of the difficult state of the law, the concrete benefits provided by the parties' agreement, and the oversight it imposes, the settlement now before the Court ("Settlement") is fair, reasonable and adequate for class members.

## Early Litigation History

6.    At the request of the Court, CSJ made an appearance in this case on July 20, 2002, on behalf of Raymond Alves and Robert McGarrey (the "Original Plaintiffs"), involuntary residents of an STU facility in Kearny, New Jersey, who had filed separate pro se civil rights complaints sixteen months earlier. (Mr. McGarrey was voluntarily dismissed from the case in November 2007, when he was transferred to state prison after committing a crime in the STU. [Dkt 75] Although he later returned to the STU, and is now a Class Member, he is not a Class Representative.). Mr. Alves' original, hand-written complaint alleged prominently that "defendants have failed to provide me with adequate and proper sex offenders treatment." [Dkt. 1]

7.    After substantial research into potential claims, CSJ filed an Amended Complaint on behalf of each Original Plaintiff on October 25, 2002, seeking injunctive relief against officers of the Department of Human Services ("DHS") for its role in administering the mental health treatment at the STU and against officers of the Department of Corrections ("DOC") for its role in maintaining the STU facility and enforcing security at the STU. [Dkt. 26]

8.    The Amended Complaints asserted  claims under the Due Process Clause for the violation of the Original Plaintiffs' right to adequate mental health treatment; under the Equal Protection Clause, because they were being denied the protections of New Jersey Patients' Bill of Rights that were afforded to other institutionalized individuals; and under the Americans with Disabilities Act.

9.    In addition to these treatment-related claims, the Amended Complaints also alleged that the implementation of the New Jersey Sexually Violent Predator Act ("Act") on a day-to-day basis was so punitive, given the conditions of confinement in the STU, that the Act

"in effect" constituted a violation of the Double Jeopardy Clause.  By making this "in effect" claim, the Original Plaintiffs hoped to avoid the bar of Kansas v. Hendricks, 521 U.S. 346 (1997),  which held that a statute nearly identical to the New Jersey Act was, on its face, not a violation of the Constitution's prohibition on double jeopardy.

10.    The Amended Complaints sought relief that  would  improve the quantity and quality of mental health services at the STU, increase the transparency and accountability of the clinical staff to residents, and create a structure that would let individuals proceed more fairly and easily through the program's treatment phases.  The Original Plaintiffs asked the Court to:

> order defendants, their agents, officials, employees and all persons acting in concert with them, under color of state law or otherwise to take all necessary actions to: (1) provide mental health treatment for plaintiff in accordance with accepted professional standards; (2) develop and implement a continuous quality improvement program with respect to the provision of progressive mental health treatment to STU residents; (3) substantially increase the amount of mental health counseling made available to plaintiff; (4) offer a reasonably individualized treatment program to plaintiff that provides him with an opportunity to participate and understand the program's goals; (5) provide additional and properly trained mental health staff; (6) provide independent and accurate evaluations of plaintiff's progress and develop independent and accurate risk assessment criteria . . .

11.    The Amended Complaints did not seek a declaration that the Act was unconstitutional, nor did  they seek an injunction ordering the release of the  Original Plaintiffs because in the considered judgment of counsel, such relief was not available under a reasonable reading of the law, including Kansas v. Hendricks.   I and my students repeatedly advised the Original Plaintiffs of this reality.

12.    On March 31, 2003, the Alves and McGarrey cases were formally consolidated. [Dkt. 40]  And on June 24, 2003, after  multiple adjournments, defendants filed motions to dismiss the Amended Complaints, primarily on the grounds that the Original Plaintiffs failed to state a cause of action.  Defendants relied heavily on Kansas v. Hendricks and on case law

instructing judges to offer administrators of STU programs considerable deference and latitude in any judgments that could be properly be called clinical.  After briefing by the parties, on November 18, 2003, the Court denied in part and granted in part defendants' motions.  [Dkt. 46] Most importantly, the Court permitted the Original Plaintiffs to pursue their substantive Due Process right to adequate mental health treatment.  However, the Court dismissed their Double Jeopardy claims, ruling that after Seling v. Young, 531 U.S. 250 (2001), an "in effect" or "as applied" argument cannot alter the "conclusive legislative and judicial determination" that the New Jersey Act is civil rather than punitive in nature.

