JEFFREY S. CHIESA
Attorney General of New Jersey
R.J. Hughes Justice Complex
25 Market Street, PO BOX 112
Trenton, New Jersey  08625

By:  David L. DaCosta
     Deputy Attorney General
     (609) 341-3689

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

| | |
|---|---|
| RAYMOND ALVES, et al.<br><br>Plaintiffs,<br><br>v.<br><br><br>MERRILL MAIN, Ph.D.,<br><br>et. al.<br><br>Defendants. | HON. DENNIS M. CAVANAUGH, U.S.D.J.<br><br>Civ. Action No. 01-0789(DMS)(MF)<br><br><br><br><br><br><br><br><br><br>**DECLARATION OF DAVID L. DaCOSTA** |

DAVID L. DaCOSTA, of full age, hereby declares and certifies:

1.  I am employed by the State of New Jersey, Department of Law & Public Safety, Division of Law, as a Deputy Attorney General assigned to the Sexually Violent Predator Unit. I have been closely involved with this litigation since September 2005, representing the New Jersey officials responsible for the mental health treatment program at the New Jersey Special Treatment

1

Unit ("STU"). I submit this Declaration in support of the joint motion made by plaintiffs and defendants for an Order approving as fair reasonable and adequate the Settlement Agreement executed on February 3, 2012, as modified by the Settlement Agreement Addendum executed on July 19, 2012.

2. This litigation, which was commenced in 2001, originally involved challenges to the mental health treatment program and the conditions of confinement provided to sexually violent predators civilly committed under the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 et seq. (SVPA). Under the SVPA, the Division of Mental Health and Addiction Services (DMHAS),* within the Department of Human Services (DHS), provides for the treatment of persons committed to the STU, and the Department of Corrections (DOC) provides for their care and custody.

3. By September 2005, when I became involved in the case, a number of separately-filed pro se complaints had been consolidated under this docket number; the Seton Hall Center for Social Justice and Gibbons, P.C. had been appointed as pro bono counsel for plaintiff Raymond Alves and another STU resident;

---

* The SVPA refers to the Division as the Division of Mental Health Services (DMHS). However, in the State's Fiscal Year 2011 Budget, DMHS was formally merged with the Division of Addiction Services to form the Division of Mental Health and Addiction Services.

2

and substantial formal discovery had occurred. In addition, the parties had agreed, on the recommendation of Magistrate Judge Mark Falk, to suspend further discovery and motion practice in order to conduct serious settlement negotiations. To that end, on May 10, 2005, plaintiffs served two written settlement demands, one addressing the mental health/treatment program issues at the STU and the other addressing the custody/facilities issues. At that time, individuals civilly committed under the SVPA were housed in two different STU facilities: one in Kearny, New Jersey and a smaller facility, known as the "Annex," in Avenel.

4. Throughout the settlement negotiations, the Seton Hall attorney/professors (Baher Azmy until the summer of 2011 and then Barbara Moses) and their law students have been at the forefront on behalf of the plaintiffs. In late 2005, however, the firm of Greenberg Traurig LLP advised the Court that it was considering an appearance on behalf of a group of pro se plaintiffs assigned to the Annex, led by STU resident Richard Bagarozy (the "Bagarozy Plaintiffs"). Several months thereafter Ian Marx, Esq., of Greenberg Traurig, entered his appearance on behalf of the Bagarozy Plaintiffs. The Court then scheduled a settlement conference for April 21, 2006. At that conference, Judge Falk facilitated substantive settlement discussions among

3

all counsel, including counsel for the Bagarozy Plaintiffs and counsel for the DOC officials responsible for the STU facilities.

5. The main treatment issues raised by plaintiffs at that time dealt with the initial clinical evaluation and assessment of newly committed individuals; resident "program time," including the amount of time that residents spent in process groups and with therapists; therapist supervision and training; the composition and conduct of process groups; the number and variety of psycho-educational classes (known as "modules") offered to the residents; the availability of individual therapy; the lack of objective standards for progressing through the phases of treatment; the lack of a grievance procedure for treatment issues; the de-escalation of restraints as residents progressed through the program; and the insufficient vocational and educational training opportunities offered to residents. The parties discussed each of these issues, and others, in detail, but were unable to reach any agreements.

6. Professor Azmy, Lawrence Lustberg of Gibbons, and Ian Marx followed up the April 21, 2006 conference with a 29-page document entitled "STU Litigation Settlement Outline," dated May 18, 2006, which commented on our conversation of April 21st and added more detail to plaintiffs' demands. After discussions

with our clients, we took the position that some of plaintiffs' demands were already incorporated into the treatment program at the STU and that, in any event, neither the Constitution nor prevailing professional standards required the changes and guarantees that plaintiffs sought. We discussed these issues in detail at a further conference before Judge Falk on September 29, 2006, after which plaintiffs' counsel sent us another follow-up letter, dated November 9, 2006.

7. We then proposed to our clients the idea of having an independent expert/consultant evaluate the program and make non-binding recommendations to all parties. Throughout the rest of 2006 and 2007, the parties continued to exchange proposals and counter-proposals, while also attempting to find an independent expert upon whom all could agree. The parties eventually identified Dr. Judith Becker, Ph.D., from the University of Arizona as the person to conduct the evaluation. After extensive negotiations over the scope of her evaluation and the manner in which she was to conduct it, the parties agreed upon a settlement protocol, ultimately incorporated into an Order Governing Settlement Procedures entered by Judge Falk on April 3, 2008.

