JEFFREY S. CHIESA
Attorney General of New Jersey
R.J. Hughes Justice Complex
25 Market Street, PO BOX 112
Trenton, New Jersey  08625

By: David L. DaCosta
    Deputy Attorney General
    (609) 341-3689

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF NEWARK

| | |
|---|---|
| RAYMOND ALVES, et al. | HON. DENNIS M. CAVANAUGH, U.S.D.J. |
| Plaintiffs, | Civ. Action No. 01-0789(DMS)(MF) |
| v. | |
| MERRILL MAIN, Ph.D., | |
| et. al. | |
| Defendants. | **DECLARATION OF MERRILL MAIN, Ph.D.** |

**MERRILL MAIN, Ph.D.**, of full age, hereby declares and certifies:

1. I am the Clinical Director of the Special Treatment Unit (STU) at Avenel, New Jersey. I joined the staff of the STU in 2002 as Director of Psychology and was promoted to Clinical Director in 2006. I submit this Declaration in connection with the joint motion made by Plaintiffs and Defendants (the Parties) in this

action for an order approving the proposed settlement (Settlement) of this action as fair, reasonable and adequate.

2. The STU is the facility designated by the State of New Jersey to provide custody, care and treatment to the men who are civilly committed under the New Jersey Sexually Violent Predator Act (Act). The Department of Human Services (DHS) through its Division of Mental Health and Addiction Services (DMHAS) is responsible for the mental health treatment provided to residents of the STU, including sex offender-specific treatment as mandated by the Act.

3. The treatment program at the STU incorporates elements of three dominant models in the field of sex offender management and treatment: the risk-need-responsivity model, the relapse prevention model, and cognitive-behavioral treatment model. As discussed below, all of these models are empirically supported by the research in terms of reducing sexual recidivism. In addition, the treatment program at the STU is based on the therapeutic milieu perspective; that is, the perspective that every interaction between a patient and a staff member has therapeutic potential for personal discovery and learning new ways of interacting with others in a healthy way. This treatment philosophy involves the belief that treatment effect not only results from structured group therapy sessions but also evolves from continual interaction

between the residents and the staff and among the residents themselves.

4. Studies conducted since the mid-1990s to assess the effectiveness of treatment for sexual offenders have found lower sexual recidivism rates for treated sex offenders than for untreated sex offenders. More specifically, the rate of sexual reoffending in these studies has been between 5 and 10 percentage points less for offenders in treatment. See Duwe, G. & Goldman, R.A., The Impact of Prison-Based Treatment on Sex Offender Recidivism - Evidence from Minnesota, *Sexual Abuse: A Journal of Research and Treatment*, 21(3), 279-307 (2009); Marques, J.K., Wiederanders, M., Day, D.M., Nelson, C., & Van Ommeren, A., Effects of a Relapse Prevention Program on Sexual Recidivism: Final Results from California's Sex Offender Treatment and Evaluation Project (SOTEP), *Sexual Abuse: A Journal of Research and Treatment*, 17(1), 79-107 (2005). The strongest evidence is from the collaborative outcome data project by Hanson et al. (2002), which included data from a wide range of programs and over 9,000 sex offenders. See Hanson, R. K., Gordon, A., Harris, A. J., Marques, J. K., Murphy, W., Quinsey, V. L., & Seto, M. C., First Report of the Collaborative Outcome Data Project on the Effectiveness of Psychological Treatment for Sex Offenders, *Sexual Abuse: A Journal of Research and Treatment*, 14(2), 169-194 (2002). That analysis found the rate of sexual reoffending was significantly lower for

treated offenders (12.3%) than for comparison groups (16.8%). A similar pattern was found for general recidivism, although overall rates of reoffending were higher: treatment group (27.9%) versus comparison group (39.2%). Current approaches examined in the study, including cognitive behavioral therapy, demonstrated a reduction in both sexual and general recidivism.

5. Consistent with our view that sex offender treatment can reduce sexual recidivism, the staff of the STU strives to engage the residents in treatment. Further, when we believe that a resident has made sufficient gains in treatment such that further involuntary commitment is unnecessary for that person, we recommend that he be conditionally discharged from the STU in accordance with the Act. In some cases, treatment alone is not sufficient to reduce sexual re-offense risk so as to provide for adequately safe discharge. In such cases, the evaluators at the STU consider whether some form of ongoing post-discharge conditions will sufficiently contain the remaining risk. The treatment program at the STU is divided into phases, from phase 1 (Orientation) to phase 5 (Transition). In almost every case where we have recommended conditional discharge, the resident has reached phase 5 of the program.

6. The therapeutic modalities used at the STU are consistent with established guidelines for the institutional treatment of sex offenders, and I believe that the treatment currently provided to

4

the residents is within the range of accepted professional judgment, practice, and standards for sex offender treatment. I recognize, however, that the field of sex offender treatment is evolving, and that other professionals in the field have recommended changes to the STU program, including an increase in the number of group therapy sessions (known as process groups) offered to residents on a weekly basis, increased availability of psychoeducational modules, and a corresponding increase in the ratio of treatment staff to residents. I am hopeful that these increases, together with other changes now incorporated into the proposed Settlement, will enable those residents who are motivated and who wish to progress through treatment to do so faster and more effectively.

    7. The Settlement also provides for outside experts in the field of sex offender treatment and assessment to train staff in the latest advancements in sex offender treatment on a quarterly basis and provide the STU administration with valuable feedback and suggestions regarding the policies and practices of the treatment program.

    8. Even in advance of the approval of the Settlement, the STU has taken certain steps to implement some of the terms of the Agreement. For example, we are currently:

- Developing pre- and post-module testing for all psychoeducational modules;

- Providing copies of module outcomes including pre/post-test results to chart and resident;

- Discussing module outcomes, including pre/post-test results, with residents in process group;

- Reviewing the contents of the Resident Guide during new resident orientation;

- Revising and updating the Resident Guide;

- Implementing a newly developed post-discharge placement form (which will be reviewed and updated annually);

- Implementing a newly developed Comprehensive Treatment Plan, which incorporates past treatment progress and evaluations, when available, sets out anticipated time frames for completion of goals and recommendations for additional privileges, and addresses any need for individual therapy and any recommendations for that individual therapy;

- Incorporating new elements into our six-month treatment plan reviews, including current phase designation, any recommendations made for change in phase designation, anticipated time frames for completion of goals, and any MAP restrictions during the review period;

- Conducting MAP groups twice per week (prior to the Settlement, MAP groups were only meeting once a week);

- Utilizing a revised TPRC Report Receipt form, which includes a section indicating that the treatment staff has discussed the report with the resident; and

- Conducting individualized vocational assessments for residents, beginning with those in Phase 4.

9.   In addition, DHS has received the necessary approvals to hire the additional staff required to implement the Settlement, include nine additional psychologists.  Similarly, I am advised

that the Department of Corrections has already posted the position for the Treatment Ombudsman.

10. I have been advised by DHS fiscal staff that, exclusive of legal fees, the Settlement is estimated to cost the State approximately $1,045,000 annually.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DATE:**   July 18, 2012                                 _Merrill Main, PhD_
                                                         **MERRILL MAIN**