<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **RAYMOND ALVES,** *et al.*, <br><br>            **Plaintiffs,** <br><br>   **v.** <br><br> **MERRILL MAIN, Ph.D.,** *et al.*, <br><br>           **Defendants.** | **Civil Action No. 01-789 (DMC)** <br><br><br> <u>**OPINION**</u> |

<u>**CAVANAUGH, U.S.D.J.**</u>

     This action began with the filing of a *pro se* complaint by Plaintiff Raymond Alves more than a decade ago. Since then, the case has transformed into a large-scale consolidated class action on behalf of all involuntarily civilly committed residents of New Jersey's Special Treatment Unit ("STU") in Avenel, New Jersey, confined pursuant to the New Jersey Sexually Violent Predator Act, N.J.S.A. 30:4-27.24, *et seq.* ("NJSVPA" or "the Act").

     Represented *pro bono* by the Seton Hall Law School Center for Social Justice and Gibbons P.C., the plaintiff class challenges the mental health treatment provided at the STU, alleging that the New Jersey Department of Human Services does not provide minimally adequate treatment required by federal and state law. After years of litigation followed by years of complex and intense settlement negotiations, a class wide settlement has been reached that the settling parties contend substantially improves the treatment available at the STU and provides the residents with a better opportunity to regain their liberty.

Presently before the Court is the joint motion for final approval of the parties' settlement. [CM/ECF No. 193.]  The parties, through their counsel, seek: (1) approval of the proposed Settlement Agreement; (2) a nominal award of attorney's fees to Class Counsel; and (3) the appointment of a monitor in furtherance of the Settlement Agreement.  The papers submitted have been carefully considered, as have objections to the settlement.  A Fairness Hearing was held on November 13, 2012.  For the reasons that follow, the Court **approves** the final settlement and **grants** attorney's fees to the Seton Hall Law School Center for Social Justice in the amount of $78,000.  The Court will appoint a monitor by separate order.

I.      **BACKGROUND**[1]

A.      **The Parties**

Plaintiffs are Raymond Alves, Derrick Sessoms and Michael Culbreath on behalf of themselves and a class consisting of all persons involuntarily confined to the STU under the New Jersey Sexually Violent Predator Act.[2]  Defendants are Merrill Main, Ph.D., in his official capacity of Clinical Director of the STU; Jennifer Velez, in her official capacity as Commissioner of the New Jersey Department of Human Services ("DHS"); Lynn A. Kovich, in her official capacity as Assistant Commissioner of the New Jersey Division of Mental Health and Addiction Services ("DMHAS"); and Jeffrey Chiesa, in his capacity as the Attorney General of New Jersey.

B.      **Overview**

Plaintiffs are convicted sex offenders who have completed prison sentences but remain involuntarily confined pursuant to the NJSVPA, which authorizes the indefinite civil

---

[1] Aspects of this Opinion are drawn from the parties' joint submission.

[2] At times in this Opinion, Plaintiffs and the Class are referred to as "residents."  This is the term the parties use to refer to individuals confined to the STU.

commitment of any individual determined to be a "sexually violent predator."   N.J.S.A. 30:4-27.26.   A sexually violent predator is defined as a person who has been convicted of at least one sexually violent offense and who suffers from "a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment."  Id.  The "secure facility" that houses the Plaintiffs in this case is the STU in Avenel, New Jersey, which is operated by the New Jersey Department of Corrections.  N.J.S.A. 30:4-27.34(a).

Once committed to the STU, a sexually violent predator remains there until such time as a state court finds that he "will not be likely to engage in acts of sexual violence," in which case he may be "conditionally discharged."  N.J.S.A. 30:4-27.32(c)(1).  In order to be "conditionally discharged," the individual must establish that he has been successfully treated for the mental abnormality or personality disorder that was the basis for his confinement to the STU.  In order for residents to have a meaningful opportunity to work toward a potential release, the Act provides that class members receive mental health treatment, which is provided by the New Jersey Department of Human Services.  N.J.S.A. 30:4-27.34(b).

Plaintiffs claim, *inter alia*, that the various Defendants have failed to provide the class with adequate mental health treatment required by federal and state law.  Mental health treatment is key for STU residents.  As discussed below, without adequate mental health treatment, Plaintiffs and the class members will likely never be released from the STU.  However, with adequate treatment, the residents have an opportunity to show that they have been cured of their mental abnormality and deserve a conditional discharge.

C.    **The STU – Present Day**

Dr. Main, the clinical director at the STU, has submitted a declaration that details the treatment programs presently in place at the facility.  According to Dr. Main, the primary therapy provided to Class Members is a form of group therapy administered in "process groups."  The process groups are supplemented, for some residents, by individual resident specific, psycho-educational "modules" devoted to topics such as victim empathy, relapse prevention, and arousal reconditioning.  (Declaration of Merril Main, Ph.D. ("Main Decl.") ¶ 3.)  At present, two process groups are offered to the residents per week.

The treatment program at the STU is divided into phases, from phase 1 (Orientation) to phase five (Transition).  (Main Decl. ¶ 5.)  When the STU staff believes that a resident has sufficiently progressed through the stages and further involuntarily commitment is unnecessary, a conditional discharge is recommended pursuant to the Act.  (Id.)  Dr. Main states that in nearly every case where a conditional discharge has been recommended, the resident had reached stage 5 of the program.  (Id.)   Discharge of STU residents is rare; since the Act was implemented in 1999, 525 individuals have been committed under the NJSVPA.   (Declaration of Barbara Moses, Esq. ("Moses Decl.") ¶ 22(a).)[3]  Of the 525 individuals committed, 47 residents have been released from the STU into the community at large.  (Id.)  Of the 47 residents released from the STU, 28 were discharged, in accordance with the recommendation of their treatment team, after reaching stage 5 of the treatment program.  (Id.)  The remaining 19 were released by state courts at phases 1-4 of the treatment program, nearly always over the objection of the STU treatment team.  (Id.)

---

[3] Ms. Moses is a Visiting Clinical Professor at Seton Hall University School of Law and serves as the Director of the Civil Rights and Constitutional Litigation Clinic at Seton Hall's Center for Social Justice, co-class counsel in this case.  (Moses Decl. ¶ 1.)

As of June 26, 2012, the total population of the STU stood at 469. (Moses Decl. ¶ 22(d).) 165 of these residents have been continuously confined for 10 years or more. (Id.) As of May 4, 2012, there were 5 men confined to the STU who had reached stage 5 of the treatment program and 20 men in phase 4. (Id.)

## D.    **The Operative Complaint**

Plaintiffs in this case challenge the quantum and quality of therapy offered, contending it is inadequate. Plaintiffs' Second Amended Complaint ("SAC") alleges inadequacy with respect to current treatment at the STU based on, among other things, the following:

- That Defendants offer Class Members a maximum of two 90-minute process groups per week, and that the groups are often overcrowded, start late, or end early, further reducing therapy time (SAC ¶¶ 32-33);

- That Defendants prevent many Class Members from enrolling in the modules they need in order to progress in treatment by failing to offer those modules at all or offering them too infrequently (SAC ¶¶ 34-35);

- That Defendants arbitrarily restrict certain Class Members (particularly those housed in the South Unit) from enrolling in therapy sessions that meet elsewhere in the STU, thus preventing them from completing modules prescribed for them and necessary for advancement (SAC ¶¶ 36-37);

- That Defendants improperly withhold therapy as punishment for infraction of STU rules (SAC ¶ 38);

- That Defendants fail to give Class Members timely and concrete information concerning the criteria used to evaluate their treatment progress and readiness for release, the goals they must accomplish in order to progress towards discharge, and the time it will take to do so, leading to confusion, frustration, and a counter therapeutic sense of hopelessness throughout the STU (SAC ¶ 42);

- That Defendants fail to assist Class Members with the discharge planning that is crucial to convince a court that they can in fact be safely released (SAC ¶ 43);

- That treatment is not adequately tailored to the specific needs of each Class Member, as required by the NJSVPA (SAC ¶ 31);

● That these deficiencies are caused in part by Defendants' failure to hire and retain sufficient qualified mental health professionals with training in sex offender specific treatment (SAC ¶ 33);

● That as a result of these deficiencies, few Class Members have been able to regain their liberty, even conditionally, and few are now sufficiently advanced in the treatment program to have a reasonable hope of discharge in the foreseeable future (SAC ¶¶ 39-41); and

● That although the DOC has appointed an ombudsman to address complaints about the STU facilities or security issues, there is no comparable mechanism for addressing complaints regarding the treatment program, leading to frustration—and a large number of *pro se* complaints by STU residents (SAC ¶ 44).

## E.   <u>Relevant Procedural History</u>

### i.      <u>Commencement of the Action</u>

On February 15, 2001, the original Complaint in the <u>Alves</u> case was submitted *pro se* by Plaintiff Raymond Alves.  On March 9, 2001, this Court granted Alves *in forma pauperis* status, directed that his Complaint be filed, and appointed *pro bono* counsel.  On July 30, 2002, the Seton Hall University School of Law Center for Social Justice, through its then director, Baher Azmy, Esq., entered an appearance as *pro bono counsel* for Mr. Alves.  (Declaration of Baher Azmy, Esq. ("Azmy Decl.") ¶¶ 1-3, 6.)[4]  Gibbons P.C., through Lawrence S. Lustberg, Esq., has joined the Center for Social Justice as *pro bono* co-counsel for Plaintiffs.