13.    I point out this ruling because it appears that many of the Class Members who have submitted objections to the Settlement believe that it does not adequately redress what they almost uniformly describe as the punitive nature of the Act as applied to them.  Unfortunately, this Court's November 18, 2003 decision, granting defendants' motion to dismiss such a claim, largely foreclosed the type of relief these objectors seek.

14.    Defendants answered the Amended Complaints in January, 2004, and discovery commenced.  Plaintiffs served interrogatories and document requests on defendants, attempting to ascertain what the treatment protocols were at the STU, the quality and quantity of the clinical staff, their training and supervision, the availability of educational, recreational and vocational opportunities to residents, and the methods by which and rates at which residents could actually proceed through the STU's 5-phase treatment program.  Defendants produced thousands of documents regarding general treatment protocols, as well as the individualized treatment records of the Original Plaintiffs.   In addition, in August 2004 the Original Plaintiffs took the deposition of Merrill Berger, Ph.D., the DHS's Chief Forensic Psychologist, just as she was leaving her official position at the STU.  Plaintiffs also noticed the deposition of the STU's Clinical Director,

Glenn Ferguson, Ph.D., for July 2004, but this deposition was delayed because of disputes related to the written discovery.

15.     Among other controversies during the course of formal discovery, plaintiffs and defendants disputed the basic scope and proper discovery in this action. The Original Plaintiffs sought numerous detailed documents related to the policies and practices of the STU, and all members of the clinical staff, because we believed these documents were relevant to an evaluation of the adequacy of the STU treatment protocols and programs as a whole. Defendants consistently objected to providing any documents that extended beyond the individual circumstances of the two Original Plaintiffs.

16.     Due in part to this fundamental disagreement, counsel began to consider transforming the case into a class action. Mindful that the original goals of the litigation were to improve the treatment program and conditions at the STU, we began to believe that class-wide procedures and class-wide relief would be the best course. Pursuing the case as a class action would also obviate defendants' objections about the scope of discovery.

**The Original Class Complaint and Initiation of Settlement Discussions**

17.     In the fall of 2004, counsel conducted dozens of interviews (some in person, many by phone) with other residents of the Kearny STU, in order to identify suitable class representatives. Because the goals of the litigation were to obtain improved treatment processes, we sought individuals who were committed to treatment but who faced obstacles to progress from the inadequacies in the STU treatment program. Through this interview process, we learned that many individuals:

        a.   were stuck for years in a particular phase of treatment, despite doing what they thought was expected of them by clinical staff;

    b.   were deeply confused about what they were concretely required to do in order to move to a higher phase of treatment and ultimately "graduate" from the STU;

    c.   were frustrated by their inability to enroll in psycho-educational modules required to advance to the next phase, because the necessary modules were simply not offered or offered too irregularly by the staff;

    d.   had to repeat modules over and over again because of a dearth of available courses that were nevertheless required for advancement; and

    e.   faced hostility and harassment from some of the DOC personnel in charge of security at the STU, which caused anxiety and undermined their ability to focus on treatment progress.

Overall, these factors created a feeling of hopeless and despair that, despite their own efforts or commitment, they were trapped indefinitely in the STU, without any light at the end of the tunnel.

    18.    Based on our interviews and the strategic goals of the litigation, we identified three additional residents—Bruce Abdullah, Derrick Sessoms and Michael Culbreth—as potential representatives, along with the Original Plaintiffs, of a putative class of STU residents. They felt trapped in the STU and were eager for improvement in the treatment protocols so they could advance through the program and obtain release.  (In late 2011, Bruce Abdullah was in fact conditionally discharged from STU and now resides in Newark, New Jersey.)