8. Dr. Becker visited the STU in Kearny and the Annex in Avenel in the summer of 2008 and prepared a draft of her report

for comment by both sides. She then presented her final report on December 29, 2008. In connection with Dr. Becker's evaluation, defendants provided her with thousands of pages of documents related to the named plaintiffs and the STU treatment program. Copies of the documents provided to Dr. Becker were also provided to plaintiffs' counsel. In her Final Report, Dr. Becker described her sources of information as follows:

> The following report is based on information I gleaned from the following activities: tours of the Kearney and Annex facilities; review of the treatment program and related documentation, including 23 resident charts, prior consultation reports, other documents that I had requested and were provided, and interviews and/or communication with the following: clinical staff members, including the Clinical Director, the Director of Psychology, the Director of Psychiatry, the Director of Rehabilitation, the Director of Social Work, and relevant DOC administrators. I also interviewed a representative sample of 40 residents including those nominated by the Plaintiffs' attorney, as well as telephonic interviews with 10 residents on conditional release…. It should be noted that I was allowed access to everything I requested and all mental health and correctional staff were extremely cooperative and welcoming.

Final Report [Dkt. 108-3] p. 1.

9. Dr. Becker also stated in her Final Report that "because there does not currently exist a universal set of professional standards for institutions that provide care and

treatment of civilly committed sex offenders, this evaluator was unable to rely on such during the evaluation." Consequently, Dr. Becker stated, in evaluating the STU she relied on professional standards drawn from various sources, and upon her own experience as a clinician and clinical researcher evaluating and treating sexual offenders.

10. Dr. Becker's Final Report found certain aspects of the STU program to be "adequate" and others "inadequate." For example, in evaluating the process groups and modules offered to STU residents, Dr. Becker found the design of the process groups and modules satisfactory, but the "availability and intensity" unsatisfactory. She recommended that each resident be offered a minimum of 15-20 hours per week in direct clinical services.

11. On receipt of the Final Report, plaintiffs' counsel took the negotiating position, in essence, that Dr. Becker's recommendations should be implemented in full. In the view of DMHAS, however, Dr. Becker had gone beyond existing professional standards in her evaluation. DMHAS believed that in many areas she relied instead on her own idiosyncratic standards, and further believed that her recommendations went far beyond what was constitutionally required or affordable by the State. Thus, the immediate effect of her report was to drive the parties further apart in their settlement positions.

12. Negotiations nonetheless continued, and intensified over the course of the next three years. The negotiations were often contentious. Over time, we did agree to a number of the changes demanded by plaintiffs and recommended by Dr. Becker, for example, that residents be given a 50% increase in process group time and that more modules be made available; that pre-and post-module testing be promptly conducted and scored; that in their periodic reviews residents be given clear and objective goals for treatment progress and estimates of the time it will take to achieve those goals; that the STU assist residents in finding housing, jobs and community-based services as part of the discharge planning process; and that DMHAS hire additional staff, including psychologists, to make all of this possible.

13. We believed that several of Dr. Becker's recommendations were already incorporated in the treatment program at the STU—such as her recommendation that the clinical staff prepare a comprehensive assessment of each resident upon commitment. The plaintiffs, however, took the position that the assessments were not being performed consistently or adequately, and we ultimately agreed to write this requirement into the settlement agreement as well.

14. We also agreed to the appointment of a Treatment Ombudsperson; agreed to bring in independent experts in sex

offender treatment to evaluate the program on an ongoing basis and provide in-service training to the STU staff; and agreed to a Court-appointment Monitor to oversee compliance with these provisions. This last issue was particularly hard-fought. DMHAS resisted a Monitor on a number of grounds, including cost and burden, but ultimately assented to the monitoring sought by plaintiffs.

15. We did not, however, agree to guarantee funding for the changes that would be required by our proposed settlement agreement. DMHAS and DHS took the position that since their funding is dependent upon the Governor and the Legislature, they could only agree to make a good-faith effort to seek the necessary appropriations. Plaintiffs pushed us repeatedly on this point, but as New Jersey's budget crisis worsened we remained resolute on the issue. Ultimately, the parties agreed to an alternative mechanism under which plaintiffs would be able to reinstitute litigation as to any settlement provisions that could not be complied with due to insufficient funding.

16. In the final months leading up to execution of the Settlement Agreement the negotiations became even more intense, as the parties went back and forth on the length of the monitoring period and related issues. In addition, plaintiffs' counsel asked for and obtained certain new protections for STU

residents placed on Modified Activities Programming (MAP) or assigned to the South Unit. By this time the Kearny STU had been closed and all individuals civilly committed under the SVPA were housed in Avenel, either in the Annex or in adjacent space that was formerly part of the East Jersey State Prison (EJSP). The South Unit is one of the housing units in the former EJSP space.

17. During the negotiations, including the period after the receipt of Dr. Becker's Final Report, DMHAS and DHS informally provided numerous documents requested by plaintiffs and responded to additional requests for information resulting from plaintiffs' review of these documents. We also helped to arrange a tour of the STU facilities for plaintiffs' counsel in November 2011. Even after the Settlement Agreement was signed, in early 2012, plaintiffs' counsel requested additional documents as "confirmatory discovery," which led to further lengthy and, at times, acrimonious discussion. Defendants eventually agreed to turn over more than 7,000 pages of additional documents and respond to additional interrogatories, and have in fact done so.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
DAVID L. DaCOSTA
Deputy Attorney General
Attorney for Defendants

Date: July 20, 2012