On October 25, 2002, Alves filed an amended complaint asserting claims against both the DHS officials responsible for the mental health program at the STU and New Jersey Department of Corrections officials responsible for the STU facility where Alves was confined at the time, then located in Kearney, New Jersey.  (Azmy Decl. ¶¶ 7-11.)  On November 17, 2003, this Court granted in part a pre-answer motion to dismiss the Amended Complaint, finding that the

---

[4] Mr. Azmy is the Legal Director of the Center for Constitutional Rights in New York, and is on leave from Seton Hall University School of Law, where he was a Professor of Constitutional Law and Director of the Center for Social Justice.  (Azmy Decl. ¶ 1.)

NJSVPA was non-punitive on its face, and that, after <u>Seling v. Young</u>, 531 U.S. 250 (2001), a plaintiff could not state a viable claim under the Double Jeopardy Clause on the theory that the Act was punitive "as applied." (Opinion dated November 17, 2003, at 9-11.) This Court also dismissed Plaintiff's claim under the Equal Protection Clause. (<u>Id.</u>)

### ii.    **Discovery & Consolidation**

From 2003 through 2005, the parties engaged in extensive discovery, including written discovery and depositions. (Azmy Decl. ¶¶ 14-26.) During this general time frame, approximately 30 additional cases filed by *pro se* residents of the STU were consolidated into the <u>Alves</u> case. (Declaration of David L. DaCosta, Esq. ("DaCosta Decl.") ¶ 3.) These consolidations included the case captioned <u>Bagarozy v. Harris</u>, 04-3066, which was filed by a group of STU residents led by Richard Bagarozy (the "Bagarozy Plaintiffs"). Prior to consolidation of the <u>Bagarozy</u> case into <u>Alves</u>, the Honorable Faith Hochberg, U.S.D.J., entered an Order granting the Bagarozy Plaintiffs' request for *pro bono* counsel, and eventually the law firm of Greenberg Traurig, LLP entered an appearance on behalf of the Bagarozy Plaintiffs. (DaCosta Decl. ¶ 4.)

### iii.    **Settlement Negotiations**

Starting in late 2004 and gaining steam in early 2005, the parties decided to concentrate on settlement negotiations with the goal of resolving all cases on behalf of all STU residents on a class wide basis. (Azmy Decl. ¶¶ 20-21.) Although no formal motion to amend the complaint or certify a class was brought at that time, it was understood by all that, given the nature of the relief sought and the alterations to the treatment structure at the STU that were being discussed, negotiations on a class-wide basis were the only feasible way for the case to resolve. This began

a period of intensive settlement negotiations, which were hard-fought and often highly contentious.  (Azmy Decl. ¶¶ 27-38; DaCosta Decl., ¶¶ 3-4; Moses Decl. ¶¶ 6-9.)

In 2008, after the parties had reached an impasse over what would constitute adequate mental health treatment at the STU, the parties agreed upon the utilization of a joint neutral expert, Judith Becker, Ph.D., who was selected by Plaintiffs' *pro bono* counsel and Defendants. (Azmy Decl. ¶¶ 36-38; DaCosta Decl. ¶7.)  The concept was that Dr. Becker would review the existing STU treatment program, offer her opinion on the program, and produce a report, which would be considered solely for purposes of breaking the stalemate in settlement discussions.  On December 29, 2008, Dr. Becker issued her report.  (See Report of Judith V. Becker, Ph.D., attached to the Certification of Ian Marx, Esq., as Exhibit C (the "Becker Report").)

Negotiations were continuing into 2010 when Alves and others were moved from Kearney, New Jersey facility to the current STU located in Avenel.  As a result of this move, the Department of Corrections and DOC-affiliated defendants took the position that the claims against them were moot.  (Azmy Decl. ¶¶ 50-51.)  In response, the parties agreed to work primarily toward a settlement of Plaintiff's treatment related claims, which were pending only against the Department of Health and Human Services and DHS-related defendants.  (Azmy Decl. ¶¶ 51-52.)   Although the DOC defendants were not formally dismissed at this time, the case turned away from DOC issues and toward resolving the treatment claims against the DHS defendants.

## II.  <u>OVERVIEW OF THE SETTLEMENT AGREEMENT</u>

In September 2011, the parties agreed to a tentative settlement, which required final approval from various levels of the state government.  (Azmy Decl. ¶ 52; Moses Decl. ¶ 15.)

On January 20, 2012, the Court conducted an in-person conference with counsel at which it was represented that counsel had authority to finalize the settlement agreement. (Moses Decl. ¶ 16.) In attendance, by video conference, were the three lead plaintiffs in the case, Raymond Alves, Michael Culbreath, and Derrick Sessoms. (Id.)

On February 3, 2012, the Settlement Agreement was executed. (Moses Decl. ¶¶ 16-17 & Settlement Agreement (attached as Exhibit A).)[5] The settlement requires Defendants to improve both the quantity and quality of the mental health treatment offered in the STU, thereby affording Class Members a better chance to be released from the facility. The Settlement Agreement itself is a lengthy document, running 35 single-spaced pages with an additional 35 pages of exhibits. The crux of the settlement is to respond to the issues in the Complaint and increase the volume and availability of treatment. Some of the more pertinent terms are the following.[6]

- **_Guarantee of Comprehensive, Individualized Treatment Plan_**. The Settlement Agreement requires that Defendants provide every member of the STU with a comprehensive treatment plan within 45 days of the individual's commitment to the facility. (Moses Decl., ¶ 19(a).) The treatment plan must be narrowly tailored to the individual resident's needs. (Id.) Moreover, the plan will be reviewed every six months by the resident's treatment team and once a year by the STU's Treatment Progress Review Committee ("TPRC"). (Id.)

- **_Guarantee of Therapy Hours_**. The Settlement Agreement increases and guarantees a specific number of hours of treatment. Upon approval, Defendants are required to offer "every class member (including detainees not yet committed who nonetheless wish to commence treatment, but excluding residents who refuse treatment and those on MAP)[7] a minimum of 20 hours per week of professionally-led or professionally monitored therapeutic programming,

---

[5] An addendum to the Settlement Agreement was executed in July 2012. (Moses Decl., Ex. B.)

[6] The pertinent settlement terms are merely summarized herein. In the event the description of settlement terms in this Opinion conflicts with the actual language of the Settlement Agreement, the Settlement Agreement, of course, controls.

[7] MAP is a program generally reserved for residents displaying more volatile or problematic behavior. A more fulsome discussion of the MAP program can be found in prior opinions. See Fournier v. Corzine, No. 07-1212, 2007 WL 2159584, at *8 n.11 (D.N.J. July 26, 2007).

regardless of the resident's living quarters."  In addition, the "therapy offered must include, at a minimum, three 90-minute process group sessions per week, one to two psycho-educational modules, if recommended for that resident, and a 90-minute self help group . . . .  If a module recommended to a resident in phase 3 or higher is unavailable, Defendants must provide that resident with the equivalent self-study materials." (Moses Decl. ¶ 19(b).)  Although residents on program MAP "may not be entitled to the full 20 hours of therapy, they will continue to attend their core therapy, consisting of regularly scheduled process groups and modules, unless therapeutically contraindicated.  Residents on tier or wing MAP will be offered twice-weekly MAP process group."  (Id.)

- ***No Changes in Program Phases Without Notice***.  The Settlement Agreement provides that Defendants may not increase the number of treatment phases (as discussed previously, presently at 5) without notice to Class Counsel.  And the treatment phases cannot be altered so as to intentionally prolong a resident's confinement to the STU.  (Moses Decl. ¶ 19(c).)

- ***Communication and Feeedback for Residents***.  The Settlement Agreement provides that "[t]he treatment plans, six-month reviews and TPRC reviews must include specific and individualized recommendations for each resident's treatment goals.  Residents must be informed of the objective criteria needed to meet those goals (for example, completion of certain modules and successful post-module testing) and must be given anticipated time frames for completion of the objective criteria and for attainment of their ultimate treatment goals.  Similarly, the TPRC reports must include an anticipated time frame for promotion for the next phase of the program.  In addition, Defendants must adopt objectively measurable pre-and post module testing and provide residents with their results within 15 days of the test.  Defendants must also inform the residents of any significant decision regarding their treatment . . . both orally and in writing within 15 days." (Moses Decl. ¶ 19(d).)

- ***Post-Discharge Preparation***.  The Settlement Agreement requires that social work staff at the STU develop a discharge plan for residents in phase 4 or higher, which includes requiring the staff to assist with housing and obtaining the support necessary for discharge.  (Moses Decl. ¶ 19(e).)

- ***Vocational, Educational, and Recreational Opportunities***.  "Defendants must conduct an individualized vocational assessment of each resident within 45 days of final commitment, develop a plan for building on his skills and strengths, and offer each resident not on MAP or treatment refusal status an average of 10 weekly hours of institutional (paid) work or other vocational activities.  Residents will also be entitled to ten hours of educational activities per week, including GED coursework. . . . Recreational activities must also be available six days per week."  (Moses Decl. ¶ 19(f).)

- ***Hire Additional Treatment Staff***.  The STU must hire additional licensed and qualified therapists so that the therapist to resident ratio is 8 therapists for every 50 residents.  Therapists must spend 16 hours a week in direct contact with the residents.  (Moses Decl. ¶ 19(g).)