    19.    On November 8, 2004, CSJ filed a motion to further amend the pleadings and to certify a class,  [Dkt. 55].  The proposed Class Complaint included class action allegations and named Messrs. Abdullah, Sessoms and Culbreth as plaintiffs (in addition to the Original

Plaintiffs) and putative class representatives.  The putative class was comprised of individuals then civilly committed in the STU facility in Kearny.  It did not include individuals who were civilly committed under the same statute but housed in a different facility, referred to as the "Annex" and located in Avenel, New Jersey.  This was due in part to counsel's limited pro bono resources and in part to the concern that the treatment program and/or the conditions of confinement in the Annex could be different, and thus present potentially distinct legal questions.

### First Phase of Settlement Negotiations

20.    In late 2004, counsel for the DOC-affiliated defendants, Victoria Kuhn, Esq., broached the idea of settlement.  Specifically, Ms. Kuhn raised the possibility of working towards a class-wide settlement, and expressed interest in including the residents of the Annex in any such settlement.  CSJ agreed to explore the possibility of a state-wide settlement, but I took the position that CSJ would not represent Annex residents if settlement negotiations failed.  As part of this process, we agreed to suspend formal discovery, on the understanding that defendants (including the DHS-affiliated defendants) would provide us access to documents and to the facility for purposes of informing our settlement discussions.  Defendants also agreed to give our experts access to the facilities and residents in both locations, and asked us to hold our motion to amend and to certify a class in abeyance as we discussed settlement.  Despite some hesitation, I concluded that this was a reasonable process—especially since I declined to formally represent any Annex residents until there was a realistic possibility of a good settlement.  I believed that this posture would put additional pressure on the defendants to make settlement concessions so as to avoid future, piecemeal litigation.

21.     The parties advised Magistrate Judge Falk of this proposed process on January 25, 2005, in a telephone conference.  Judge Falk endorsed the proposal and encouraged the parties to pursue settlement.

22.     We explained the proposal to all five of our clients and identified what we thought were the benefits of this process compared to the costs and risks of continuing with litigation. The clients also endorsed our process.   Thereafter, as settlement discussions continued, the clients (particularly the Original Plaintiffs, Messrs. Alves and McGarrey) sometimes expressed frustration with the pace of the settlement process and its prospects for genuine reform; on several occasions they stated that they would prefer to go to trial.  We met with and wrote to the clients frequently, acknowledging their frustrations, but continued to recommend that we pursue a settlement, as we believed this process would likely achieve concrete reforms in a shorter period of time than could litigation.  The clients accepted counsel's advice.

23.     In 2005, plaintiffs retained two experts (at considerable cost to Gibbons) to evaluate the STU.  We first retained Dr. Robert F. Prentky, one of the nation's foremost academic experts on the assessment and treatment of sex offenders and the former Clinical Director of a similar civil-commitment facility in Massachusetts.  We also retained Timothy App, a professor of Criminal Justice at Northeastern University, who served for 13 years as the Assistant Deputy Commissioner of Corrections and Executive Director of Massachusetts Parole Board, where he researched, developed, implemented and managed Massachusetts' first state-wide sex offender management program.

24.     By agreement of the parties, plaintiffs' experts visited the STU facility in Kearny and the Annex in Avenel in March 2005.  In advance of the visit, they were given documents related to the STU treatment protocol and treatment records for a number of residents (all of

whom had consented).   The experts toured both facilities; spoke informally with several dozen residents; conducted private interviews of approximately 15 residents; observed process groups in action; interviewed, without presence of supervisors, a team of clinical staff; and interviewed Merrill Main, Ph.D., who was then the Director of Psychology at the STU and is now the Clinical Director of the STU and a defendant in this action.

25.     Both Dr. Prentky and Mr. App produced reports that were critical of the STU's treatment protocols and the conditions of confinement in the Kearny facility.   Among other things, their reports criticized: (a) the anti-therapeutic conditions at the Kearny facility; (b) delays in moving individuals out of phase 1 of treatment, particularly where they had advanced further in a similar treatment program offered when they were incarcerated; (c) the lack of clarity and communication to residents about how to progress to subsequent phases and opaque advancement criteria; (d) the insufficient time given to mental health treatment, including educational, recreational and vocational activities, which the experts believed should occupy significantly more hours of substantive time per resident, per week; (e) insufficient therapist contact time with residents, which the experts believed should be 15-20 hours per resident, per week; (f) insufficient supervision and training of the staff; (g) the inadequate of module offerings and insufficient educational and vocational opportunities.   With the exception of improving the conditions at the Kearny facility—which no longer houses any civilly committed former sex offenders—the proposed Settlement now before the Court addresses most of these recommendations in a material way.   However, as described below, it took several more years, and another expert report, before defendants were willing to make these concessions.