- ***Staff Training & Evaluation***.  The Settlement requires the DHS to retain independent experts in the field of sex offender treatment and have at least one expert visit the facility per quarter.  The expert will evaluate the STU program, report his or her findings to the STU administration and provide continuing education to the STU's therapists and staff.  (Moses Decl. ¶ 19(h).)

- ***The Appointment of a Treatment Ombudsperson***.  The Settlement Agreement requires Defendants to retain a treatment ombudsperson who will establish a resident complaint system for treatment issues.  The ombudsperson will be required to investigate all treatment related complaints and report back to residents.  The ombudsperson will also meet with the residents in town hall meetings.  (Moses Decl. ¶ 19(i).)

- ***The Appointment of an Independent Monitor***.   The Settlement Agreement will also result in the appointment of a neutral monitor by the Court.  The monitor will be responsible for conducting annual inspections of the facility, during which he or she will be given full access to the facilities, residents and staff.  The agreement also provides that the monitor will prepare a written report regarding defendant's compliance for the period being evaluated, which will be provided to counsel for Plaintiffs and Defendants.  Defendants will then have a period to respond to the monitor's report.  If Defendants lodge objections and they are overruled, Defendants will have a 75 day period to cure any deficiency identified.  If they fail to do so, Plaintiffs can seek enforcement from the Court or declare the provisions null and void and resume litigation.  The monitoring period is for a presumptive five years.  There are certain triggers that can shorten the monitoring period for specific provisions to no less than 3 years.  (Moses Decl. ¶ 19(j).)

- ***Preservation of Individual Claims***.  The settlement agreement also preserves for class members the right to pursue damages with respect to any claims not alleged in the Second Amended Complaint, including tort claims.  (Moses Decl. ¶ 31(a) citing Settlement Agreement § Section IX.)


**III.    CERTIFICATION OF THE CLASS & PRELIMINARY APPROVAL**

On March 24, 2012, Plaintiffs filed an amended consolidated class action complaint,

which remains the operative pleading.[8]  Shortly thereafter, the parties filed a joint motion for

class certification and preliminary approval of the settlement.  By Order dated March 29, 2012,

modified on April 4, 2012, this Court certified a class pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(2) that is defined as:

> all persons who are committed or confined pending commitment to
> the New Jersey Special Treatment Unit pursuant to the New Jersey
> Sexually Violent Predator Act, N.J.S.A. 30:4-27.24, *et seq.*

(Order dated April 4, 2012; CM/ECF No. 158.)

This Court also: (1) found that the settlement is "preliminarily approved as fair,

reasonable and adequate subject to further consideration by this Court"; (2) designated Plaintiffs

as class representatives; (3) appointed Gibbons P.C. and Seton Hall's Center for Social Justice as

Class Counsel; (4) approved the form and manner of notice to be given to the class, including a

deadline for class members to submit objections; and (5) scheduled a Fairness Hearing.  Id.

The Class includes approximately 471 residents of the STU.  (Declaration of Barbara

Moses, Esq., Regarding Notice and Objections, dated June 12, 2012 ("June 12 Decl.") ¶  8;

CM/ECF No. 177.)  Notice of the settlement was provided to all class members who were given

a chance to submit objections.  (June 12 Decl. ¶¶ 4-7.)[9]  Approximately 156 objections to the

settlement have been received.  (June 12 Decl. ¶ 9.)

Thereafter, Class Counsel and Defendants submitted a joint motion for final approval of

the settlement.  *Pro bono* counsel for the Bagarozy Plaintiffs submitted a brief in opposition to

---

[8]  Of note, the Department of Corrections and the DOC-related defendants are not named in the
SAC and the parties, and any related claims, are not part of this settlement.  (Moses Decl. ¶
31(e); Azmy Decl. ¶ 51.)

[9] Rule 23(e) requires that notice of a proposed class settlement be provided "in a reasonable
manner to all class members who would be bound."  Id.  Here, no legitimate challenge to the
adequacy of class notice has been made.  And the fact that a number of objections have been
received confirms that notice of the proposed settlement was adequate.

the settlement.  Generally speaking, as is discussed more below, the Bagarozy Plaintiffs are

dissatisfied with the settlement because it does not incorporate all of the recommendations of Dr.

Becker, the expert who evaluated the STU during settlement negotiations.  This group of

Plaintiffs also objects to the settlement's lack of guaranteed funding.  In addition to the brief

from the Bagarozy group, 156 objections were received by individuals confined to STU.  These

objections are, at times, difficult to understand and run the gamut from objecting to issues or

parties that are not involved in the case, to seeking millions of dollars in damages, even though

this is an injunctive class action.

On November 13, 2012, a Fairness Hearing was held pursuant to Federal Rule of Civil

Procedure 23(e)(2).  Appearing for Plaintiffs was Class Counsel, Seton Hall's Center for Social

Justice and Gibbons, as well as three Seton Hall Law School students working under the

supervision of Professor Moses.[10]  *Pro bono* counsel Greenberg Traurig appeared for the

Bagarozy Plaintiff/Objectors.  Also appearing was Jack Furlong, Esq., representing two Plaintiffs,

William Moore and Maryann Hysler.[11]

## IV.   APPROVAL OF CLASS ACTION SETTLEMENTS

Under Rule 23, a court may only approve a class settlement after it has held a hearing and

determined that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The

fairness of a class action settlement is most commonly evaluated by consideration of the factors

---

[10] The students are Lisa Savadjian, Rose Harper, and Kyle Bruno.  (Transcript of Fairness Hearing, dated November 13, 2012 ("Tr.") at 3:21-25.)

[11] Lamont Brooks and Douglas Minatee, two former residents of the STU, also appeared at the Fairness Hearing and placed comments on the record.  (Tr. at 49:4-56:4.)  However, the Court notes that neither Mr. Brooks nor Mr. Minatee are class members since neither is confined to the STU.

found in <u>Girsch v. Jepson</u>, 521 F.2d 153 (3d Cir. 1975):

> 1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

The <u>Girsch</u> factors are a guide and the absence of one or more does not automatically render the settlement unfair.  See <u>In re Am. Family Enter.</u>, 256 B.R. 377, 418 (D.N.J. 2000). Rather, the Court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness.  See <u>In re AT&T Corp. Secs. Litig.</u>, 455 F.3d 160 (3d Cir. 2006).  In addition, a district court should consider whether the settlement is proposed by experienced counsel who reached the agreed-upon terms through arms-length bargaining.  See <u>In re Warfain Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004). Settlement of litigation is generally favored by courts, especially in the class action setting.  "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.</u>, 55 F.3d 768, 784 (3d Cir. 1995); <u>see also</u> <u>In re Warfain</u>, 391 F.3d at 535 (noting the "overriding public interest in settling class action litigation").  At the same time, the district court functions as "a fiduciary who must serve as a guardian of the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate."  <u>In re General Motors</u>, 55 F.3d at 785.  In sum, the Court's evaluation of the settlement is guided by the <u>Girsch</u> factors, but the Court is "free to consider other relevant

considerations and tacts involved in the settlement." Colon v. Passaic County, No. 08-4439,

2012 WL 1457764, at *2 (D.N.J. Apr. 24, 2012).

**V.      APPLICATION OF THE GIRSCH FACTORS**

      **1.     Complexity, Expense and Likely Duration of the Litigation**

This factor is intended to "capture 'the probable cost, in both time and money, of

continued litigation.'" In re General Motors, 55 F.3d at 812 (quoting Bryan v. PPG Indus., 494

F.2d 799, 801 (3d Cir. 1974)). Where the complexity, expense, and duration of litigation are

significant, the Court will view this factor as favoring settlement. In re Prudential Ins. Co. of

Am. Sales Practices Litig., 962 F. Supp. 450, 536 (D.N.J. 1997) ("Prudential I").

If this action were to continue, the parties would expend considerable time and money

pursuing their claims. Absent settlement, additional discovery would be required, including

depositions, additional expert discovery and dispositive motion practice. If the action survived

dispositive motion practice (in whole or in part), a trial would also be required, which could take

weeks. Appeals that would likely follow could take additional years. Added to all of this would

be the further complication that the consolidated cases contain a mix of individual *pro se*

litigants who would likely seek to pursue individual claims. By reaching a settlement now, the

parties "avoid[] the costs and risks of a lengthy and complex trial." Ehrheart v. Verizon

Wireless, 609 F.3d 590, 595 (3d Cir. 2010). Since continued litigation would be time-consuming

and expensive, settlement makes eminent sense. This factor weighs in favor of approving the

settlement.

      **2.     Reaction of Class**

The second Girsch factor evaluates whether members of the class generally support or

object to the settlement.  See In re General Motors, 55 F.3d at 812.  In order to properly evaluate the settlement, "the number and vociferousness of the objectors" must be examined.  Id. Generally, "silence constitutes tacit consent to the settlement."  Id.