26.     Our initial experts made other recommendations as well, regarding clinical assessment techniques and the "double bind" the commitment process produces by encouraging

residents to discuss deviant thoughts in treatment sessions, which can then be used against them in re-commitment hearings as evidence of dangerousness. These issues were raised in settlement negotiations but plaintiffs were ultimately unsuccessful in obtaining concessions from defendants concerning them, due in part to the lack of a consensus in the clinical literature and the likelihood that the Court would defer to defendants' judgment regarding them.

27.     By letter dated May 16, 2005, after a telephone conference with Magistrate Judge Falk, we withdrew our motion to further amend the pleadings and certify a class, without prejudice to re-file. Because settlement negotiations would potentially continue for a long period of time, it made no sense to continue to hold the motion in abeyance and unresolved.

28.     Throughout 2005, CSJ personnel spent literally hundreds of hours on our own and in consultation with our experts, assessing and organizing and distilling their recommendations into more concrete form that we could present to opposing counsel. In preparing this declaration, I reviewed my working files from this period. Those files reveal numerous detailed letters to our experts to translate their observations into concrete proposals for reform, and massive research documents and charts that align an expert's critique with proposed solution, the legal and/or clinical bases for such a recommendation, and with other states' practices for each area. In short, we devoted enormous time, resources, consideration and expertise to understanding the parameters of an effective sex offender treatment program, studying the limitations in law and state practice on our potential demands, and developing meaningful demands that would provide genuine benefits for residents at the STU. As noted above, many of the provisions in the proposed Settlement agreement trace their origin to the original findings of plaintiffs' experts as distilled through hundreds of hours of work by CSJ.

29.     On May 10, 2005, CSJ sent a preliminary settlement demand letter to counsel for the DHS-affiliated defendants.  On the same date, we sent a letter to counsel for DOC-affiliated defendants.   Neither DHS nor DOC responded meaningfully to our demands over the summer of 2005, although during this time there  were  several informal conversations among counsel and defendants' counsel continued to provide information to plaintiffs, such as information concerning improvements being made to the physical plant at the STU.

30.     On October 4, 2005, the parties appeared before Judge Cavanaugh to discuss the progress of the settlement negotiations.  The Court urged the parties to move more expeditiously.

31.     During late 2005 and early 2006, DHS counsel took the position that the existing treatment program at the STU was "state of the art" and that no significant reforms were needed. We then agreed to share the Prentky and App expert reports with our opponents, hopeful that it could  move  them  towards  a  more  flexible  position.    However,  DHS  counsel  expressed considerable  antipathy  to  the  experts'  conclusions  and  dismissed  their  recommendations. Although Magistrate Judge Falk held a number of settlement conferences during this period, he too was unable to persuade defendants' counsel to move closer to Plaintiffs' demands.

32.     In this same period, we learned that the STU facility in Kearny  was likely to be closed—in which case the residents would be moved to another facility—due to a dispute with a local  municipality.    We repeatedly requested that  we be involved in discussions regarding the design and/or location of the new facility, so that residents' concerns with that new facility could be remediated in advance.  Defendants consistently rejected these requests.

33.     Similar requests were made by Ian Marx, Esq., of Greenberg Traurig LLP.  Mr. Marx made an appearance in early 2006 on behalf of a group of      STU residents led by Richard Bagarozy (the "Bagarozy Plaintiffs").  Although the cases filed by the Bagarozy Plaintiffs were

not formally consolidated with the <u>Alves</u> case until early 2008 [Dkt. 76], Mr. Marx began participating in our settlement negotiations as soon as he appeared.