Here, there are approximately 471 members in the Class.  (See June 12 Decl. ¶ 8.)  Two-thirds of the class did not submit timely objections to the settlement.  (Id.)  Thus, the Court presumes that two-thirds, or approximately 312 class members, support the settlement.  See In re General Motors, 55 F.3d at 812.  This is strong support in the STU community for approval of the Settlement Agreement.  See, e.g., Pack v. Beyer, No. 91-3709, 1995 WL 775360, at *6 (D.N.J. Dec. 22, 1995) (approving prison conditions settlement with more than 40% of class objecting because, in part, "a clear majority of the class favors settlement").  The two-third support is even more impressive because Class Counsel states that she observed a flyer posted in the STU, which was apparently created by an objecting member of the class, attempting to gather support for opposition to the settlement, stating: "Counsel has told us that the more residents that make valid challenges, the better chance we have of getting a better deal."  (June 12 Decl. ¶ 7.) The Court does not comment on the flyer to suggest that the effort was in any way improper, but rather to illustrate that, despite this effort, more than two-thirds of the class (i.e., over 300 STU residents) agreed with the settlement reached.  (Moses Decl. ¶ 29.)  Thus, overall, the Court considers the reaction of the class to be very positive.

Objections to the settlement were also received.  The Bagarozy Plaintiffs, through *pro bono* counsel, the Greenberg Trauig law firm, submitted a brief, which primarily objects to the settlement based on their concern that the settlement does not incorporate all or mostly all of the report of Dr. Becker.   In addition, the Court received 156 timely *pro se* objections to the settlement, which amounts to about one-third of the class.  (June 12 Decl. ¶ 9.)  These objections

16

were submitted by un-counseled class member residents of the STU and touch on a wide range

of issues.   Some of the objections are difficult to understand, and many are repetitive.[12]

Moreover, a number of the objections lack legal merit on their face[13] and/or are "the result of a

fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge

of the ramifications to class members of a court-approved settlement, and unrealistic or overly

optimistic expectations."  Hawker v. Consovoy, 198 F.R.D. 618, 628 (D.N.J. 2001).[14]  Class

Counsel has submitted a declaration that attempts to summarize these *pro se* objections.  (See

generally June 12 Decl.)

 Turning to the objections, the Court begins with Dr. Becker's report.

**(i) Objections Based on the Becker Report**

 Judith Becker, Ph.D., evaluated the STU facility in 2008, pursuant to a Court-approved

regimen for the sole purpose of aiding settlement negotiations.  Following the evaluation, a

report was issued in which Dr. Becker opined on whether aspects of the facility were "minimally

adequate/satisfactory" or "not minimally adequate/unsatisfactory."  (See Procedures of Joint

---

[12] For example, a number of objections are presented in the context of form letters, which means that the letter was prepared by a resident (or residents) and then circulated to others who changed the name on the letter and submitted it.  Form letters like those described are submitted multiple times and are signed by various class members, sometimes with alterations and comments. (June 12 Decl. ¶ 12.)

[13] By way of example only, one objection complains about life in the STU but also states that the objector generally "does not wish to escape and that if the doors were opened he would get some burgers but return to the STU to eat them." (Moses Decl. ¶ 25(d).)

[14] In cases of this type, it is not unusual to have a large number of objections, nor is it unusual for a court to approve a settlement over such objections.  See, e.g., Reed v. General Motors Corp., 703 F.2d 170 (5th Cir. 1983) (approving settlement over objections of more than 40% of class members and 23 out of 27 named plaintiffs); Austin v. Pa. Dep't of Corr., 876 F. Supp. 1437, 1472 (E.D. Pa. 1995) (approving settlement related to prison conditions over objections of 457 class members); Hawker, 198 F.R.D. at 628 (approving prison conditions settlement over objections from 250 class members); Pack, 1995 WL 775360, at *5 (approving prison conditions settlement over objection from 41% the class)

Expert Review and Evaluation; CM/ECF No. 214 at 41.)   The primary objection to the settlement, from counseled objectors like the Bagarozy Plaintiffs and from *pro se* objector/class members alike, is that the settlement agreement does not adopt *all* or nearly all of the Report's recommendations.

This objection confuses the appropriate inquiry for evaluating the fairness of the settlement, essentially contending that the settlement must be measured by Dr. Becker's report. In short, these objectors ostensibly state that any settlement that does not fully incorporate Dr. Becker's report is inadequate or unfair.  This is unrealistic and incorrect.  The applicable legal standard is much different than the one relied upon by Dr. Becker in preparing her report.  Under an appropriate legal analysis guided by controlling principles, there is no question that the settlement is fair, reasonable and adequate and would provide Plaintiffs with more than the minimally adequate mental health treatment to which they are entitled.

### a.  The Becker Report Does Not Apply the Applicable Law

"Minimally adequate" treatment is determined by the standard set forth by the Supreme Court in Youngberg v. Romeo, 457 U.S. 307 (1982).  In Youngberg, which arose under facts different from those here, the Supreme Court held that an individual involuntarily confined to an institution for the mentally retarded had a fundamental liberty interest in "minimally adequate" treatment, defined as "such training as an appropriate professional would consider reasonable" to facilitate his freedom from restraint.  Id. at 318.

The Third Circuit has applied the Youngberg standard to involuntarily committed sex offenders confined to the STU.  See Deavers v. Santiago, 243 Fed. Appx. 719, 722 (3d Cir. 2007) (applying Youngberg to STU resident committed under the NJSVPA); cf. Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002) (applying Youngberg to individual confined under New

Jersey's former sex offender statute).  Thus, in cases where, like here, state officials have

imposed substantial deprivations of liberty associated with civil commitment, they must also

provide access to mental health treatment that gives those committed a chance to be cured or to

improve the medical condition for which they were confined.  See Greenfield v. Corzine, No. 09-

4983, 2012 WL 1134917, at *22 (D.N.J. Apr. 4, 2012); see also Badu-Shabazz v. Sharp, No. 10-

5637, 2011 WL 1080521, at *14 (D.N.J. Mar. 21, 2011).

      However, Youngberg only requires "minimally adequate" treatment, which is not the

same as optimal treatment, perfect treatment, desired treatment, or state-of-the-art treatment.  Id.

at 202; see also Haggert v. Adams, No. 02-1456, 2005 WL 399300, at *18 (N.D. Ill. Jan. 14,

2005) (noting, in action by Illinois sexually violent predators, that Youngberg "does not provide

for optimal treatment"); Canupp v. Sheldon, No. 04-260, 2009 WL 4042928, at *11 (M.D. Fla.

Nov. 23, 2009) (noting that Youngberg requires only "minimal" treatment).  Indeed, under

Youngberg there is a presumption that a treatment professional's decisions are correct, and a

constitutional violation only occurs when there is "such a substantial departure from accepted

professional judgment, practice or standards as to demonstrate that the person responsible did not

base the decision on such a judgment."  Id. at 202; see also Deavers, 243 Fed. Appx. at 722;

Badu-Shabazz, 2011 WL 1080521, at *14 (finding no Youngberg allegation could be sustained

because there is "no factual allegation of an absolute denial of treatment . . . and [plaintiff] does

not allege that he has been denied treatment altogether"); Canupp, 2009 WL 4042928, at *11

(noting in, SVP case, that "[u]nder the professional judgment standard decisions made by trained

professionals are entitled to a presumption of correctness").[15]

_____

[15]  While obviously bound by the law of this Circuit, it is worth noting that that the Eighth
Circuit has not read Youngberg the same as the Third Circuit and has held that sex offenders are
not constitutionally entitled to any mental health treatment.  See Strutton v. Meade, 668 F.3d

Dr. Becker's report does not mention or apply the <u>Youngberg</u> standard.  This alone invalidates using her report as the measure of fairness of the settlement.  No one disputes Dr. Becker's expertise or that her report was comprehensive, learned, and scholarly and that it furthered the settlement process in this case.  However, in performing her review, Dr. Becker was to rely on the "professional standards [she] believed relevant and applicable."  (<u>See</u> Joint Settlement Procedures at 40.)  That is, Dr. Becker gave her opinion as any expert would based on her expertise and her personal view of the circumstances she was evaluating.  However, Dr. Becker's report does not substitute for the judgment of the court and does not replace the <u>Youngberg</u> standard for determining minimally adequate care.

**b.      The Becker Report Conflicts With Other Relevant Authority**

There are other problems with using the Becker Report to judge the settlement's fairness.  For example, the objectors fail to acknowledge that Dr. Becker is not the only expert in the field of sex offender treatment, and other experts have substantially differing opinions about what constitutes adequate treatment.  For example, Dr. Main, a defendant in this case, is also an expert on the subject of treatment for civilly committed sex offenders.  And while his view with respect to this case is weighted, he has also served as an expert in other cases.  In one such case, <u>Strutton v. Meade</u>, Dr. Main testified as an expert witness that a program offering substantially less than what is <u>already</u> offered to STU residents would satisfy <u>Youngberg</u>.  <u>See</u> 2010 WL 1253715, at *4, 17-18 (E.D. Mo. Mar. 31, 2010).  There, the treatment offered consisted of only one weekly process group (one third of what the settlement here requires) and no modules at all (less than what is already offered at the STU and certainly less than what the settlement provides).  <u>See</u> <u>id.</u>

549, 557 (8th Cir. 2012) ("the district court was correct that Strutton does not have a fundamental right to sex offender treatment).  Of course, the NJSVPA requires that the New Jersey DHS "provide or arrange for treatment for a person committed pursuant to [the Act]." N.J.S.A. 30:4-27.34(b).

at *17-18.  After a jury trial, the district court found such treatment more than sufficient, concluding that sex offenders did not have a right to *any* treatment.  Id.  The Eighth Circuit affirmed on direct appeal.  See Strutton v. Meade, 668 F.3d 549, 557 (8th Cir. 2012) ("the district court was correct that Strutton does not have a fundamental right to sex offender treatment").