34.     On May 18, 2006, CSJ, Gibbons, and Greenberg Traurig sent to defendants a comprehensive, 29-page Settlement Outline.  This document set forth each of plaintiffs' numerous demands, listed the defendants' prior response (if any), described any changes that defendants had actually agreed to, and discussed outstanding factual questions remaining relating to particular changes.  Plaintiffs asked defendants for a substantive response.  When no such response was forthcoming—although counsel did meet with Judge Falk on September 29, 2006—plaintiffs supplemented the Settlement Outline with a letter dated November 9, 2006.

35.     On December 1, 2006, defendants finally responded to plaintiffs' May 18, 2006 Settlement Outline.  In our view, however, the response was cursory, dismissive and unhelpful. As to most of the issues we raised, counsel for DHS-affiliated defendants stated, in substance, either that their clients were already doing what we were demanding of them, or that the law did not require them to do so.  This created a serious impasse.

36.     On February 16, 2007, the parties held a telephone status conference with Magistrate Judge Falk, advising him that they were still far apart.  Judge Falk stated that he still believed that a settlement would be a positive result in the case, given its complexity and the ambiguity regarding relevant legal and clinical standards.  If the parties could not settle, however, Judge Falk indicated that he would push the case quickly towards judgment.

### <u>The Becker Expert Report and Subsequent Settlement Process</u>

37.     In the Spring of 2007, I spoke by telephone to Deputy Attorney General Beth Leigh Mitchell, a senior DHS attorney not previously involved in the settlement talks, to discuss possible ways to move the process forward.  She proposed that the plaintiffs and the DHS-

affiliated defendants retain a joint expert to conduct an independent evaluation of the treatment program at the STU, on the theory that both sides would trust the judgment of the consensus expert and would have difficulty quarreling with the conclusions of professional they had vetted in advance. I agreed to this plan, in principle, and counsel informed Judge Falk on July 18, 2007 that we were negotiating procedures for the joint retention.

38. We then spent the remainder of 2007 addressing the selection of the expert, the way she would conduct her review, the scope of her investigation, the substantive evaluation criteria, the timing of the process, and the consequences of the expert's findings, among other issues. Ultimately plaintiffs and DHS agreed to retain Dr. Becker as the joint expert; agreed that she would have access to all STU facilities and could review documents and interview residents and staff; agreed that she would evaluate twelve specific aspects of the treatment program at the STU, using the "professional standards she believes relevant and applicable"; and agreed that she would rate each area as either "Minimally Adequate/Satisfactory" or "Not Minimally Adequate/Unsatisfactory." These terms were memorialized in an Order Governing Settlement Procedures, issued on April 3, 2008. [Dkt. 78]

39. Dr. Becker conducted her STU visits in the summer of 2008. Shortly thereafter I commenced my academic sabbatical. During this time Visiting Clinical Professor Emily Goldberg managed the case and supervised the students, but I remained involved in reviewing and responding to Dr. Becker's report.

40. Dr. Becker distributed a draft report to the parties on September 8, 2008. After each side responded, Dr. Becker issued her final report (the "Becker Report") on December 29, 2008. The Becker Report was highly critical of the STU treatment program. It found a number of areas to be "not minimally adequate/unsatisfactory, and rated others as "barely minimally

adequate/satisfactory." Moreover, Dr. Becker's conclusions echoed many of the findings made earlier by Dr. Prentky.

41.     On February 11, 2009, Deputy Attorney General David L. DaCosta, counsel for the DHS-affiliated defendants, wrote to plaintiffs. Notwithstanding Ms. Mitchell's prior assurances that both sides would trust a jointly-selected expert, Mr. DaCosta largely dismissed the Becker Report, claiming again that most of the items recommended by the expert "were and are already being done." This was surprising to me, in part because one of Dr. Becker's criticisms of the STU was that certain procedures and treatments appeared to exist only on paper. As she put it, "what appears in the manual does not appear to be fully carried out in practice." Mr. DaCosta's letter did state in general terms that DHS would be willing to make certain commitments to change or go beyond the existing program at the STU.