Likewise, the objectors' reliance on the Becker Report fails to account for the fact that many of the Report's recommendations are not required for the provision of minimally adequate care based on existing case law.  The Bagarozy Plaintiffs (and other *pro se* objectors) claim that Dr. Becker's recommendations were not followed with respect to, primarily, the following subjects: the gradual de-escalation of restraints;[16] increased therapeutic community time; increased visitation; recreational activities; and psychiatric consultation.  (Bagarozy Br. 22.)  However, in light of preexisting case law in this district, the inclusion of these recommendations are not required under the Youngberg standard, and it is hard to see how Class Counsel could have forced Defendants to relent on any of these subjects during settlement negotiations.

For example, in Greenfield v. Corzine, this Court already dismissed a class member's claim alleging, among other things, that the vocational, recreational, and educational offerings at the STU were inadequate.  See 2012 WL 1134917 (D.N.J. Apr. 4, 2012) (Cavanaugh, J.).  In Minatee v. Special Treatment Unit, another court in this district dismissed claims of one of the Bagarozy Plaintiffs alleging that Defendants should have placed him in a community based setting, and rejected the plaintiff's request for an injunction directing the creation of a halfway house or community-based treatment facility.  See 2011 WL 5873055, at *4 n.6 (D.N.J. Nov. 16,

---

[16]  This refers to STU residents' desire for to have more freedom of movement, including greater opportunities for furloughs and/or supervised forays into the community and the use of a halfway house or group home community.  (See Bagarozy Br. at 22.)

2011); see also Fornier v. Corzine, 2007 WL 2159584 (D.N.J. July 26, 2007) (Cavanaugh, J.)
(rejecting challenge that NJSVPA was punitive because residents are not permitted to transfer to
halfway houses).  Finally, in Badu-Shabazz, another court dismissed allegations that treatment
program at the STU was inadequate because there is "no factual allegation of an absolute denial
of treatment . . . and [plaintiff] does not allege that he has been denied treatment altogether."
2011 WL 1080521, at *14.

In sum, the Becker Report contains recommendations that could be described as "pie-in
the-sky" in terms of the quality and quantity of sex offender treatment.  However, the report is
not based on the Youngberg standard and does not control whether the settlement is fair and
reasonable.[17]  Despite the objectors' protestations to the contrary, the Court does not find that the
Becker Report weighs against approval of the settlement.

### c.   The Settlement Incorporates Many of Dr. Becker's Recommendations

Although full implementation of the Becker Report is not necessary for a fair and
reasonable settlement, the Bagarozy Plaintiffs and the unrepresented class member objectors fail
to account for the fact that the Settlement Agreement does, in fact, implement many of Dr.
Becker's recommendations.

For example, Dr. Becker recommended that the STU conduct a comprehensive
psychological evaluation of each resident upon admission, that pre- and post-module testing be
performed, and that certain instruments, including the "Psychopathy Checklist Revised," be
utilized to assess treatment progress.  (See Becker Report at 12-13, 27.)  The Settlement

---

[17]  The objectors frequently invoke a statement in Dr. Becker's report that the living conditions in
the STU were "the worst she has ever seen."  (Becker Report at 9.)  However, this was not a
reference to the STU's treatment programs, which is what this case is about, but rather a
reference to the physical facilities, which have since changed and are nevertheless within the
control of the New Jersey Department of Corrections, a non-party.

Agreement responds to these recommendations.  See Settlement Agreement §§ VI.A.3.a,

VI.A.3.c., and VI.A.3.e.[18]

Dr. Becker also suggested that the STU provide more "clear criteria" for the advancement

through the STU treatment phases and ensure that therapists were available to further that

advancement.  The settlement addresses these issues.  It increases the number of process groups,

mandates a greater number of available modules, requires the staff to provide a minimum

number of resident to therapist hours, and results in the hiring of additional therapists.  See

generally Settlement Agreement at §§ VI.A.3.a.3, VI.B.2.

Dr. Becker also recommended that "more process groups and more modules be offered,"

so that each resident is provided "a minimum of 15 to 20 hours in direct clinical service."  The

Settlement Agreement incorporates this recommendation.  See Settlement Agreement §§ VI.B.3

and VI.B.10.

Likewise, Dr. Becker criticized the STU's procedures for "release preparation and

programming" based on her primary concern that a majority of men on conditional release "felt

that had to find housing and jobs on their own."   The Settlement Agreement again addresses this

issue by requiring the STU's social work staff to develop a discharge plan for every resident in

stage 4 or higher and assist the resident in finding housing and obtaining support.  See generally

Settlement Agreement at § VI.G.

---

[18] Coincidentally, Dr. Becker recommended that every resident be assessed using the Hare
Psychopathy Checklist (which is psycho-diagnostic tool commonly used to asses psychopathy)
and urged the parties to utilize penile plethysmography "with every resident who is willing to
undergo such assessment."  (Becker Report at 12.)  The settlement does not implement these
recommendations; indeed, the settlement agreement prohibits the use of both techniques unless
they are administered by properly trained staff.  This is noteworthy because a number of
objectors oppose the use of these assessment tools for any reason, while at the same time
championing the Becker Report as the barometer of the settlement's fairness.  This inconsistency
underscores that Dr. Becker's opinion is subject, like any other assessment, to negotiation and
compromise, especially in the course of settlement discussions.

The Settlement Agreement also adopts additional recommendations in the Becker Report regarding staffing levels, vocational and recreational offerings, and the hiring of an Ombudsman. (Moses Decl. ¶ 33.)  Thus, even though much of the treatment recommended does not appear to be constitutionally required, the Settlement Agreement does not ignore or minimize the Becker Report, as the objectors contend.  In fact, the Settlement Agreement adopts much of it.

In sum, the objections that have been filed based on the Becker Report do not demonstrate to the Court that the settlement is unfair or unreasonable.

**(ii)** <u>**Objections Based on the Possibility of Inadequate Funding**</u>

The Bagarozy Plaintiffs and other class members also object to the settlement because it requires funding by the State of New Jersey, which is not guaranteed.  The Court does not view this objection as a serious impediment to approving the settlement.  Defendants cannot guarantee the funding needed to fully implement the settlement because it is subject to the budget process.  However, that does not make the settlement illusory, as the objectors suggest.  Indeed, the Settlement Agreement clearly provides that the Defendants will seek "as one of DHS's top priorities" sufficient funding for the settlement.  <u>See</u> Settlement Agreement § VIII.A.

The settlement also goes a step further.  In the event funding is not secured, the Plaintiffs are *not*, as they suggest, without recourse.  The Settlement Agreement specifically provides that, if funding is not secured, the Plaintiffs have the opportunity to declare any affected provisions "void" and resume litigation with respect to that provision.  <u>See</u> Settlement Agreement §§ VIII.B, X.A.  Plaintiffs are not required to give up any additional rights or forfeit any other terms of the settlement and can simply resume litigation with respect to any affected portion.  This is a palpable benefit to Plaintiffs; if a portion of the settlement is not funded, Plaintiffs will continue

to reap the benefits of whatever portions of the agreement are not affected, and still have the right to pursue litigation to address any shortfalls.

Defendants cite <u>Levell v. Monsanto</u>, 191 F.R.D. 551 (S.D. Ohio 2000), to suggest a lack of guaranteed funding undercuts the fairness of the settlement. This case is easily distinguishable. In <u>Monsanto</u>, the settlement, which was contingent on funding from the federal government, did <u>not</u> have a provision that allowed the Plaintiffs to reinstitute suit such as the one present here, leaving the Plaintiffs with <u>absolutely no recourse</u> if the necessary funding was not secured. <u>Id.</u> at 551-53. Rather than suggesting that guaranteed funding was required for a fair settlement, the <u>Monsanto</u> court went out of its way to say that, had the parties provided a contingency for the funding issue, such as one that would allow the plaintiffs to resume litigation if funding was not secured, the settlement could have been approved. <u>See id.</u> at 553 n.16.[19] That is precisely what has happened here.

This case is very much like <u>Austin v. Pa. Dep't of Corr.</u>, 876 F. Supp. 1437 (E.D. Pa. 1995), where the court specifically rejected the argument that the settlement was illusory and unenforceable because it required statutory funding, noting that the ability to reinstiute suit gave Defendants a "clear incentive to achieve full compliance." <u>Id.</u> at 1448. So too here.

Finally, it should be noted that Defendants have *already* begun to implement the settlement, even though it has not yet been approved. Dr. Main represents that, using funds already received from prior appropriations acts, "even in advance of the approval of the settlement," the STU has begun to develop pre- and post-module testing; revised the Resident Guide; implemented a newly devised and developed treatment plan, and conducted

---

[19] Objectors also cite <u>Wyatt v. Anderholt</u>, 503 F.2d 1305 (5th Cir. 1974) and <u>Harris v. Vector Marketing Corp.</u>, 2011 WL 4831157 (N.D. Cal. Oct. 12, 2011) to support their argument. The precise reason is unclear, however, because neither case has anything to do with settlement or fairness of class action settlements.

individualized vocational assessments for residents.  (Main Decl. ¶ 8; Supplemental Declaration of Merrill Main, Ph.D. ("Supp. Main Decl.") ¶¶ 2-4.)  Moreover, the state has entered into two previous settlement agreements with similar funding contingencies and neither of those agreements has been voided due to insufficient funding.  (See Supplemental Declaration of David L. DaCosta ("Supp. DaCosta Decl.") ¶ 4.)