42.     On May 22, 2009, CSJ wrote to DHS with an updated comprehensive settlement proposal, incorporating the findings and recommendations of the Becker Report. As with CSJ's 2006 Settlement Outline, this comprehensive document set forth: (i) areas in which the parties appeared to have reached an agreement; (ii) areas in which plaintiffs were requesting further information from defendants; and (3) plaintiffs' additional settlement demands. One key request made in this May 22, 2009, proposal — a request that defendants had regularly rejected in the past—was for the appointment of an independent Monitor to oversee compliance should a settlement be reached.

43.     On September 18, 2009, shortly after I returned from my sabbatical, DHS responded to our May 22, 2009 proposal. Defendants' counsel remained largely dismissive of the Becker Report and for this reason, among others, appeared to be unserious about settlement even after going through the joint expert process. In the same letter, Mr. DaCosta took the

position for the first time that the Becker Report would be inadmissible in court should the case go to trial. This position seemed deeply at odds with the premises on which his colleague had convinced me to embark on the joint expert plan, but Mr. DaCosta never acknowledged any inconsistency.

44.     On September 21, 2009, we held another status call with Judge Falk. During that call, I recounted the history of the settlement process, described my frustration with DHS's reluctance to accept the findings of Dr. Becker or otherwise engaged in meaningful consideration of plaintiffs' proposals. I also told Judge Falk that CSJ was no longer optimistic that a settlement could be negotiated. I indicated that CSJ would likely abandon settlement proceedings, forgo class certification, and simply proceed with individual claims on behalf of Messrs. Alves, Sessoms, Abdullah and Culbreth. In short, I explained, despite my past optimism and best efforts, I had had enough and did not trust that the defendants had any real interest in meaningful settlement negotiations.

45.     Judge Falk told us that he was disappointed with the prospect of failed negotiations and reiterated that he thought settlement was a wise course, particularly since we had traveled down this road for so long. The judge urged the parties to try again. And committed to increase his personal engagement with settlement negotiations. To that end, shortly thereafter Judge Falk directed counsel to meet in person, in chambers. That conference was originally scheduled for November 2009 but was later rescheduled for January 19, 2010.

46.     In the intervening period, we simultaneously re-assessed plaintiffs' settlement demands and prepared for the possibility of trial. In addition, we learned about a settlement reached by the parties in a Florida case, Canupp v. Sheldon, which also sought improvements to a treatment program for civilly committed former sex offenders. We spent considerable time

speaking with the attorneys in Canupp for guidance on their settlement, and we researched options for post-settlement monitoring, ultimately concluding that we could never accept a settlement without a meaningful monitoring provision. My records reveal, among other things, a 60 page document from this period collating the Becker findings, our demands, and the defendants' most recent responses, which was prepared in an effort to further identify potential areas of agreement.

47.     At the January 19, 2010, in-person settlement conference, Mr. DaCosta was accompanied by his section chief, Deputy Attorney General Susan J. Dougherty. Judge Falk met with both sides—separately—and once again exhorted the parties to press for settlement, particularly in light of what he perceived would be a drawn out, expensive and potentially unproductive litigation process. The parties then met together in a conference room and—for the first time—began to jointly outline the basic contours of what is now the proposed Settlement.

48.     After this meeting, settlement negotiations were intensive and fast-paced. Detailing the settlement process step-by-step during this time would be too voluminous. Throughout 2010 and early 2011 the parties exchanged hundreds of pages of draft agreements, which got progressively longer and more detailed. We met for lengthy periods of time in person on at least three occasions and had multiple phone conversations. As a rule, these conversations were civil; however, they frequently became contentious as each side vigorously advocated for its clients' position. During this time CSJ's process of tracking the settlement demands and offers was meticulous. For nearly every demand that defendants rejected, CSJ demanded concrete reasons. Moreover, we did not relent on any demand until we had made multiple attempts to press for it, had insisted on an alternate arrangement that would address the same concern, or had obtained a valuable concession in another area.