      **(iii)**    **Additional Objections**

The Court has received additional *pro se* objections from class member residents of the STU.  These objections have been summarized by Class Counsel.  (See June 12 Decl. & Ex. D (Table Summary of Objections).)  Some of the objections are difficult to understand.  Some are also repetitive in the sense that there are a number of objections stating, in verbatim fashion, the same grievances but signed by different residents.  And, as mentioned before, a number of additional objections appear to be "the result of a fundamental misunderstanding of the underlying purpose of the class action, a lack of knowledge of the ramifications to class members of a court-approved settlement, and unrealistic or overly optimistic expectations."  Hawker, 198 F.R.D. at 628.  To the extent possible, the objections are grouped by category and addressed below.  The Court has also tried to identify representative objections for each category; however, many of the objections raise a number of issues, and thus, do not fit neatly within any single category.

      **a.**    **Objections Based on Claims for Monetary Damages**

There are a number of objections that seek monetary damages, often tens of millions of

dollars.[20]   These objections are meritless because this is a class action certified pursuant to Rule 23(b)(2) that seeks only injunctive relief.  See Hawker, 198 F.R.D. at 630 (when complaint did not seek money damages "the absence of an award of money damages is neither unfair nor unreasonable).

### b. Objections Based on Commitment to the STU

There are a large number of objections that claim that the writer was improperly committed to the STU; that civil commitment to the STU is unconstitutional; that the living conditions at the STU are substandard; and that actuarial instruments used in pre-commitment hearings are improper.[21]   Any objections challenging the constitutionality of civil commitment fail as a matter of law.  See Kansas v. Hendricks, 521 U.S. 346 (1997) (upholding constitutionality of indefinite civil commitment).  The remaining objections simply misapprehend the scope of this case.  This case is limited to the quantum and quality of mental health treatment at the STU.  It does not involve commitment to the STU or what happened to individual class members prior to commitment.  Thus, these objections do not weigh against approval of the settlement.  See, e.g., D.M. v. Terhune, 67 F. Supp. 2d 401, 406 (D.N.J. 1999) (objections based on issues not involved in the case are futile).

---

[20] For example, class member Joseph Aruanno seeks "significant monetary and punitive damages."  See Objection of Joseph Aruanno [CM/ECF No. 177-5 at 17].  Likewise, class member John Banda asks for "$25 million dollars from each listed defendant in their personal and individual capacities."  See Objection of John Banda [CM/ECF No. 177-5 at 91].

[21] See, e.g., Objection of Walter Harrell [CM/ECF No. 177-4]; Objection of Daniel Goodman [CM/ECF No. 177-5]; Objection of Santos Rivera [CM/ECF No. 177-7 at 112]; Objection of Bharat Malde [CM/ECF No. 176-6 at 141]; Objection of David Carson [CM/ECF No. 177-5 at 145-46].

### c.      Objections Seeking Halfway House Community

A number of objections seek the use of a halfway house system, or the implementation of outpatient sex offender treatment, as opposed to the in-patient STU facility.  See, e.g., Objection of Michael Hasher [CM/ECF No. 177-6 at 66-85.]  However, the creation of a halfway house system is not required under Youngberg.  See, e.g., Fournier, 2007 WL 2159584, at *8.  And the Supreme Court has already approved the use of inpatient facilities like the STU.  See Kansas, 521 U.S. at 370.  Thus, these objections do not weigh against approval of the settlement.

### d.      Objections Seeking Release

A number of objectors seek immediate release or release from the STU at a certain age or after a certain period of confinement.[22]  However, the Supreme Court has already approved indefinite civil confinement of sexually violent predators.  See Kansas, 521 U.S. at 346.  Thus, these objections are futile.

### e.      Objections Based on Department of Corrections Issues

A large number of objections are focused on the physical facilities at the STU and on the presence and activities of DOC personnel.[23]  These objections do not bear on the fairness of the settlement because the DOC and its personnel are not parties to this case.  See, e.g., D.M, 67 F. Supp. 2d at 406.  To the extent appropriate, these claims may be pursued as individual actions.

---

[22]  See, e.g., Objection of Tyrone Hill [CM/ECF No. 177-6 at 88]; Objection of Stephen Jaffe [CM/ECF No. 177-6 at 103]; Objection of David Haggerty [CM/ECF No. 177-6 at 58]; Objection of Victor Moody [CM/ECF No. 177-7 at 47].

[23]  See, e.g., Objection of Mark King [CM/ECF No. 177-6 at 113]; Objection of Benjamin Hudson [CM/ECF No. 177-6 at 95]; Objection of Paul Winthrop [CM/ECF No. 177-8 at 82].

### f.  **Objections Based on Individual Claims**

A number of objections have been filed that are based on individual issues or the perception that the settlement will eliminate a resident's individual claims, including objections focused on the "prison like" conditions at the facility; the food served; the housing conditions;[24] and other similar, individual issues.  These objections also do not bear on the fairness of the settlement because the Settlement Agreement does not address or extinguish these claims.  Stated differently, any complaints based on issues that are beyond the scope of the Second Amended Complaint are not part of this settlement.  The objections received show tremendous confusion on this subject so it bears repeating:  To the extent claims are not part of the Second Amended Complaint and are otherwise cognizable, residents can attempt to pursue these claims independently.  See Settlement Agreement § Section IX.[25]

### g.  **Objections to the Class Representatives**

A number of objectors, including one of the more prominent form objection letters, object to Plaintiffs' class representatives.  Although the reasons are not entirely clear, some objectors suggest the class representatives are subject to different treatment regimes and that this creates a conflict.[26]  Others suggest that the representatives were either misled or engaged in collusion.

---

[24]  See, e.g., Objection of Richard Bagarozy [CM/ECF No. 177-5 at 22-31].

[25]  A letter from Jack Furlong, Esq., dated May 14, 2012, suggests that his clients, William Moore and Maryann Hysler, object to the settlement to the extent it impacts their claims regarding religious liberty and the right to marry.  As discussed at the Fairness Hearing, the settlement does not impact these claims.  (See Tr. 38:8-40-23.)

[26]  See, e.g., Objection of Benjamin Hudson [CM/ECF No. 177-6 at 95]; Objection of Gilden Rivera [CM/ECF No. 177-7 at 106]; Objection of Edward Salerno [CM/ECF No. 177-7 at 123-24]; Objection of Rodney Roberts [CM/ECF No. 177-7 at 115].

For Rule 23 purposes, lead plaintiffs are typical of the class they represent if there is a strong similarly in legal theories alleged and the claims arise from the same course of conduct. See In re Prudential Ins. Co. Sales Practices Litig., 148 F.3d 283, 311-12 (3d Cir. 1998) ("Prudential II"); Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123 (3d Cir. 1987).  Lead plaintiffs are considered adequate representatives if they do not have interests antagonistic to those of the class.  See Prudential II, 148 F.3d at 312; Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

Here, there is no conflict between the class representatives and class members because, regardless of why each class member is confined in the STU, they are all subject to the same general mental health program and, therefore, its alleged inadequacies impacts all of them.  The lead plaintiffs seek a mental health program that offers them a reasonable prospect of being successfully treated for the mental abnormality that led to their confinement.  This goal does not and could not conflict with any other class member because no class member has an interest in an inadequate treatment program.  Thus, regardless of any slight variance in treatment for individual class members, the Court is satisfied that the lead plaintiffs are adequate and typical class representatives.

### h.    Objections to Class Counsel

A number of objectors contend that Class Counsel suffers from a conflict of interest.  In determining the adequacy of class counsel, the Court determines whether counsel is "qualified, experienced, and generally able to conduct the proposed litigation."  New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 303 (3d Cir. 2007).  These objectors contend that the Seton Hall Law School Center for Social Justice has a conflict and cannot represent the Plaintiffs

in this case because, in 1999, certain professors at the law school supported passage of the

NJSVPA.[27]  This objection is frivolous.

First, none of the professors that supposedly create this conflict have ever represented

Defendants.  Second, none have ever been part of the Center for Social Justice, let alone worked

on this case.  (Azmy Decl. ¶ 3.)  Third, this Court has already twice before rejected requests to

remove Class Counsel; the first in an Order dated September 6, 2012, and the second at the

Fairness Hearing.  (See Order dated September 6, 2012, at 6 ¶ 10; Tr. 12:8-21.)  Class Counsel

has done an exemplary job representing the Plaintiffs in this case, and any objections to the

fairness of the settlement on this ground are rejected.

**3.      The Stage of the Proceedings and the Amount of Discovery Completed**

The third Girsh factor requires that the Court consider the "degree of case development

that Class Counsel have accomplished prior to Settlement," including the type and amount of

discovery already undertaken.  In re General Motors, 55 F.3d at 813.  Under this factor, the Court

considers whether the amount of discovery completed in the case has permitted "counsel [to

have] an adequate appreciation of the merits of the case before negotiating."  In re Schering–

Plough/Merck Merger Litig., No. 09–1099, 2010 U.S. Dist. LEXIS 29121 at *30 (Mar. 26,

2010).  The discovery analyzed encompasses both formal and "informal" discovery, including

discovery from parallel proceedings, companion cases and even third parties, such as experts or

witnesses.  Id.