49.     During this period, we met several times in Judge Falk's chambers to discuss settlement progress.  We often surfaced areas of disagreement for the Judge, and he attempted to resolve them on the spot, or motivate the parties to do so themselves.  In each of our meetings, Judge Falk reiterated his strong view that settlement—and the achievement of concrete results— was preferable for plaintiffs to a protracted litigation which plaintiffs could lose or find themselves defending on appeal for many more years.  We kept our clients updated on key developments in the settlement negotiations, and communicated Judge Falk's perspective to them.  Our clients generally agreed with our approach throughout these negotiations.

50.     In the spring of 2010, while these negotiations were going on, the DOC finally announced its plans for relocating the Kearny facility.  DOC planned to move the men from Kearny to new quarters in Avenel, adjacent to the Annex, using a portion of the East Jersey State Prison complex previously devoted to "administrative segregation" cells.  In addition to moving residents from Kearny to Avenel, DOC asserted that it would move enough men out of the Annex itself, and into the new quarters, to alleviate the overcrowding noted by Dr. Becker in her report.

51.     As a result of this move, which was completed by April, 2010, DOC took the position that all of plaintiffs' remaining claims concerning the physical STU facilities were moot. Because a significant portion of our settlement demands with DOC were related to conditions and milieu of the Kearny facility itself, the move to the Avenel facility complicated our settlement process with DOC considerably.  Judge Falk urged us strongly to try to proceed with an agreement with the DHS defendants separately, without prejudice to pursuing claims or a settlement with DOC at a later date.  We accepted the judge's recommendation.  We agreed to set aside our conditions-related claims against DOC, without prejudice to plaintiffs or other

residents later asserting them after the necessary factual development was completed regarding conditions and milieu at the new Avenel facility.  We only agreed to set aside these claims upon condition that we be able to tour the new facility, which we were ultimately able to do (albeit later than we had hoped to).

52.     On April 29, 2011, Mr. DaCosta submitted a copy of the parties' draft settlement agreement to Judge Falk for in camera review, stating that it was "in substantially final form." Thereafter, at a status conference on July 22, 2011, Mr. DaCosta told Judge Falk that the agreement was being circulated to the necessary government agencies and personnel, on an expedited basis, for approval.  When I commenced my leave of absence in August 2011, I believed—and I stated to Visiting Clinical Professor Barbara Moses, who had just arrived to direct the Clinic during my absence—that the Settlement had been fully negotiated and we were simply waiting for the Attorney General's Office to obtain client sign-off.

### The Final Settlement

53.     As set forth in the accompanying Declaration of Barbara Moses, the negotiations were not yet over.  The final Settlement, however, hews closely to the document that I negotiated and in certain respects provides additional benefits to the Class Members.  More importantly, the Settlement reflects many of the demands that plaintiffs originally presented based on the findings of Dr. Prentky and Mr. App, including:  increases in treatment hours for residents and treatment obligations for staff; increased staffing and a higher staff/resident ratio; more recreational time and vocational opportunities; more feedback and transparency from the treatment staff to the residents; objective indications of progress in the treatment program; more in-service training for the STU staff; and a grievance procedure for treatment issues.   From the start, we were aware we would not likely succeed in closing the facility, obtaining a quick release for our clients, or

setting a firm date or limit by which residents would have to be released.  Instead, we focused throughout this case on identifying ways in which the STU staff would be more accountable for their treatment program and ways in which residents would be provided concrete and meaningful opportunities to progress through the treatment phases and thereby regain their liberty.  Our litigation – and hence the settlement – did not address the mechanisms for challenging a resident's commitment through periodic re-commitment hearings pursuant to the SVP statute; residents, through private counsel or counsel appointed by the state, can still challenge the basis for their continued commitment periodically before a designated state court judge.

54.    A key portion of the Settlement— and the part that produced the most difficulty among the parties—was enforcement.  Despite their initial reluctance, defendants ended up agreeing to an independent Monitor to visit the facility annually and assess defendants' compliance with the Settlement.  Defendants also agreed to bring in outside experts on a quarterly basis to evaluate the program and provide in-service staff training, which we thought was an important way to ensure that the treatment program was not frozen in place by the terms of the Settlement.  The Settlement also provides for a Treatment Ombudsman, to whom residents can complain about treatment related issues (e.g., failure to be given certain modules, cancellation of treatment sessions, chronic unavailability of treatment or testing opportunities); the Ombudsman is obligated to forward meritorious complaints to the STU administration and work to remediate a resident's concerns.