This factor weighs heavily in favor of settlement.  The lead case in this consolidated

action is a decade old.  The parties engaged in years of formal discovery.  They also engaged in a

---

[27]  See, e.g., Objection of Eric Cruz [CM/ECF No. 177-5 at 168]; Objection of Benjamin Hudson [CM/ECF No. 177-6 at 95]; Objection of Daniel Richards [CM/ECF No. 177-7 at 97]; Objection of Mark Pepe [CM/ECF No. 177-7 at 73].

continual informal exchange of information during the settlement process.  The Becker Report

provided a form of searching discovery that likely exceeds any discovery permitted by the rules.

Indeed, the existence of the Becker Report and the discovery prior to and after it makes clear that

counsel was intimately familiar with the facts of this litigation.  And if that wasn't enough,

following consummation of the settlement, the parties engaged in "confirmatory discovery" on

the merits of the settlement.  Prior opinions have addressed how comprehensive the discovery

process was in this case:

> The facts and merits of this case have been investigated, pored
> over, and discussed in depth for more than 10 years, including
> through STU facility changes and changes in administrations.
> There were at least three full years of formal fact discovery.  In
> addition, in a searching and lengthy process supervised by the
> Court, a neutral expert approved by both sides did an
> unprecedented, and for the most part unlimited, investigation of the
> conditions and treatment programs at the STU.  This involved
> numerous on-site visits, interviews with staff and residents, and the
> review of countless documents.  During this process, the Court
> resolved any disputes on a real time basis, so that the investigation
> could proceed.  This investigation resulted in a highly detailed, 27
> page, single spaced report on the STU.  The Court cannot imagine
> any "discovery" that would even approach this delving
> investigation and report, which certainly aided the contentious
> settlement process.  Morever, during the arduous settlement
> negotiations, exhaustive information was exchanged and it was
> patently obvious to the Court that all counsel were apprised of the
> relevant facts.  Indeed, adversary counsel argued strenuously over
> many specific and discrete issues that revealed a deep
> understanding of the issues in this case.
>         In sum, this is not a case resolved on a scant record without
> discovery.  Nor does class counsel lack an understanding of the
> facts and issues.  Quite the opposite.

Alves v. Ferguson, No. 01-789, 2012 WL 2339809, at *3-4 (D.N.J. June 19, 2012).  This factor

weighs in favor of settlement.

**4 & 5.   The Risk of Establishing Liability and Damages**

The fourth and fifth Girsch factors are commonly analyzed together.  See, e.g., McCoy v. Healthnet, Inc., 569 F. Supp. 2d 448, 461 (D.N.J. 2008).  These factors survey the "possible risks of litigation by balancing the likelihood of success . . . against the immediate benefits offered by settlement."  Prudential II, 148 F.3d at 319.  Where the risks of litigation are high, these factors weigh in favor of the settlement.  See id.  To properly weigh these considerations, the Court should rely to a certain extent on the estimation provided by class counsel, who is experienced with the intricacies of the underlying case. See Weber v. Gov't Empls. Ins. Co., 262 F.R.D. 431, 445 (D.N.J. 2009) (quoting Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 115 (E.D. Pa. 2005)).

When the risk of establishing liability in this case is balanced against the benefit resulting from the Settlement Agreement, it is clear these factors weigh heavily in favor of settlement.  Certain Objectors to the settlement contend that, in light of the Becker Report, the risk of not establishing liability is very slight.  Their view is that liability is a *fait accompli* and the only discussion should be about the scope of damages.  This position is not realistic.  Liability would be a strongly contested issue in this case.

As mentioned previously, the Youngberg standard controls the adequacy of treatment, not the Becker Report.  And under Youngberg, Plaintiffs would have to establish that the present state of the STU is legally deficient.  This would not necessarily be simple.  This is demonstrated by the fact that class members, often proceeding *pro* se, have had tremendous difficulty successfully litigating the issue of their treatment.  See, e.g, Deavers, 243 Fed. Appx. at 722 (no violation of rights when placed in restricted activities program without opportunity to contest allegations against him); Belton v. Singer, No. 10-6462, 2011 WL 2690595 (D.N.J. July 8, 2011)

33

(dismissing case brought by class member and finding that rights were not violated when placed in prison facility with poor conditions and subjected to prison policies); <u>Bondutrant v. Christie</u>, No. 10-3005, 2010 WL 4869094, at *6 (D.N.J. Nov. 22, 2010) (dismissing claim of class member that his rights were violated when placed in South Unit and limited to "segregated activities").[28]

Yet, the class members' lack of success is not for a lack of trying.  A brief sampling of Third Circuit case law shows that, certain objectors, such as Joseph Aruanno, are prolific *pro se* litigators on the subjects of their confinement, treatment, and civil rights, having more than 20 cases reach the Third Circuit—all without success.[29]  Likewise, at the Fairness Hearing, Class Counsel persuasively described the repeated inability of class members to establish liability and prevail on the merits in cases that were somewhat similar to this case.  (Tr. 17:9-18:21.)

Class Counsel's oral presentation on prior cases underscores the considerable risk Plaintiffs would face if the settlement was rejected and Plaintiffs attempted to litigate the case to conclusion.  In the face of all of this, some objectors still seem to think that liability can be easily established in light of the Becker Report, which they contend is the report of the State's "own expert."[30]  This oversimplifies the liability issue in the case and ignores that the Becker Report does not utilize the <u>Youngberg</u> standard, wholly apart from the fact that there are serious issues

---

[28] <u>See also</u> <u>Greenfield</u>, 2012 WL 1134917; <u>Minatee</u>, 2011 WL 5873055; <u>Fornier</u>, 2007 WL 2159584; and <u>Badu-Shabazz</u>, 2011 WL 1080521, all discussed *supra*.

[29] <u>See</u> <u>Aruanno v. Velez</u>, No. 12-152, 2012 WL 1232415 (D.N.J. Apr. 12, 2012) (noting, "[s]ince 2005, Mr. Aruanno has filed over 28 civil cases in this Court and 27 appeals in the United States Court of Appeals for the Third Circuit"), <u>aff'd</u> 2012 WL 4748193 (3d Cir. Oct. 5, 2012).

[30] This is a highly misleading description.  It is true that Dr. Becker was one of several experts suggested by Defendants when the parties were considering various individuals to evaluate the STU for settlement purposes.  But, this does not make Dr. Becker "Defendants' expert," and Defendants never adopted Dr. Becker's opinions.  And, were the case to proceed, it would seem certain that Defendants would, in fact, retain a different expert.

regarding whether the Becker Report would even be admissible at a trial.[31]  In reality, as Class Counsel notes, this settlement would be the first time that a federal court has mandated change to the STU and would achieve more for the residents in one action then has been accomplished in more than a decade of *pro se* litigation.  (See Moses Decl. ¶¶ 40-42.)  With no track record of prior success, Plaintiffs' ability to establish liability in this case is questionable.

Moreover, even if Plaintiffs were successful and *prevailed* on the merits of the case (which, again, has apparently never happened in this district), there is the further risk that the relief they would obtain following a trial would be *less* or the same as what has already been negotiated in the parties' Settlement Agreement.  In other words, contrary to what many objectors seem to think, prevailing on the merits of the case does not mean that the entire Becker Report would be automatically implemented.  Thus, the Court believes the risk that Plaintiff would not establish liability at trial weighs in favor of settlement.

In stark contrast to the serious risk associated with liability, the benefits of settlement are obvious.  As the papers and objections received make clear, one of the primary complaints of the residents at the STU is how long they have been confined to the facility.  Professor Moses has expressed the opinion that the Settlement Agreement provides real change in the near future and that she believes the best and most effective way for class members to regain their liberty is to pursue increased treatment and eschew further litigation.  (Moses Decl. ¶ 47.)  Thus, this factor weighs in favor of approving the settlement.

---

[31] There is some disagreement among the parties as to whether Dr. Becker's report was to be considered for settlement purposes only pursuant to Federal Rule of Evidence 408.  The relevant procedural history suggests that the Becker Report was for settlement purposes only and would not be properly admissible at trial.

**6.      The Risk of Maintaining the Class Through Trial**

The sixth <u>Girsch</u> factor "measures the likelihood of obtaining and keeping class

certification if the action were to proceed to trial." <u>In re Warfain</u>, 391 F.3d at 538.  This case

was certified as a class action regardless of whether the settlement was approved.  This was not a

settlement class.  <u>Cf.</u> <u>In re Cmty Bank of N. Va.</u>, 418 F.3d 277, 299 (3d Cir. 2005) (discussing

concept of "settlement only" classes).  Thus, there is no real risk that this action would not

proceed to trial as a class action.  Nevertheless, it should be noted that this consolidated class

action is comprised of many individual *pro se* complaints from confined residents, which

presents practical problems.  In addition, class certification can always be modified at any time

before final judgment. Fed.R. Civ. P. 23(c)(1)(C).  All in all, the risk of decertification is small.

Yet, should this case proceed to trial, there remains the possibility that the class could be

decertified or procedural problems managing the class could arise.  This factor is neutral.