55.    In some areas, creative compromise was necessary.  For example, due to the State's difficult budget situation, defendants refused to guarantee that the Legislature would appropriate all of the necessary funding for the Settlement.  Instead, we obtained a provision

permitting plaintiffs to declare the Settlement void, and recommence litigation, as to any provisions that defendants fail to honor due to lack of funding.

56.     Overall, after a decade litigating and attempting to settle this case—including many hundreds of hours studying the clinical literature and the law—I believe the Settlement is fair under the circumstances.  Of course, I would have liked to see even more improvements for the residents of the STU, but the nature of any settlement requires compromise, and in this case I believed that continued litigation carried a non-trivial risk of loss at or before trial, and an even more significant risk that any gains won at trial would not be realized for many years.   In addition, as deeply flawed as I believe the STU treatment program to be, I was and remain concerned that the legal landscape is highly unfavorable for claims of this nature.  Since I first appeared in this case in 2002, the law has gotten only worse for civilly committed sex offenders.

57.     I am enormously sympathetic to the views of the objectors, including those who desire wholesale changes to the Act, and those who would replace the STU with outpatient treatment of the type mandated by the laws of certain other states, and those who believe that each and every one of Dr. Becker's recommendations should be implemented—including those requiring action from the DOC, which is not a party to the Settlement.   As explained in the Moses Declaration, however, the law in this Circuit demands only that a sex offender treatment program be "minimally adequate," and instructs the courts to defer to the therapeutic judgments of clinical staff.  This is a regrettable hurdle in my view, but a real one, which a conscientious lawyer must face.

58. I ultimately conclude that the Settlement is valuable because it does provide concrete improvements of the kind we have been pressing for since 2005, and in a way that is enforceable through the courts.  I believe obtaining these improvements today is better than the alternative:

spending several years litigating the case to trial, where we could lose or—even if we win—spend additional years defending the judgment on appeal.

59.     In addition, I consider what a judgment in this case might ultimately look like.  If plaintiffs are successful at trial, we will prove that the current treatment protocol at the STU does not provide the residents with a realistic opportunity to be cured and/or is not minimally adequate under the circumstances.  This does not guarantee, however, that the Court will ultimately mandate relief that is any more robust than the agreed-upon terms of the Settlement. Indeed, the Court could appoint a Special Master—as was done in another civil commitment case that we studied—who could then take months or years to issue recommendations which, in the end, may look much like those submitted by Drs. Prentky and Becker.  To be sure, the findings of a Special Master would have more weight than the findings of a joint expert or plaintiffs' expert.  But they could still be rejected by the Court, or made the subject of further motion practice and appeals.  On balance, I conclude that this Settlement provides most if not all of the relief that Court or a Special Master would likely compel defendants to do should plaintiffs ultimately prevail in litigation—and the Settlement provides that relief now, not many years in the future.

## Attorneys' Fees

60.    CSJ staff and students have spent thousands of hours on this case since 2002.  I estimate that I spent 1500 hours of my own time on this litigation from 2002 through mid-2011. During the same period, dozens of Seton Hall law students worked on the case under my direction.  The $78,000 fee award offered to CSJ in this case represents a discount amounting to pennies on the dollar compared to a lodestar award under 42 U.S.C. § 1988.  I accepted this exceedingly discounted amount deliberately, because I did not want to hold up a fair Settlement over a fee dispute—particularly in light of the State's budget situation—and because I did not want to create even the slightest impression that CSJ is profiting from the Settlement.

61.    As is always the case when CSJ receives a fee award, the money is used to finance future pro bono litigation undertaken by CSJ clinics.  Neither I nor any of the individual lawyers and students who worked on this case will be paid any portion of the award.

        I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 19, 2012, at New York, New York.

                                                    Baher Azmy