**7.      The Ability of Defendants to Withstand a Greater Judgment**

The seventh <u>Girsch</u> factor is "concerned with whether the defendants could withstand a

judgment for an amount significantly greater than the settlement."  <u>In re Cendant</u>, 264 F.3d 201,

244 (3d Cir. 2001).  Since the individual defendants are state employees, it would be the State of

New Jersey that bears ultimate responsibility for satisfying any judgment, as well as funding any

additional litigation, trials, and appeals.  Presumably the State can fund any judgment that could

be received, thus this factor is neutral.  However, it should be noted that these are difficult

economic times.  And the negotiations in this case were not isolated from the economic reality

affecting the State of New Jersey.   (Azmy Decl. ¶ 55.)   While New Jersey would be able to fund

a judgment in this case following a trial, it is more preferable to have a settlement that

36

Defendants consider a funding priority, as opposed to the potential for an unfunded judicial mandate following a trial and appeals years from now.

**8 & 9.   The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Risks of Litigation**

The final two <u>Girsh</u> factors collectively "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." <u>In re Warfarin</u>, 391 F.3d at 538. To make this determination, the Court analyzes the reasonableness of the settlement against the best possible recovery and the risks the parties would face if the case went to trial. <u>Prudential II</u>, 148 F.3d at 322.

Here, continued litigation involves considerable risk that the Plaintiffs would lose the merits of the case.  Moreover, even if Plaintiffs prevailed, the relief obtained could be less than is provided for in the Settlement Agreement.  The best possible recovery is hard to quantify in a case like this.  <u>See</u> <u>Canupp</u>, 2009 WL 4042928, at *11 (noting in, SVP case, that [i]t is difficult to gauge the range of possible recovery in an injunctive case for an area of the law that is not well litigated").  It appears that few comparable cases have actually been tried, and when they have, the results have not been good for plaintiffs.  <u>See generally</u> <u>Strutton</u>, 668 F.3d at 557 (affirming complete denial of relief and finding no treatment is required).  The only case that has been identified where civilly committed sexually violent predators prevailed following a trial is <u>Turay v. Richards</u>, No. 07-35309, 2009 WL 229838 (9th Cir. Jan. 29, 2009).  And <u>Turay</u> is not necessarily encouraging for Plaintiffs.  In <u>Turay</u>, while the plaintiffs were successful at trial in showing that the State of Washington's SVP treatment program was constitutionally deficient,

after appeals, the involvement of a special master and many court proceedings, it took seven years for plaintiffs to secure any relief.[32]

In contrast, the Settlement Agreement here mandates material improvements to the treatment program at the STU within 6 months.  (Moses Decl. ¶ 43.)  The reforms address most of the issues in the second amended complaint and do so quickly and with some degree of certainty.  The settlement yields substantial and immediate benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation—little or no recovery at all.  Thus, the Court finds these factors weigh in favor of settlement.

**10.**     **Additional Considerations**

**(i)**     **Class Counsel**

In addition to the <u>Girsh</u> factors, courts in this Circuit traditionally "attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class." <u>Austin</u>, 876 F. Supp. at 1472.  As the Third Circuit has noted, "[c]lass counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors." <u>Walsh v. Great Atl. & Pac. Tea Co.</u>, 726 F.2d 956, 964  (3d Cir. 1983) (affirming district court decision denying named plaintiff's motion to dismiss class counsel, denying motion to appoint additional counsel for objectors, and approving settlement over objections from named plaintiff).

Here, Class Counsel are highly skilled attorneys, especially in this area of the law.  Their opinions carry persuasive weight.  <u>See</u> <u>Prudential I</u>, 962 F. Supp. at 543 ("the Court credits the judgment of Plaintiff's counsel, all of whom are active, respected, and accomplished in this type of litigation").  Professor Moses represents that class counsel has "reviewed all of the objections

---

[32]  While the <u>Turay</u> plaintiffs did secure the right to be discharged to halfway house-like communities as sought by some objectors in this case, there is a crucial distinction between the Washington program and the NJSVPA.  In particular, the Washington SVP program expressly contemplates the use of less restrictive facilities; the NJSVPA does not.  (Moses Decl. ¶ 44.)

and have spoken to a large number of Class Members about the Settlement, both in person and via telephone," and that "[counsel] continue to sincerely believe . . . that the Settlement is in the best interest of the Class as a whole."  (Joint Br. 29.)  Moreover, Professor Moses states that "while the settlement does not guarantee release for any class member, class counsel believes that the bargained for improvements to the quantity and quality of the mental health treatment offered at the STU—overseen by an independent monitor—will enable the Class Members to progress more rapidly and regain their freedom more quickly."  (Moses Decl. ¶ 47.)  Class Counsel's recommendation provides further support for approving the settlement.

### (ii)      The Settlement Negotiations Were Overseen by a Magistrate Judge

In this case, the parties also benefitted from the involvement of a magistrate judge in mediating the Settlement.[33]  The participation of an independent mediator in settlement negotiations "virtually insures that the negotiations were conducted at arm's length and without collusion between the parties."  Bredbenner v. Liberty Travel, Inc., 09-905, 2011 WL 1344745, at *10 (D.N.J. Apr. 8, 2011); Kolar v. Rite Aid Corp., No. 01-cv-1229, 2003 WL 1257272, at *3 (E.D. Pa. Mar. 11, 2003) (noting that involvement of magistrate judge in settlement process "provides a great deal of comfort at the threshold of our fairness consideration").

### (iii)      The Settlement Agreement Requires a Court Appointed Monitor

The Settlement Agreement also calls for the Court to appoint a monitor to ensure compliance with the agreement's terms.  While the appointment of a monitor may not fit neatly within any of the traditional Girsch factors, the presence of an observer specifically delegated the

---

[33]  The Court would be remiss if it did not recognize Magistrate Judge Falk for his outstanding effort in bringing this matter to a joint conclusion.  During the course of this litigation, he shepherded this matter through numerous pretrial obstacles and played a major role in bringing both sides together in final settlement.  Quite simply, but not for his significant involvement over a period of ten years, no resolution would be in sight.

task of ensuring compliance with the agreement is an additional safeguard that the settlement reforms are real, will be implemented, and will provide the class with the increased treatment that they have bargained for.

## VI.   <u>SUMMARY</u>

To the extent the future of the STU residents depends largely on mental health treatment, this Court finds that the Settlement Agreement does an excellent job of increasing the quantum and quality of available care.  This should provide each resident with an increased opportunity to show that he has successfully treated his mental abnormality and should be considered for a conditional discharge.  The Agreement may not provide every class member with every aspect of treatment that they desire.  But, the settlement does more for the treatment of sexually violent predators than any case has been able to accomplish in more than a decade of *pro se* litigation since the NJSVPA was passed into law.

The Settlement Agreement easily satisfies the <u>Girsch</u> factors.  The settlement is eminently fair and the negotiation process was unassailable. The Court has no hesitation in concluding that the majority (if not all) of the <u>Girsh</u> factors, and several additional considerations, strongly favor approval.  The settlement provides a significant benefit to all class members, which is substantiated by the generally positive response from the class.  The settlement was also recommended by two groups of experienced class counsel, who truly advocated for the best interests of their clients.  For all of the reasons stated above, the settlement is fair, reasonable and adequate.  The Settlement Agreement is **approved**.

## VII.   <u>ATTORNEY'S FEES</u>

The Settlement Agreement also provides that Defendants agree to pay Plaintiffs' class counsel, the Seton Hall Center for Social Justice, $78,000 in attorney's fees as part of the

settlement.  See Settlement Agreement XII.A.  In any Section 1983 action, like this one, the Court may determine that a prevailing party is entitled to attorney's fees.  See 42 U.S.C. § 1988. A reasonable fee is generally calculated by application of the lodestar method, which requires multiplying the hours reasonably expended by a reasonable hourly rate.  See City of Riverside v. Rivera, 477 U.S. 561, 568 (1986) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

There is no need for a full lodestar analysis in this case.  The Court finds that the comparatively *de minimus* attorney's fee award agreed to by the parties in this case is *per se* reasonable in this decade old case.  Professor Moses represents that she personally spent more than 400 hours on this litigation, and that her usual billing rate is $375.00 per hour.  (Moses Decl. ¶¶ 48-49.)  Professor Azmy represents that he spent nearly 1,500 hours working on the case at $375.00 per hour for a total of more than $560,000 in attorney's fees.  (Moses Decl. ¶ 50; Azmy Decl. ¶ 59.)  Seton Hall Law School students also spent more than a 1,000 hours working on this litigation.  (Moses Decl. ¶ 48.)  Co-class counsel at Gibbons, Lawrence Lustberg, Esq. and other attorneys, spent nearly 700 hours working on the case—in addition to incurring nearly $40,000 in expenses.  (Moses Decl. ¶ 51.)  In total, the attorney's fees expended in this case appear to be close to $2 million.  In light of this, the minimal fee award of $78,000 is clearly "reasonable" under the circumstances.  Hensley, 462 U.S. at 433.

## VIII.   **MONITOR**

The Settlement Agreement also calls for the Court to appoint a monitor to facilitate the implementation of the Settlement Agreement and render determinations as to whether DMHAS is in compliance.  See generally Settlement Agreement § VII.  The monitor will be appointed by separate order following further conference with counsel.

**IX.**   **CONCLUSION**

Based on all of the reasons set forth above, the party's motion for joint approval of

settlement [CM/ECF No. 193] is **GRANTED**.  The Court hereby **approves** the parties

Settlement Agreement and **grants** Class Counsel's request for $78,000 in attorney's fees.

An appropriate Order will be entered.


<u>s/Dennis M. Cavanaugh</u>_____
**DENNIS M. CAVANAUGH**
**UNITED STATES DISTRICT JUDGE**


**DATED:  December 4, 2012**